## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA,
3145 Benham Avenue Suite 1
Elkhart, IN 46517;

THE AFRICAN METHODIST
EPISCOPAL ZION CHURCH,
3225 West Sugar Creek Road
Charlotte, NC 28269;

CENTRAL ATLANTIC CONFERENCE
UNITED CHURCH OF CHRIST,
918 South Rolling Road
Catonsville, MD 21228;

THE CENTRAL CONFERENCE OF
AMERICAN RABBIS,
355 Lexington Avenue
New York, NY 10017;

CHRISTIAN CHURCH (DISCIPLES OF
CHRIST),
1099 N. Meridian Street
Indianapolis, IN 46204;

CHURCH OF THE BRETHREN, INC.
1451 Dundee Avenue
Elgin, IL, 60120;

CONVENCIÓN BAUTISTA HISPANA
DE TEXAS,
PO Box 761264
San Antonio, TX 78245;

THE EPISCOPAL CHURCH,
815 Second Avenue
New York, NY 10017;

FELLOWSHIP SOUTHWEST,
PO Box 822993
Dallas, TX 75382;

Case No.: _____

**COMPLAINT**

FRIENDS GENERAL CONFERENCE,
PO Box 40844
Philadelphia, PA 19107;

GENERAL ASSEMBLY OF THE
PRESBYTERIAN CHURCH (U.S.A.),
through the Stated Clerk of the General
Assembly, Rev. Jihyun Oh,
100 Witherspoon Street
Louisville, KY 40202;

GENERAL COMMISSION ON
RELIGION AND RACE OF THE UNITED
METHODIST CHURCH,
100 Maryland Avenue, NE
Washington, DC 20002;

LATINO CHRISTIAN NATIONAL
NETWORK,
PO Box 32382
Amarillo, TX 79120;

MASSACHUSETTS COUNCIL OF
CHURCHES,
138 Tremont Street
Boston, MA 02111;

THE NEW YORK ANNUAL
CONFERENCE OF THE UNITED
METHODIST CHURCH,
20 Soundview Avenue
White Plains, NY 10606;

NEW YORK STATE COUNCIL OF
CHURCHES,
85 Chestnut Street
Albany, NY 12210;

NORTH CAROLINA COUNCIL OF
CHURCHES,
27 Horne Street
Raleigh, NC 27607;

THE NORTH GEORGIA CONFERENCE
OF THE UNITED METHODIST
CHURCH, through The Board of Trustees,

North Georgia Conference, United
Methodist Church, Inc.,
1795 Old Peachtree Road
Duluth, GA 30097;

THE RABBINICAL ASSEMBLY,
3080 Broadway #604
New York, NY 10027;

RECONSTRUCTING JUDAISM,
1299 Church Road
Wyncote, PA 19095;

RHODE ISLAND STATE COUNCIL OF
CHURCHES,
1520 Broad Street
Providence, RI 02905;

UNION FOR REFORM JUDAISM,
633 Third Avenue, 7th Floor
New York, NY 10017;

UNITARIAN UNIVERSALIST
ASSOCIATION,
24 Farnsworth Street
Boston, MA 02210;

THE UNITED SYNAGOGUE OF
CONSERVATIVE JUDAISM,
3080 Broadway, Suite B208
New York, NY 10027;

THE WESTERN NORTH CAROLINA
CONFERENCE OF THE UNITED
METHODIST CHURCH, through The
Board of Trustees, Western North Carolina
Conference, United Methodist Church, Inc.,
13924 Professional Center Drive #200
Huntersville, NC 28078;

WISCONSIN COUNCIL OF CHURCHES,
203 Wisconsin Avenue
Madison, WI 53703; and

WISDOM, INC.,
2821 North Vel R. Phillips Avenue #115,

Milwaukee, WI 53212,

       *Plaintiffs*,

    *v.*

U.S. DEPARTMENT OF HOMELAND
SECURITY,
2707 Martin Luther King Jr. Avenue, SE
Washington, DC 20528;

KRISTI NOEM, Secretary of the U.S.
Department of Homeland Security, in her
official capacity,
2707 Martin Luther King Jr. Avenue, SE
Washington, DC 20528;

U.S. CUSTOMS AND BORDER
PROTECTION,
1300 Pennsylvania Avenue, NW
Washington, DC 20004;

PETE R. FLORES, Acting Commissioner,
U.S. Customs and Border Protection, in his
official capacity,
1300 Pennsylvania Avenue, NW
Washington, DC 20004;

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT,
500 12th Street, SW
Washington, DC 20536; and

CALEB VITELLO, Acting Director, U.S.
Immigration and Customs Enforcement, in
his official capacity,
500 12th Street, SW
Washington, DC 20536,

       *Defendants*.

## INTRODUCTION

1.        Plaintiffs in this challenge are 12 national denominational bodies and

representatives, 4 regional denominational bodies, and 11 denominational and

interdenominational associations, all rooted in the Jewish and Christian faiths.  Plaintiffs and

their members are Baptist, Brethren, Conservative Jewish, Episcopalian, Evangelical,

Mennonite, Quaker, Pentecostal, Presbyterian, Reconstructionist Jewish, Reform Jewish,

Unitarian Universalist, United Methodist, Zion Methodist, and more.  They bring this suit unified

on a fundamental belief: Every human being, regardless of birthplace, is a child of God worthy

of dignity, care, and love.[1]  Welcoming the stranger, or immigrant, is thus a central precept of

their faith practices.

2.        The Torah lays out this tenet 36 times, more than any other teaching: "The stranger

who resides with you shall be to you as one of your citizens; you shall love them as yourself, for

you were strangers in the land of Egypt" (Leviticus 19:34).  In the Gospels, Jesus Christ not only

echoes this command, but self-identifies with the stranger: "For I was hungry, and you gave me

food, I was thirsty, and you gave me drink, I was a stranger, and you welcomed me" (Matthew

25:35).  Plaintiffs' religious scripture, teaching, and traditions offer clear, repeated, and

irrefutable unanimity on their obligation to embrace, serve, and defend the refugees, asylum

seekers, and immigrants in their midst without regard to documentation or legal status.

3.        Recognizing the importance of communal religious practices "to the well-being of

people and the communities of which they are a part,"[2] the Department of Homeland Security

---

[1] The Unitarian Universalist belief system is explained in footnote 43.
[2] Ex. 2, Memorandum from Alejandro N. Mayorkas, Sec'y, Dep't of Homeland Sec.,
"Guidelines for Enforcement Actions in or Near Protected Areas" (Oct. 27, 2021),
https://www.dhs.gov/sites/default/files/publications/21_1027_opa_guidelines-enforcement-actions-in-near-protected-areas.pdf [https://perma.cc/49LU-BNAK] ("2021 Memo").

("DHS") for over 30 years substantially restricted immigration enforcement action in or near places of worship. Although DHS has statutory authority to conduct a variety of enforcement actions—such as conducting stops and interrogations, serving process and other orders, and executing immigration arrests and raids without judicial warrant—DHS's longstanding "sensitive locations" (or "protected areas") policy provided that Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP") would do so at or near places of worship only under exigent circumstances or with prior written, high-level supervisory approval.

4.    On January 20, 2025, DHS abruptly reversed course and rescinded the sensitive locations policy.[3] Disavowing the need for any "bright line rules regarding where our immigration laws are permitted to be enforced," the Rescission Memo instead directs ICE and CBP officers to "use [their] discretion along with a healthy dose of common sense" in deciding whether to conduct immigration enforcement actions at places of worship, during religious ceremonies, and at other sensitive locations.[4] DHS's website features a news article stating that ICE agents understand the rescission "to free them up to go after more illegal immigrants."[5]

---

[3] *See* Press Release, DHS, Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole (Jan. 21, 2025), https://www.dhs.gov/news/2025/01/21/statement-dhs-spokesperson-directives-expanding-law-enforcement-and-ending-abuse [https://perma.cc/5TFV-ZSKP].

[4] Ex. 1, Memorandum from Benjamine C. Huffman, Acting Sec'y, DHS, "Enforcement Actions in or Near Protected Areas" (Jan. 20, 2025) ("Rescission Memo").

[5] Press Release, DHS, Promises Made, Promises Kept: President Trump Is Already Securing Our Border and Deporting Criminal Aliens (Jan. 26, 2025), https://www.dhs.gov/news/2025/01/26/president-trump-already-securing-our-border-and-deporting-criminal-aliens [https://perma.cc/EG9L-UPKR].

5.      The rescission reflects President Donald Trump's goal of deporting all immigrants in the United States without lawful status during his current four-year term.[6]  To accomplish this, President Trump's "border czar" Tom Homan explained, DHS will conduct immigration enforcement actions "across the country, uninhibited by any prior administration guidelines."[7]  Federal officials have confirmed that the target of these enforcement actions will include undocumented immigrants with no criminal record.[8]  Over the first week of the current Trump Administration, ICE arrested over 4,500 people,[9] including nearly 1,000 people in a Sunday "immigration enforcement blitz."[10]

6.      At least one of these enforcement actions occurred at a church in Georgia during worship service.  According to news coverage,[11] an usher standing in the church entrance saw a group of ICE agents outside and locked the door.  The agents said that they were there to arrest Wilson Velásquez, who had traveled to the United States from Honduras with his wife and three children in 2022.  Immediately after crossing the border, they turned themselves in to U.S. authorities and requested asylum.  They were given a court date and then released after federal

---

[6] Ted Hesson, *Trump Aims to Deport All Immigrants in the US Illegally*, Reuters (Dec. 8, 2024), https://www.reuters.com/world/us/trump-says-he-aims-deport-all-immigrants-us-illegally-2024-12-08/ [https://perma.cc/XZD9-UXLQ].

[7] Nick Miroff & Maria Sacchetti, *Trump Officials Haven't Decided on Post-Inauguration Chicago Raids, Homan Says*, Wash. Post (Jan. 18, 2025), https://www.washingtonpost.com/immigration/2025/01/18/chicago-immigration-raids/ [https://perma.cc/D7AZ-P5WK].

[8] *Id.*

[9] Adam Fullerton, *Texas ICE Raid Tracker: Cities Where Arrests Have Happened*, Fox 4 News (Jan. 28, 2025), https://www.fox4news.com/news/texas-ice-raid-tracker-cities-dallas-austin-houston-jan-28 [https://perma.cc/D2F3-MDXV].

[10] Priscilla Alvarez & Rosa Flores, *Trump Administration Launches Nationwide Immigration Enforcement Blitz*, CNN (Jan. 27, 2025), https://www.cnn.com/2025/01/26/politics/chicago-immigration-trump-ice/index.html [https://perma.cc/22MM-9M68].

[11] *See* Andy Olsen, *When ICE Comes to Church*, Christianity Today (Jan. 31, 2025), https://www.christianitytoday.com/2025/01/should-churches-fear-ice-raids-atlanta/ [https://perma.cc/FPG3-5YNZ].

agents cinched a GPS-tracking monitor on Velásquez's ankle.  After settling in suburban Atlanta, the family joined a Pentecostal church where they worshipped several times a week and helped with music.  They were listening to the pastor's sermon when ICE agents arrived to arrest Velásquez.  Although Velásquez had attended all his required check-ins at an Atlanta ICE office and had a court date scheduled to present his asylum case to a judge, ICE agents arrested him anyway, explaining that they were simply "looking for people with ankle bracelets."  The pastor, Luis Ortiz, tried to reassure his congregation, but he "could see the fear and tears on their faces."

7.      Plaintiffs' congregations and members face an imminent risk of similar immigration enforcement actions at their places of worship.  Consistent with their call to welcome and serve all people, many have undocumented congregants and many offer social service ministries— such as food and clothing pantries, English as a Second Language ("ESL") classes, legal assistance, and job training services—at their churches and synagogues that serve undocumented people.  An immigration enforcement action during worship services, ministry work, or other congregational activities would be devastating to their religious practice.  It would shatter the consecrated space of sanctuary, thwart communal worship, and undermine the social service outreach that is central to religious expression and spiritual practice for Plaintiffs' congregations and members.

8.      The rescission of the sensitive locations policy is already substantially burdening the religious exercise of Plaintiffs' congregations and members.  Congregations are experiencing decreases in worship attendance and social services participation due to fear of immigration enforcement action.  For the vulnerable congregants who continue to attend worship services, congregations must choose between either exposing them to arrest or undertaking security measures that are in direct tension with their religious duties of welcome and hospitality.

Likewise, the choice that congregations currently face between discontinuing social service ministries or putting undocumented participants at risk of arrest is no choice at all: Either way, congregations are forced to violate their religious duty to serve and protect their immigrant neighbors.

9.      DHS's authorization of immigration enforcement action at Plaintiffs' places of worship in the absence of exigent circumstances or a judicial warrant violates Plaintiffs' rights under the Religious Freedom Restoration Act ("RFRA") and the First Amendment.  Under RFRA, the federal government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the government demonstrates that the burden is "the least restrictive means of furthering [a] compelling governmental interest."  *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694 & n.2 (2014) (quoting 42 U.S.C. § 2000bb-1(a), (b)).  The First Amendment similarly prohibits government interference in the freedom of expressive association—including association for the purpose of engaging with others in protected religious exercise, speech, or peaceable assembly—unless the government can show its conduct serves "compelling state interests . . . that cannot be achieved through means significantly less restrictive of associational freedoms."  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

10.      As described above, the burden imposed on Plaintiffs' religious exercise by the looming threat of immigration enforcement action at their places of worship and during their religious ceremonies is profound, as is the interference such action causes to Plaintiffs' expressive association.  Whatever interest DHS has in enforcing immigration law, it cannot meet its burden of demonstrating that its interference with Plaintiffs' religious practices is the least restrictive means of serving that interest.

11.     Aside from substantially burdening religious exercise, DHS's abrupt rescission of its sensitive locations policy flouts legal constraints on agency action.  Before reversing longstanding policy, an agency must recognize that it is changing course, reasonably explain its rationale for adopting the new policy, consider reliance interests that the previous policy may have engendered, and grapple with alternatives.  DHS made no attempt to engage in such a considered approach.  Instead, the agency simply declared—on the first full day of the new presidential administration—that "no longer" will "criminal aliens," such as "murders [sic] and rapists . . . . hide in America's schools and churches."[12]  DHS provided no evidence suggesting that the previous policy had allowed criminals to hide in churches, or otherwise had thwarted immigration enforcement.  Nor did it consider the reasons animating the unbroken policy that had, over multiple administrations of both major political parties, recognized the sanctity of houses of worship and the need to abstain from violating those sacred spaces, absent compelling and unusual circumstances.  DHS likewise ignored the serious harms that will befall communities of faith and those they serve if the government now is free to conduct immigration enforcement actions at places of worship and during religious ceremonies.  The rescission is final agency action that violates the requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*

## JURISDICTION AND VENUE

12.     The Court has jurisdiction under the United States Constitution and 28 U.S.C. § 1331.

---

[12] Press Release, DHS, Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole, *supra* note 3.

