**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

     *v.*

                                        Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

**<u>MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................................ii

INTRODUCTION ..............................................................................................................................1

FACTUAL BACKGROUND...............................................................................................................2

    I.     Plaintiffs' Religious Duty to Welcome and Serve Immigrants ...................................2

    II.    DHS's Thirty-Year Sensitive Locations Policy ...........................................................4

    III.   DHS's New Enforcement Policy .................................................................................8

LEGAL STANDARDS.....................................................................................................................11

ARGUMENT..................................................................................................................................12

    I.     Plaintiffs Have Standing To Challenge DHS's New Enforcement Policy ...........................12

        A. DHS's New Enforcement Policy Injures Plaintiffs ........................................................12

        B. Plaintiffs' Injuries Are Caused By DHS's Abrupt Adoption Of Its New Enforcement
           Policy.........................................................................................................................15

        C. An Injunction Will Redress Further Injury During This Litigation. ....................................15

    II.    Plaintiffs Are Likely To Succeed On The Merits Of Their Claims .......................................16

        A. Plaintiffs Are Likely To Succeed On Their RFRA Claim ................................................16

          1.  Plaintiffs have shown a substantial burden on their religious exercise. ...........................16

          2.  DHS's new enforcement policy cannot satisfy strict scrutiny. ........................................21

        B. Plaintiffs Are Likely To Succeed On Their First Amendment Claim ................................23

          1.  Plaintiffs' expressive association is significantly burdened by DHS's new enforcement
             policy.....................................................................................................................23

          2.  Defendants cannot satisfy exacting scrutiny. ....................................................................26

        C. DHS's Rescission of Its Longstanding Sensitive Locations Policy Was Arbitrary And
           Capricious.................................................................................................................26

    III.   Plaintiffs Are Irreparably Harmed By DHS's New Enforcement Policy ..............................30

    IV.   The Balance Of Equities And Public Interest Favor Plaintiffs' Request For A Preliminary
        Injunction...................................................................................................................32

    V.    The Court Should Enjoin DHS From Further Burdening Plaintiffs' Religious Exercise And
        Stay The Effective Date of the Rescission Memo ......................................................33

CONCLUSION...............................................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014) ................................................................ 11

*Abdulhaseeb v. Calbone*, 600 F.3d 1301 (10th Cir. 2010) ................................................... 20

*Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) ................................... 23, 24, 26

*Bates v. City of Little Rock*, 361 U.S. 516 (1960) ............................................................... 24

*Bennett v. Spear*, 520 U.S. 154 (1997) ...................................................................... 15, 27, 28

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) ............................................................... 24

*Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011) ........................................................... 22

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ........................... 16, 17, 20, 21, 22

*Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284 (D.D.C. 2020) ........... 16, 18, 31, 32

*Chamber of Com. of U.S. v. E.P.A.*, 642 F.3d 192 (D.C. Cir. 2011) ................................... 15

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ........... 31

*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ........... 28, 29, 30

*Dep't of Homeland Security v. Regents of the Univ. of California*, 591 U.S. 1 (2020) ........... 29

*District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1 (D.D.C. 2020) ........... 32, 34

*Emp. Div. v. Smith*, 494 U.S. 872 (1990) ........................................................................... 16, 17

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414 (2021) ................... 28

*Fellowship of Christian Athletes v. D.C.*, 2024 WL 3400104 (D.D.C. July 11, 2024) ........... 22, 30

*Fifth Ave. Presbyterian Church v. City of N.Y.*, 2004 WL 2471406 (S.D.N.Y. Oct. 29, 2004) ........... 18

*Fulton v. City of Phila.*, 593 U.S. 522 (2021) ................................................................... 24

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) ........... 11, 21, 33

*Healy v. James*, 408 U.S. 169 (1972) ................................................................................... 24

*Henderson v. Kennedy*, 253 F.3d 12 (D.C. Cir. 2001) ........................................................ 17, 18

*Holt v. Hobbs*, 574 U.S. 352 (2015) ..................................................................................... 21

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ............................................................. 12

*Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008).............................................................................. 17

*Karem v. Trump*, 960 F.3d 656 (D.C. Cir. 2020) ........................................................................................ 32

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) ............................................................................. 22

*League of Women Voters v. Newby*, 838 F. 3d 1 (D.C. Cir. 2016) ............................................................. 32

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ......................................................................................... 12

*Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582 (D.C. Cir. 2023) ........................ 15

*Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29 (1983) .............................................................28, 30

*N. Mariana Islands v. United States*, 686 F. Supp. 2d 7 (D.D.C. 2009) ..................................................... 32

*Nat'l Ass'n for Advancement of Colored People v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958)................. 26

*Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415 (1963)....................................... 24

*Nat'l En't. Dev. Ass'n Clean Air Project v. EPA*, 752 F.3d 999 (D.C. Cir. 2104) ..................................... 28

*People for the Ethical Treatment of Animals v U.S. Dep't of Agric.*, 797 F.3d 1087 (D.C. Cir. 2015) .......... 12

*Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989) ....................................19, 25

*Quaker Action Grp. v. Hickel*, 421 F.2d 1111 (D.C. Cir. 1969) ................................................................. 30

*Religious Sisters of Mercy v. Becerra*, 55 F.4th 583 (8th Cir. 2022)........................................................... 30

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) .....................................................................................23, 26

*Roman Cath. Archbishop of Wash. v. Bowser*, 531 F. Supp. 3d 22 (D.D.C. 2021)...................................... 20

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020)..................................................18, 20, 30

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47 (2006) ..................................................... 24

*Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26 (1976) .............................................................................. 15

*Singh v. Berger*, 56 F.4th 88 (D.C. Cir. 2022).................................................... 21, 22, 30, 31, 32, 33

*Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023) ........................................................................................ 26

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ............................................................................................. 12

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590 (2016) ..................................................27, 28

*Warth v. Seldin*, 422 U.S. 490 (1975) ................................................................................ 15

*Widmar v. Vincent*, 454 U.S. 263 (1981) ............................................................................ 23

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .................................................. 11


**Statutes**

5 U.S.C. § 551 ...................................................................................................................... 27

5 U.S.C. § 705 ...................................................................................................................... 34

5 U.S.C. § 706 ...................................................................................................................... 27

8 U.S.C. § 1103 ...................................................................................................................... 4

8 U.S.C. § 1226 ...................................................................................................................... 5

8 U.S.C. § 1231 ...................................................................................................................... 5

8 U.S.C. § 1357 ...................................................................................................................... 5

42 U.S.C. § 2000bb ............................................................................................................. 16

42 U.S.C. § 2000bb-1 .............................................................................................. 16, 21, 22

42 U.S.C. § 2000bb-2 ................................................................................................... 17, 21

42 U.S.C. § 2000cc-5 ........................................................................................................... 17


**Other Authorities**

Lalee Ibssa et al., Trump Vows Mass Deportation of Protected Migrants in Springfield, Dismisses
    Threats to Town, ABC News (Sept. 13, 2024), https://abcnews.go.com/Politics/trump-vows-
    mass-deportation-migrants-springfield-dismisses-threats/story?id=113661663 ............................. 10

Press Release, Department of Homeland Security, DHS Announces Nationwide and International
    Ad Campaign Warning Illegal Aliens to Self-Deport and Stay Out (Feb. 17, 2025),
    https://www.dhs.gov/news/2025/02/17/dhs-announces-ad-campaign-warning-illegal-aliens-self-
    deport-and-stay-out ....................................................................................................................... 10

Press Release, Department of State, Ending Illegal Immigration in the United States (Jan. 26, 2025),
    https://www.state.gov/ending-illegal-immigration-in-the-united-states ............................................ 10

@RealTomHolman, Twitter (X) (Feb. 17, 2025 3:55 PM),
    https://x.com/RealTomHoman/status/1891592453897191690 ....................................................... 10

Unitarian Universalist Association, *Bylaws and Rules* (June 23, 2024),
    https://www.uua.org/files/2024-09/uua_bylaws_06232024.pdf ....................................................... 3

## INTRODUCTION

Plaintiffs are 12 national denominational bodies and representatives, 4 regional denominational bodies, and 11 denominational and interdenominational associations, all rooted in the Jewish and Christian faiths.  Plaintiffs, their members, and their congregations (collectively, "Plaintiffs") represent millions of people of faith across dozens of religious traditions:  Baptists, Brethren, Conservative Jews, Episcopalians, Evangelicals, Mennonites, Quakers, Pentecostals, Presbyterians, Reconstructionist Jews, Reform Jews, Unitarian Universalists, United Methodists, Zion Methodists, and more.  They join together to bring this suit in response to an unprecedented assault on their religious exercise by the Department of Homeland Security ("DHS").

For three decades, DHS's official policy substantially restricted immigration enforcement or investigative activity in or near places of worship.  Although DHS has statutory authority to conduct a variety of enforcement actions—such as conducting stops and interrogations, serving process and other orders, and executing immigration arrests and raids without judicial warrant—DHS's longstanding "sensitive locations" (or "protected areas") policy provided that Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP") would do so at or near places of worship only under exigent circumstances or with prior written, high-level supervisory approval.

On January 20, 2025, DHS abruptly reversed course and rescinded the sensitive locations policy.  DHS's new enforcement policy simply directs ICE and CBP officers to "use [their] discretion along with a healthy dose of common sense" in deciding whether to conduct immigration enforcement actions at places of worship, during religious ceremonies, and at other sensitive locations.  As Plaintiffs' declarations establish, immigration agents already have begun exercising this newfound authority to snare worshippers and other visitors at Plaintiffs' places of worship, inflicting grave harm on Plaintiffs' ability to freely exercise their religious beliefs and to assemble.  Absent preliminary relief, these enforcement activities in and near sacred spaces will multiply and so, too, will the intense burden this government action places on Plaintiffs' religious exercise.

