# EXHIBIT 5

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MENNONITE CHURCH USA et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY et al., <br><br> *Defendants.* | Civil Action No. 1:25-cv-00403 |

### DECLARATION OF RABBI HARA PERSON, CHIEF EXECUTIVE OF PLAINTIFF THE CENTRAL CONFERENCE OF AMERICAN RABBIS

I, Rabbi Hara Person, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the Chief Executive of the Central Conference of American Rabbis ("CCAR"), and have served in that role since 2019.

2. I make this statement based upon personal knowledge, files and documents of CCAR that I have reviewed, as well as information supplied to me by members of CCAR whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting CCAR business.

3. CCAR was founded in 1889 as a way to gather Reform rabbis so they could provide support to one another. We are a nonprofit membership organization headquartered in New York with more than 2,300 members. CCAR's mission is to support and strengthen Reform rabbis so that our members, their communities, and Reform Jewish values thrive.

4. Welcoming the stranger, or immigrant, is a central tenet of the Jewish religion, mentioned 36 times in the Torah—more than any other teaching. As Leviticus 19:34 commands, "The stranger who resides with you shall be to you as one of your citizens; you shall love them as yourself, for you were strangers in the land of Egypt." We are commanded to recognize that all human beings are created *b'tzelem Elohim* (in the image of God), and therefore are deserving of our respect and care (Genesis 1:27). As Jewish leaders, we are also mindful of our history as an immigrant people. For most of our history, we have moved from one land to another—because we were exiled or persecuted in the country we were in, or for economic reasons. Sometimes we chose to move, and sometimes we were forced to do so. Most Jews in this country came as immigrants and, as we established ourselves, we have supported and welcomed immigrants.

5. Rooted in this religious text and history, CCAR has adopted several resolutions about immigration including one entitled *Protecting Individuals at Risk for Deportation*. That resolution recommends, among other action items, that congregational rabbis provide sanctuary in the form of temporary shelter within their facilities and provide legal assistance to fight deportation cases. Consistent with our resolutions, CCAR rabbis work directly with the immigrant community—with newly resettled families and with those who have been here for a longer period of time. To us, there is no difference in our service regarding the legal status of these people.

6. I have good reason to believe that DHS's rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people in the country puts CCAR members at imminent risk of immigration enforcement activity at their synagogues.

7. Rabbis within the CCAR serve in congregations in major cities with large immigrant populations where ICE raids have taken place, including in California, Florida, and Arizona,

among others, as well as in congregations along the southern border in locations such as San Diego, Tucson, El Paso, and McAllen.

8. Many of our member's synagogues provide social services to immigrants. Rabbi Serge Lippe's congregation, for example, has operated an on-site homeless shelter for almost 40 years. It is one of the longest operating synagogue-based homeless shelters in New York City, and while the congregation does not ask its shelter guests about their legal status, it is demographically likely that some are undocumented. Another member rabbi's congregation in the Mid-Atlantic runs an on-site preschool in which 40 percent of families are from Central America, and it is well known in the congregation's largely immigrant community that the preschool is open to both documented and undocumented families. And a CCAR member's synagogue in the Northeast hosts programs twice a month to teach English to immigrants from Syria, Central America, Afghanistan, African nations, and Ukraine and to help them writing resumes and conducting job searches, without regard to their legal status.

9. An immigration enforcement action at CCAR members' synagogues will substantially burden their religious exercise by shattering the sense of safety that congregants need in their places of worship, harkening back to the persecution of Jews by government agents before and during the Holocaust. Moreover, Judaism is a communal religion in which individuals are instructed to gather and celebrate as a community, and Jews cannot say certain prayers or read from the Torah without a *minyan* (a group of ten Jewish adults). An enforcement action would spark fear of gathering in person, impacting congregants' ability to freely practice their faith, and likely would cause some synagogue members to dissociate from Jewish life entirely.

3

10. Likewise, an immigration enforcement action directed at congregations' social services will prevent members' synagogues from carrying out their mission to welcome and serve all immigrants as part of the Biblical command to care for the strangers in their midst.

11. The imminent risk of immigration enforcement action is already substantially burdening the religious exercise of our members' congregations. As mentioned, helping the stranger is a central tenet of the Jewish faith. But the prospect of immigration raids at synagogues is interfering with congregations' efforts to carry out this sacred work. For example, families have expressed nervousness about sending their children to the previously mentioned preschool operated at a CCAR member's synagogue. And one family has stopped attending the program for immigrant families run by the congregation in the Northeast due to fears about immigration enforcement. If participation in these social service ministries continues to decrease, or if CCAR members' congregations are forced to change the way they deliver their services, there will also be a devastating impact on both the recipients of those services and CCAR members' ability to lead their congregations in fulfilling their religious mandate of service.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/19/2025

Respectfully submitted,

Signed by:
*Hara Person*
4FC0F5F5BBAF46D...

Rabbi Hara Person