# EXHIBIT 44

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MENNONITE CHURCH USA, et al., *Plaintiffs*, vs. U.S. DEPARTMENT OF HOMELAND SECURITY, et al., *Defendants*. | Civil Action No. 1:25-cv-00403 |

### DECLARATION OF REVEREND JENNIFER COPELAND, EXECUTIVE DIRECTOR OF PLAINTIFF NORTH CAROLINA COUNCIL OF CHURCHES

I, Reverend Jennifer Copeland, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the Executive Director of the North Carolina Council of Churches ("NCCC"), a role I have held since 2015.

2. I make this statement based upon personal knowledge, files and documents of NCCC whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting the NCCC's business.

3. NCCC is a non-profit, ecumenical membership organization promoting Christian unity and working towards a more just society in the State of North Carolina. NCCC's members include 27 judicatories of 19 denominations and seven individual congregations. Across the state, our members have over 6,200 congregations. Founded in 1935 to address racial inequality, NCCC enables denominations, congregations, and people of faith to impact the State on issues

such as economic justice and development, human well-being, equality, and compassion and peace, following the example and mission of Jesus Christ. Ensuring labor and housing protection for migrant farmworkers is one of NCCC's top priority areas, and its work includes mobilizing people of faith to participate in grassroots movements and legislative efforts to empower immigrants in North Carolina.

4. Our immigrant advocacy work is driven by scripture. Immigrant populations — also called sojourners, refugees, and foreigners — are mentioned repeatedly in Old Testament scripture as a group whom God directs the people to protect because they were some of the most socially and economically vulnerable groups in that day. Care for the most vulnerable among us carries over into the New Testament when God's people are reminded of this imperative through the teaches of Jesus and the letters of Paul. And just as scripture makes no distinction between our families and the "sojourner who is among you" and directs us to rejoice in God's generosity equally with both (Deuteronomy 26:11), neither does the Council distinguish between those with U.S. citizenship and those without. I have every reason to believe that each of our member bodies are in accord with our interpretation of the biblical imperative to care for and protect our immigrant neighbors.

5. In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that NCCC members are at imminent risk of immigration enforcement activity.

6. NCCC has members across North Carolina, a state with a large immigrant population and significant Immigration and Customs Enforcement ("ICE") activity, including several raids just this past week. Most of NCCC's denominational members have congregations with immigrant

members and immigrant congregations, and some of those congregants are undocumented. One congregation, for example is approximately two-thirds immigrant, and another is 96 percent immigrant, primarily from Spanish speaking countries.

7. In addition, many of NCCC members' congregations provide social service ministries at their churches, such as English as a Second Language ("ESL") classes, soup kitchens, and food pantries that serve both documented and undocumented people. One church, for example, runs a "Circle of Welcome" ministry that specifically targets refugees, providing them with wraparound services, and partners with another local outreach ministry to serve the Spanish-speaking community, such as by offering space for ESL classes.

8. An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will substantially burden our members' religious exercise by interfering with their congregations' ability to worship in person together, with all members of their community, including those who are immigrants and without lawful status. Likewise, an enforcement action directed at our members' social service ministries will prevent them from fulfilling their mission to welcome and serve all immigrants, whom scripture directs us to protect regardless of status.

9. The rescission of the sensitive locations policy is already substantially burdening our members' religious exercise. Since the recission, multiple congregations have reported a decrease in worship attendance, with congregants conveying that they are afraid of going to church due to the threat of ICE activity. Our members are also now in the impossible position of choosing whether to continue to minister to undocumented immigrants at their churches, thereby making them a potential target for arrest, or to instead cut back on their social service ministries in an effort to protect them. Either option violates the churches' religious beliefs. At least one of

3

our members' congregations is considering worshipping in secret, in private homes, or virtually as a precaution, which undermines their spirit of welcome and hospitality. That congregation is also preparing to deliver communion to individual homes, a labor-intensive practice that is a poor replacement for taking communion together as a congregation in person.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/20/2025

Respectfully submitted,

*Jennifer Copeland*

Reverend Jennifer Copeland

4