# EXHIBIT 58

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

Civil Action No. 1:25-cv-00403

## DECLARATION OF CAREY MCDONALD, EXECUTIVE VICE PRESIDENT OF PLAINTIFF UNITARIAN UNIVERSALIST ASSOCIATION

I, Carey McDonald, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am Executive Vice President of the Unitarian Universalist Association ("UUA") and I have served in that role since 2018. I am an officer of the UUA, appointed by our Board of Trustees. I also serve as the UUA's clerk under Massachusetts law.

2. I make this statement based upon personal knowledge, files and documents of the UUA that I have reviewed, as well as information supplied to me by UUA staff members whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting the UUA's business.

3. The UUA was founded in 1961 as a merger of the American Unitarian Association (founded in 1825) and the Universalist Church of America (founded in 1793). We are headquartered in Boston, Massachusetts. We have over 1000 member congregations and related

faith communities, located across all 50 states and the District of Columbia.  Our adult

membership numbers over 130,000 people.  UUA member congregations covenant

congregation-to-congregation and through our Association to support and assist one another in

our ministries.

4.   We believe Love is the power that holds us together and is at the center of our shared

values, which also include Justice, Equity, Transformation, Pluralism, Interdependence,

Generosity, and Hope.  Our religious beliefs and structure are grounded in the mutual

commitment (covenant) we make on behalf of our shared values and, in turn, on the practice of

living out those commitments in religious community.  Because we are united in a shared

covenant, and because we believe that our destinies are fundamentally intertwined, harm to one

of our congregations or members impacts our denomination as a whole.

5.   These principles have guided our longstanding, robust commitment to immigration

justice.  They compel us to affirm that all immigrants, regardless of legal status, should be

treated humanely.  We explicitly and publicly support humane treatment of immigrants without

regard to whether they are documented or undocumented, and we have issued statements

condemning immigration raids and the inhumane treatment of immigrants.  In putting these

principles into practice, we have dedicated ourselves to caring for those at risk.  Our members

have consistently affirmed Unitarian Universalism's commitment to immigration justice as a

core aspect of how our values call us to practice our faith.

6.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive

locations policy and as part of its plan to deport all undocumented people during President

Trump's second term, I have strong reason to believe that our congregations are at imminent risk

of an immigration enforcement action.

7.   Many UUA congregations are located near the U.S.-Mexico and U.S.-Canada borders, or in cities where immigration-enforcement actions have recently occurred.  For example, one congregation in Indiana is located in an area where local industry has created a significant migrant community; the members of that church include immigrants and a Deferred Action for Childhood Arrivals ("DACA") recipient.  Many other of our congregations include immigrants, both documented and undocumented.  In addition, several UUA congregations have declared themselves sanctuary congregations and have housed immigrants on short- and long-term bases. Our members are often well-known, locally or nationwide, for providing sanctuary and resources to immigrants.  Stemming from a religious value to care for the strangers and immigrants among us, for instance, a congregation in Colorado has dedicated itself to serving and ministering to immigrants, regardless of legal status, and opted to become a sanctuary congregation.  Another congregation in Massachusetts is a sanctuary church that became certified as a temporary overnight shelter to provide short-term housing to migrants.

8.   UUA congregations are actively and publicly involved in social service ministries that provide assistance for immigrants regardless of documentation status.  For example, the same Colorado congregation provides monthly English as a Second Language ("ESL") classes in conjunction with an immigration justice group.  This congregation also hosts a bi-weekly food pantry with a large number of immigrant participants and provides church space to community partners who serve immigrants.  Together, those ministries regularly bring immigrants into the church building, and the congregation welcomes immigrants without inquiry of their legal status. Another congregation in California actively works for immigration justice within its community, including for undocumented immigrants.  This congregation operates a large food and diaper charitable distribution for which the vast majority of its clients are immigrants.  Yet another

congregation, in the Midwest, rents church space to a Head Start program that serves the local migrant community.

9.    An immigration enforcement action during religious services or ministries would interfere enormously with UUA congregations' abilities to act consistent with their foundational principles: to welcome and care for the stranger; or to provide a space for sanctuary, safety, and trust to congregants, including immigrants and other vulnerable people.  UUA congregations would be left unable to fulfill their spiritual mission through congregants' participation in worship, prayer, or other services.  An action by Immigration and Customs Enforcement ("ICE") or Customs and Border Protection ("CBP") at congregations' outreach ministries will likewise prevent them from putting our religious values into practice and caring for those at risk.  Overall, an enforcement action at a UUA congregation would harm our ability to communicate the core messaging of our faith tradition, particularly the traditions of justice and equality.  It would weaken the fabric of our community as a whole.

10. DHS's new enforcement policy is already substantially burdening UUA congregations' religious exercise.  Since the policy rescission, it is my understanding that members of some congregations have stopped attending services.  Congregation leaders have expressed concerns over publicly sharing information about worship services (including how to join the church or the timing of services) even though that information is essential to full participation in congregational life.  One congregation in Massachusetts has stopped publicizing its various immigrant support efforts out of concern that such publicity may draw attention to its immigrant congregants and they would no longer feel safe at worship.  The UUA has already diverted many resources to responding to congregant and participant concerns, and to providing guidance, in the wake of the sensitive locations policy rescission.

11. DHS's new enforcement policy also puts our congregations in the impossible position of choosing whether to freely carry out their religious mission while exposing their communities to the risk of an immigration action, or to instead change the way they serve and minister in an effort to protect those congregants. Either of these choices is inconsistent with our religious beliefs, and each carries with it practical and intangible harms to our member congregations.

12. Faced with this choice, some congregations are already making changes to the way worship and other services are conducted. Many are considering changes to enhance their congregants' physical safety. A congregation in Colorado feels forced to consider increasing its security and moving some religious gatherings to private homes, though the financial burden of such measures might require them to limit their social service ministries. A church in San Diego is also evaluating additional security plans and procedures; another church in Southern California has already begun putting additional protection systems in place. In addition to imposing a heavy resource burden, measures such as these prevent our congregations from providing the open and welcoming worship spaces that are so central to our faith.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/20/2025

Respectfully submitted,

Signed by:

Carey McDonald

B63D2602B3C7497...

Carey McDonald