13.     Venue is proper in this District under 28 U.S.C. § 1391(e) because Defendants are officers and employees of the United States, acting in their official capacities, or an agency thereof, and reside in this District; a substantial part of the events or omissions giving rise to this action are occurring in this District; and at least one Plaintiff resides in this District.

## PARTIES

14.     **Plaintiff The African Methodist Episcopal Zion Church** ("A.M.E. Zion") is a historically African-American Christian denomination, founded by Bishop James Varick in 1796 in New York City, chartered in 1801, and authorized as a denomination in 1820.  A.M.E. Zion currently has 1,600 congregations and approximately 1,500,000 active members across the continental United States.  Affectionately known as "The Freedom Church" and the Church of Harriet Tubman, Frederick Douglass, and Sojourner Truth, A.M.E. Zion proudly upholds Methodist doctrine and consistently promotes civil rights and liberation theology as its central focus for all people.  Because its mission is "Loving God with all our heart, with all our soul, and with all our minds, and to love our neighbor as ourselves," A.M.E. Zion is committed to serving people regardless of race, creed, color, faith, or national origin, including immigrants lacking legal status.  A.M.E. Zion is headquartered in Charlotte, North Carolina.

15.     **Plaintiff Central Atlantic Conference United Church of Christ** ("CAC") includes 153 congregations of the United Church of Christ in the mid-Atlantic region of the United States. Inspired by Jesus's "inclusive journey of love, justice, and hope," CAC "strives to foster the strength and well-being of the church in all its settings."  Consistent with the United Church of Christ's core value of Extravagant Welcome, CAC believes that immigrants are human beings, made in God's image, and do not deserve the terror of harassment, threats, raids, violence,

imprisonment, separation from their families, and deportation; they deserve welcome and sanctuary.  CAC is headquartered in Catonsville, Maryland.

16.    **Plaintiff The Central Conference of American Rabbis** ("CCAR") is the Reform Rabbinic leadership organization.  Founded in 1889 with the mission of gathering Reform rabbis to provide mutual support, CCAR currently has 2,300 member rabbis who serve over 2 million Reform Jews.  CCAR enriches and strengthens the Jewish community by fostering excellence in the Reform rabbis who lead it.  Because the Jewish people's scripture and history compels them to work with and help immigrants and refugees, CCAR's member rabbis directly serve immigrant communities without regard to legal status.  CCAR recognizes that all human beings are created b'tzelem Elohim (in the image of God), and therefore are deserving of our respect and care.  CCAR is headquartered in New York, New York.

17.    **Plaintiff Christian Church (Disciples of Christ)** ("DOC") originated in Cane Ridge, Kentucky, in the early 1800s as a movement that rejected any test of fellowship to be welcomed into the Body of Christ.  The current denominational name and structure were adopted in 1969, and DOC now has over 3,000 congregations, all but 20 of which are in the United States.  Because the Bible calls Christians to welcome the stranger, DOC congregations have long been "immigrant welcoming" and involved in settling refugees and supporting immigrants in local communities.  DOC congregations welcome and serve immigrants regardless of status, believing that all are created in the image of God and that all persons have a right to respect, dignity, a means to support themselves, and opportunity to determine their own futures.  DOC is headquartered in Indianapolis, Indiana.

18.    **Plaintiff Church of the Brethren** ("COB") currently has approximately 75,185 members in 782 congregations within 23 districts.  It traces its roots back more than 300 years to

Germany when, in 1708, a group of individuals influenced by Pietism and Anabaptism broke

away from the state churches to form their own religious group seeking to follow a different kind

of life based on peaceful and compassionate action.  Due to persecution and economic hardship,

its members migrated to North America and organized the first congregation in 1723 in

Germantown, Pennsylvania.  COB is considered a historic peace church, and has continually

prioritized loving enemies, welcoming the stranger, and acting in ways that promote the well-

being of all and help those in need or who have been marginalized.  Consistent with those

beliefs, COB expresses its deep concern for the plight of refugees and immigrants, both

undocumented and documented, and advocates for just and humane immigration policies.  COB

is headquartered in Elgin, Illinois.

19.    **Plaintiff Convención Bautista Hispana de Texas** ("CBHT") was founded in 1910

(f.k.a. Convención Bautista Mexicana de Texas) and incorporated in 2011 with the mission of

serving its churches and members to fulfill their unique God-inspired vision.  CBHT's

membership includes approximately 1,100 Hispanic Baptist churches across Texas.  Most of

CBHT's congregations are affiliated at the national level with the Southern Baptist Convention,

which has affirmed the responsibility of churches to minister to all individuals, regardless of

immigration status, and has declared that any form of nativism, mistreatment, or exploitation is

inconsistent with the Gospel of Jesus Christ.  CBHT's member churches thus welcome

immigrants into their congregations and serve them through social service ministries without

regard to documentation.  CBHT's registered office is in San Antonio, Texas.

20.    **Plaintiff The Episcopal Church** ("TEC") was established in 1785 and is a

constituent member of the Anglican Communion, a global family of churches that have historic

roots in the Church of England.  TEC has 106 dioceses, with 96 in the United States and its

territories, that include more than 6,700 congregations with approximately 1.5 million active members. Recognizing the Bible's repeated calls for God's people to embrace the foreigner as a way of extending the work that is at the heart of God in every time and place, TEC champions and advocates for humane policies towards migrants, and many dioceses, parishes, and Episcopal networks provide resources, support, and care for asylum seekers, undocumented immigrants, refugees, and other migrant communities. TEC is headquartered in New York, New York.

21.    **Plaintiff Fellowship Southwest** is an independent, ecumenical, Christian nonprofit entity with numerous denominations represented on its board and among its member churches, which are located primarily in Texas, Oklahoma, New Mexico, Arizona, and Southern California. Fellowship Southwest's basic mission is to help Christians and churches practice compassion, pursue justice, and build new connections across racial and denominational boundaries. It focuses on four areas of compassionate mission work and advocacy: immigration, racial justice, Native American justice, and hunger. Immigration is its most active area of work, which includes establishing and supporting a network of churches, ministries, and pastors serving migrants on the U.S. southern border. Fellowship Southwest is headquartered in Dallas, Texas.

22.    **Plaintiff Friends General Conference** ("FGC"), founded in 1900, is an association of 16 regional Quaker organizations (called yearly meetings) and 12 directly affiliated monthly meetings primarily in the United States and Canada. The 16 Yearly Meetings are composed of hundreds of local Quaker meetings and churches with approximately 30,000 total members and attenders. Because Jesus's teachings related to compassion, peace, and justice ground Quaker spiritual practices, FGC is committed to working for a world where dignity and rights are upheld regardless of migration status. The principles of inclusion and welcoming are common practices

14

at Quaker meetings with no distinction made for legal status, and concern for immigrants, refugees, and asylum seekers is widespread among Quakers.  FGC is headquartered in Philadelphia, Pennsylvania.

23.    **Plaintiff General Assembly of the Presbyterian Church, U.S.A.** ("PCUSA"), through the Stated Clerk of the General Assembly, Reverend Jihyun Oh,[13] is a national Christian denomination with nearly 1.1 million members in over 8,500 congregations, organized into 166 presbyteries under the jurisdiction of 16 synods.  Shaped by its Reformed theology, history, and representational form of leadership, PCUSA faithfully works to serve Christ in the world through new and existing communities of faith, hope, love, and witness.  Guided by their call to welcome the stranger and belief in the inherent dignity of all people, PCUSA actively advocates for and works toward more just immigration laws and processes.  PCUSA is headquartered in Louisville, Kentucky.

24.    **Plaintiff General Commission on Religion and Race of The United Methodist Church** ("GCORR") is one of 13 churchwide agencies established by the General Conference of The United Method Church to provide essential services and ministries beyond the scope of individual local congregations and annual conferences.  GCORR's mandate is to challenge, lead, and equip the people of The United Methodist Church ("UMC") to become interculturally competent, ensure institutional equity, and facilitate vital conversations about religion, race, and culture.  GCORR administratively houses and provides oversight for the Plan for

---

[13] The Stated Clerk appears here on behalf of the policies of the General Assembly and is the highest ecclesiastical officer of the General Assembly.  The General Assembly does not claim to speak for all Presbyterians, nor are its policies binding on the membership of the Presbyterian Church.  However, the General Assembly is the highest legislative and interpretive body for the denomination, and it is the final point of decision in all disputes.  As such, its statements are considered worthy of the respect and prayerful consideration of all the denomination's members.

Hispanic/Latino Ministries of the UMC, which impacts over 600 Latino immigrant congregations and ministries.  As provided by the United Methodist Social Principles, GCORR affirms the sacred status of migrants, immigrants, and refugees, and opposes all laws and policies that attempt to criminalize, dehumanize, or punish displaced individuals and families based on their status as migrants, immigrants, or refugees.  GCORR is specifically acting together with the New York, North Georgia and Western North Carolina Annual Conferences of the UMC and within the scope of its own ministry areas in acting as plaintiff in this case.  GCORR is headquartered in Washington, DC.

25.     **Plaintiff Latino Christian National Network** ("LCNN") is a vibrant community of Latino Christian leaders representing Evangelical, Pentecostal, Historic Protestant, and Catholic traditions across the United States.  LCNN began in 1998 under the umbrella of another Christian organization, and then was independently founded in 2021 with the mission of working towards unity among Latino Christian leaders for the holistic transformation of communities in the United States.  LCNN's members include 80 Christian pastors and leaders.  Because innumerable Bible passages instruct the people of God to welcome immigrants and refugees, advocacy for comprehensive immigration reform has been at the core of LCNN's mission for over 12 years.  LCNN is registered in Orlando, Florida.

26.     **Plaintiff Massachusetts Council of Churches** ("MCC") is an association of congregations and 18 denominations convinced that what binds us together in Christ is stronger than what divides us.  As the nation's oldest state council of churches, MCC is the embodied expression of Christian unity in faith and witness across the Commonwealth of Massachusetts. Throughout its history, MCC has devoted itself to working for and witnessing the dignity and support of immigrants.  Indeed, MCC's commitment to serving and ministering to immigrants

precedes its founding, through its predecessor bodies that provided direct services of pastoral care, feeding, counseling, literacy education, and housing to immigrant laborers. MCC is headquartered in Boston, Massachusetts.

27.    **Plaintiff Mennonite Church USA** ("MC USA") was founded in 2001 as a merger of two preceding national bodies (General Conference Mennonite Church and Mennonite Church). MC USA currently has approximately 50,000 members in 477 congregations within 15 area conferences. MC USA is considered a historic peace church, part of the Anabaptist tradition that has continually prioritized loving enemies and doing good to all. MC USA renounces the indifference to and mistreatment of undocumented and documented immigrants and commits itself to joining God's reconciling mission and to living and acting as sisters and brothers in Christ regardless of legal status. As such, MC USA advocates for just and humane immigration policies for immigrants and refugees, and it empowers congregations, area conferences, and denominational staff to serve as advocates for these vulnerable groups of people. MC USA is headquartered in Elkhart, Indiana.

28.    **Plaintiff The New York Annual Conference of The United Methodist Church** ("NYAC") is an Annual Conference of approximately 410 United Methodist churches across New York and western Connecticut. NYAC's mission is to share God's love by creating safe places where all are accepted and welcomed, connecting the needs of people to the presence of God, and transforming the world through Christ. As a United Methodist Church Annual Conference, NYAC affirms the sacred status of migrants, immigrants, and refugees, and opposes all laws and policies that attempt to criminalize, dehumanize, or punish displaced individuals and families based on their status as migrants, immigrants, or refugees. This position is consistent with the denominational standards and foundational principles expressed in Paragraph 163.g

"Migrants, Immigrants, and Refugees" of the 2020/2024 United Methodist Book of Discipline of The United Methodist Church. NYAC is headquartered in White Plains, NY.

29.    **Plaintiff New York State Council of Churches** ("NYSCOC") is a statewide organization through which Christians accomplish mission goals that can be achieved more effectively by working together. Founded in 1893, NYSCOC consists of nine denominational members representing 29 distinct judicatories in New York. NYSCOC's members covenant to care for one another, safeguard the presence of vital Christian communities, provide hospitality to all, proclaim the Gospel boldly in each place, and declare God's just will among the powers and principalities. NYSCOC's members believe that congregations should be a place of peace and safety for the oppressed in our midst, and they resist laws, directives, and structures that compromise that welcome. NYSCOC is headquartered in Albany, New York.

30.    **Plaintiff North Carolina Council of Churches** ("NCCC") is an ecumenical organization promoting Christian unity and working towards a more just society in the State of North Carolina. NCCC's members include 27 judicatories of 19 denominations and seven individual congregations. Across the state, its members have over 6,200 congregations. Founded in 1935 to address racial inequality, NCCC enables denominations, congregations, and people of faith to impact the State on issues such as economic justice and development, human well-being, equality, and compassion and peace, following the example and mission of Jesus Christ. Ensuring labor and housing protection for migrant farmworkers is one of NCCC's top priority areas, and its work includes mobilizing people of faith to participate in grassroots movements and legislative efforts to empower immigrants in North Carolina. NCCC is headquartered in Raleigh, North Carolina.

31.    **Plaintiff The North Georgia Conference of The United Methodist Church**

("NGA"), through The Board of Trustees, North Georgia Conference, United Methodist Church,

Inc., is an Annual Conference of over 400 United Methodist churches in North Georgia.  NGA's

mission is to actively engage and transform communities through the love and grace of Jesus

Christ.  As a United Methodist Church Annual Conference, NGA affirms the sacred status of

migrants, immigrants, and refugees, and opposes all laws and policies that attempt to criminalize,

dehumanize, or punish displaced individuals and families based on their status as migrants,

immigrants, or refugees.  NGA is headquartered in Duluth, Georgia.

32.    **Plaintiff The Rabbinical Assembly** ("the RA") is the international association of

Conservative rabbis.  Since its founding in 1901, the RA has been the creative force shaping the

ideology, programs, and practices of the Conservative movement.  The RA currently has 1,640

member rabbis worldwide of whom 1,301 are located within the United States.  Around 60

percent of its members work in congregational settings.  In adherence to the tenets of

Conservative Judaism, the RA advocates for just and humane immigration policies for

immigrants and refugees and encourages rabbis, congregations, and staff to serve as advocates

for these vulnerable groups of people.  The RA is headquartered in New York, New York.

33.    **Plaintiff Reconstructing Judaism** has been the central organization of the

Reconstructionist movement since 2012 and currently has 94 congregations, mostly in the United

States.  Reconstructing Judaism's vision is a diverse, connected, and engaged Judaism that

meaningfully contributes to a just and compassionate world.  Inspired by the Torah's repeated

teaching that Jews have a special obligation to welcome and care for "strangers," the

Reconstructionist movement holds an abiding commitment to supporting and sheltering

immigrants, regardless of whether they are Jews and regardless of their legal status.  This

religious mandate is bolstered by centuries of Jewish lived experience, including the Holocaust, when Jews were immigrants and refugees seeking shelter in the face of danger and discrimination.  Reconstructing Judaism is headquartered in Wyncote, Pennsylvania.