DHS's authorization of immigration enforcement action at Plaintiffs' places of worship and religious ceremonies, in the absence of exigent circumstances or a judicial warrant, violates Plaintiffs' rights under the Religious Freedom Restoration Act ("RFRA") and the First Amendment. The burden imposed on Plaintiffs' religious exercise by the looming threat of immigration enforcement action at their places of worship and during their religious ceremonies is profound, as is the interference such action causes to Plaintiffs' expressive association. Whatever compelling interest DHS may have in enforcing immigration law, it cannot meet its burden of demonstrating that its interference with Plaintiffs' religious practices is the least restrictive means of serving that interest.

DHS's abrupt rescission of its sensitive locations policy also flouts legal constraints on agency action. Before reversing longstanding policy, an agency must recognize that it is changing course, reasonably explain its rationale for adopting the new policy, consider reliance interests that the previous policy may have engendered, and grapple with alternatives. DHS made no attempt to engage in such a considered approach.

Plaintiffs are likely to succeed on the merits of their claims. As shown herein, Plaintiffs already are suffering irreparable harm from DHS's activities and will suffer immeasurable further harm if DHS is not enjoined from continuing to burdening Plaintiffs' religious beliefs. And the balance of equities and public interest tilt sharply in Plaintiffs' favor. This Court should preliminarily enjoin DHS from conducting immigration enforcement activities in or near Plaintiffs' places of worship or religious ceremonies, and should stay the effective date of DHS's rescission of its 30-year policy.

## FACTUAL BACKGROUND

### I.    Plaintiffs' Religious Duty to Welcome and Serve Immigrants

Although Plaintiffs represent a wide range of Jewish- and Christian-rooted faiths, they are united in their belief that every human being—without exception—is created in God's image (Genesis 1:27). Welcoming and serving the stranger, or immigrant, is thus a central tenet of each of Plaintiffs' religious practices.

2

The Torah, the most sacred and central document of Judaism, lays out this command 36 times, more than any other teaching: "The stranger who resides with you shall be to you as one of your citizens; you shall love them as yourself, for you were strangers in the land of Egypt" (Leviticus 19:34). The history of the Jewish people, from escaping slavery in Egypt to the horrors of the Holocaust, reinforces the many struggles faced by immigrants throughout the world. The Jewish religious mandate that comes out of these traumatic times is not simply to protect the Jews in various lands, but to serve and defend all who are vulnerable and oppressed. As a community of immigrants, Jews are charged by God to pursue justice, to build a society that is welcoming to all of God's creatures, and to provide support and shelter to other immigrants regardless of legal status.

The Christian and Christian-rooted Plaintiffs receive from Judaism the Hebrew Bible's exhortation to welcome, protect, and care for the exiles and refugees who become our neighbors through displacement. They further embrace the Gospel of Jesus Christ, who not only echoed this command, but self-identified with the stranger: "For I was hungry, and you gave me food, I was thirsty, and you gave me drink, I was a stranger, and you welcomed me" (Matthew 25:35). Indeed, Jesus became a refugee in Egypt after Herod's persecution forced Mary and Joseph to flee their home (Matthew 2:1-15). Their Biblical call to love their neighbors (Luke 10:25-28; John 13:34; 1 John 4:7), to care for strangers and foreigners (Exodus 22:21; Leviticus 24:22; Deuteronomy 10:18-19; Deuteronomy 24:17-18; Jeremiah 22:3), and to show hospitality (Genesis 18:1-8; Luke 10:29-37; Romans 12:13; Hebrews 13:1-2), makes no distinction based on immigration status.[1]

---

[1] The Unitarian Universalists ("UU") represented by the Unitarian Universalist Association ("UUA") recognize Jesus's teachings and Biblical guidance as prophetic and primary sources of wisdom, without requiring any credal tests related to their divinity; these teachings belong to the core sources of faithful inspiration in the UU Living Tradition. As a tradition with historical roots in Christianity, Christian imperatives for hospitality and to care for one's neighbor are reflected in the UUA's shared religious values, which covenant to "declare that every person is inherently worthy and has the right to flourish with dignity, love, and compassion," to "build and sustain fully accessible and inclusive communities," and to "protect Earth and all beings from exploitation." Unitarian Universalist Association, *Bylaws and Rules* 1 (June 23, 2024), https://www.uua.org/files/2024-09/uua_bylaws_06232024.pdf.

In short, Judeo-Christian scripture, theology, and tradition demonstrate clear and irrefutable unanimity on Plaintiffs' religious duty to welcome, serve, and protect the undocumented immigrants in their midst. Plaintiffs take this duty seriously. They emphatically reject any citizenship or documentation requirement for membership or participation in their religious communities: *All* are welcome to participate in their worship services, social service ministries, and other religious activities, regardless of immigration status. *See, e.g.*, Ex. 26, Oh Decl. ¶ 8; Ex. 6, Lippe Decl. ¶ 3; Ex. 13, Rojas Decl. ¶ 8; Ex. 25, Doe # 8 Decl. ¶ 8 ("We make no distinction between human beings on those terms . . . ."). Many of Plaintiffs' congregations affirmatively communicate to their congregants and communities, through physical signs and social media, that immigrants are welcome, safe, and loved in their churches and synagogues. *See, e.g.*, Ex. 3, Palmer Decl. ¶ 9; Ex. 6, Lippe Decl. ¶ 7; Ex. 24, Crossno Decl. ¶ 7; Ex. 62, Doe # 24 Decl. ¶ 11; Ex. 31, Wailoo Decl. ¶ 9. Many have undocumented congregants. *See, e.g.*, Ex. 33, Malavé Decl. ¶ 9; Ex. 37, Carlson Decl. ¶ 8; Ex. 12, Rincones Decl. ¶ 8; Ex. 21, Reeves Decl. ¶ 8; Ex. 35, Everett Decl. ¶ 7; Ex. 39, Doe # 15 Decl. ¶ 6; Ex. 18, Reddall Decl. ¶5; Ex. 46, Dease Decl. ¶ 8. Many have social service ministries— English language classes, food distribution centers, clothing pantries, health care clinics, legal services—that bring undocumented people into their churches and synagogues on a regular basis. *See, e.g.*, Ex. 49, Blumenthal Decl. ¶ 9; Ex. 3, Palmer Decl. ¶ 10; Ex. 12, Rincones Decl. ¶ 9; Ex. 56, Johnson Decl. ¶ 10; Ex. 21, Reeves Decl. ¶¶ 9–12; Ex. 42, Cook Decl. ¶ 8. All understand this integration of undocumented neighbors into the life and service of their congregations as "core" to their mission and a "key element of [their] religious practice." Ex. 1, Sadler Decl. ¶ 11; *see also* Ex. 53, Doe # 19 Decl. ¶ 6 (describing housing immigrants as "vital" to their work and religious teachings).

## II.     DHS's Thirty-Year Sensitive Locations Policy

The Department of Homeland Security ("DHS") is the Executive Branch agency with principal responsibility to enforce the nation's immigration laws. *See* 8 U.S.C. § 1103(a)(1). Although Congress granted DHS statutory authority to conduct a variety of immigration

enforcement actions—such as conducting stops and interrogations, serving process and other orders, detaining individuals subject to removal, and executing immigration arrests and raids without judicial warrant, *see* 8 U.S.C. §§ 1226(a), (c)(1); 1231(a)(1)(A), (2); 1357(a)(1), (2)—DHS long has acknowledged the need to conduct those activities mindful of the potential burden on impacted communities.

In particular, recognizing the importance of communal religious practices "to the well-being of people and the communities of which they are a part," DHS for over 30 years substantially restricted immigration enforcement action and investigative activity at places of worship. *See* Compl., Ex. 2, ECF No. 1-2, Memorandum from Alejandro N. Mayorkas, Sec'y, Dep't of Homeland Sec., "Guidelines for Enforcement Actions in or Near Protected Areas" 2 (Oct. 27, 2021) ("2021 Memo"). Its longstanding "sensitive locations" (or "protected areas") policy thus provided that Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP") would conduct enforcement activity at or near places of worship only under exigent circumstances or with prior written, high-level supervisory approval.