34.     **Plaintiff Rhode Island State Council of Churches** ("RISCC") was convened in 1937 by a Christian minister, a Unitarian minister, and a Rabbi who recognized during the poverty of the Great Depression that people of faith have a responsibility to advocate for, and call leaders into the work of, justice.  RISCC maintains relationships with ten judicatory bodies of eight denominations.  Its membership consists of 20 individual congregations across Rhode Island.  RISCC's advocacy work is rooted in the spiritual principle that we are called to act in defense of vulnerable populations and communities.  Owing to the clear Biblical record to "welcome the stranger," RISCC's programming includes mobilizing and equipping its members to resist oppressive enforcement actions against undocumented immigrants.  RISCC is headquartered in Providence, Rhode Island.

35.     **Plaintiff the Union for Reform Judaism** ("URJ") was founded in 1873 by Rabbi Isaac Mayer Wise as the Union of American Hebrew Congregations.  Today, URJ includes 815 congregations across North America encompassing 1.5 million Reform Jews.  URJ envisions a world in which Judaism enables all people to experience peace and wholeness (shalom), justice and equity (tzedek), and belonging and joy (shayachut and simcha).  URJ has long supported a fair and generous immigration policy, informed by the history of the Jewish people as a group forced time and again to flee the lands in which it resided.  URJ affirms its commitment to create the same opportunities for today's immigrants that America offered the Jewish community not so many years ago.  URJ is headquartered in New York, New York.

36.    **Plaintiff Unitarian Universalist Association** ("UUA") was founded in 1961 as a merger of the American Unitarian Association (founded in 1825) and the Universalist Church of America (founded in 1793). The UUA currently has over 1,000 congregations and related faith communities, located across all 50 states and the District of Columbia. Its adult membership is over 130,000. Unitarian Universalism is a non-credal faith, bound together by a covenant which is expressed through the inseparable and deeply interwoven shared religious values of interdependence, pluralism, justice, transformation, generosity, and equity—all centered around love. The imperative to care for those most at risk, especially due to systems of injustice, is one of Unitarian Universalism's historic and defining religious commitments. The UUA's longstanding, robust commitment to immigration justice, explicit in its support of both documented and undocumented immigrants as well as its commitment to human rights, has been democratically established through its General Assembly, which is the UUA's highest ecclesiastical authority. The UUA is headquartered in Boston, Massachusetts.

37.    **Plaintiff The United Synagogue of Conservative Judaism** ("USCJ") was founded as an unincorporated federation of Conservative Jewish synagogue congregations in 1913 and incorporated as the United Synagogue of America by special act of the New York Legislature in 1916. Its name was changed to The United Synagogue of Conservative Judaism by act of the New York Legislature in 1992. USCJ currently has 560 member congregations located in seven Districts throughout North America, including over 500 located within the United States. Its member congregations have over 1,000,000 individual members. In adherence to the tenets of Conservative Judaism, USCJ advocates for just and humane immigration policies for immigrants and refugees, and encourages congregations and staff to serve as advocates for these vulnerable groups of people. USCJ is headquartered in New York, New York.

38.      **Plaintiff The Western North Carolina Conference of The United Methodist Church** ("WNCC"), through The Board of Trustees, Western North Carolina Conference, United Methodist Church, Inc., is an Annual Conference of 628 United Methodist churches in Western North Carolina.  WNCC's mission is to make disciples of Jesus Christ for the transformation of the world, which it accomplishes through creating vital and sustainable local congregations, embracing racial justice and inclusion as discipleship and sanctification, and centering the well-being and health of leadership, both clergy and laity.  As a United Methodist Church Annual Conference, WNCC affirms the sacred status of migrants, immigrants, and refugees, and it opposes all laws and policies that attempt to criminalize, dehumanize, or punish displaced individuals and families based on their status as migrants, immigrants, or refugees. WNCC is headquartered in Huntersville, North Carolina.

39.      **Plaintiff Wisconsin Council of Churches** ("WCC") was incorporated in 1947 to address human needs in the State of Wisconsin that were too great for any one church to address alone.  WCC's members include 32 judicatory bodies (representing 23 Christian traditions), three observer bodies, and 13 ecumenical partners.  These member bodies span approximately 2,000 congregations and approximately one million Christians.  For over 70 years, WCC has engaged in direct ministry related to immigrants, immigrant-serving organizations, and churches that seek to be welcoming of immigrants and refugees.  WCC seeks economic justice through immigration policies that prioritize family reunification, protect workers' rights, and enforce immigration laws with justice and compassion, as well as through increased efforts to address the root causes of international migration in poverty, war, persecution, and environmental degradation.  WCC is headquartered in Madison, Wisconsin.

40.    **Plaintiff WISDOM** is a network of interfaith organizations who work for racial and economic justice throughout Wisconsin.  WISDOM began with Milwaukee Inner-City Congregations Allied for Hope's founding in 1988 and then became its own membership organization in 2000.  WISDOM's members include 180 congregations from 19 different faith traditions across Wisconsin.  For over 25 years, WISDOM has consistently advocated for fair and safe immigration processes for all families.  WISDOM is headquartered in Milwaukee, Wisconsin.

41.    **Defendant U.S. Department of Homeland Security** ("DHS") is the federal agency responsible for, among other things, enforcing immigration laws.  DHS is an executive department of the United States Government, headquartered in Washington, DC.

42.    **Defendant Kristi Noem** is the Secretary of DHS and is sued in her official capacity as the official exercising the power as head of the agency.

43.    **Defendant U.S. Customs and Border Protection** ("CBP") is a subcomponent of DHS, headquartered in Washington, DC, and is responsible for, among other things, enforcing immigration laws at and between ports of entry.

44.    **Defendant Pete R. Flores** is the Acting Commissioner of CBP and is sued in his official capacity as the individual exercising the power as head of the subcomponent.

45.    **Defendant U.S. Immigration and Customs Enforcement** ("ICE") is a subcomponent of DHS, headquartered in Washington, DC, and is responsible for, among other things, interior immigration enforcement and detention and removal operations.

46.    **Defendant Caleb Vitello** is the Acting Director of ICE and is sued in his official capacity as the individual exercising the power as head of the subcomponent.

# LEGAL BACKGROUND

## Religious Freedom Restoration Act

47.     "In order to ensure broad protection for religious liberty," the Religious Freedom

Restoration Act ("RFRA") provides that the federal "'[g]overnment shall not substantially

burden a person's exercise of religion even if the burden results from a rule of general

applicability.'"  *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694 & n.2 (2014) (quoting

42 U.S.C. § 2000bb-1(a)).  In *Employment Division v. Smith*, 494 U.S. 872 (1990), the Supreme

Court ruled that the First Amendment's guarantee of free exercise of religion is not offended by

operation of neutral laws of general applicability.  In enacting RFRA, however, Congress

expressly concluded that "laws 'neutral' toward religion may burden religious exercise as surely

as laws intended to interfere with religious exercise."  42 U.S.C. § 2000bb(a).  RFRA thus

requires the government to provide a "compelling justification" and demonstrate that it is acting

through the least restrictive means even when defending neutral laws, whenever those laws

substantially burden religious exercise.  *Id.*; *see id.* § 2000bb-1.

48.     Under RFRA, exercise of religion includes "'not only belief and profession but the

performance of (or abstention from) physical acts' that are 'engaged in for religious reasons.'"

*Hobby Lobby*, 573 U.S. at 710 (quoting *Smith*, 494 U.S. at 877).  Moreover, RFRA protects "*any*

exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42

U.S.C. § 2000cc-5(7)(A) (emphasis added) (incorporated through *id.* § 2000bb-2(4)).

49.     "If the Government substantially burdens a person's exercise of religion," then

RFRA entitles "that person . . .  to an exemption from the rule unless the Government

'demonstrates that application of the burden to the person—(1) is in furtherance of a compelling

governmental interest; and (2) is the least restrictive means of furthering that compelling

governmental interest.'" *Hobby Lobby*, 573 U.S. at 694–95 (quoting 42 U.S.C. § 2000bb-1(b)).

In other words, the government must satisfy strict scrutiny. *Singh v. Berger*, 56 F.4th 88, 93

(D.C. Cir. 2022).

50.     To do so, the government may not rely on "broadly formulated interests," and

instead must focus on the "harm of granting specific exemptions to particular religious

claimants." *Hobby Lobby*, 573 U.S. at 726–27 (quoting *Gonzales v. O Centro Espírita*

*Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006)).  And if the government can achieve its

"marginal interest" in enforcing a rule against the plaintiffs, *id.* at 727, without burdening

religion, then "it must do so," *Singh*, 56 F.4th at 93 (quoting *Fulton v. City of Philadelphia*, 593

U.S. 522, 541 (2021)).

### The First Amendment

51.     The First Amendment to the U.S. Constitution protects the interconnected rights to

free religious exercise, freedom of speech, and peaceable assembly.  U.S. Const. amend. I.  The

Supreme Court has also recognized, among these constitutional protections, a right to expressive

association.  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984).  This "corresponding"

associational right, *id.* at 622, safeguards the freedom "to associate for the purpose of engaging

in those activities protected by the First Amendment—speech, assembly, petition for the redress

of grievances, and the exercise of religion," *id.* at 618.

52.     These rights are fundamental.  The right of expressive association, in particular, is

"indispensable" to "preserving other individual liberties."  *Id.*  It is constitutionally protected not

only against "actual restrictions on an individual's ability to join with others to further shared

goals" but also against more indirect government action, including that which "risk[s]" a

"chilling effect on association . . . ."  *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595,

618 (2021); *Pathfinder Fund v. Agency for Int'l Dev.*, 746 F. Supp. 192, 195 (D.D.C. 1990)

(quoting *Lyng v. Int'l Union*, 485 U.S. 360, 367 & n.5 (1988)).  Such indirect interference

includes conduct that "directly and substantially" interferes with the protected activity by

"preventing" people from associating or "burdening their ability to do so in any significant

manner."  *Pathfinder Fund*, 746 F. Supp. at 195 (internal quotation marks and alterations

omitted); *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 69 (2006) (freedom of

expressive association protects against government action that "ma[kes] group membership less

attractive"); *see also Bonta*, 594 U.S. at 615–17 (discussing chilling effect of requiring group

membership disclosure).

53.     A significant burden on expressive association runs afoul of the First Amendment

unless the government can show its conduct serves "compelling state interests . . . that cannot be

achieved through means significantly less restrictive of associational freedoms."  *Roberts*, 468

U.S. at 623; *Nat'l Ass'n for Advancement of Colored People v. Alabama ex rel. Patterson*, 357

U.S. 449, 460–61 (1958) (finding it "immaterial whether the beliefs sought to be advanced by

association pertain to political, economic, religious or cultural matters, and state action which

may have the effect of curtailing the freedom to associate is subject to the closest scrutiny").

**DHS's Statutory Immigration Enforcement Authority**

54.     Immigration officers have broad statutory authority to engage in a variety of

immigration enforcement actions.  This authority includes the investigatory power to conduct

warrantless interrogations and temporary detentions, patrol private land near the border, enter

and inspect locations open to the general public, and serve process and other orders; it also

includes the power to make arrests, with and without a warrant.  *See* 8 U.S.C. §§ 1226(a),

1357(a).

55.     Under 8 U.S.C. § 1357(a), immigration officers are empowered to take several enforcement actions even in the absence of a warrant. Section 1357(a) grants officers the power to execute and serve orders, subpoenas, and other process. 8 U.S.C. § 1357(a). It allows them to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." *Id.* § 1357(a)(1). It permits them to "patrol[]" private land near the border. *Id.* § 1357(a)(3). And it authorizes warrantless arrests under multiple circumstances "if there is a likelihood of the [subject] escaping" before a warrant can issue—including where an officer "has reason to believe" an immigrant has violated a law or regulation, observes a person committing a federal crime, or "has reasonable grounds to believe" a person has committed or is committing a federal felony offense. *Id.* § 1357(a)(2), (a)(4)–(5); 8 C.F.R. § 287.8(c).

56.     Section 1226(a) separately governs immigration officers' arrest and detention authority pursuant to a warrant. *See* 8 U.S.C. § 1226(a). It provides that certain supervisory federal immigration enforcement officials[14] may issue non-judicial warrants (commonly referred to as "ICE warrants") authorizing the arrest and detention of an immigrant pending a decision on whether he is removable from the United States. An ICE warrant may be executed by trained immigration officers identified by regulation. 8 C.F.R. § 287.5(e)(3); *cf.* 8 U.S.C. § 1357(g) (permitting state and local officers to perform investigative, apprehension, or detention functions of a federal immigration officer upon written agreement).

---

[14] The Immigration and Nationality Act originally vested a variety of immigration enforcement powers, including the power to issue administrative warrants, in the Attorney General. After DHS was created as part of the Homeland Security Act of 2002, those functions shifted to the Secretary of DHS. *See* 8 U.S.C. § 1103(a). By regulation, various immigration officials in DHS and its constituent subcomponents are now authorized to exercise the power to issue arrest warrants for immigration violations. 8 C.F.R. §§ 287.5(e)(2), 241.2(a)(1).

57.     Unlike judicially authorized warrants, ICE warrants are issued by an immigration official rather than a neutral magistrate.  Such warrants are based only on that official's finding of probable cause of removability (a civil violation) rather than probable cause of a criminal offense.  The documents used to issue ICE warrants provide authorizing officials with a series of checkboxes through which to indicate the basis for arrest: the probable cause of removability or, in the case of a warrant of removal/deportation, the entity that issued a final removal order.  ICE warrants do not authorize immigration officers to enter non-public areas or to conduct broader searches of an arrest location.

58.     Regulations promulgated under §§ 1226 and 1357 help illustrate the full scope of these statutory authorities.  For instance, as 8 C.F.R. § 287.8 elaborates, although immigration officers may not enter non-public areas (except as provided by § 1357(a)(3)) to conduct questioning without a warrant or consent, "nothing . . . prohibits" them entry into places of general public access "without a warrant, consent, or any particularized suspicion in order to question any person whom the officer believes to be an alien . . . ."  8 C.F.R. § 287.8(f) (discussing "site inspections").  The regulations further provide that immigration officers may interrogate anyone and, in some circumstances, may "briefly detain" them.  *Id.* § 287.8(b); 8 C.F.R. § 287.5(a)(1).

## FACUAL BACKGROUND

### History of the Sensitive Locations Policy

59.     For decades, the federal government has maintained a general policy of not conducting immigration enforcement operations in designated "sensitive locations" (also referred

to as "protected areas"), including, but not limited to, places of worship and religious ceremonies.