This policy dates back at least through the early 1990s. In 1993, the Acting Associate Commissioner for Operations of the Immigration and Naturalization Service, the predecessor of ICE, issued a memorandum confirming that it was the agency's "policy . . . to attempt to avoid apprehension of persons and to tightly control investigative operations on the premises of . . . places of worship, funerals and other religious ceremonies." Compl., Ex. 6, ECF No. 1-6, Memorandum from James A. Puleo, Acting Assoc. Comm'r, Immigration & Naturalization Serv., "Enforcement Activities at Schools, Places of Worship, or at Funerals or Other Religious Ceremonies" 1 (May 17, 1993) ("1993 Memo"). Specifically, the memo required officers to receive prior written approval by a district director or chief patrol agent before conducting any "[e]nforcement operations which are likely to involve apprehensions on the premises" of a place of worship or the site of a funeral or other religious ceremony, unless exigent circumstances existed. *Id.* In determining whether to grant prior approval for a proposed enforcement action at a sensitive location, the memo instructed designated high-level decisionmakers to consider factors such as the availability of alternative

measures, the importance of the enforcement objective, and whether, and how, agents could minimize the impact on the operation of the place of worship. *Id.* at 2. It further directed that, in the unusual situation where exigent circumstances required an agent to enter a place of worship without prior written approval, the action must be immediately reported to headquarters. *Id.*

In 2008, the Assistant Secretary of ICE issued field guidance reiterating the importance of the existing policy prohibiting apprehensions in sensitive locations, and affirming its direction that officers should "[a]ttempt to avoid apprehension of persons and to tightly control investigative operations on the premises of . . . places of worship, funerals and other religious ceremonies." Compl., Ex. 5, ECF 1-5, Memorandum from Julie L. Myers, Assistant Sec'y, ICE, "Field Guidance on Enforcement Actions or Investigative Activities at or Near Sensitive Community Locations" 1 (July 3, 2008) ("2008 Memo") (quoting 1993 Memo). The guidance left in place the 1993 memo but provided additional detail outlining the high bar for ICE personnel "to act at or near sensitive locations," including places of worship or the site of religious ceremonies, and confirmed that appropriate justification would include situations such as "terrorism-related investigations, matters of public safety, or [investigative] actions where no enforcement activity is involved." *Id.* at 2. The field guidance specified that, even in these exceptional circumstances, pre-approval from "the appropriate Headquarters program office" was required. *Id.*

In 2011, the Director of ICE issued a memo that superseded the prior policy but maintained tight restrictions on enforcement activity at sensitive locations. Compl., Ex. 4, ECF 1-4, Memorandum from John Morton, Dir., ICE, "Enforcement Actions at or Focused on Sensitive Locations" (Oct. 24, 2011) ("2011 Memo"). As that memo explained, ICE's policy was "to ensure these enforcement actions do not occur at nor are focused on sensitive locations such as schools and churches" without prior high-level written approval, absent exigent circumstances such as terrorism, imminent risk of death or physical harm, pursuit of a dangerous felon, or an imminent risk of destruction of evidence material to a criminal case. *Id.* at 1-3. The memo explicitly defined "enforcement actions covered by this policy" to include "(1) arrests; (2) interviews; (3) searches; and (4) for purposes of immigration enforcement only, surveillance." *Id.* at 1. The advanced written

permission necessary to conduct arrests at a sensitive location, absent exigent circumstances, required high-level approval from one of four designated Headquarters-level officials. *Id.* at 2. The Deputy Commissioner of CBP issued similar guidance in 2013. Compl., Ex. 3, ECF 1-3, Memorandum from David V. Aguilar, Deputy Comm'r, CBP, "U.S. Customs and Border Protection Enforcement Actions at or Near Certain Community Locations" (Jan. 18, 2013).

In 2021, the Secretary of DHS issued a memo that superseded the prior policies of both ICE and CBP, reaffirmed the government's longstanding policy to refrain from enforcement in sensitive locations, and expanded its scope. 2021 Memo at 1-5. Recognizing the profound impact that immigration enforcement can have on people's lives and broader societal interests, the 2021 Memo directed that, "[t]o the fullest extent possible," ICE and CBP "should not take an enforcement action in or near a location that would restrain people's access to essential services or engagement in essential activities." *Id.* at 2. It described this principle as "fundamental." *Id.* It further emphasized that DHS "can accomplish [its] enforcement mission without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more." *Id.*

The 2021 Memo offered a non-exhaustive list of sensitive locations (or "protected areas") where such essential services or activities take place and enforcement activity should be avoided, including churches, schools, hospitals, and social service establishments. *Id.* at 2-3. As relevant here, that list specifically included "[a] place of worship or religious study, whether in a structure dedicated to activities of faith (such as a church or religious school) or a temporary facility or location where such activities are taking place" as well as "[a] place where a funeral, . . . rosary, wedding, or other religious . . . ceremonies or observances occur." *Id.* at 2. The policy also recognized that enforcement action that is not taken "in" a sensitive location may still have the same restraining effect on an individual's access to the location itself if conducted "near" the location, and instructed agents to avoid enforcement action near such spaces to the fullest extent possible. *Id.* at 3. It further reiterated the agency's policy to abstain from not only apprehensions, but also certain investigative activities, in sensitive locations. Activities covered by the policy "include[d], but [were]

7

not limited to, . . . arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance." *Id.* at 4.

As had been the case for decades, the 2021 Memo acknowledged that exigent circumstances might require officers to undertake immigration enforcement at sensitive locations without prior written approval. *Id.* at 3. It provided examples of the narrow types of circumstances in which that exception would apply, such as where "[a] safe alternative location does not exist"; where the enforcement action involves "a national security threat," "an imminent risk of death, violence, or physical harm to a person," "[t]he hot pursuit of an individual who poses a public safety threat," or "a personally observed border-crosser"; or "an imminent risk that evidence material to a criminal case will be destroyed." *Id.* at 4. Like the prior policies, the 2021 Memo required agents promptly to report to headquarters any enforcement undertaken at a sensitive location without prior authorization. *Id.* And even where exigent circumstances precluded prior approval, the 2021 Memo instructed that, "[t]o the fullest extent possible," any enforcement action in or near a sensitive location "should be taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing" the sensitive location. *Id.*

## III.    DHS's New Enforcement Policy

On January 20, 2025, shortly after President Trump was sworn into office, DHS Acting Secretary Benjamine Huffman issued a new memorandum that rescinded the 2021 Memo and jettisoned the government's decades-old sensitive locations policy. *See* Compl., Ex. 1, ECF 1-1, "Enforcement Actions in or Near Protected Areas" (Jan. 20, 2025) ("Rescission Memo"). DHS did not publish the memo on its website; instead, the rescission was first reported by a news outlet that explained it had received a draft of the memo. Compl. ¶ 69. DHS later issued a press release confirming it had rescinded the sensitive locations policy, but it still has not formally published the Rescission Memo. *Id.*

The Rescission Memo abruptly ends DHS's policy of prohibiting immigration enforcement activities in sensitive locations in the absence of exigent circumstances or prior written, high-level supervisory approval.  Disavowing the need for any "bright line rules regarding where our immigration laws are permitted to be enforced," the Rescission Memo instead directs ICE and CBP to "use [their] discretion along with a healthy dose of common sense" in deciding whether to conduct a law enforcement action at a sensitive location.  Rescission Memo at 1.  It does not include any acknowledgment of the rationales that motivated the 30-year policy prohibiting arrests in houses of worship or during religious ceremonies, and it does not point to any evidence that the government's previous policy of abstention had thwarted legitimate immigration enforcement interests.

Because the Rescission Memo places no boundaries on where immigration agents may engage in enforcement activities, ICE and CBP agents now have unconstrained authority to undertake enforcement actions at or near places of worship.  In its Press Release announcing DHS's new enforcement policy, a DHS spokesperson explained that "the Trump Administration will not tie the hands of our brave law enforcement, and instead trusts them to use common sense."  Compl. ¶ 72.  DHS's website features a news article stating that ICE agents understand the rescission "to free them up to go after more illegal immigrants."  *Id.*

The purpose of DHS's new enforcement policy is to facilitate the agency's efforts to accomplish President Trump's goal of deporting *all* undocumented immigrants in the United States during his current four-year term as part of the "the largest deportation in the history of our

country."[2]  This mass deportation of all "citizens who are illegally present in the United States" will be undertaken "in a serious and expeditious manner."[3]

Federal officials have confirmed that the Trump Administration's mass deportation plan includes undocumented immigrants with no criminal record.  Compl. ¶ 73.  In emphasizing the president's "countless" statements that "he is focused on launching the largest mass deportation operation in American history of illegal criminals," the White House Press Secretary claimed that "if you are an individual, a foreign national, who illegally enters the United States of America, you are, by definition, a criminal."  *Id.*  Accordingly, DHS promises: "If you are here illegally, we will find you and deport you.  You will never return."[4]

To achieve this goal, President Trump's "border czar" Tom Homan has explained, DHS will conduct enforcement actions "across the country, uninhibited by any prior administration guidelines."  Compl. ¶ 73.  Indeed, over the first week of the Trump Administration, ICE arrested more than 4,500 people, including nearly 1,000 people in a Sunday "immigration enforcement blitz." *Id.* ¶ 74.  A few weeks later, Homan announced, "Interior arrests by ICE have increased more than 137% under President Trump. . . . We are less than a month in and have more to do."[5]

Those numbers are expected to grow: each of the 25 "ICE field offices have been told to meet a quota of 75 arrests per day," a number that far exceeds the arrests made during previous

---

[2] Lalee Ibssa et al., *Trump Vows Mass Deportation of Protected Migrants in Springfield, Dismisses Threats to Town*, ABC News (Sept. 13, 2024), https://abcnews.go.com/Politics/trump-vows-mass-deportation-migrants-springfield-dismisses-threats/story?id=113661663 [https://perma.cc/75AL-JXKF]; *see also* Compl. ¶ 73.

[3] Press Release, Department of State, Ending Illegal Immigration in the United States (Jan. 26, 2025), https://www.state.gov/ending-illegal-immigration-in-the-united-states [https://perma.cc/L3U2-7A3K].

[4] Press Release, Department of Homeland Security, DHS Announces Nationwide and International Ad Campaign Warning Illegal Aliens to Self-Deport and Stay Out (Feb. 17, 2025), https://www.dhs.gov/news/2025/02/17/dhs-announces-ad-campaign-warning-illegal-aliens-self-deport-and-stay-out [https://perma.cc/4X6X-QKHE].

[5] @RealTomHolman, Twitter (X) (Feb. 17, 2025 3:55 PM), https://x.com/RealTomHoman/status/1891592453897191690 [https://perma.cc/3RKS-TLTA].