60.     Over 30 years ago, the Acting Associate Commissioner for Operations of the Immigration and Naturalization Service, the predecessor of ICE, issued a memorandum confirming that it was the agency's "policy . . . to attempt to avoid apprehension of persons and to tightly control investigative operations on the premises of . . . places of worship, funerals and other religious ceremonies."[15]  Specifically, the memo required officers to receive prior written approval by a district director or chief patrol agent before conducting any enforcement "operations which are likely to involve apprehensions on the premises" of a place of worship or the site of a funeral or other religious ceremony, unless exigent circumstances existed.  In determining whether to grant prior approval for a proposed enforcement action at a sensitive location, the memo instructed applicable high-level decisionmakers to consider factors such as the availability of alternative measures, the importance of the enforcement objective, and whether, and how, agents could minimize the impact on the operation of the place of worship. The memo further directed that, in the unusual situation where exigent circumstances required an agent to enter a place of worship without prior written approval, the action must be immediately reported to headquarters.

61.     In 2008, the Assistant Secretary of ICE issued field guidance reiterating the importance of the existing policy prohibiting apprehensions in sensitive locations, and affirming its direction that officers should "[a]ttempt to avoid apprehension of persons and to tightly control investigative operations on the premises of . . . places of worship, funerals and other

---

[15] Ex. 6, Memorandum from James A. Puleo, Acting Assoc. Comm'r, Immigration & Naturalization Serv., "Enforcement Activities at Schools, Places of Worship, or at Funerals or Other Religious Ceremonies," HQ 807-P (May 17, 1993).

religious ceremonies."[16]  The guidance stated that the 1993 memo remained in effect, and it

provided additional detail outlining the high bar for ICE personnel "to act at or near sensitive

locations," including "terrorism-related investigations, matters of public safety, or actions where

no enforcement activity is involved."  The field guidance specified that, even in these

exceptional circumstances, pre-approval from "the appropriate Headquarters program office"

was required.

62.     In 2011, the Director of ICE issued a memo that superseded the prior guidance but

maintained tight restrictions on enforcement activity at sensitive locations. [17]  As that memo

explained, ICE's policy was "to ensure these enforcement actions do not occur at nor are focused

on sensitive locations such as schools and churches" without prior written approval, absent

exigent circumstances such as terrorism, imminent risk of death or physical harm, pursuit of a

dangerous felon, or an imminent risk of destruction of evidence material to a criminal case.  The

memo explicitly defined "enforcement actions covered by this policy" to include "(1) arrests;

(2) interviews; (3) searches; and (4) for purposes of immigration enforcement only,

surveillance."  The prior written permission necessary to conduct arrests at a sensitive location,

absent exigent circumstances, required high-level approval from one of four designated

Headquarters-level officials

63.     The Deputy Commissioner of CBP issued similar guidance in 2013.[18]

---

[16] Ex. 5, Memorandum from Julie L. Myers, Assistant Sec'y, ICE, "Field Guidance on
Enforcement Actions or Investigative Activities at or Near Sensitive Community Locations,"
10029.1 (July 3, 2008).

[17] Ex. 4, Memorandum from John Morton, Dir., ICE, "Enforcement Actions at or Focused on
Sensitive Locations," 10029.2 (Oct. 24, 2011), https://www.ice.gov/doclib/ero-
outreach/pdf/10029.2-policy.pdf [https://perma.cc/7UME-P62Z].

[18] Ex. 3, Memorandum from David V. Aguilar, Deputy Comm'r, CBP, "U.S. Customs and
Border Protection Enforcement Actions at or Near Certain Community Locations" (Jan. 18,
2013).

64.    In 2021, the Secretary of DHS issued a memo that superseded the prior guidance for both ICE and CBP, reaffirmed the government's longstanding policy to refrain from enforcement in sensitive locations, and expanded its scope.[19]  Recognizing the profound impact that immigration enforcement can have on people's lives and broader societal interests, the 2021 Memo directed that, "[t]o the fullest extent possible," ICE and CBP "should not take an enforcement action in or near a location that would restrain people's access to essential services or engagement in essential activities."  It described this principle as "fundamental."  It further emphasized that DHS "can accomplish [its] enforcement mission without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more."[20]

65.    The 2021 Memo offered a non-exhaustive list of sensitive locations (or "protected areas") where such essential services or activities take place, including churches, schools, hospitals, and social service establishments.  As relevant here, that list specifically included "[a] place of worship or religious study, whether in a structure dedicated to activities of faith (such as a church or religious school) or a temporary facility or location where such activities are taking place" as well as "[a] place where a funeral, . . . rosary, wedding, or other religious . . . ceremonies or observances occur."  The policy also recognized that enforcement action that is not taken "in" a sensitive location may still have the same restraining effect on an individual's access to the location itself if conducted "near" the location, and instructed agents not to take enforcement action near such spaces to the fullest extent possible.[21]

---

[19] Ex. 2, 2021 Memo, *supra* note 2.
[20] *Id.* at 2.
[21] *Id.* at 2–3.

66.     The 2021 Memo reiterated the agency's policy to abstain from not only apprehensions, but also certain investigative activities, in sensitive locations. Activities covered by the policy "include[d], but [were] not limited to, . . . arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance."[22]

67.     As had been the case for decades, the 2021 Memo acknowledged that exigent circumstances might require officers to undertake immigration enforcement at sensitive locations without prior written approval.  It provided examples of the narrow types of circumstances in which an exception would apply, such as a where "[a] safe alternative location does not exist"; where the enforcement action involves "a national security threat," "an imminent risk of death, violence, or physical harm to a person," "[t]he hot pursuit of an individual who poses a public safety threat," or "a personally observed border-crosser"; or "an imminent risk that evidence material to a criminal case will be destroyed."  And, like the prior policies, the 2021 Memo imposed certain reporting requirements for enforcement undertaken at a sensitive location without prior authorization.[23]

68.     Finally, even where exigent circumstances preclude prior approval, the 2021 Memo instructed that "[t]o the fullest extent possible," any enforcement action in or near a sensitive location "should be taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing" the sensitive location.[24]

---

[22] *Id.* at 4.
[23] *Id.* at 3–4.
[24] *Id.* at 4.

### The Rescission of the Sensitive Locations Policy

69.     On January 20, 2025, shortly after President Trump was sworn into office, DHS

Acting Secretary Benjamine Huffman issued a new memo that rescinded the 2021 Memo and

jettisoned the government's decades-old sensitive locations policy.[25]  DHS did not publish the

memo on its website; instead, the rescission was first reported by a news outlet that explained

that it had received a draft of the memo.[26]  DHS later issued a press release confirming it had

rescinded the sensitive locations policy,[27] but it still has not published the Rescission Memo.

70.     The Rescission Memo ends DHS's policy of refraining from conducting arrests or

other enforcement activities in sensitive locations.  Disavowing the need for any "bright line

rules regarding where our immigration laws are permitted to be enforced," the Rescission Memo

instead directs ICE and CBP to "use [their] discretion along with a healthy dose of common

sense" in deciding whether to conduct a law enforcement action at a sensitive location.

71.     The Rescission Memo fails to even acknowledge the compelling rationales that

motivated the unbroken 30-year policy prohibiting arrests in houses of worship or during

religious ceremonies.  It provides no evidence whatsoever that the government's previous policy

of abstention had thwarted legitimate immigration enforcement interests, nor any support for the

contention that "criminals" are hiding in churches or synagogues, *see supra* note 3.  The

Rescission Memo provides no cogent reason for its abrupt about-face on the very day President

Trump was sworn into office.  It fails to consider the reliance interests of communities and

---

[25] Ex. 1, Rescission Memo, *supra* note 4.

[26] *See* Adam Shaw & Bill Melugin, *Trump DHS Repeals Key Mayorkas Memo Limiting ICE Agents, Orders Parole Review*, Fox News (Jan. 21, 2025), https://www.foxnews.com/politics/trump-dhs-repeals-key-mayorkas-memo-limiting-ice-agents-orders-review-parole-use [https://perma.cc/QLZ9-AGCJ].

[27] Press Release, DHS, Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole, *supra* note 3.

persons of faith that have felt free to engage in religious worship and religiously mandated acts of service without fear of placing their immigrant neighbors at risk of arrest or deportation. Nowhere does the memo acknowledge, much less grapple with, the substantial religious burden imposed by enforcement activity at or near places of worship.  And finally, it neglects to consider alternative, less-burdensome means through which the government could pursue its legitimate interests.

72.     Because the Rescission Memo places no boundaries on where immigration agents may engage in enforcement activities, ICE and CBP agents are now authorized under 8 U.S.C. §§ 1226(a) and 1357(a) to engage in broad enforcement actions at places of worship.  In its press release announcing the policy change, a DHS spokesperson explained that "the Trump Administration will not tie the hands of our brave law enforcement, and instead trusts them to use common sense."[28]  DHS's website features a news article stating that ICE agents understand the rescission "to free them up to go after more illegal immigrants."[29]

73.     The rescission reflects President Trump's goal of deporting all immigrants in the United States without lawful status during his current four-year term.[30]  To accomplish this, President Trump's "border czar" Tom Homan explained, DHS would conduct enforcement actions "across the country, uninhibited by any prior administration guidelines."[31]  Federal officials have confirmed that the target of these enforcement actions will include undocumented immigrants with no criminal record.[32]  In emphasizing the president's "countless" statements

---

[28] *Id.*
[29] Press Release, DHS, Promises Made, Promises Kept: President Trump Is Already Securing Our Border and Deporting Criminal Aliens, *supra* note 5.
[30] Hesson, *supra* note 6.
[31] Miroff & Sacchetti, *Trump Officials Haven't Decided on Post-Inauguration Chicago Raids, Homan Says*, *supra* note 7.
[32] *Id.*

that "he is focused on launching the largest mass deportation operation in American history of illegal criminals," the White House Press Secretary explained that "if you are an individual, a foreign national, who illegally enters the United States of America, you are, by definition, a criminal."[33]

74.      Over the first week of the Trump Administration, ICE arrested over 4,500 people,[34] including nearly 1,000 people in a Sunday "immigration enforcement blitz."[35]  At least one of these arrests occurred at a church in Georgia during worship service.[36]  Those numbers are only expected to grow: "ICE field offices have been told to meet a quota of 75 arrests per day," a much higher rate of arrests than previous administrations.[37]

75.      The wave of enforcement actions has not been limited to those with criminal records or pending charges.  Those arrested in the first week of the new Trump Administration included an individual who had been in the United States for a year and a half, had no criminal record outside of a traffic violation, and had an asylum application pending.[38]  As Homan warned, all undocumented immigrants are "on the table" and "got a problem."[39]

---

[33] Karoline Leavitt, White House Press Secretary, Press Briefing (Jan. 29, 2025), https://www.whitehouse.gov/briefings-statements/2025/01/press-briefing-by-press-secretary-karoline-leavitt/ [https://perma.cc/F2SK-CESS].
[34] Fullerton, *supra* note 9.
[35] Alvarez & Flores, *supra* note 10.
[36] *See supra* ¶ 6.
[37] Nick Miroff & Maria Sacchetti, *Trump Officials Issue Quotas to ICE Officers to Ramp Up Arrests*, Wash. Post (Jan. 26, 2025), https://www.washingtonpost.com/immigration/2025/01/26/ice-arrests-raids-trump-quota [https://perma.cc/2FKT-EUW8].
[38] Ashley Ahn & Miguel Martinez, *ICE Makes Arrests in Metro Atlanta, Announces 'Targeted Operations' Here and Elsewhere*, Atlanta Journal-Constitution (Jan. 27, 2025), https://www.ajc.com/news/atlanta-news/ice-makes-arrests-in-metro-atlanta-announces-targeted-operations-elsewhere/MXCCJQIQR5CIRPDIMCRPESFGNA [https://perma.cc/NJ5X-KUW7].
[39] Mike Levine & Meghan Mistry, *Trump's Border Czar: 'If You're in the Country Illegally, You Got a Problem'*, ABC News (Jan. 26, 2025), https://abcnews.go.com/Politics/trumps-border-czar-youre-country-illegally-problem/story?id=118085728 [https://perma.cc/2MER-NLHL].

76.    Nor are arrests and detentions limited to those who are actually subject to removal. During the first week of the administration, for example, ICE arrested a grandmother, mother, and toddler in Milwaukee after the family was overheard speaking Spanish while shopping—despite the fact that all three were U.S. citizens from Puerto Rico.  Not until after the family had been taken into custody and transported to a detention center did officials verify their status and release them.[40]

77.    Experts believe that the reported quotas imposed on ICE officers will "significantly increase the chance that officers will engage in more indiscriminate enforcement tactics," including targeting easy-to-access locations and immigrants who have not committed crimes.[41] A former ICE chief counsel explained that "[q]uotas will incentivize ICE officers to arrest the easiest people to arrest, rather than the people that are dangerous noncitizens."[42]

**Plaintiffs' Sincerely Held Religious Beliefs**

78.    As adherents of Judaism, Plaintiffs The Central Conference of American Rabbis, Reconstructing Judaism, The Rabbinical Assembly, The United Synagogue of Conservative Judaism, and the Union for Reform Judaism believe that every human being—without exception—is created in God's image (Genesis 1:27).  Welcoming the stranger, or immigrant, is a central tenet of the Jewish religion, mentioned 36 times in the Torah—more than any other teaching: As Leviticus 19:34 commands, "The stranger who resides with you shall be to you as

---

[40] Allison Walker, *ICE Says 'Sorry' After Detaining US Citizens for Speaking Spanish: Report*, Latin Times (Jan. 29, 2025), https://www.latintimes.com/ice-says-sorry-after-detaining-us-citizens-speaking-spanish-report-573967 [https://perma.cc/632H-4KTH].
[41] Miroff & Sacchetti, *Trump Officials Issue Quotas to ICE Officers to Ramp Up Arrests*, *supra* note 37.
[42] *Id.*

one of your citizens; you shall love them as yourself, for you were strangers in the land of Egypt."

79.     The history of the Jewish people, from escaping slavery in Egypt to the horrors of the Holocaust, reinforces the many struggles faced by immigrants throughout the world.  The Jewish religious mandate that comes out of these traumatic times is not simply to protect the Jews in various lands, but to serve and defend all who are vulnerable and oppressed.  It is to turn Jewish suffering into the sacred work of ensuring liberty and dignity for all human beings.  As a community of immigrants, Jews are charged by God to pursue justice, to build a society that is welcoming to all of God's creatures, and to provide support and shelter to other immigrants regardless of their legal status.

80.     The remaining Plaintiffs represent dozens of Christians and Christian-rooted faiths— Baptists, Brethren, Disciples, Episcopalians, Evangelicals, Mennonites, Quakers, Pentecostals, Presbyterians, Unitarian Universalists, United Methodists, Zion Methodists, and more.  These Plaintiffs receive from Judaism the Hebrew Bible's exhortation to welcome, protect, and care for the exiles and refugees who become our neighbors through displacement.  They further embrace the Gospel of Jesus Christ, who not only echoed this command, but self-identified with the stranger: "For I was hungry, and you gave me food, I was thirsty, and you gave me drink, I was a stranger, and you welcomed me" (Matthew 25:35).  Indeed, Jesus became a refugee in Egypt after Herod's persecution forced Mary and Joseph to flee their home (Matthew 2:1-15).  To love the outsider, then, is to love Jesus himself.