Administrations.  Compl. ¶ 74.  Experts believe that the reported quotas imposed on ICE officers will "significantly increase the chance that officers will engage in more indiscriminate enforcement tactics," including targeting easy-to-access locations and immigrants who have not committed crimes.  *Id.* ¶ 77.  A former ICE chief counsel explained that "[q]uotas will incentivize ICE officers to arrest the easiest people to arrest, rather than the people that are dangerous noncitizens."  *Id.*

As promised, the wave of enforcement actions has not been limited to people with criminal records or pending charges.  Those arrested in the first week of the new Trump Administration included an individual who had been in the United States for a year and a half, had no criminal record outside of a traffic violation, and had an asylum application pending.  Compl. ¶ 75.  As Homan warned, all undocumented immigrants are "on the table" and "got a problem."  *Id.*  Nor are arrests and detentions limited to those who are actually subject to removal.  During the first week of the Administration, for example, ICE arrested a grandmother, mother, and toddler in Milwaukee after the family was overheard speaking Spanish while shopping—despite the fact that all three were U.S. citizens.  *Id.* ¶ 76.  Not until after the family had been taken into custody and transported to a detention center did officials verify their status and release them.  *Id.*

## LEGAL STANDARDS

A plaintiff seeking preliminary injunctive relief must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "The primary purpose of a preliminary injunction is to preserve … the status quo."  *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (internal quotation marks and citation omitted).  In cases arising under the Religious Freedom Restoration Act, where a showing of religious burden is made, the government must "demonstrate, at the preliminary injunction stage, a compelling interest" and least restrictive means "to strike sensible balances between religious liberty and competing prior governmental interests."  *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 439 (2006) (cleaned up).

# ARGUMENT

## I.    Plaintiffs Have Standing To Challenge DHS's New Enforcement Policy

"The irreducible constitutional minimum of standing" requires a plaintiff to show an "injury in fact" that is "fairly traceable to the challenged action of the defendant" and that "will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks, alteration, and citations omitted). Plaintiffs here have both associational and organizational standing. An association has standing to sue "on behalf of its members" when those members otherwise possess standing to sue in their own right, the interests pressed by the association are germane to its purpose, and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Organizational standing requires a plaintiff to show that actions of the defendant concretely injure the organization's ability to carry out its mission or activities. *People for the Ethical Treatment of Animals v U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015).

### A.    DHS's New Enforcement Policy Injures Plaintiffs

The injury-in-fact required to demonstrate standing must be both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks and citation omitted). A concrete injury "must actually exist"—in other words, it must be "real" rather than "abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). The injury must also personally and individually affect the plaintiff. *Id.* at 339.

Plaintiffs here are injured by DHS's new enforcement policy because it puts them at imminent risk of immigration enforcement action in or near their places of worship, which will profoundly interfere with their religious exercise and expressive association rights. As required by their religious mandate to welcome and serve immigrants without regard to legal status, Plaintiffs regularly welcome undocumented immigrants into their churches and synagogues, either as congregants or recipients of social-service ministries. *See, e.g.*, Ex. 41, Karpen Decl. ¶ 7; Ex. 34, Doe # 13 Decl. ¶ 6; Ex. 57, Doe # 21 Decl. ¶ 7. The Trump Administration has been explicit about its

intent to arrest and deport every one of those undocumented persons over the next four years,

Compl. ¶ 5, and the express purpose of DHS's new enforcement policy is to empower ICE and

CBP to detain individuals in the "sensitive locations" they cannot easily avoid without significant

personal and societal cost—*i.e.*, Plaintiffs' churches and synagogues.

DHS is already conducting enforcement actions in close proximity to Plaintiffs' churches

and synagogues. *See* Ex. 37, Carlson Decl. ¶ 7 (ICE raid down the street from church a few weeks

ago); Ex. 35, Everett Decl. ¶ 6 (significant ICE enforcement within two miles of church since policy

change); Ex. 66, Doe # 26 Decl. ¶ 7 (recent suspected ICE surveillance outside church); Ex. 39,

Doe # 15 Decl. ¶ 5 (ICE raid down the street from church a few weeks ago); Ex. 18, Reddall Decl.

¶ 4 (reported ICE raids near churches over the last month); Ex. 20, Ashby Decl. ¶ 5 (ICE agents

took photos of church's food pantry participants in early February 2025).

Indeed, several Plaintiffs have already experienced ICE enforcement actions at their

churches since the policy rescission. *See* Ex. 32, Doe #12 Decl. ¶ 5 (ICE agents showed up at

worship services and waited for someone to exit the sanctuary); Ex. 46, Dease Decl. ¶ 7 (reporting

ICE agents entering church daycare office on suspicion of undocumented staff member; describing

separate enforcement action next door to a church). And at least one enforcement action that

occurred at a church in Georgia during worship service has been reported by the news media. An

usher standing in the church entrance reportedly saw a group of ICE agents outside and locked the

door. Compl. ¶ 6. The agents said that they were there to arrest Wilson Velásquez, who had

traveled to the United States from Honduras with his wife and three children in 2022. *Id.*

Immediately after crossing the border, they turned themselves in to U.S. authorities and requested

asylum. *Id.* They were given a court date and then released after federal agents cinched a GPS-

tracking monitor on Velásquez's ankle. *Id.* After settling in suburban Atlanta, the family joined a

Pentecostal church where they worshipped several times a week and helped with music*,* and where

they were listening to the pastor's sermon when ICE agents arrived to arrest Velásquez. *Id.*

Although Velásquez had attended all his required check-ins at an Atlanta ICE office and had a court

date scheduled to present his asylum case to a judge, ICE agents arrested him anyway, explaining

that they were "looking for people with ankle bracelets." *Id.*  The pastor, Luis Ortiz, tried to reassure his congregation, but he "could see the fear and tears on their faces." *Id.*

Similar immigration enforcement action during Plaintiffs' worship services, ministry work, or other congregational activities has been and will be devastating to their religious practice.  It shatters the consecrated space of sanctuary, thwarts communal worship, and undermines the social service outreach that is central to Plaintiffs' religious expression and spiritual practice.  Plaintiffs have standing to seek an injunction preventing these profound and imminent injuries from occurring.

Plaintiffs also are injured by the new DHS enforcement policy's ongoing interference with their religious exercise and expressive association rights.  Plaintiffs' churches and synagogues are already experiencing decreases in worship attendance and social services participation due to fear of immigration enforcement action under DHS's new policy.  *See* Ex. 37, Carlson Decl. ¶ 12; Ex. 51, Waxman Decl. ¶ 11; Ex. 49, Blumenthal Decl. ¶ 11; Ex. 1, Sadler Decl. ¶ 12; Ex. 9, Steele Decl. ¶ 12. The new policy is also presently forcing Plaintiffs to make an unconscionable "Hobson's choice": If they continue to welcome immigrants to participate in congregational activities and social service ministries at their churches and synagogues, they make their congregants and visitors an easy target for enforcement action, in abrogation of their religious obligation to love and protect their vulnerable neighbors.  But if they withdraw that welcome by cutting back on their in-person religious services and ministries, they "violate God's commands in favor of human ones."  Ex. 34, Doe # 13 Decl. ¶ 12; *see also* Ex. 12, Rincones Decl. ¶ 17; Ex. 33, Malavé Decl. ¶ 13.

DHS's new enforcement policy has also forced many of Plaintiffs' congregations to undertake measures to protect their congregants and visitors—such as heightening security, locking doors, moving services online, and being less public about their immigrant-focused ministries— which are both costly and in tension with their religious duties of openness and hospitality.  *See* Ex. 52, Noily Decl. ¶ 8; Ex. 21, Reeves Decl. ¶ 16; Ex. 30, Arroyo Decl. ¶ 12; Ex. 58, McDonald Decl. ¶ 10; Ex. 56, Johnson Decl. ¶ 13; Ex. 43, Doe # 16 Decl. ¶ 8.  Plaintiffs' presently occurring injuries to their religious beliefs and association support standing to challenge DHS's new policy.

14

**B. Plaintiffs' Injuries Are Caused By DHS's Abrupt Adoption Of Its New Enforcement Policy**

Causation is established where a plaintiff's injury is "fairly . . . trace[able]" to the defendant's conduct, rather than the result of some independent action by a "party not before the court." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976). "[A]n injury may be 'fairly traceable' to [a government] action that is not 'the very last step in the chain of causation,'" as long as it has a determinative or coercive effect on the injurious outcome. *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 593 (D.C. Cir. 2023) (quoting *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997)). Here, Plaintiffs have shown that DHS's new enforcement policy already has caused drops in worship attendance, *see, e.g.*, Ex. 41, Karpen Decl. ¶ 11–12; Ex. 44, Copeland Decl. ¶ 9; caused them to scale back on social-service ministries, *see, e.g.*, Ex. 30, Arroyo Decl. ¶ 11; Ex. 28, Doe # 10 Decl. ¶ 8; and led them to take protective measures to prevent congregants from being placed at risk should ICE show up to their houses of worship, Ex. 26, Oh Decl. ¶ 11; Ex. 46, Dease Decl. ¶ 13. The injuries inflicted by DHS's rescission already are burdening Plaintiffs' religious exercise. Causation is clear.

**C. An Injunction Will Redress Further Injury During This Litigation**

Redressability requires simply that "if the court affords the relief requested, the [injury] will be removed." *Chamber of Com. of U.S. v. E.P.A.*, 642 F.3d 192, 201 (D.C. Cir. 2011) (alteration in original) (citing *Warth v. Seldin*, 422 U.S. 490, 504 (1975)). The injunction requested by Plaintiffs— which would require DHS to abstain from immigration enforcement in houses of worship or the site of religious ceremonies, absent a judicial warrant or exigent circumstances—would restore Plaintiffs' and their communities' confidence that their sacred spaces remain inviolable. Plaintiffs could continue to welcome their congregants to gather and worship freely; they could continue to operate their service ministries without fearing that such offerings place recipients at an untenable risk of encountering ICE agents; they could worship together peacefully without fearing that their holy spaces may be intruded upon by law enforcement at any moment; and their religious exercise

no longer would be burdened by an ill-conceived decision to upend decades of settled policy that had protected Plaintiffs.  That injunction plainly would redress their injuries.