81.     The Christian Plaintiffs claim their identity as citizens of God's kingdom and reject all hierarchies of race, language, nationality, and legal status as anathema to the original unity given to people by God.  Their Biblical call to love their neighbors (Luke 10:25-28; John 13:34;

1 John 4:7), to care for strangers and foreigners (Exodus 22:21; Leviticus 24:22; Deuteronomy

10:18-19; Deuteronomy 24:17-18; Jeremiah 22:3-5), and to show hospitality (Genesis 18:1-8;

Luke 10:29-37; Romans 12:13; Hebrews 13:1-2),  makes no distinction based on immigration

status.[43]  The Bible, Christian theology, and the traditions of the Church thus offer clear,

repeated, and irrefutable unanimity on the obligation of Christian and Christian-rooted followers

to welcome, serve, and protect the undocumented immigrants in their midst.

### The Substantial Burden on Plaintiffs' Religious Exercise

82.    **Plaintiff The African Methodist Episcopal Zion Church** ("A.M.E. Zion") faces

an imminent risk of an immigration enforcement action at its churches.  A.M.E. Zion has

congregations in cities and neighborhoods with large immigrant communities and in areas where

ICE or CBP have conducted enforcement actions, including in the past few weeks.  Some of their

congregations have immigrant members, including those who are undocumented.  Some of their

congregations also provide social service ministries on their church campus that serve

immigrants, such as food distribution, and others provide facility space to Hispanic churches or

immigrant rights advocacy groups.

83.    An enforcement action during a worship service, religious ceremony, or other church

activity will harm A.M.E. Zion by interfering with the church's religious mandate to worship in

person together as a congregation and to welcome all people regardless of status to join them in

---

[43] Unitarian Universalists ("UU") recognize Jesus's teachings and Biblical guidance as prophetic and primary sources of wisdom, not requiring any credal tests related to their divinity; these teachings belong to the core sources of faithful inspiration in the UU Living Tradition.  As a tradition with historical roots in Christianity, Christian imperatives for hospitality and to care for one's neighbor are reflected in the UUA's shared religious values, which covenant to "declare that every person is inherently worthy and has the right to flourish with dignity, love, and compassion," to "build and sustain fully accessible and inclusive communities," and to "protect Earth and all beings from exploitation."

their worship.  It will violate the sanctity of their worship space and disrupt congregants' ability

to worship without fear.  Likewise, an immigration enforcement action directed at their social

service ministries will prevent them from carrying out their mission to serve all immigrants,

whom they feel called to welcome without regard to status, and to protect their vulnerable

neighbors.

84.     The rescission of the sensitive locations policy is already substantially burdening

A.M.E. Zion's religious exercise.  Since the rescission of the sensitive locations policy,

congregations have reported a decrease in worship attendance, with congregants conveying that

they are now afraid of going to church due to the imminent risk of an immigration enforcement

action.  Moreover, the imminent threat of an enforcement action on church property places

A.M.E. Zion congregations in the impossible position of choosing whether to freely carry out

their religious mission, putting congregants and those they serve at risk of arrest or deportation,

or to change the way they serve and minister to those congregants, in an effort to protect them.

Either of these choices would violate their religious beliefs.

85.     **Plaintiff Central Atlantic Conference United Church of Christ** ("CAC")'s

member churches face an imminent risk of an immigration enforcement action.  CAC has

member churches in five states and the District of Columbia, and there have been numerous

immigration raids in cities where congregations are located.  Some congregations have

immigrant members, including those who are undocumented.  A substantial number of

congregations have outreach services to immigrant communities, including but not limited to

ESL courses, soup kitchens, and legal services, and they offer those services to participants

irrespective of immigration status.  Several member churches also provide physical sanctuary to

immigrants in need, which has gained attention from immigration authorities: While one church was serving as a sanctuary, ICE agents were spotted around the outside of the building.

86.    An enforcement action taken during a worship service, religious ceremony, or other church activity will harm CAC congregations by interfering with their religious mandate to worship in person together, with all members of their community, including those who are immigrants and without lawful status.  One of the United Church of Christ's core values is "extravagant welcome," and churches' outreach to immigrant populations is a ministry of welcome, hospitality, and, in a fundamental sense, justice.  An enforcement action in a CAC church will be sacrilegious and cause emotional, spiritual, and potentially physical harm to congregants and those served by church programs.

87.    The rescission of the sensitive locations policy is already substantially burdening CAC's religious exercise.  CAC congregants report stories of immigrant parents in their communities keeping children at home because going out in the community—even to school or church—is unsafe.  Fearful of exposing the immigrants they serve to arrest, CAC congregations feel significant pressure to reconsider the social service ministries they consider important to their religious mission.

88.    **Plaintiff The Central Conference of American Rabbis** ("CCAR")'s members work in congregations across the country that face an imminent risk of an immigration enforcement action.  Rabbis within CCAR serve in congregations in major cities with large immigrant populations where ICE raids have taken place, including in California, Florida, and Arizona, among others, as well as in congregations along the southern border in locations such as San Diego, Tucson, El Paso, and McAllen.  Many of these synagogues provide social services to immigrants.  For example, one synagogue runs an on-site preschool in which 40 percent of

participating families are from Central America; another runs a longstanding, on-site homeless shelter in a major city.

89.    Enforcement action at CCAR members' synagogues will shatter the sense of safety that congregants need in their places of worship by harkening back to the persecution of Jews by government agents before and during the Holocaust. Judaism is a communal religion in which individuals are instructed to gather and celebrate as a community; an immigration enforcement action will spark fear of gathering in person, impacting congregants' ability to freely practice their faith, and some members have indicated that it might cause them to dissociate from Jewish life entirely. A enforcement action while young children are present and being educated in their religious tradition will be particularly shocking and injurious to member communities: the guarantee that Jews, as a minority religion, can conduct their religious life without fear of government intrusion is the backbone of the American compact with religious groups.

90.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of CCAR rabbis and their broader congregations. One rabbi reported that, although providing educational services to all community members (including immigrant families) is a supreme religious value, families are nervous about sending their children to school in the synagogue due to fears about immigration enforcement.

91.    **Plaintiff Christian Church (Disciples of Christ)** ("DOC") faces an imminent risk of an immigration enforcement action at its churches. DOC has congregations in border areas, in cities with large immigrant communities, and in at least one city that is a large refugee resettlement site. ICE arrests and detentions have occurred in recent weeks in cities and states that are home to member congregations. Many of DOC's congregations include immigrants, and at least one has congregants who were previously arrested or detained by ICE or CBP. Several

41

DOC congregations provide social service ministries, such as food pantries, on their campus that are open to and serve immigrants regardless of documentation status. One church advertises on its building that it shares worship space with a Spanish-speaking congregation.

92.    An enforcement action during a worship service, religious ceremony, or other activity will harm DOC by interfering with its congregations' abilities to worship together in person with congregants who are immigrants without legal status. Such action will further interfere with DOC congregations' religious mandate to be a safe and welcoming place for all. An enforcement action that interferes with DOC congregations' on-site community food distribution will preclude them from carrying out their core religious mandate to feed their neighbors, which they view as fundamental to being the church that God calls on them to be.

93.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of DOC congregations. Since the rescission, some DOC congregants are staying home from services due to the threat of an enforcement action. Clergy have experienced stress corresponding to the palpable fears of their congregants, and they have been forced to take time, attention, and energy away from ministry to focus instead on securing resources and developing plans to keep their houses of worship and congregants safe. The looming threat of an enforcement action puts pressure on DOC congregations to consider cutting back on worship services and other congregation activities; reducing their actions and statements, including during services and on social media, regarding inclusivity; or changing social ministries like food provision to more resource-intensive, and less inclusive, direct delivery. Each of these alternatives interferes with DOC's religious mission to openly welcome and minister to all.

94.    **Plaintiff Church of the Brethren** ("COB") faces an imminent risk of an immigration enforcement action at its churches. COB has congregations in various states with

significant numbers of immigrant congregants who risk deportation because they are undocumented or have parole status or Temporary Protected Status ("TPS") which may soon expire. These congregations are located in communities where ICE has conducted raids and enforcement actions over the past few weeks. Some congregations also provide social service ministries on their church campuses that serve both documented and undocumented immigrants, such as food distribution or soup kitchens.

95.     An enforcement action during a worship service, religious ceremony, or other church activity will harm COB congregations by interfering with their ability to worship in person together as a congregation, with all members of their community, including those who are immigrants and without lawful status. It will substantially disrupt COB's spiritual practices and destroy all sense of peace and safety in what is supposed to be a place of sanctuary for congregants. Likewise, an enforcement action directed at COB congregations' social service ministries will prevent them from carrying out their mission to welcome and serve all immigrants, whom they feel called to minister to as part of their evangelical faith and whom they are called to protect as some of the most vulnerable in our society.

96.     The rescission of the sensitive locations policy is already substantially burdening COB's religious exercise. Since the rescission, COB churches providing services such as food distribution or soup kitchens have reported a decline in attendance and participation. Congregations have also reported a decrease in worship attendance, with congregants conveying that they are now afraid of going to church due to the imminent risk of an enforcement action. Not only has this burdened the religious exercise of those congregants who are missing worship services due to fear, but it also impacts the religious exercise of those attending by diminishing the shared community and fellowship experience. Since its founding, COB has emphasized the

centrality of community to Christian faith and the belief that interpreting Scripture and following the teachings of Jesus cannot be done in isolation or separation, but require the participation of all persons.  In a church grounded in the centrality of community, the inability of any person to participate within the community due to fear denies the rich variety of that community to all of its members.  The imminent threat of an enforcement action on church property also puts congregations in the impossible position of choosing whether to freely carry out their religious mission (putting congregants and those they serve at risk of arrest or deportation), to tell their immigrant neighbors to stay home, or to change or cut back on the way they worship and minister in an effort to protect them.  Any of these choices would violate the churches' religious beliefs.

97.    **Plaintiff Convención Bautista Hispana de Texas** ("CBHT")'s member churches face an imminent risk of an immigration enforcement action.  CBHT has churches all along the border of Texas and in cities with large immigrant communities, including in cities where ICE has conducted raids and enforcement actions over the past few weeks.  The overwhelming majority of CBHT churches have immigrant congregants.  There are undocumented congregants and pastors in CBHT churches, some of whom have received letters to appear or have been arrested by ICE in the past.  Other undocumented congregants have been deported.  Some CBHT churches also provide social service ministries on their campuses that serve both documented and undocumented immigrants, such as food distribution, health care, and legal services.

98.    An enforcement action during a worship service, religious ceremony, or other church activity will harm CBHT churches by interfering with their religious mandate to worship in person together as a congregation, with all members of their community, including those who are immigrants and without lawful status.  It will substantially disrupt the whole church's spiritual

practices and destroy all sense of peace and safety in what is supposed to be a place of sanctuary for congregants. Likewise, an enforcement action directed at their social service ministries will prevent them from carrying out their mission to welcome and serve all immigrants, whom they feel called to minister to as part of their evangelical faith.

99.     The rescission of the sensitive locations policy is already substantially burdening the religious exercise of CBHT churches. Since the rescission, some CBHT churches have reported a decrease in worship attendance, with congregants conveying that they are now afraid of going to church due to the imminent risk of an enforcement action. Moreover, the imminent threat of an enforcement action on church property places CBHT churches in the impossible position of choosing whether to continue pursuing their religious activities, thereby putting their undocumented congregants and social service recipients at risk of arrest, or to protect them by changing or cutting back on church activities and ministries. Either option violates their religious beliefs.

100.     **Plaintiff The Episcopal Church** ("TEC")'s congregations face an imminent risk of an immigration enforcement action. TEC has congregations across the country, including in communities that are mere miles from the border, have large undocumented populations, have experienced ICE actions, or have been specifically named by the Trump Administration as targets for enforcement actions. Many congregations include worshippers who have come to this country from across the world, with some composed almost exclusively of immigrants (both documented and undocumented), and with congregants who have been arrested and placed in removal proceedings. Indeed, one church was targeted by local officials who parked outside and attempted to arrest undocumented congregants leaving church in past enforcement efforts. Some congregations also provide social services to documented and undocumented immigrants as part

of their ministry, including food banks and shared meals, ESL classes, health services, and more. These services are open to anyone who needs them, regardless of their legal status, and ICE agents have already appeared outside the food pantry at one congregation, photographing those in line and causing some to leave without being fed.

101.    An enforcement action at an Episcopal congregation during a worship service or other church activity will undermine fundamental tenets of the faith.  Episcopal worship takes an incarnate form: congregants must be with one another in a community.  Having the sacred trust of worship and the consecrated space of sanctuary shattered by an immigration enforcement action will be directly opposed to that practice and will harm the Church and its members.  And even the loss of some congregants to the fear that immigration enforcement officers could enter during services undermines core Episcopalian beliefs that the Church is one body—when the whole community cannot gather, the communion of the members is impaired, and an injury to one is an injury to the whole denomination.  Likewise, enforcement actions targeted at social service ministries impede the church's spiritual mission by violating the fundamental principles of sanctuary, mercy, and care for the vulnerable.

102.    Episcopal congregations are already experiencing a substantial burden on their religious exercise as a result of the rescission of the sensitive locations policy.  Congregations across the country have experienced a decrease in attendance at worship services and social service ministries because of members' fears of ICE or CBP as well as the same fears felt by nonmembers who participate in congregations' social service ministries.  Some congregants with legal status are choosing to stay home out of fear that they may be mistakenly arrested simply because of their appearance.  In one diocese, congregants were too afraid to even attend an informational Zoom call with an immigration attorney.  Certain ministries, like those that serve

largely undocumented farm worker populations, have had to be ended or restructured to keep congregants safe. Some congregations have stationed members at the church door to keep an eye out for immigration officials. The threat of an immigration enforcement action on church property could force Episcopal congregations to change their worship because of the fear of putting those they serve at risk or suffering the loss of leaders, congregants, and fellowship who are afraid to attend.

103.    **Plaintiff Fellowship Southwest**'s member churches face an imminent risk of an immigration enforcement action. Fellowship Southwest has churches located along the border and near ports of entry, in cities with significant immigrant populations, and in areas where ICE has recently conducted raids and enforcement actions. Several of its churches have congregations comprised of nearly all immigrants—some are undocumented, and some have been the subject of immigration enforcement action in the past, including arrest and deportation. One church has congregants who work for DHS, CBP, and ICE. In addition to worship services and activities, some of Fellowship Southwest's member churches provide social service ministries that serve both documented and undocumented immigrants, including ESL classes, citizenship classes, low-cost immigration legal services, health fairs, and food and clothes distribution. These ministries are considered part of the churches' mission, occur on the church campus, and many are publicly advertised. One member church's outreach ministry work brings it into contact with ICE and CBP.