## II.    Plaintiffs Are Likely To Succeed On The Merits Of Their Claims

### A.    Plaintiffs Are Likely To Succeed On Their RFRA Claim

"In order to ensure broad protection for religious liberty," RFRA provides that the federal government "'shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability.'"  *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694 (2014) (quoting 42 U.S.C. § 2000bb-1(a)).  Congress passed RFRA in response to *Emp. Div. v. Smith*, 494 U.S. 872 (1990), in which the Supreme Court had held that the Free Exercise Clause is not violated by neutral and generally applicable laws that burden an individual's sincere religious beliefs, even when those laws are not supported by a compelling governmental interest.  42 U.S.C. § 2000bb(b)(1); *Hobby Lobby*, 573 U.S. at 693–94.  RFRA restored the compelling interest test by requiring that the "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person" satisfies strict scrutiny—that is, if the burden (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(b); *see also* 42 U.S.C. § 2000bb(a)(2) (finding that "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise").

#### 1.    Plaintiffs have shown a substantial burden on their religious exercise.

Plaintiffs will succeed on their RFRA claim because they are "person[s]" whose "exercise of religion" has been "substantially burden[ed]" by the government.  42 U.S.C. § 2000bb-1(a).  As denominational bodies and nonprofit associations of churches and synagogues (including their congregants and faith leaders), Plaintiffs are "persons" under RFRA.  *See Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 293 n.8 (D.D.C. 2020) ("Although RFRA speaks of a 'person's' exercise of religion, the Supreme Court has confirmed that RFRA protections extend to entities such as

16

churches, nonprofit organizations, and closely held corporations." (citing *Hobby Lobby*, 573 U.S. at 707–08)).

Worshipping together in person as a congregation, welcoming immigrants into their congregations, and serving immigrants in their communities through social service ministries—all without regard to immigrants' legal status—are essential components of Plaintiffs' "exercise of religion" within the meaning of RFRA. Religious exercise "involves 'not only belief and profession but the performance of (or abstention from) physical acts' that are 'engaged in for religious reasons.'" *Hobby Lobby*, 573 U.S. at 710 (quoting *Smith*, 494 U.S. at 877). And it includes "*any* exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A) (emphasis added) (incorporated via *id.* § 2000bb-2(4)). As a fundamental tenet of their faiths, Plaintiffs sincerely believe that they are called to join in fellowship with *all* worshippers, regardless of their immigration statuses, through in-person religious services and activities. *See supra* pp. 2–4. Indeed, Plaintiffs believe that welcoming immigrants, who are some of the most vulnerable members of the community and whose shared humanity is emphasized throughout Judeo-Christian scripture, is a religious imperative. *See id.* So, too, is ministering to and serving immigrants, which stems from Plaintiffs' religious commitment not only to welcome and love their immigrant neighbors as themselves but also to provide support for those in need. *See id.*

The burden imposed on Plaintiffs' religious exercise by DHS's new enforcement policy is also "substantial." A substantial burden exists where the government "forces [plaintiffs] to engage in conduct that their religion forbids" or "prevents them from engaging in conduct their religion requires." *Henderson v. Kennedy*, 253 F.3d 12, 16 (D.C. Cir. 2001). It also exists where "government action puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (internal quotation marks and citation omitted).

Under either metric, DHS's new enforcement policy substantially burdens Plaintiffs' religious exercise in several different ways. The new enforcement policy—which gives ICE and CBP unconstrained discretion to conduct immigration enforcement operations, including raids,

arrests, investigations, and surveillance, in or near houses of worship—poses an imminent risk of injury through actual disruption to worship services or church activities. *See supra* pp. 12–14. Such disruption will not only "desecrate[e congregants] worship space" and destroy all sense of safety therein, Ex. 43, Doe # 16 Decl. ¶ 7, but also will "prevent" Plaintiffs from "engaging in conduct [that their] religion requires." *Henderson*, 253 F.3d at 16; *see also* Ex. 51, Waxman Decl. ¶ 9; Ex. 3, Palmer Decl. ¶ 11. For example, interruptions by ICE agents that result in the removal of any person from the property, as was the case recently in Georgia, *see supra* pp. 13–14, could prevent Plaintiffs from completing religiously mandated obligations, such as offering holy communion to congregants (in the case of the Christian plaintiffs) or completing a service as a whole congregation (in the case of the Jewish plaintiffs who require a minyan). *See* Ex. 34, Doe # 13 Decl. ¶ 9 (interrupting or preventing communion); Ex. 5, Person Decl. ¶ 9 (preventing a *minyan* for Torah reading).

Such interruptions, or a decline in attendance among congregants, *see supra* p. 14, will also prevent Plaintiffs from engaging in communal worship with *all* members of their communities— including those who are immigrants and those without lawful status—which lies at the core of their religious practice. *See* Ex. 40, Bickerton Decl. ¶ 10; Ex. 26, Oh Decl. ¶ 9; Ex. 46, Dease Decl. ¶ 15; *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19–20 (2020) ("attending religious services" is "at the very heart" of the "guarantee of religious liberty"); *Capitol Hill Baptist Church*, 496 F. Supp. 3d at 294–95 (finding a substantial burden where COVID-19 regulations prevented church from "gathering in person as a full congregation[,]" "as its faith requires").

Likewise, an enforcement action directed at social service ministries on church or synagogue property will prevent Plaintiffs from carrying out their religious mission of welcoming and serving all immigrants without regard to status—either through direct interruption of worship or through a decline in ministry participation by service recipients. *See, e.g.*, Ex. 40, Bickerton Decl. ¶ 10; Ex. 26, Oh Decl. ¶ 10; Ex. 46, Dease Decl. ¶ 15; *cf. Fifth Ave. Presbyterian Church v. City of N.Y.*, No. 01 CIV. 11493 (LMM), 2004 WL 2471406, at *3 (S.D.N.Y. Oct. 29, 2004) (finding a substantial burden

18

where police removed homeless persons from church grounds, preventing the church from providing charitable services).

The threat of enforcement action under DHS's new enforcement policy also constitutes a present injury and substantial burden in its own right. Plaintiffs are already reporting decreased participation in their worship services and social service ministries since the sensitive locations policy rescission, with congregants and social service recipients conveying that they are now too afraid to visit churches and synagogues due to the looming threat of immigration enforcement action. *See supra* p. 14. By reducing the number and diversity of worshippers and people served through ministries, and by interfering with Plaintiffs' ability to worship communally in accordance with their religious beliefs, DHS already is substantially burdening Plaintiffs' religious exercise. *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 522 (9th Cir. 1989) ("When congregants are chilled from participating in worship activities, when they refuse to attend church services because they fear the government is spying on them and taping their every utterance, all as alleged in the complaint, we think a church suffers organizational [First Amendment] injury because its ability to carry out its ministries has been impaired."). Indeed, if the reduced attendance persists, some of Plaintiffs' congregations will be forced to shut down their social service ministries or even close their doors altogether. *See, e.g.*, Ex. 13, Rojas Decl. ¶ 11; Ex. 36, Hanlon Decl. ¶ 9; Ex. 62, Doe # 25 Decl. ¶¶ 6–7 (enforcement action "could even force us to close our doors"); Ex. 65, Liners Decl. ¶ 9 (enforcement action "will likely lead to [a] church's closure, due to the high number of immigrants among its numbers"); Ex. 62, Doe # 24 Decl. ¶ 10 (church has had to cancel Bible studies and may have to shutter its clothing pantry).

DHS's new enforcement policy also presently substantially burdens Plaintiffs' religious exercise by forcing them to make an unconscionable choice: If they continue to welcome immigrants to participate in congregational activities and social service ministries at their churches and synagogues, they make their congregants and visitors an easy target for enforcement action, in abrogation of their religious obligation to love and protect their vulnerable neighbors. But if Plaintiffs cut back on their in-person religious services and ministry programs, they are no longer

fulfilling their "religious mission," Ex. 12, Rincones Decl. ¶ 17, or "spiritual calling," Ex. 33, Malavé

Decl. ¶ 13, to serve any and every person, immigrants included.  *See also* Ex. 34, Doe # 13 Decl.

¶ 12.

This choice, which "places substantial pressure on [Plaintiffs] either not to engage in conduct

motivated by a sincerely held religious belief or to engage in conduct contrary to a sincerely held

religious belief," is an illusory one: no matter what the Plaintiffs "choose," they will be violating a

central tenet of their religion.  *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1315 (10th Cir. 2010); *see also*

*Hobby Lobby*, 573 U.S. at 721 (rejecting argument that plaintiffs could avoid substantial burden

caused by Affordable Care Act's contraceptive mandate by simply requiring employees to buy

insurance in government exchanges, which "entirely ignore[d] that the [plaintiffs] have religious

reasons for providing health-insurance coverage for their employees").

Finally, in response to DHS's new enforcement policy, many Plaintiffs have implemented, or

will soon need to implement, changes to the way they conduct their worship services, church

activities, and outreach ministries—such as locking church and synagogue doors, moving services

online, or being less public about their immigrant-focused ministries.  *See, e.g.*, Ex. 52, Noily Decl.