104.    An enforcement action taken during a worship service, religious ceremony, or other church activity will harm Fellowship Southwest churches by preventing them from worshiping together freely and peacefully as a congregation in a place they consider sanctuary, and from welcoming the stranger as they feel so called. Such action will be particularly traumatizing for

the churches who consider themselves congregations of immigrants.  Similarly, any immigration enforcement action taken at or near the churches' outreach ministries will impede their mission of serving their most vulnerable neighbors, including undocumented immigrants, whom they seek to embrace and assist as a demonstration of God's love.

105.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of Fellowship Southwest churches.  Since the rescission, some member churches have reported a decrease in worship attendance, and congregants have expressed fear to go to church due to the imminent risk of an enforcement action.  Moreover, the looming threat of an enforcement action on church property puts member churches in the impossible position of choosing whether to freely carry out their religious mission, placing congregants and those they serve at risk of arrest or deportation, or to change the way they worship and conduct their outreach ministries in an effort to protect their immigrant neighbors.  Either of these options violates the churches' religious beliefs.  Some Fellowship Southwest churches have already implemented, or are considering implementing, additional security measures such as locking doors or holding more private streaming services.

106.    The Quaker meetings of **Plaintiff Friends General Conference** ("FGC") face an imminent risk of an immigration enforcement action.  Several FGC meetings are located in border-state cities, cities with high immigrant populations, and cities that have seen recent immigration enforcement actions.  FGC meetings welcome all comers, including immigrants. Several meetings have openly served as sanctuary locations for asylum-seekers and other immigrants; ICE has previously targeted some of those individuals in sanctuary for deportation. In addition, many FGC meetings are publicly involved in social justice issues: one hosts Spanish-language worship groups; another provides on-site services to unhoused people

regardless of legal status; and still others publicize their commitment and connection to immigrant relief efforts online or through the media. One meeting in particular hosts a ministry that provides food and legal advice to immigrants who are in removal proceedings. That ministry is known both to the general public and to the local ICE field office.

107. An enforcement action during a meeting activity will harm FGC meetings by interfering with a core Quaker practice of seeking and experiencing communion with the Divine through community and silent worship (called expectant waiting). An enforcement action in a meetinghouse will violate the meetings' religious traditions of welcoming the stranger, recognizing God in everyone, and creating a safe space for worship and the spiritual, internal experience of communion. As many meetings also provide children's programming in their meetinghouses, an enforcement action will also present a traumatizing disruption to their important religious education efforts.

108. The rescission of the sensitive locations policy is already substantially burdening the FGC meetings' religious exercise. Multiple meetings have been grappling with their congregants' increased feelings of anxiety, unease, and lack of safety in their community. Some are considering controlling entrance to their meetinghouses, including by locking their doors during worship, despite the negative impact on open and welcome community worship that has long been Quaker tradition.

109. **Plaintiff General Assembly of the Presbyterian Church, U.S.A.** ("PCUSA") faces an imminent risk of an immigration enforcement action at its worshiping communities and congregations. PCUSA has worshiping communities and congregations across the United States, including in border states and in cities with large immigrant populations, such as Chicago and Philadelphia. These congregations are reporting ICE activity in their communities and near their

church buildings.  Proof of immigration status has never been a requirement for membership in PCUSA churches.  Immigrants with a variety of legal statuses lead PCUSA congregations and comprise a significant portion of numerous PCUSA congregations.  Some congregants are undocumented and some are facing removal orders.  All are beloved members of the worshiping communities and congregations they attend.  Numerous congregations are providing housing and other assistance to immigrant families as they navigate various immigration processes.  PCUSA congregations also provide social service ministries on their campuses that are open to and serve immigrants regardless of documentation status.  Those ministries include food and clothing distribution, schools, ESL classes, legal assistance, and job training services.

110.    A core Presbyterian tenet is group discernment.  Members discern the will of God together as a body of believers.  An immigration enforcement action during a worship service, religious ceremony, or other church activity will harm PCUSA by violating the religious sanctuary, peace, and security they strive to provide to all congregants.  It will prevent congregations from expressing and practicing their communal faith, which prioritizes group discernment, in-person worship with singing, prayer, and small-group support.  And, to the extent any such action is directed at the congregations' social service ministries, it will interfere with their ability to engage in community-based services and act as Christ's hands and feet in the world, action which is central to their faith and practice.

111.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of PCUSA congregations.  At least one congregation has already experienced a significant decrease in church attendance since the rescission of the sensitive locations policy, while others fear that congregants will be reluctant to worship together in person; still others have stopped live streaming their services despite their desire to witness to the larger community

with this technology. Some PCUSA congregations have recently implemented, or are considering implementing, additional security measures such as closing or locking church doors. Such measures, however, stand in direct tension with the hospitality of Christ that PCUSA endeavors to provide all worshippers, and with PCUSA's essential mission to provide fellowship, spiritual growth, and community support to its congregants.

112. **Plaintiff General Commission on Religion and Race of The United Methodist Church** ("GCORR") faces an imminent risk of an immigration enforcement action at UMC congregations. Some congregations are located in cities with large immigrant communities where ICE has conducted raids and enforcement actions over the past few weeks. Some of these congregations are predominantly Hispanic, and some worship with, and provide sanctuary to, undocumented individuals as an exercise of their faith. Some congregations also provide social service ministries on their church campus that serve both documented and undocumented immigrants, such as food distribution, clothing closets, wellness services, and immigration advice and support. Several congregations have been targeted by ICE in the past.

113. An enforcement action during a worship service, religious ceremony, or other church activity will harm GCORR by interfering with the religious mandate given by the UMC to GCORR and UMC congregations to engage in communal worship and participate in sacraments such as holy communion, and to welcome and embrace all members of the community in doing so, without regard to legal status. These services are sacred, and any enforcement action will not only disrupt them in a literal sense, but will compromise churches' ability to provide a safe space for congregants to freely worship in peace. Similarly, an enforcement action during any ministries will prevent GCORR and UMC congregations from carrying out the UMC's mission

to serve their immigrant neighbors without regard to status, which is central to their expression of their Christian faith.

114.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of GCORR and UMC congregations.  Since the rescission, some congregants have been too afraid to attend church in person, making the communal worship central to the United Methodist faith an impossibility, and forcing churches to explore alternatives such as bringing communion to members directly.  Likewise, those served by outreach ministries have expressed fear of immigration enforcement, and some have been too afraid to come to church to receive these services.  A decrease in participation in these ministries prevents GCORR and UMC congregations from living out the Gospel of providing hospitality to their most vulnerable neighbors.  And those congregations that continue to welcome their immigrant neighbors to worship with them and participate in their ministries are forced to assume the risk of exposing their neighbors to arrest or deportation, which is directly at odds with their faith-based commitment to protect them.

115.    **Plaintiff Latino Christian National Network** ("LCNN")'s members face an imminent risk of an immigration enforcement action at their churches.  LCNN represents Latino Christian leaders across the country.  Many of its members' churches are located at or close to the border, and many serve largely Latino congregations.  A significant proportion of these congregations consist of immigrants vulnerable to deportation or individuals who are part of mixed-status families.  Indeed, there are congregants who have already received Notices to Appear or final orders of removal.  Some LCNN members provide social services as part of their church's ministry, such as ESL classes, clothing distribution, ministry for special needs individuals, and classes on healthcare access and financial literacy.  These services are provided

without regard to an individual's immigration status. Members' churches have also hosted and supported asylum seekers and unaccompanied minors who have crossed the border.

116.    An enforcement action taken during a worship service, religious ceremony, or other church activity will harm LCNN members by interfering with their religious mandate to worship in person together with their congregations, welcoming all members of their community, including those who are undocumented. An enforcement action will disrupt their duty to worship God in community and peace, and it will destroy the sanctuary of their churches, which should be a place of safety and refuge. Social service ministries, moreover, are a key part of their religious practices, allowing them to live out their sacred responsibility to love and serve the vulnerable. A decline in participation in worship or social services will undermine their fundamental commitment to build a community of faith and offer communion to those in need. For LCNN members, worship and faith-based gatherings are not just optional events—they are an essential formational practice where faith is nurtured, hope is restored, and the community is strengthened.

117.    The rescission of the sensitive locations policy is already substantially burdening LCNN members' religious exercise. LCNN has received reports of members cancelling regular weekly events and moving their worship services online. LCNN's members have already seen attendance drop, and congregants are expressing fear and anxiety about coming to church due to concerns about potential enforcement actions. One of LCNN's members has seen his church's small business support program lose 75 percent of its participants since the policy was rescinded. As the viability of these social service ministries is uncertain, LCNN members have been forced to let go of staff.

118.    The congregations and denominations that comprise **Plaintiff Massachusetts Council of Churches** ("MCC")'s congregations face an imminent risk of an immigration enforcement action.  ICE has conducted several widely reported enforcement actions across the state of Massachusetts where MCC churches are located.  Moreover, many member churches are based in areas with large immigrant populations and are made up of many immigrant congregants and clergy, including undocumented immigrants.  Congregants have reported contact from or surveillance by ICE agents; some churches have received reports of congregants being placed in removal proceedings.  Many MCC member churches also offer social service ministries—such as food pantries, clothing provision, or legal aid programs—that cater to immigrant populations.

119.    An enforcement action during worship services or other church activities will harm member churches by interfering with their ability to gather, worship, and serve together.  It will inject fear, intimidation, and trauma into worship spaces crafted to provide safety, sanctuary, and community.  And it will contradict the member churches' core belief in welcoming the stranger (including immigrants and foreigners) as one of their own.  In addition, an enforcement action during social service ministries, such as food distribution, will shatter the community safety net that many MCC churches view as a religious expression and extension of worship.

120.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of MCC churches.  Member churches are reporting decreased attendance, both at church services and at food pantries, in the wake of the rescission.  The fears animating these drops in attendance are also weakening congregations' sense of community, prompting many church leaders to consider trade-offs between fundamental aspects of their faith and the security of their congregants.  Some churches have removed essential information about religious

services from public websites or have canceled events altogether.  Others have expended already-limited resources on additional security measures or to secure more volunteers for church services.

121.    **Plaintiff Mennonite Church USA** ("MC USA")'s congregations faces an imminent risk of an immigration enforcement action.  MC USA has congregations in border states and in cities with large immigrant populations, such as Chicago and Philadelphia, where ICE has recently taken enforcement actions.  Immigrants comprise a significant portion of numerous MC USA congregations, including some in which all or nearly all of the congregants are immigrants. Many of those immigrant congregants are undocumented; some are facing removal orders. Numerous congregations are providing sanctuary and other assistance to immigrant families as they navigate the asylum process.  MC USA congregations also provide social service ministries on their campuses that are open to and serve immigrants regardless of documentation status. Those ministries include food and clothing distribution, ESL classes, legal assistance, and job training services.

122.    An enforcement action taken during a worship service, religious ceremony, or other church activity will harm MC USA by violating the religious sanctuary, peace, and security they strive to provide to all congregants.  It will prevent congregations from expressing and practicing their communal faith, which prioritizes in-person worship with singing, prayer, and small-group support.  And, to the extent any such action is directed at the congregations' social service ministries, it will interfere with their ability to engage in community-based services that are central to their faith and practice.

123.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of MC USA congregations.  At least one congregation has experienced a

significant decrease in church attendance since the rescission, while others fear that congregants will be reluctant to worship together in person. Some MC USA congregations have recently implemented, or are considering implementing, additional security measures such as closing or locking church doors, or moving services online. Such measures, however, stand in direct tension with the hospitality of Christ that MC USA endeavors to provide all worshippers, and with MC USA's essential mission to provide fellowship, spiritual growth, and community support to its congregants.

124.    **Plaintiff The New York Annual Conference of The United Methodist Church** ("NYAC") faces an imminent risk of an immigration enforcement action at its churches. NYAC congregations are diverse, with significant ethnic constituencies from South America, Africa, Central America, the Caribbean, East Asia, and Southeast Asia, and some congregants are undocumented. They are located in communities with significant immigrant populations and where ICE has conducted enforcement actions in recent weeks. At least one congregant and a ministry volunteer were recently detained by ICE. Many NYAC congregations also provide social service ministries on their church campus that serve both documented and undocumented immigrants, such as ESL classes, soup kitchens, food pantries, clothing closets, warming centers, legal service clinics, and tutoring programs. And some NYAC congregations have declared themselves "sanctuary churches" and provide a safe living space for immigrants facing deportation. As part of this work, one NYAC church has visited ICE offices to advocate for a stay of deportation and has received a threatening letter from ICE.

125.    An enforcement action taken on church property will harm NYAC congregations by interfering with worship services and ministries that are central to their religious practices. The Discipline governing United Methodists commands congregations to open their doors to all

persons in the community regardless of status and to gather—as one—in fellowship to hear the Word of God and receive sacraments such as holy communion. It also commands that they welcome and serve their immigrant neighbors, such as by helping them to secure food, education, housing, and employment. The entry of armed immigration enforcement officers will be particularly disruptive to this exercise of faith and violate the sanctity of the property: United Methodists consider all local church buildings to be sacred Christian spaces dedicated to God, and prohibit firearms based, among other things, on Jesus's call to his followers to be peacemakers.

126.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of NYAC churches. At least one congregation has seen a decline in participation in its outreach ministries since the rescission, with those they serve expressing their fear of immigration enforcement. If immigrants do not feel safe participating in NYAC church ministries, that impedes its congregants' spiritual mission of welcoming and serving immigrants and thus impact their witness to the world. And just as changing the way they worship with and serve their immigrant neighbors would violate the churches' religious beliefs, so, too, would continuing to offer social service ministries if it means putting congregants and neighbors at risk of arrest or deportation.

127.    **Plaintiff New York State Council of Churches** ("NYSCOC")'s members face an imminent risk of an immigration enforcement action. NYSCOC's members have churches throughout New York State, including in areas with large immigrant populations or that have been targeted enforcement actions. Many of these churches have large immigrant congregations, and others host social service outreach ministries (e.g., legal services, health clinics, clothing closets, and food pantries) that serve undocumented people, some of whom have been detained

and deported.  Numerous NYSCOC members have declared themselves to be sanctuary churches, and at least one has been subjected to ICE surveillance and unauthorized entry by ICE agents.  In one instance while the sensitive locations policy was still in place, a sanctuary guest was arrested by ICE shortly after leaving church property.

128.    An enforcement action during a worship service, religious ceremony, or other church activity will harm NYSCOC's members by interfering with their religious mandate to worship in person together as a congregation, with all members of their community, including those who are immigrants and without lawful status.  Although NYSCOC's members follow a variety of faith traditions, they are united in the belief that all people should be treated equally as children of God.  All members feel that caring for and protecting the most vulnerable members of society, with no status distinctions, is a Biblical imperative.  When their churches are inhibited or prohibited from offering the services and conducting the worship and programming germane to their faith expression, they are denied access to the faith itself.