¶ 8; Ex. 4, Kaper-Dale Decl. ¶ 9; Ex. 13, Rojas Decl. ¶ 11; Ex. 48, Doe # 18 Decl. ¶ 8.  Such

measures run afoul of their "essential" faith-based "mission to provide fellowship, spiritual growth,

and community support" to their congregants and neighbors.  Ex. 37, Carlson Decl. ¶ 14.  Thus, this

too constitutes a substantial burden on religious exercise.  *See, e.g.*, *Roman Cath. Diocese of Brooklyn*, 592

U.S. at 19 ("[W]hile those who are shut out may in some instances be able to watch services on

television, such remote viewing is not the same as personal attendance.  Catholics who watch a Mass

at home cannot receive communion, and there are important religious traditions in the Orthodox

Jewish faith that require personal attendance."); *see also Roman Cath. Archbishop of Wash. v. Bowser*, 531

F. Supp. 3d 22, 36 (D.D.C. 2021) (finding substantial burden where church was pressured to turn

worshippers away as a result of COVID-19 restrictions on in-person gatherings and to resort to a "virtual, second-best alternative [for] its parishioners who [could not] attend Mass").[6]

### 2. DHS's new enforcement policy cannot satisfy strict scrutiny.

Because Plaintiffs have shown that DHS's new enforcement policy substantially burdens their religious exercise, DHS must show that the policy satisfies strict scrutiny.  *See Singh v. Berger*, 56 F.4th 88, 93 (D.C. Cir. 2022); *see also* 42 U.S.C. §§ 2000bb-1(b), 2000bb-2(3) (government bears burdens of proof and persuasion).  DHS cannot meet that "exceptionally demanding" standard here. *Singh*, 56 F.4th at 93.  DHS does not have a compelling government interest in conducting immigration enforcement at or near houses of worship absent exigent circumstances or a judicial warrant and, in any event, its new policy is not the least restrictive means of furthering any such interest.

Because RFRA requires the government to demonstrate that its "application of the burden *to the person*" satisfies strict scrutiny, 42 U.S.C. § 2000bb-1(b) (emphasis added), the government "cannot rely on 'broadly formulated interests.'"  *Singh*, 56 F.4th at 97 (quoting *Hobby Lobby*, 573 U.S. at 726); *see also Holt v. Hobbs*, 574 U.S. 352, 362–63 (2015) (rejecting the government's attempt to rely on a generalized interest in "prison safety and security" because "RLUIPA, like RFRA, contemplates a more focused inquiry and requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened." (internal quotation marks and citation omitted)).  Instead, the government "must demonstrate the specific harm that 'would'—not could—result from 'granting specific exemptions to particular religious claimants.'"  *Singh*, 56 F.4th at 97 (quoting *Gonzales*, 546 U.S. at 431).  In other words, DHS must point to its specific interest in conducting immigration enforcement operations at or near Plaintiffs' churches or synagogues.  *See*

---

[6] Nor will such measures always be an option for Plaintiffs.  *See, e.g.*, Ex. 37, Carlson Decl. ¶ 14 (describing a Texas congregation that has begun to close its doors at all hours and move religious services online, though "many of its congregants may not have the access or skills necessary to participate online"); Ex. 43, Doe # 16 Decl. ¶ 8 (security measures "increas[e] the cost of worship to the church").

*Fellowship of Christian Athletes v. D.C.*, No. 24-cv-1332 (DLF), -- F. Supp. 3d --, 2024 WL 3400104, at

*8 (D.D.C. July 11, 2024) (quoting *Hobby Lobby*, 573 U.S. at 727).

The Rescission Memo itself points to no government interest served by the revocation of

the sensitive locations policy, aside from a mere desire to eschew "bright line rules" in favor of

"discretion . . . with a healthy dose of common sense." Rescission Memo at 1. And though DHS

publicly claimed an interest in not allowing "criminal aliens" such as "murders [sic] and rapists" to

continue "to hide in America's schools and churches to avoid arrest," *see* Compl. ¶ 11, the agency

provided no evidence whatsoever to support that claim. Nor did it explain why giving agents

essentially free reign to enter houses of worship will lead to the apprehension of the "dangerous

criminals" it purports are hiding in churches, particularly when the prior policies already permitted

ICE and CBP to enter places of worship under exigent circumstances, *see infra*. To satisfy strict

scrutiny, the government must show that its stated interest is a "genuine" one, *Kennedy v. Bremerton

Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022), and that "the curtailment of rights" is required to fix a non-

speculative "actual problem in need of solving," *Fellowship of Christian Athletes*, 2024 WL 3400104, at

*9 (quoting *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011)). DHS cannot do so here.

Moreover, even if DHS did have a compelling government interest, its new enforcement

policy is not the "least restrictive means" of furthering that interest. 42 U.S.C. § 2000bb-1(b). "If

the Government can achieve its interests without burdening religion, it must do so." *Singh*, 56 F.4th

at 93 (internal quotation marks and citation omitted); *see also Hobby Lobby*, 573 U.S. at 728

(government must "show[] that it lacks other means of achieving its desired goal without imposing a

substantial burden on the exercise of religion"). A blanket policy allowing unconstrained

enforcement in places of worship is the antithesis of a narrowly tailored policy. *See Singh*, 56 F.4th at

103 ("A government policy is not narrowly tailored when it is . . . overinclusive"). The prior

sensitive locations policies prove that there are less restrictive means at the government's disposal.

Those policies included an exception for exigent circumstances, such as where "[a] safe alternative

location does not exist," or where the enforcement action involves "a national security threat," "an

imminent risk of death, violence, or physical harm to a person," "[t]he hot pursuit or an individual

who poses a public safety threat" or "a personally observed border-crosser," or "an imminent risk that evidence material to a criminal case will be destroyed." 2021 Memo at 3–4.  DHS also can limit its enforcement activities to situations where a judicial warrant has been obtained.  It even acknowledged in its 2021 Memo that it can accomplish its mission "without denying or limiting . . . people of faith access to their places of worship." *Id.* at 2.  DHS's new enforcement policy therefore fails strict scrutiny.

**B.    Plaintiffs Are Likely To Succeed On Their First Amendment Claim**

In addition to violating Plaintiffs' rights under RFRA, DHS's new enforcement policy also violates Plaintiffs' First Amendment freedom of expressive association.  The Supreme Court has long recognized a "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984).  This associational right is not only "implicit in" and "corresponding" to other First Amendment protections, *id.* at 622, it is also "an indispensable means of preserving other individual liberties," *id.* at 618.  Government action that interferes with expressive association thus violates the First Amendment, unless the government can show the conduct is narrowly tailored to a compelling government interest that could not "be achieved through means significantly less restrictive of associational freedoms." *Id.* at 623; *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 611 (2021).

Because DHS's new enforcement policy significantly burdens Plaintiffs' expressive association, and because DHS cannot show that the policy is narrowly tailored to meet a compelling government interest, Plaintiffs are likely to succeed on their First Amendment claim.

**1.    Plaintiffs' expressive association is significantly burdened by DHS's new enforcement policy.**

In gathering for group worship, social-service ministries, and other faith-based practices, Plaintiffs engage in constitutionally protected expressive association.  *See, e.g.*, *Widmar v. Vincent*, 454 U.S. 263 (1981) (religious worship and discussion are "forms of speech and association protected by

the First Amendment."). The Supreme Court has recognized that this protection is broad. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000) (group expression may be public or private); *cf. Fulton v. City of Phila.*, 593 U.S. 522, 532 (2021) ("[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection" (citation omitted)). Central to these activities is Plaintiffs' ability to advance their religious beliefs in welcoming the stranger, building a community and sanctuary for all, and ministering to refugees and immigrants regardless of status. These beliefs are deeply and sincerely held. Indeed, they are "rooted in biblical passages that instruct the people of God to welcome immigrants and refugees . . . ." Ex. 33, Malavé Decl. ¶ 5; *see also, e.g.*, Ex. 54, Langill Decl. ¶ 4 ("It is our firmly rooted theological commitment that all are welcome at the table, that all are included in God's embrace. God does not turn anyone away from God's family, so we do not either."); Ex. 13, Rojas Decl. ¶ 3 ("[T]he Bible commands us to welcome and protect immigrants . . . .").

DHS's new enforcement policy unconstitutionally burdens Plaintiffs' collective religious expression and exercise. As the Supreme Court has made clear, the First Amendment protects associational rights not only against targeted restrictions and "heavy-handed frontal attack, but also from being stifled by more subtle government interference." *Healy v. James*, 408 U.S. 169, 183 (1972) (quoting *Bates v. City of Little Rock*, 361 U.S. 516, 623 (1960)). It therefore both precludes government action that prohibits or prevents association, and "reach[es] activities that affect a group's ability to express its message by making group membership less attractive." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 49 (2006). And it is triggered by government action that creates a "risk of chilling effect on association," recognizing that "First Amendment freedoms need breathing space to survive." *Ams. for Prosperity*, 594 U.S. at 618–19 (quoting *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 432 (1963)). Courts defer "to an association's view of what would impair its expression." *Boy Scouts*, 530 U.S. at 653.

Here, and as described in detail *supra* pp. 16–21, the looming threat of immigration enforcement actions has predictably burdened Plaintiffs' congregants, religious leaders, and other participants with the fear of interrogation, detention, or arrest during worship and other services.

24

*See, e.g.*, Ex. 37, Carlson Decl. ¶ 12; Ex. 34, Doe # 13 Decl. ¶ 11; Ex. 5, Person Decl. ¶ 11; Ex. 19, Rice Decl. ¶ 8.  This threat extends to immigrants and non-immigrants alike: Members of both groups are reasonably deterred from participation by the prospect of armed ICE agents interrupting their religious activities.  *See, e.g.*, Ex. 63, Parker Decl. ¶ 10.