129.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of NYSCOC members, who are reporting decreased attendance at worship services and other church activities due to fear of an enforcement action.  At least one member church has incurred costs for increased security measures to prevent immigration enforcement officers from entering the building without a judicial warrant.

130.    **Plaintiff North Carolina Council of Churches** ("NCCC") member churches face an imminent risk of an immigration enforcement action.  NCCC has members across the state of North Carolina, which has a large immigrant population, and most of its denominational members have congregations with immigrant members and immigrant congregations.  Some NCCC churches also provide social service ministries on their church campus, such as ESL

classes, soup kitchens, and food pantries that serve their communities regardless of immigration status. One church, for example, runs a "Circle of Welcome" ministry that specifically targets refugees, providing them with wraparound services, and partners with another local outreach ministry to serve the Spanish-speaking community, such as by offering space for ESL classes.

131. An enforcement action during a worship service, religious ceremony, or other church activity will harm NCCC churches by interfering with their religious mandate to welcome all persons into their congregations, including undocumented immigrants, and by violating the sanctity and peace of their worship. Similarly, an enforcement action directed at their social service ministries will prevent them from carrying out their mission of welcoming and serving all immigrants, whom scripture directs them to protect, regardless of status, as some of society's most vulnerable.

132. The rescission of the sensitive locations policy is already substantially burdening the religious exercise of NCCC churches. Since the rescission, multiple congregations have reported a decrease in worship attendance, with congregants conveying that they are now afraid of going to church due to the imminent risk of an enforcement action. At least one member church has removed any mention of their Latino congregation from its website and social media. Moreover, the looming threat of an enforcement action on church property puts NCCC churches in the impossible position of choosing whether to freely carry out their religious mission, thereby putting congregants and those they serve at risk of arrest or deportation, or to change the way they serve and minister to them, in an effort to protect them. Either option violates the churches' religious beliefs.

133. **Plaintiff The North Georgia Conference of The United Methodist Church** ("NGA") faces an imminent risk of an immigration enforcement action at its local churches.

NGA has numerous predominantly immigrant congregations and many of its churches offer a variety of outreach ministries specifically for immigrant populations, such as ESL classes, soup kitchens, food pantries, clothing pantries, and tutoring programs.

134.    An enforcement action taken on church property will harm NGA's congregations by interfering with worship services and ministries that are central to their religious practices. The Discipline governing United Methodists commands congregations to open their doors to all persons in the community regardless of status and to gather—as one—in fellowship to hear the Word of God and receive sacraments such as holy communion. It also commands that they welcome and serve their immigrant neighbors, such as by helping them to secure food, education, housing, and employment. The entry of armed immigration enforcement officers will be particularly disruptive to this exercise of faith and violate the sanctity of the property: United Methodists consider all local church buildings to be sacred Christian spaces dedicated to God, and firearms are prohibited based, among other things, on Jesus's call to his followers to be peacemakers.

135.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of NGA's congregations. Since the rescission, congregants have expressed fear over attending worship services. The looming threat of an enforcement action on church property also puts congregations in the impossible position of choosing whether to freely carry out their religious mission but risk subjecting their members and those they serve to arrest or deportation, or to change or cut back on the way they worship and minister in an effort to protect their immigrant neighbors. Either option violates United Methodist religious beliefs.

136.    **Plaintiff The Rabbinical Assembly** ("the RA")'s member rabbis face an imminent risk of an immigration enforcement action at their synagogues. The RA has rabbis serving in

congregations in border states and in cities with large immigrant populations, such as Chicago and Philadelphia, where ICE has recently taken enforcement actions. Immigrants belong to many congregations where RA rabbis serve, and their synagogue spaces are sometimes used by people who are undocumented and in at least one instance may also be facing removal orders. A number of RA rabbis serve in congregations that provide sanctuary and other assistance to immigrant families including social service ministries on their campuses and partnering with other religious institutions that are open to and serve immigrants regardless of documentation status. Those ministries include food and clothing distribution as well as emergency and long-term housing support.

137.    An enforcement action during a worship service, religious ceremony, or other synagogue activity will harm the RA's members by violating the religious sanctuary, peace, and security they strive to provide to all who use these spaces. It will prevent congregations from expressing and practicing their communal faith, which prioritizes in-person worship with singing, prayer, and learning as a community. And, to the extent any such action is directed at the congregations' social service ministries, it will interfere with their ability to engage in community-based services that are central to their faith and practice.

138.    **Plaintiff Reconstructing Judaism**'s member congregations face an imminent risk of an immigration enforcement action at their synagogues. Reconstructing Judaism has congregations across the United States, including in areas that have been targeted for immigration enforcement because they have large immigrant populations. Many Reconstructionist congregations serve immigrants or those with immigrant family members as part of their congregations and offer social services that are used by immigrants regardless of their immigration status. Many members have also taken actions specifically to welcome

immigrants, including becoming a Welcoming Congregation involved in supporting refugees and offering sanctuary to immigrant families.

139.    An enforcement action during a worship service, religious ceremony, or other church activity will harm Reconstructionist congregations by interfering with their religious mandate to worship in person together with all members of their community, including those who are immigrants and without lawful status.  It is a spiritual obligation and an abiding commitment among Reconstructionist Jews to provide support and shelter to immigrants, regardless of whether they are Jews and regardless of their legal status.  The knowledge of suffering and fear by immigrants, particularly fear that affects their participation in worship and activities, is considered a loss and a wound to Reconstructionist congregations.  Moreover, the holiness of Jewish worship sites, extending to the breadth of synagogue property, is sacrosanct, and an immigration enforcement action on synagogue property will violate the safety and sanctity of that space.

140.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of Reconstructionist congregations.  Congregants have reported that they are afraid that they may be swept up in raids regardless of their immigration status, and some are suffering and staying home from services as a result.  Reconstructionist congregations feel pressure to choose between their moral and religious obligations as Jews and as human beings and the risk of putting immigrants in harm's way.  Already, in response to the rescission of the policy, many congregations have invested time and resources in training staff and congregants about how to respond to the possibility of an enforcement action and how to keep each other safe.

141. **Plaintiff Rhode Island State Council of Churches** ("RISCC")'s member churches face an imminent risk of an immigration enforcement action. Many of its congregations serve immigrant populations, including individuals of various immigration statuses. Numerous member congregations provide on-site social services, such as food and clothing, to a diverse range of people, including undocumented immigrants. Member churches also have provided sanctuary shelter for immigrant families on church premises.

142. Enforcement action at an RISCC church will represent an unprecedented and untenable incursion into a sacred space in which congregants are invited to be co-creators with the divine and freely participate in the life of the church. RISCC member churches believe in the importance of the separation of church and state as a foundational principle that protects both our democracy and religious exercise, and immigration enforcement—the business of the secular state—is for another place.

143. The rescission of the sensitive locations policy is already substantially burdening RISCC members' religious exercise because it pressures them to cut back on worship, ceremonies, and other activities. These offerings are the very heart of Christian living: the gathering of community, where congregants gather as members of the body of Christ (including those who are undocumented) to celebrate communion, baptism, and marriage; to serve one another; and to celebrate the other rites of the Church. Some RISCC churches already are reporting a decrease in attendance since the policy rescission. This decrease represents a clear attack on the rights of member churches freely to live out their religious values, especially the value of providing for the most vulnerable among society. At least one member church is working on a safety plan for the congregation, including educating members on their legal rights in the event of an immigration raid.

144.    **Plaintiff the Union for Reform Judaism ("URJ")**'s members face an imminent risk of an immigration enforcement action. Many of its congregations are located in cities where high-profile immigration raids have been, and likely will be, conducted; others are located in border communities, including the Rio Grande Valley. Reform synagogues within its organization have declared themselves "sanctuary congregations" offering shelter to immigrants. Many of its member synagogues host on-site foodbanks, meal programs, homeless shelters, clothing donation, ESL classes, or other support services for undocumented individuals. Undocumented immigrants enter URJ synagogues daily to worship, seek pastoral counsel, learn, socialize, and obtain needed services and support.

145.    An enforcement action at a URJ synagogue will have a profoundly disruptive effect on their ability to fulfill their religious and prophetic mandate. It would be expected to fray the social bonds within the congregation and inhibit the core value of creating experiences that strengthen a vibrant Jewish life. It also will catalyze a decline in worship attendance, which could impact a synagogue's ability to hold prayer services with the common quorum for public prayer. Synagogue members already are on high alert due to recurring, violent, and high-profile antisemitic events; the infiltration into a sacred space of armed immigration enforcement officers would be highly triggering of emotional distress, which is antithetical to its religious mission. An enforcement action during worship or a religious ceremony will stand in direct contrast to URJ synagogues' mission to serve as "a house of prayer for all peoples" (Isaiah 56:7), without regard to demographics or status.

146.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of URJ synagogues. Many of these congregations have, since the 1980s, declared themselves to be sanctuaries for those risking deportation—yet several congregations

already have contacted URJ out of concern for the legal ramifications of continuing to offer these faith-driven services.  The threat of enforcement action interferes with synagogues' ability to fulfill the central prophetic value of caring for the migrant.  One synagogue already has changed its food pantry policies to ensure that patrons do not wait outside in the parking lot where they may be excessively vulnerable.

147.    **Plaintiff Unitarian Universalist Association** ("UUA")'s congregations face an imminent risk of an enforcement action, as UUA congregations are known for providing sanctuary and resources to immigrants; several have declared themselves sanctuary congregations and have housed immigrants on short- and long-term bases.  Many are located near the U.S.-Mexico or U.S.-Canada borders, or in cities where immigration enforcement actions have recently occurred.  UUA congregations include both documented and undocumented immigrants.  Consistent with the UUA's call to care for and minister to immigrants regardless of legal status, many congregations provide social ministries that serve immigrant communities in church spaces, such as through food and diaper distribution, ESL classes, a migrant-focused early learning program, and other tutoring and skill-building.  A congregation that hosts an immigration-related legal clinic has been reported by neighbors to DHS for having undocumented people on church property.

148.    An enforcement action at a UUA place of worship during religious services or other religious activity will significantly interfere with its congregations' ability to welcome the stranger and to provide a sacred space for sanctuary, safety, and trust to congregants, including immigrants and other vulnerable people.  An enforcement action will leave UUA congregations unable to fulfill their spiritual mission—one grounded in relationship, community, and spiritual growth by living out their values—through outreach or congregant participation in services.

149.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of UUA congregations.  Since the rescission, leaders of UU congregations have expressed concerns over publicly sharing information about worship services or immigrant support efforts, though they recognize that limiting dissemination of that information precludes full participation in congregational life.  Members of some congregations have already stopped attending services due to the sensitive locations policy rescission.  Multiple congregations are considering additional security measures, including adding security or registration to protect those who come to worship—measures that carry significant financial costs and would burden any ability to provide open and welcoming worship spaces.  Some congregations are now forced to choose between options that both violate their religious principles: continuing to provide social service ministries despite risk to their immigrant participants, or denying basic resources to entire communities by reducing or discontinuing the services.

150.    **Plaintiff The United Synagogue of Conservative Judaism** (USCJ)'s congregations face an imminent risk of an immigration enforcement action.  USCJ has congregations in border states and in cities with large immigrant populations, such as Chicago and Philadelphia, where ICE has recently taken enforcement actions.  Immigrants comprise a portion of nearly every USCJ congregation, and their synagogue spaces are sometimes used by people who are undocumented and may in at least one instance also be facing removal orders.  A number of USCJ congregations are providing sanctuary and other assistance to immigrant families including social service ministries on their campuses and partnering with other religious institutions that are open to and serve immigrants regardless of documentation status.  Those ministries include food and clothing distribution as well as emergency and long-term housing support.

151.    An enforcement action during a worship service, religious ceremony, or other synagogue activity will harm USCJ's members by violating the religious sanctuary, peace, and security they strive to provide to all who use these spaces.  It will prevent congregations from expressing and practicing their communal faith, which prioritizes in-person worship with singing, prayer, and learning as a community.  And, to the extent any such action is directed at the congregations' social service ministries, it will interfere with their ability to engage in community-based services that are central to their faith and practice.

152.    **Plaintiff The Western North Carolina Conference of The United Methodist Church** ("WNCC") faces an imminent risk of an immigration enforcement action at its churches.  Several of WNCC's congregations have a heavy percentage of immigrant members and immigrants who benefit from social service ministries—such as ESL classes, soup kitchens, food pantries, clothing pantries, mobile showers, and tutoring programs—that they provide on their church campuses.  These congregations do not ask about immigration status; legal status is irrelevant for membership in a local church, attendance at worship services, or receipt of outreach ministry services.  The location of these churches also puts them at heightened risk of enforcement.  One church, for example, is located in a community where ICE's physical presence has visibly increased; another is located next door to an ICE office; and another is located in an area that has seen large scale raids and detentions by ICE in the past.

153.    An enforcement action on church property will harm WNCC's churches by interfering with worship services and ministries that are central to their religious practices.  The Discipline governing United Methodists commands congregations to open their doors to all persons in the community regardless of status and to gather—as one—in fellowship to hear the Word of God and receive sacraments such as holy communion.  It also commands that they

welcome and serve their immigrant neighbors, such as by helping them to secure food, education, housing, and employment. The entry of armed immigration enforcement officers will be particularly disruptive to this exercise of faith and violate the sanctity of the property: United Methodists believe that all local church buildings are sacred Christian spaces dedicated to God, and firearms are prohibited based, among other things, on Jesus's call to his followers to be peacemakers.

154.    The rescission of the sensitive locations policy is already substantially burdening the WNCC's religious exercise. Since the rescission, several WNCC congregations have seen a marked and sudden decline in worship attendance and ministry participation among immigrants, and church members and service recipients have expressed concern about immigration enforcement. WNCC congregations have also experienced a consequent drop in tithes as well as volunteers to support to outreach ministries. One congregation has taken down its website and social media pages, ended its live-stream option for worship services, cancelled small groups in order to keep a low profile, and installed security cameras; it also now locks its doors during worship services. These changes are at odds with the United Methodist mission to provide maximum opportunity for spiritual growth and fellowship, but the rescission of sensitive locations policy forces all WNCC churches to violate their religious beliefs one way or another—either by changing the way they worship and minister to protect their immigrant neighbors, or by continuing to freely carry out their religious mission while putting their immigrant neighbors at risk of arrest or deportation.

155.    **Plaintiff Wisconsin Council of Churches** ("WCC")'s member churches face imminent risk of an immigration enforcement action. WCC has churches throughout the state, including in cities where previous immigration raids have created massive fear, and many

churches serve agricultural areas that host large numbers of seasonal migrants. Many WCC member churches have immigrant pastors and mixed-status family members, including Deferred Action for Childhood Arrivals recipients and those with no documentation, and some member congregations are comprised of immigrants from around the world. One church lost its own pastor to deportation. WCC member churches recently have provided sanctuary for homeless immigrants on their campuses, and many member churches provide other on-site social services to immigrants, including food pantries, meal delivery, community gardens, clothing, medical clinics, and immigration clinics.