DHS's new enforcement policy therefore has had the predictable effect of decreased attendance at a number of Plaintiffs' congregations—reducing the number of voices in prayer or song at religious services; the diversity of perspectives and experiences shared during religious teaching; and the volunteers and resources to offer (and the number of those who receive) social service ministries.  *See, e.g.*, Ex. 37, Carlson Decl. ¶ 12; Ex. 36, Hanlon Decl. ¶ 9; *see also Presbyterian Church (U.S.A.)*, 870 F.2d at 522 (decrease in attendance at worship activities resulting from immigration enforcement surveillance of churches was a "distinct and palpable" injury).  An enforcement action during religious services or ministries—an imminent risk under DHS's new enforcement policy—will also directly impair Plaintiffs' associational rights by interrupting their worship and social service ministries.

These harms are not hypothetical or subjective.  Prior ICE arrests, detentions, and interrogations have been widely reported, as have the current Administration's threats to engage in broad and heavy-handed immigration enforcement.  *See supra* pp. 9-11; Compl. ¶¶ 5–6, 74–77.  Indeed, the previous policy explicitly recognized that enforcement actions at a sensitive location could make immigrants "hesitant to visit" that location, and that such action could "restrain people's access to essential services or engagement in essential activities."  2021 Memo at 2.  Together, these harms strike at the heart of Plaintiffs' religious beliefs, which focus on welcoming the stranger and providing safety and sanctuary for all, regardless of legal status, and impair their abilities to collectively practice and express those beliefs.  *See, e.g.*, Ex. 13, Rojas Decl. ¶ 9 (noting "religious mission of making people feel welcome and secure"); Ex. 2, Doe # 1 Decl. ¶ 8 ("The imminent threat of enforcement action undermines our ability . . . to serve our immigrant neighbors as Jesus commands us to do.").

### 2. Defendants cannot satisfy exacting scrutiny.

The new enforcement policy's significant burden on Plaintiffs' expressive-association rights may only be justified if DHS can show its new policy bears "substantial relation" to a compelling government interest and is "narrowly tailored" to serve that interest. *Ams. for Prosperity*, 594 U.S. at 611. These requirements of "exacting scrutiny" set a high bar for government action. *Id.*; *see also Nat'l Ass'n for Advancement of Colored People v. Alabama ex rel. Patterson*, 357 U.S. 449, 460–61 (1958) (describing "the closest scrutiny" for state action that infringes on the freedom to associate); *Slattery v. Hochul*, 61 F.4th 278, 286 (2d Cir. 2023) (explaining if "state action imposes severe burdens on associational rights . . . we apply strict scrutiny, in which case the restriction applies only if it is narrowly drawn to advance a compelling state interest" (internal quotation marks and citation omitted)). DHS cannot meet that bar.

For the reasons discussed *supra* pp. 21–23, DHS's new enforcement policy neither furthers nor is narrowly tailored to serve a compelling government interest. And for the reasons that the new policy ultimately fails to meet strict scrutiny, so too does it fall far short of the "exacting scrutiny" applied to infringements on expressive association. Nothing indicates that any arguable government interest in immigration enforcement could not "be achieved through means significantly less restrictive of [the] associational freedoms" at issue here. *Roberts*, 468 U.S. at 623. The prior sensitive locations policy alone makes this abundantly clear. While the policy caused significantly fewer restrictions on expressive association—by creating, for example, an "obligation to refrain, to the fullest extent possible" from enforcement action in or near places of worship, 2021 Memo at 3—it confirmed that DHS could "accomplish [its] enforcement mission" all the same, *id.* at 2.

### C. DHS's Rescission of Its Longstanding Sensitive Locations Policy Was Arbitrary And Capricious

Not only does DHS's decision to permit immigration enforcement in houses of worship and during religious ceremonies violate Plaintiffs' rights under both RFRA and the First Amendment, DHS's rescission of its decades-old policy also constitutes arbitrary and capricious agency action.

Plaintiffs are likely to succeed on their claim that DHS violated the Administrative Procedure Act ("APA") in issuing the Rescission Memo.

The APA instructs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law."  5 U.S.C. § 706(2)(A).  Review under this provision is available only for final agency action.  Agency action is "final" for purposes of APA review if it "mark[s] the consummation of the agency's decisionmaking process," rather than "be[ing] of a merely tentative or interlocutory nature," and if the decision is "one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett*, 520 U.S. at 178 (internal quotation marks and citations omitted).  The Rescission Memo easily satisfies this standard.

DHS's longstanding sensitive locations policy, which most recently had been delineated in the now-rescinded 2021 Memo, constituted an agency "rule[,] mean[ing] the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," 5 U.S.C. § 551(4).  The 2021 Memo set forth the agency's "fundamental" policy to "accomplish [its] enforcement mission without denying or limiting individuals' access to" critical services such as healthcare, education, food, shelter, and "people of faith access to their places of worship."  2021 Memo at 2.  It further instructed agency employees to implement that policy through specific measures, including by abstaining from enforcement activities in certain areas absent exigent circumstances or headquarters-level approval.  *Id.* at 2–3.

DHS's Inauguration-Day decision to abandon its previous rule—encapsulated in an official memorandum from the Acting Secretary of Homeland Security stating official agency enforcement policy—creates a new agency rule, 5 U.S.C. § 551(4), and thus constitutes final agency action.  As to the first prong, the Rescission Memo plainly marks the completion of agency decisionmaking, as it "supersedes and rescinds" the 2021 Memo and contains no hint of an intention to revisit the issue.  It likewise is a decision from which rights and obligations are determined and which "gives rise to 'direct and appreciable legal consequences.'"  *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 598 (2016) (citation omitted).  Communities of faith, including Plaintiffs, now face "the denial

27

of the safe harbor," *id.* at 599, they previously relied upon freely to practice their faith while serving their immigrant community members.  The Rescission Memo therefore "alter[s] the legal regime" to which Plaintiffs are "subject," *Bennett*, 520 U.S. at 178, especially in light of the grave First Amendment and RFRA concerns engendered by the new policy, *see supra* pp. 16 –26.  An agency decision "to adopt and enforce policies regarding how . . . the agency must implement and enforce the statute" it administers, or to effect "a new enforcement regime," is final agency action.  *Nat'l En't. Dev. Ass'n Clean Air Project v. EPA*, 752 F.3d 999, 1007 (D.C. Cir. 2014).

The APA's arbitrary-and-capricious standard is deferential, to be sure.  But it requires a reviewing court to ensure that an agency "has reasonably considered the relevant issues and reasonably explained the decision." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  The agency's decisionmaking process must consider the relevant issues, including "examin[ation of] the relevant data," and must articulate a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983) (citation omitted).

The Rescission Memo flouts these minimum constraints in myriad ways.  Indeed, DHS does not even appear to have engaged in *any* decisionmaking process; rather, it hastily issued an about-face of a decades-old policy, within hours of the start of the new Administration, without attempting to elucidate any rationale whatsoever.  The Rescission Memo simply declares that, "effective immediately," "[i]t is not necessary . . . for the head of the agency to create bright line rules regarding where our immigration laws are permitted to be enforced," including "in or near areas that [DHS] previously determined require special protection," such as places of worship and sacred religious observances.  No further explanation or consideration was given.  This is the opposite of a reasonable explanation, *contra Prometheus Radio Project*, 592 U.S. at 423.

DHS gave similarly short shrift to the requirement that, prior to upending longstanding policies that have engendered reliance interests, an agency must acknowledge its change of course and explain its reasons for adopting a new policy.  *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  For more than three decades, DHS consistently had maintained some

form of sensitive locations policy restricting immigration enforcement activities, including arrests and apprehensions, in houses of worship or the site of religious ceremonies. That policy was based on weighty concerns, including the critical importance of religious exercise to persons of faith; the serious burden on religious exercise that immigration enforcement—or even the presence of enforcement agents—could impose on the impacted communities; and the need to "accomplish" the government's "enforcement mission without denying or limiting individuals' access to" critical services. *See* 2021 Memo at 2; 2008 Policy ("Such restraint strikes a balance between our law enforcement responsibilities and the public's confidence in the way ICE executes its mission."); 1993 Policy (setting forth the "policy . . . to attempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, . . . and other religious ceremonies.").

Here, DHS made no attempt to proffer the type of "reasoned explanation [that] is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy," or even to demonstrate "that there are good reasons for the new policy," *Fox Television*, 556 U.S. at 515–16. It also overlooked any consideration of alternative, less-burdensome means by which it could accomplish its legitimate governmental interests. These failures are arbitrary and capricious.

DHS also failed to consider the reliance interests of those impacted by its abrupt policy change. *See Dep't of Homeland Security v. Regents of the Univ. of California*, 591 U.S. 1, 30–31 (2020). Plaintiffs have welcomed immigrant neighbors into their congregations and set up a wide variety of social service ministries to serve the vulnerable and needy in their communities, including food pantries, clothing, English language classes, and even housing. *See, e.g.*, Ex. 34, Doe # 13 Decl. ¶ 6; Ex. 37, Carlson Decl. ¶ 9; Ex. 5, Person Decl. ¶ 8. The risk that these services might draw immigration enforcement agents into their houses of worship—and that worshippers might be made vulnerable simply by visiting their churches and synagogues—likely will cause many Plaintiffs to scale back or cease altogether these offerings, which will have ripple effects throughout their communities, including to U.S. citizen family members and minor children. *See, e.g.*, Ex. 34, Doe # 13 Decl. ¶ 13; Ex. 13, Rojas Decl. ¶ 10; Ex. 57, Doe # 21 Decl. ¶ 10. DHS was required to grapple

with the fact that "its prior policy has engendered serious reliance interests that must be taken into account." *Fox Television*, 556 U.S. at 515.  Not only did the agency fail to do so, but it made no mention of the substantial religious burden imposed by immigration enforcement actions in these sensitive locations.