156.    WCC's churches will be substantially burdened by an enforcement action during worship services or other church activities. Such action will be physically, emotionally, and spiritually disruptive. It will violate a space that has been dedicated to the holy work of God and the care of neighbors. And it will cause congregants to associate their sacred space with harmful and violent memories. WCC churches and their parishioners would struggle to recover from an enforcement action at their place of worship because they would perceive a loss of safety and damage to their public image in the community.

157.    WCC member churches' religious exercise already is substantially burdened by the rescission of the sensitive locations policy. Since DHS announced the rescission, WCC churches have experienced declines in attendance. One WCC church with an 85-percent immigrant congregation is currently developing an emergency plan of action due to fears that an enforcement action at its premises would mean the end of the congregation and its ability to live out its mission as a Christian community. One Latino pastor was advised by members to consider closing the church. Some WCC churches are preparing to shift to virtual worship and Bible study, which compromises their ability to practice together as "one body" according to the

teaching of scripture.  Their religious practice is further burdened by the need to scale back their social service offerings to avoid hosting large events at which immigrants may be targeted.

158.  **Plaintiff WISDOM**'s member congregations face imminent risk of an immigration enforcement action.  WISDOM's faith communities are located throughout Wisconsin, including where previous immigration raids have occurred.  For example, one congregation's membership is roughly 50 percent Mexican; many of its congregants are undocumented; several congregants have received communications from ICE, including a recent demand to self-deport; and the church previously experienced the detention and deportation of one of its ministry students and her family.

159.  An enforcement action during worship services or other religious activities will harm WISDOM members by destroying their feelings of safety and sanctuary in their place of worship and spurring reluctance to come together and worship as a community.  One member church reports that an enforcement action at its location will likely lead to the church's closure, due to the high numbers of immigrants among its members.  Enforcement action targeted at WISDOM members will also pressure them to cut off social service support systems they currently offer, out of fear of placing undocumented members at greater risk of detection and arrest.

160.  The rescission of the sensitive locations policy is already substantially burdening WISDOM members' religious practices.  One church reports incredible anxiety among its members because it is well-known locally as a community that welcomes and ministers to large numbers of immigrants, including those without documentation.  Some congregations are now locking their doors at all times—including during Sunday worship; they also are making changes to worship offerings and procedures for drop-off and pick-up for children's activities, and

discontinuing social media outreach in their communities, which burdens their ability to reach current and prospective members and practice their faith.

## CAUSES OF ACTION

### Count I

### Religious Freedom Restoration Act (42 U.S.C. § 2000bb *et seq.*)

161.    Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

162.    Under RFRA, the federal "'[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability'" unless the government demonstrates that the burden is "'the least restrictive means of furthering [a] compelling governmental interest.'"  *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694 & n.2 (2014) (quoting 42 U.S.C. § 2000bb-1(a), (b)).

163.    Any "person whose religious exercise has been burdened in violation of" RFRA "may assert that violation as a claim . . . in a judicial proceeding" and "obtain appropriate relief" against the government.  42 U.S.C. § 2000bb-1(c).  As denominational bodies and nonprofit associations of churches, synagogues, pastors, and rabbis, Plaintiffs are "persons" within the meaning of RFRA.  *See Hobby Lobby*, 573 U.S. at 707–08 (recognizing that churches and nonprofits, as well as closely held corporations, constitute "persons" under RFRA).

164.    As a fundamental tenet of their faiths, Plaintiffs sincerely believe that they are called to join in fellowship with *all* worshippers, regardless of their immigration status, through in-person religious services and activities.  Indeed, Plaintiffs believe that welcoming immigrants, who are some of the most vulnerable members of the community and whose shared humanity is emphasized throughout Judeo-Christian scripture, is a religious imperative.  So, too, is ministering to and serving immigrants, which stems from Plaintiffs' religious commitment not

only to welcome and love their immigrant neighbors as themselves but also to provide support for those in need.  Worshipping together in person as a congregation, welcoming immigrants into their congregation, and serving immigrants regardless of status in the broader community through social service ministries are therefore all essential components of Plaintiffs' religious exercise.

165.    Plaintiffs are at imminent risk of immigration enforcement actions violating the sanctity of their places of worship.  Enforcement actions at or near Plaintiffs' churches and synagogues will substantially burden Plaintiffs' religious exercise.  It will disrupt their worship and potentially prevent them from completing their religious responsibilities; it will desecrate and destroy all sense of safety in what is supposed to be a peaceful and holy space for congregants; and, if such action results in the removal of any person from the property, or in the further decline in attendance among congregants, it will prevent Plaintiffs' congregations and members from engaging in communal worship with all members of their community—including, but not limited to, those who are immigrants and those without lawful status.  Likewise, an enforcement action directed at social service ministries on church or synagogue property will prevent Plaintiffs' congregations and members from carrying out their religious mission of welcoming and serving all immigrants without regard to status—either through direct interruption of worship or through a further decline in ministry participation by service recipients.

166.    The rescission of the sensitive locations policy is already substantially burdening Plaintiffs' religious exercise.  Many of their congregations have experienced a decrease in attendance at worship services and/or outreach ministries since the rescission, with congregants and those served by the ministries conveying that they are too afraid to visit churches and

synagogues due to the looming threat of immigration enforcement action.  By reducing the number and diversity of worshippers and people served through ministries, and by interfering with the ability of Plaintiffs' congregations and members to practice communally in accordance with their religious beliefs, the rescission substantially burdens Plaintiffs' religious exercise.

167.    The rescission of the sensitive locations policy also substantially burdens the religious exercise of Plaintiffs' congregations and members by forcing them to make an impossible choice: either refrain from welcoming immigrants to worship and participate in their outreach ministries, or put their congregants and others they serve at risk of arrest and deportation, despite their religious obligation to love and protect them as some of their most vulnerable neighbors.  Both options violate Plaintiffs' religious beliefs.

168.    Finally, in response to the policy rescission, many of Plaintiffs' congregations and members have implemented, or are considering implementing, changes to the way they conduct their worship services, church activities, and outreach ministries—such as locking church and synagogue doors, moving services online, or being less public about their immigrant-focused ministries.  Such measures also run afoul of their faith-based mission to provide fellowship, spiritual growth, and community support to their neighbors, and therefore also constitute a substantial burden on religious exercise.

169.    Defendants cannot meet their burden of showing that the rescission of the decades-old sensitive locations policy is necessary to "further[] a compelling government interest" or that it is "the least restrictive means of furthering" any such interest.  42 U.S.C. § 2000bb-1.  Among other things, as past enforcement regimes have shown, the government may achieve robust immigration enforcement through measures far less burdensome on Plaintiffs' religious exercise rights.

170.    Defendants' violation of RFRA is causing ongoing, irreparable harm to Plaintiffs, their congregations, and their members.

### Count II

### First Amendment—Freedom of Expressive Association

171.    Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

172.    The First Amendment protects against government interference in the freedom of expressive association—including association for the purpose of engaging with others in protected religious exercise, speech, or peaceable assembly.  Conduct that prevents or significantly burdens expressive association unconstitutionally interferes with these rights.  *See Pathfinder Fund v. Agency for Int'l Dev.*, 746 F. Supp. 192, 195 (D.D.C. 1990) (quoting *Lyng v. Int'l Union*, 485 U.S. 360, 366, 367 n.5 (1988)).

173.    Plaintiffs engage in expressive association when their religious leaders, congregants, and other participants assemble for religious worship and instruction, for the exchange of religious ideas and experiences, and for social service ministries that put their faith into action. Animating these associations are Plaintiffs' central and sincerely held religious beliefs in providing sanctuary, welcoming the stranger, caring for one's neighbor, and worshipping God in community, among others.  These beliefs extend to the inclusion of immigrants in church services and activities, regardless of legal status.

174.    With the rescission of the sensitive locations policy, and against the backdrop of statutory and regulatory enforcement authorities, DHS has licensed its agents to enter places of worship and to detain, question, and arrest religious leaders, congregants, and others inside. Particularly in light of the reported arrest quotas placed on ICE offices and the recent wave of

immigration arrests and detentions, Plaintiffs face an imminent risk of an enforcement action, including during religious services, gatherings, and ministries.

175.    The threat of enforcement action has and will continue to exact a "chilling effect" that substantially burdens Plaintiffs' association. Plaintiffs' congregations and members have already experienced a reduction in attendance at many religious services and other religious activities, arising from attendants' fears over immigration enforcement actions at houses of worship. Plaintiffs' congregations and members have experienced direct and substantial impacts to the sanctuary, security, and atmosphere of openness that is central to their religious worship. They have begun or have considered reducing outward expressions of their faith, including being less public about the times and locations of religious services and about immigrant-focused ministries. They have also implemented, or have considered implementing, security measures such as locking church and synagogue doors or monitoring arrivals to services. These effects, among others, impede Plaintiffs' abilities to gather for communal worship, share religious ideas and experiences, and otherwise express their religious beliefs.

176.    The execution of an immigration enforcement action at or near Plaintiffs' churches and synagogues will inflict devastating, direct, and substantial harms to the ability of Plaintiffs' congregations and members to join with others to worship, gather, and profess their faith. Such enforcement action will constitute an immediate disruption to Plaintiffs' association for the purpose of religious exercise, assembly, and expression of religious belief. It will also exacerbate the chilling effect already occurring.

177.    Defendants cannot show that immigration enforcement action at Plaintiffs' places of worship serves a compelling state interest "that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

As past enforcement regimes have shown, the government may achieve robust immigration enforcement through measures far less burdensome on Plaintiffs' First Amendment rights.

178.    Defendants' violation of the First Amendment is causing ongoing, irreparable harm to Plaintiffs, their congregations, and their members.

### Count III

### Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A)

179.    Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

180.    Under the Administrative Procedure Act ("APA"), a court shall "hold unlawful and set aside agency action" that is arbitrary and capricious.  5 U.S.C. § 706(2).  DHS's rescission of the sensitive locations policy is arbitrary and capricious in numerous ways.

181.    For more than three decades, DHS has maintained a consistent set of policies, *see supra* ¶¶ 59–68, recognizing the critical importance of religious exercise, the serious burden that immigration enforcement in places of worship could impose on communities and persons of faith, and tightly restricting the circumstances in which ICE or CBP (or their predecessor) could undertake such enforcement activities, including arrests.  DHS's hasty determination to rescind its longstanding policy is final agency action because it represents "the consummation of the agency's decisionmaking process," and it both determines rights and obligations and creates "legal consequences."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted).  This Court may review final agency action.  5 U.S.C. § 551(4), (13); 5 U.S.C. § 706.

182.    At a minimum, the APA demands that, prior to upending longstanding policies that have engendered reliance interests, an agency must acknowledge that it is changing course and explain its reasons for doing so.  *Fed. Commc'ns. Comm'n v. Fox Television*, 556 U.S. 502, 515 (2009); *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30–31

(2020). And although review under the arbitrary-and-capricious standard is deferential, a reviewing court must ensure that the agency "has reasonably considered the relevant issues and reasonably explained its decision." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Consideration of the relevant issues must include an "examin[ation of] the relevant data" alongside a "rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983), as well as consideration of the reliance interests of those likely to be impacted by an abrupt policy change, *Regents*, 591 U.S. at 30–31.

183.    The Rescission Memo makes no attempt to comply with these minimum standards. It fails to articulate any rationale whatsoever for upending its longstanding policy to abstain from certain enforcement actions in sensitive locations like houses of worship and religious ceremonies. It likewise fails to cite any relevant data supporting the need to conduct arrests, raids, and other enforcement actions in these locations, or to justify DHS's assertion that "criminals" are hiding in churches and synagogues. Nor does the agency endeavor to connect the facts to its choice to rescind longstanding policy.

184.    The Rescission Memo likewise fails to acknowledge, much less consider, the reliance interests of the communities and individuals already being harmed by its decision to overturn its prior practice. It makes no mention of the substantial religious burden imposed by immigration enforcement actions in these sensitive locations.

185.    DHS also failed to consider any alternative, less-burdensome means by which it could accomplish its legitimate governmental interests.

186.    For all these reasons, among others, DHS's abrupt rescission of the sensitive locations policy is arbitrary and capricious.

187.    Defendants' violation of the APA is causing ongoing, irreparable harm to Plaintiffs, their congregations, and their members.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

a.    A declaration that 8 U.S.C. §§ 1226(a) and 1357(a), along with relevant implementing regulations and as interpreted by DHS to permit immigration enforcement activities in or near places of worship or during religious ceremonies, impose a substantial burden on Plaintiffs' and their members' exercise of religion, and do not reflect the least restrictive means to accomplish a compelling government interest, and thus violate the Religious Freedom Restoration Act as applied to Plaintiffs, their congregations, and their members;

b.    A declaration that 8 U.S.C. §§ 1226(a) and 1357(a), along with relevant implementing regulations and as interpreted by DHS to permit immigration enforcement activities in or near places of worship or during religious ceremonies, violate the First Amendment rights of Plaintiffs, their congregations, and their members;

c.    A preliminary and permanent injunction prohibiting DHS and its subcomponents, their officials, agents, employees, assigns, and all persons acting in concert with them, from carrying out immigration enforcement activities, including but not limited to activities authorized by 8 U.S.C. §§ 1226(a) and 1357(a) and relevant regulations, at Plaintiffs' places of worship or during religious ceremonies, absent

        exigent circumstances or the existence and planned execution of a judicial

        warrant;

d.      A preliminary and permanent injunction prohibiting DHS and its subcomponents,

        their officials, agents, employees, assigns, and all persons acting in concert with

        them, from effectuating the 2025 Rescission Memo purporting to rescind DHS's

        longstanding sensitive locations policy, and further requiring that the procedures

        and policies set forth in the 2021 sensitive locations policy be maintained unless

        and until DHS revises that policy in a manner consistent with applicable laws and

        regulations;

e.      An order setting aside, vacating, and remanding the 2025 Rescission Memo as

        arbitrary and capricious and as issued without observance of procedures required

        by law, *see* 5 U.S.C. §706(2)(A), (D);

f.       An award to Plaintiffs of reasonable costs and attorneys' fees, to the greatest

        extent authorized by law; and

g.      Such other and further relief that this Court may deem fit and proper.


February 11, 2025                  Respectfully submitted,

                               /s/ *Kelsi Brown Corkran*
                               Kelsi Brown Corkran (Bar No. 501157)
                               Shelby B. Calambokidis (Bar No. 1684804)
                               Julia Gegenheimer* (NY Bar No. 4949475)
                               Alexandra Lichtenstein (Bar No. 1724947)
                               Kate Talmor* (Maryland Bar)
                               INSTITUTE FOR CONSTITUTIONAL ADVOCACY
                                 AND PROTECTION
                               600 New Jersey Avenue, NW
                               Washington, DC 20001
                               (202) 661-6728

                               *Attorneys for Plaintiffs*

*Pro hac vice application forthcoming. DC Bar application pending, practice pursuant to Rule 49(c)(8), DC Courts, and supervised by DC Bar member.