In publicly announcing its policy reversal, DHS asserted that "criminals" are hiding in churches and synagogues.  *See* Compl. n.3.  DHS provided no factual support whatsoever for that salacious claim, nor did it make any effort to provide relevant data or factual support for the need to conduct arrests, raids, or other enforcement actions in these locations.  Similarly, the agency did not endeavor to connect the facts to its decision to rescind longstanding policy.  The APA demands more.  A decision made without consideration of the relevant issues, including an "examin[ation of] the relevant data" alongside a "rational connection between the facts found and the choice made," is arbitrary and capricious.  *State Farm*, 463 U.S. at 43.

For these reasons, among others, Plaintiffs are likely to succeed on their claim that the Rescission Memo violates the APA, and the decision should be stayed during the pendency of this litigation.

## III.    Plaintiffs Are Irreparably Harmed By DHS's New Enforcement Policy

Plaintiffs will suffer irreparable harm if the Court does not enjoin operation of DHS's new enforcement policy.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn*, 592 U.S. at 19 (citation omitted); *see also Quaker Action Grp. v. Hickel*, 421 F.2d 1111, 1116 (D.C. Cir. 1969) ("[A]ny delay in the exercise of First Amendment rights constitutes an irreparable injury.").  "So too for RFRA claims." *Fellowship of Christian Athletes*, 2024 WL 3400104, at *13; *see Singh*, 56 F.4th at 109 (finding a "comparabl[e] irreparable injury . . . [under] RFRA" where government had not argued "there is any relevant daylight between the RFRA and First Amendment analyses"); *see also Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 609 (8th Cir. 2022) ("Other circuits are in agreement that

establishing a likely RFRA violation satisfies the irreparable harm factor." (internal quotation marks and citation omitted) (citing cases)).

As explained above, Plaintiffs have shown a likelihood of succeeding on their First Amendment and RFRA claims. Moreover, preliminary relief is appropriate here because the irreparable harm asserted by Plaintiffs is "ongoing," in the case of the substantial burden to religious exercise that Plaintiffs are already suffering. *See Singh*, 56 F.4th at 109 ("[E]ven in claims of constitutional or RFRA violations, a preliminary injunction will issue only if the asserted harm will certainly accrue 'in the absence of preliminary relief'—that is, before the district court can resolve the case on the merits. The asserted irreparable injury, in other words, must be ongoing or 'imminent.'" (citations, quotations, and alteration omitted)). Each day that the sensitive locations policy remains rescinded, Plaintiffs suffer an injury to their religious and associational rights.

For similar reasons, Plaintiffs have also demonstrated irreparable harm with respect to their APA claim. To show irreparable harm, a movant must ordinarily show that (1) the harm is "certain and great," "actual and not theoretical," and so "imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm"; and (2) that the harm is "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The first prong is satisfied here for the reasons stated above; the same ongoing harms will result to Plaintiffs if this Court does not temporarily stay or enjoin DHS's new policy.

The second prong also is met because the injury to Plaintiffs' ability to associate for religious purposes and freely exercise their sincerely held religious beliefs is not a "[m]ere injur[y] . . . in terms of money, time and energy." *Id.* (citation omitted). According to the sincerely held religious beliefs of Plaintiffs, "there is no substitute for meeting as a unified whole." *Capitol Hill Baptist Church*, 496 F. Supp. 3d at 302 (finding injury to church's ability "to gather on Sunday" as "a unified whole" was a harm for which "there can be no do over and no redress" (citation omitted); *see also, e.g.*, Ex. 9, Steele Decl. ¶ 14 ("Our belief is that interpreting scripture and following the teachings of Jesus cannot be done in isolation or separation, but require the participation of all persons."); Ex. 39, Doe # 15 Decl. ¶ 9; Ex. 1, Sadler Decl. ¶ 10. Nor is there an adequate substitute or remedy for serving

and ministering to their immigrant neighbors or freely exercising their right to worship peacefully and in a manner compelled by their respective faiths. *See, e.g.*, Ex. 33, Malavé Decl. ¶ 15 (describing "a final reckoning for those who had the capacity to provide for others but failed to fulfill that sacred commandment").

## IV.    The Balance Of Equities And Public Interest Favor Plaintiffs' Request For A Preliminary Injunction

The third and fourth preliminary injunction factors also weigh in favor of granting relief. Where, as here, the government is a party, the balance of the equities and the public interest merge. *Singh*, 56 F.4th at 107. "[E]nforcement of an unconstitutional law is always contrary to the public interest." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (citation omitted). "[T]here is undoubtedly . . . a public interest in ensuring that the rights secured under the First Amendment and, by extension, the RFRA, are protected." *Capitol Hill Baptist Church*, 496 F. Supp. 3d at 303 (alteration in original) (internal quotation marks and citation omitted). That is sufficient to satisfy the final two factors.[7]

Moreover, any harm to the government if preliminarily enjoined from rescinding the sensitive locations policy cannot outweigh the severe harm caused to Plaintiffs. For one thing, a preliminary injunction would simply preserve the status quo that has existed for over three decades. *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 45 (D.D.C. 2020) (finding hardship to agency was outweighed by plaintiffs' injuries where its "only harm is that it will be required to keep in place the existing regulation—which USDA has used for 19 years—while judicial review of its new regulation runs its course"). And notably, that status quo provides Defendants with alternative means of accomplishing their goals without burdening Plaintiffs' religious practice, *see supra* pp. 22–23, which tips the scales further in Plaintiffs' favor, *see Singh*, 56 F.4th at 108 (citing the government's

---

[7] There is also a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters v. Newby*, 838 F. 3d 1, 12 (D.C. Cir. 2016) (internal quotation marks and citation omitted); *see also N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA.").

failure to address existence of less restrictive means as reason harm to plaintiffs outweighed government interest in preserving military training status quo).

## V.    The Court Should Enjoin DHS From Further Burdening Plaintiffs' Religious Exercise And Stay The Effective Date of the Rescission Memo

Plaintiffs have established a strong likelihood of success on their claims that DHS's new enforcement policy violates their rights under RFRA and the First Amendment.   This showing requires the government to demonstrate that its policy can survive strict and exacting scrutiny, respectively.  *See Gonzales*, 546 U.S. at 439 (affirming that RFRA requires government "to demonstrate, at the preliminary injunction stage, a compelling interest in barring" "the particular [religious] practice at issue").  "As under the First Amendment, RFRA's 'compelling interest test' is an 'affirmative defense' for which the Government bears the burden of persuasion, and it subjects governmental action to . . . an 'exceptionally demanding' test."  *Singh*, 56 F.4th at 92–93 (citation omitted).

The government cannot meet its burden.  Any compelling interest DHS has in immigration enforcement has been adequately served for decades by a policy that *did not* target houses of worship and religious ceremonies.  And any compelling interest the government may claim in conducting enforcement in these locations can be addressed through far-less-burdensome means, including requiring the government to obtain a judicial warrant or to show that exigent circumstances justify incursion on a sacred space and preclude securing a warrant.  This Court should preliminarily enjoin DHS and its subcomponents from carrying out immigration enforcement activities at Plaintiffs' places of worship or during religious ceremonies, absent exigent circumstances or the existence and planned execution of a judicial warrant.

Plaintiffs likewise have shown that DHS's Rescission Memo is arbitrary and capricious in numerous respects: the Rescission Memo provides no rationale for overturning longstanding policy on which Plaintiffs and others have relied; it fails even to acknowledge the serious constitutional and statutory violations that will result from a freewheeling policy of "common sense" immigration enforcement in houses of worship; it cites no data or factual support for the idea that "criminals" are

hiding in churches and synagogues; and it fails to explain its reasons for abruptly reversing course on longstanding policy. This Court should preliminarily enjoin DHS and its subcomponents from giving effect to the 2025 Rescission Memo that purports to rescind the 2021 Memo and DHS's longstanding sensitive locations policy, and should further require that, during the pendency of this litigation, DHS and its subcomponents adhere to the procedures and policies set forth in the 2021 Memo. Finally, the Court should stay the effective date of the Rescission Memo, *see* 5 U.S.C. § 705, to prevent further irreparable injury pending judicial review. *District of Columbia*, 444 F. Supp. 3d at 15 ("The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay.").

## CONCLUSION

For the reasons stated herein, this Court should grant Plaintiffs' motion for a preliminary injunction, as set forth in Plaintiffs' proposed order, and stay the effective date of DHS's 2021 Rescission Memo, pending final resolution of Plaintiffs' claims.

February 21, 2025                                Respectfully submitted,

                                                 */s/ Kelsi Brown Corkran*
                                                 Kelsi Brown Corkran (Bar No. 501157)
                                                 Shelby B. Calambokidis (Bar No. 1684804)
                                                 Julia Gegenheimer* (NY Bar No. 4949475)
                                                 Alexandra Lichtenstein (Bar No. 1724947)
                                                 Kate Talmor* (Maryland Bar)
                                                 INSTITUTE FOR CONSTITUTIONAL ADVOCACY
                                                     AND PROTECTION
                                                 600 New Jersey Avenue, NW
                                                 Washington, DC 20001
                                                 (202) 661-6728
                                                 kbc74@georgetown.edu

                                                 *Attorneys for Plaintiffs*

*\*Pro hac vice application forthcoming. DC Bar application pending, practice pursuant to Rule 49(c)(8), DC Courts, and supervised by DC Bar member.*