## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA, *et al.*,

      Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, *et al.*,

      Defendants.

Civil Action No. 25-CV-00403-DLF

## DEFENDANTS'MEMORANDUM IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................................. 1

BACKGROUND ............................................................................................................................. 2

I.        Statutory Background ................................................................................................... 2

II.      DHS's Internal Guidance For Immigration Enforcement Actions ............................... 4

III.    Plaintiffs' Lawsuit ....................................................................................................... 6

IV.   Related Lawsuits ......................................................................................................... 7

STANDARD OF REVIEW .............................................................................................................. 7

ARGUMENT .................................................................................................................................. 8

I.        Plaintiffs' Are Unlikely To Succeed On The Merits Of Their Claims ......................... 8

         A.       Plaintiffs Lack Standing ................................................................................ 8

                 1.       Plaintiffs have not clearly shown a cognizable injury ..................... 9

                 2.       Even if Plaintiffs have demonstrated a cognizable injury, they have not clearly shown the injury was caused by and is traceable to the Huffman Memorandum ................................................................... 15

                 3.       Plaintiffs have not clearly shown a favorable decision will redress their injury ........................................................................................ 19

         B.       This Court Lacks Jurisdiction to Issue the Requested Injunction ................ 21

         C.       Plaintiffs Have Failed to Establish a Likelihood of Success on their RFRA Claim .......................................................................................................... 22

                 1.       Plaintiffs have not demonstrated that their religious exercise is substantially burdened by the Huffman Memorandum directing law enforcement officers to exercise their "discretion" and "common sense" ............................................................................................... 22

                 2.       The Huffman Memorandum furthers compelling governmental interests in uniform enforcement of the Nation's immigration laws and is the least restrictive means of advancing those interests ......................... 26

         D.       Plaintiffs Have Failed to Establish a Likelihood of Success on their First Amendment Claim ...................................................................................... 31

                 1.       Plaintiffs have not shown that the Huffman Memorandum significantly burdens their expressive association rights .................... 32

2.    The Huffman Memorandum furthers compelling governmental interests in uniform enforcement of the Nation's immigration laws that cannot be achieved through means significantly less restrictive of associational rights ..................................................................33

E.    Plaintiffs Are Not Likely to Succeed on their APA claim ............................33

1.    Immigration enforcement is committed to agency discretion by law ............34

2.    The Huffman Memorandum is not a reviewable final agency action ............36

II.    Plaintiffs Have Not Shown Irreparable Harm ...................................................................40

III.    Plaintiffs Have Not Shown That The Balance Of Equities And Public Interest Tip In Their Favor.........................................................................................................................41

IV.    Plaintiffs' Requested Relief is Overbroad .......................................................................42

CONCLUSION...........................................................................................................................45

# TABLE OF AUTHORITIES

**CASES**

*Abdullah v. Obama,*
   753 F.3d 193 (D.C. Cir. 2014) ......................................................................................................7

*Al-Owhali v. Ashcroft,*
   279 F. Supp. 2d 13 (D.D.C. 2003) ...................................................................................10, 11, 26

*Am. Library Ass'n v. Barr,*
   956 F.2d 1178 (D.C. Cir. 1992) .................................................................................................13, 14

*Ams. for Prosperity Found. v. Bonta,*
   594 U.S. 595 (2021) ...................................................................................................................32

*Arizona v. United States,*
   567 U.S. 387 (2012) ...............................................................................................................*passim*

*Arpaio v. Obama,*
   797 F.3d 11 (D.C. Cir. 2015) ....................................................................................................16

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta,*
   785 F.3d 710 (D.C. Cir. 2015) ............................................................................... 37, 38, 39, 40

*Ass'n of Irritated Residents v. EPA,*
   494 F.3d 1027 (D.C. Cir. 2007) ................................................................................................40

*Bennett v. Spear,*
   520 U.S. 154 (1997) ........................................................................................................37, 39, 40

*Biden v. Texas,*
   597 U.S. 785 (2022) .......................................................................................................22, 28, 39

*Blackie's House of Beef, Inc. v. Castillo,*
   659 F.2d 1211 (D.C. Cir. 1981) .......................................................................................27, 30, 42

*Blum v. Holder,*
   744 F.3d 790 (1st Cir. 2014) .....................................................................................................14

*Bowen v. Roy,*
   476 U.S. 693 (1986) ...................................................................................................................24

*Boy Scouts of Am. v. Dale,*
   530 U.S. 640 (2000) ........................................................................................................31, 32, 33

*Burwell v. Hobby Lobby Stores, Inc.,*
   573 U.S. 682 (2014) ...................................................................................................................24

*Cady v. Dombrowski,*
    413 U.S. 433, (1973) ..................................................................................................30

*California v. Texas,*
    593 U.S. 659 (2021) ...................................................................................................16

*California v. U.S. Bureau of Land Mgmt.,*
    277 F. Supp. 3d 1106 (N.D. Cal. 2017) ....................................................................44

*Chang v. Republic of S. Sudan,*
    548 F. Supp. 3d 34 (D.D.C. 2021) ............................................................................12

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) ..................................................................................40

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) .....................................................................................................41

*\*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ..............................................................................................*passim*

*Cobell v. Kempthorn,*
    455 F.3d 301 (D.C. Cir. 2006) ..................................................................................20

*Cox Broad. Corp. v. Cohn,*
    420 U.S. 469 (1975) ...................................................................................................12

*Ctr. for Biological Diversity v. Regan,*
    597 F. Supp. 3d 173 (D.D.C. 2022) ..........................................................................44

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ..........................................................................................8, 15, 20

*Davis v. FEC,*
    554 U.S. 724 (2008) ...................................................................................................15

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019) ...................................................................................................16

*Doe v. Von Eschenbach,*
    No. 06-cv-2131, 2007 WL 1848013 (D.D.C. June 27, 2007) ...................................12

*DSE, Inc. v. United States,*
    169 F.3d 21 (D.C. Cir. 1999) ....................................................................................45

*Employment Division, Department of Human Resources of Oregon v. Smith,*
    494 U.S. 872 (1990) ...............................................................................................23, 31

*Food & Drug Admin. v. All. for Hippocratic Med.,*
   602 U.S. 367 (2024) ..............................................................................8, 18, 19

*Garland v. Aleman Gonzalez,*
   596 U.S. 543 (2022) ..........................................................................................21

*Go Leasing, Inc. v. Nat'l Transp. Safety Bd.,*
   800 F.2d 1514 (9th Cir. 1986) ........................................................................35

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
   546 U.S. 418 (2006) ................................................................................... 29, 31

*Haaland v. Brackeen,*
   599 U.S. 255 (2023) ..........................................................................................16

*Heckler v. Chaney,*
   470 U.S. 821 (1985) .............................................................................34, 35, 36

*Henderson v. Kennedy,*
   253 F.3d 12 (D.C. Cir. 2001) ..........................................................................23

*Hernandez v. Mesa,*
   589 U.S. 93 (2020) ............................................................................................28

*Hill v. City of Hous.,*
   789 F.2d 1103 (5th Cir. 1986) ........................................................................14

*Huisha-Huisha v. Mayorkas,*
   27 F.4th 718 (D.C. Cir. 2022) ........................................................................20

*Hunt v. Wash. State Apple Advert. Comm'n,*
   432 U.S. 333 (1977) ............................................................................................8

*In re Navy Chaplaincy,*
   738 F.3d 425 (D.C. Cir. 2013) ........................................................................17

*Interstate Com. Comm'n. v. Bhd. Of Locomotive Eng'rs,*
   482 U.S. 270 (1987) .................................................................................. 34, 35

*Iowaska Church of Healing v. Werfel,*
   105 F.4th 402 (D.C. Cir. 2024) ................................................................ 24, 29

*JGE ex rel. Tasso v. United States,*
   772 F. App'x 608 (10th Cir. 2019) .................................................................35

*Johnson v. District of Columbia,*
   71 F. Supp. 3d 155 (D.D.C. 2014) .......................................................... 13, 14

*Kaemmerling v. Lappin*,
 553 F.3d 669 (D.C. Cir. 2008) ......................................................................... 23, 24, 25, 27

*Laird v. Tatum*,
 408 U.S. 1 (1972) ...................................................................................................................9

*Lewis v. Casey*,
 518 U.S. 343 (1996) ............................................................................................................15

*Lincoln v. Vigil*,
 508 U.S. 182 (1993) ............................................................................................................34

*Lujan v. Def. of Wildlife*,
 504 U.S. 555 (1992) .................................................................................................8, 11, 19

*Lujan v. Nat'l Wildlife Fed'n*,
 497 U.S. 871 (1990) ............................................................................................................36

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
 485 U.S. 439 (1988) ............................................................................................................24

*M.M.V. v. Garland*,
 1 F.4th 1100 (D.C. Cir. 2021) ......................................................................................15, 43

*Murthy v. Missouri*,
 603 U.S. 43 (2024) .......................................................................................................*passim*

*Nat. Res. Def. Council v. U.S. Dep't of Energy*,
 362 F. Supp. 3d 126 (S.D.N.Y. 2019) ..............................................................................44

*Nat'l Treasury Emps. Union v. Von Raab*,
 489 U.S. 656 (1989) ............................................................................................................27

*Nken v. Holder*,
 556 U.S. 418 (2009) .....................................................................................................27, 41

*Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*,
 473 U.S. 1301 (1985) ..........................................................................................................44

*Ord v. District of Columbia*,
 587 F.3d 1136 (D.C. Cir. 2009) .........................................................................................14

*O'Shea v. Littleton*,
 414 U.S. 488 (1974) ............................................................................................................12

*Parker v. District of Columbia*,
 478 F.3d 370 (D.C. Cir. 2007), *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008) ........14

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015) ......................................................................................... 37, 40

*Philadelphia Yearly Meeting of Religious Society of Friends v. U.S. Department of Homeland Security,*
    ---F. Supp. 3d---, 2025 WL 585768 (D. Md. Feb. 24, 2025) ........................... 7, 43

*Presbyterian Church (U.S.A.) v. United States,*
    870 F.2d 518 (9th Cir. 1989) ..............................................................................25

*Real Alternatives, Inc. v. Sec'y Dep't of Health & Hum. Servs.,*
    867 F.3d 338 (3d Cir. 2017) ...............................................................................23

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984) ..................................................................................... 31, 32

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.,*
    547 U.S. 47 (2006) .............................................................................................31

*Sackett v. EPA,*
    566 U.S. 120 (2012) ...........................................................................................39

*Safety-Kleen Corp. v. EPA,*
    Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324 (D.C. Cir. Jan. 19, 1996) ...............................44

*Saline Parents v. Garland,*
    88 F.4th 298 (D.C. Cir. 2023) ....................................................................... 9, 10

*Saline Parents v. Garland,*
    630 F. Supp. 3d 201 (D.D.C. 2022), *aff'd,* 88 F.4th 298 (D.C. Cir. 2023) ...........................10

*Sampson v. Murray,*
    415 U.S. 61 (1974) .............................................................................................44

*Seegars v. Gonzales,*
    396 F.3d 1248 (D.C. Cir. 2005) ..........................................................................14

*Sherbert v. Verner,*
    374 U.S. 398 (1963) ...........................................................................................24

*Singh v. Berger,*
    56 F.4th 88 (D.C. Cir. 2022) ..............................................................................30

*Starbucks Corp. v. McKinney,*
    602 U.S. 339 (2024) ..................................................................................... 44, 45

*Strait Shipbrokers Pte. Ltd. v. Blinken,*
    560 F. Supp. 3d 81 (D.D.C. 2021) ......................................................................43

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) ................................................................................................. 13

*Thomas v. Review Bd.,*
450 U.S. 707 (1981) ................................................................................................. 23

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ................................................................................................. 35

*U.S. Army Corp. of Eng'rs v. Hawkes Co.,*
578 U.S. 590 (2016) ................................................................................. 37, 38, 39, 40

*\*United Presbyterian Church in the U.S.A. v. Reagan,*
738 F.2d 1375 (D.C. Cir. 1984) ......................................................................... *passim*

*United States v. Grady,*
18 F.4th 1275 (11th Cir. 2021) ................................................................................ 30

*United States v. Iowa,*
126 F.4th 1334 (8th Cir. 2025) ................................................................................ 30

*United States v. Lee,*
455 U.S. 252 (1982) ................................................................................................. 29

*United States v. Place,*
462 U.S. 696 (1983) ................................................................................................. 30

*United States v. Texas,*
599 U.S. 670 (2023) ..................................................................................... 15, 25, 30, 35

*Urb. Health Care Coal. v. Sebelius,*
853 F. Supp. 2d 101 (D.D.C. 2012) ......................................................................... 14

*Whole Woman's Health v. Jackson,*
595 U.S. 30 (2021) ................................................................................................... 14

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ........................................................................................... 7, 40, 42

*Wisconsin v. Yoder,*
406 U.S. 205 (1972) ................................................................................................. 23

**STATUTES**

5 U.S.C. § 701 .......................................................................................................... 34

5 U.S.C. § 704 ..................................................................................................... 36, 37

5 U.S.C. § 705 ................................................................................................. 43, 44, 45

8 U.S.C. § 1103 ..................................................................................................3

8 U.S.C. §§ 1221-1231 ......................................................................................43

8 U.S.C. § 1226 ...............................................................................3, 27, 36, 38

8 U.S.C. § 1227 ..................................................................................................3

8 U.S.C. § 1229a ................................................................................................3

8 U.S.C. § 1231 .....................................................................................3, 27, 36

8 U.S.C. § 1252 ...........................................................................................4, 21

8 U.S.C. § 1357 .....................................................................................3, 22, 27, 36

42 U.S.C. § 2000bb ..........................................................................................23

42 U.S.C. § 2000bb-1 ................................................................................22, 27

Immigration Reform and Control Act of 1986,
    Pub. L. No. 99–603, 100 Stat. 3359 ........................................................29

## REGULATIONS

*Declaring a National Emergency at the Southern Border of the United States,*
    Proclamation 10,886, 90 Fed. Reg. 8327 (Jan. 20, 2025) ........................28

*Protecting the American People Against Invasion,*
    Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025) ..............27, 28

*Securing Our Borders,*
    Exec. Order No. 14,165, 90 Fed. Reg. 8467 (Jan. 20, 2025) ....................28

## RULES

Fed. R. Civ. P. 5.2 ............................................................................................12

Fed. R. Civ. P. 65 ......................................................................................43, 45

## OTHER AUTHORITIES

Administrative Procedure Act, S. Doc. No. 79-248 (1946) ..............................44

House Committee on Homeland Security, *Crisis by Design: A Comprehensive Look at the*
    *Biden-Harris Administration's Unprecedented Border Crisis* (Sept. 18, 2024)................28

# INTRODUCTION

This case involves a challenge to a change in internal guidance provided by Defendant Department of Homeland Security (DHS) to its immigration enforcement officers. For decades, DHS has issued internal guidance to immigration enforcement officers governing the factors they should consider, and the approvals they should obtain, before conducing enforcement actions in certain locations. That guidance has often changed. In 2021, then Secretary of Homeland Security Alejandro Mayorkas issued a guidance memorandum that identified certain areas—including, as relevant here, places of worship—as protected areas, generally explained when immigration officers should pursue enforcement in those areas, noting that the exercise of judgment was required, and provided that prior authorization by a supervisory official was required unless exigent circumstances were present. In January 2025, the then-acting Secretary of Homeland Security Benjamine Huffman issued new internal guidance instructing immigration officers to exercise their "discretion" and "common sense" when conducting immigration enforcement activities in or near places of worship and other sensitive locations. The Huffman Memorandum also authorized DHS's enforcement components to issue further guidance, which U.S. Immigration and Customs Enforcement (ICE) has recently done, directing supervisory officials to make case-by-case determinations about enforcement actions in or near protected areas.

Plaintiffs speculate that this latest change in internal guidance may result in their places of worship becoming targets of immigration enforcement operations, given the President's widely publicized prioritization of enforcement of the Nation's immigration laws. Plaintiffs' conjecture, however, about possible injury from possible future law enforcement actions is insufficient to establish Article III standing under longstanding principles, much less irreparable injury required for the extraordinary remedy of a preliminary injunction. In any event, those speculative harms are

outweighed by the Government's strong interest in immigration enforcement and avoiding interference with discretionary law enforcement decisions.

Plaintiffs' arguments on the merits fare no better. Plaintiffs ignore that Congress has enacted a clear jurisdictional bar to the relief they seek by prohibiting lower courts from issuing injunctions that restrain certain provisions of the Immigration and Nationality Act (INA) authorizing arrests. The Huffman Memorandum does not impose a substantial burden on Plaintiffs' exercise of their religion under the Religious Freedom Restoration Act (RFRA). Plaintiffs' novel First Amendment expressive association theory fails because this case does not present a situation where the Government is imposing a significant burden on Plaintiffs' right to associate, such as coercing Plaintiffs to accept persons who express conflicting messages or religious beliefs. Further, the Government has a compelling interest in the uniform enforcement of the Nation's immigration laws in light of the overwhelming surge of illegal immigration over the past several years, and the Huffman Memorandum is the least restrictive means of advancing those interests. Plaintiffs' Administrative Procedure Act (APA) claim fails because the Huffman Memorandum does not constitute a final agency action from which legal consequences flow, and the guidance it provides law enforcement officers in the field is committed to DHS's discretion by law.

At bottom, Plaintiffs ask this Court to superintend the discretionary decisions of law enforcement officers on the basis of a conjectural and speculative injury. The Court should refuse that extraordinary request for a preliminary injunction and deny Plaintiffs' motion.

## BACKGROUND

### I.    Statutory Background

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Through the INA and related statutes, Congress has established an "extensive and complex" framework for the

"governance of immigration and alien status." *Id.* at 395. "A principal feature" of this congressionally established "removal system is the broad discretion exercised by immigration officials." *Id.* at 396.

Congress has charged the Secretary of Homeland Security with "administration and enforcement" of immigration laws. *See* 8 U.S.C. § 1103(a)(1). As relevant here, Congress has vested immigration officers with broad authority to arrest, detain, and remove aliens who are unlawfully present or otherwise removable. *See id.* §§ 1226(a) (permitting arrest and detention upon a warrant issued by the Secretary), 1226(c)(1) (the Secretary "shall take into custody any alien" who has committed certain crimes), 1231(a)(1)(A), (2) (authorizing detention of aliens with final removal orders); *see also id* §§ 1227(a) (grounds for deportability), 1229a (removal proceedings), 1357(a) (listing powers that immigration officers may exercise, including interrogation without a warrant of "any alien or person believed to be an alien as to his right to be or to remain in the United States").

This authority is subject to only a few location-based rules. Congress has limited certain investigative activities at farms. *See id.* § 1357(e) (prohibiting officers from entering a farm or other outdoor agricultural operation for investigative purposes "without the consent of the owner (or agent thereof) or a properly executed warrant"). And it has granted immigration officers expanded authority for investigations near the border. *See id.* § 1357(a)(3) (providing that within 25 miles of an international border, immigration officers may have access, without a warrant, to any "private lands, but not dwellings"). But Congress has not otherwise imposed any location-based restrictions—such as restrictions relating to places of worship—on the general arrest and detention authority of immigration officers.

Congress has also restricted the authority of lower courts to enjoin or restrain operations by immigration officers to arrest and detain aliens. Except in a case brought by "an individual alien" in removal proceedings, and "[r]egardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction

or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter," which includes Sections 1221-1231 of Title 8 of the U.S. Code. *Id.* § 1252(f)(1).

## II.    DHS's Internal Guidance For Immigration Enforcement Actions

Since at least 1993, DHS or its predecessor, the Immigration and Naturalization Service, has permitted immigration enforcement activities in or near sensitive locations, including places of worship, with prior supervisor approval or where exigent circumstances are present. *See, e.g.*, Compl., Ex. 6, ECF No. 1-6, Memorandum from James A. Puleo, Acting Assoc. Comm'r, Immigration & Naturalization Serv., "Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies" (May 17, 1993) (Puleo Memorandum); Compl., Ex. 4, ECF No. 1-4, Memorandum from John Morton, Director, U.S. Immigration and Customs Enforcement (ICE), "Enforcement Actions at or Focused on Sensitive Locations" (Oct. 24, 2011) (Morton Memorandum). As Director Morton explained, the agency's guidance was "not intended to categorically prohibit lawful enforcement operations" but rather is "meant to ensure that ICE officers and agents exercise sound judgment when enforcing federal law at or focused on sensitive locations[,]" particularly when a situation arises that does not permit prior approval. Morton Memorandum at 2; *see also* Compl., Ex. 3 at 1-2, ECF No. 1-3, Memorandum from David V. Aguilar, Deputy Comm'r, U.S. Customs & Border Protection, "U.S. Customs and Border Protection Enforcement Actions at or Near Certain Community Locations" (Jan. 18, 2013) ("[w]hen situations arise" that do not permit "prior written approval, Agents and Officers are expected to exercise sound judgment and common sense"); Puleo Memorandum at 2 ("officers are expected to exercise good judgment concerning the appropriate action to take" when exigent circumstances arise that do not permit prior approval).

In October 2021, the then-Secretary of Homeland Security issued updated guidance regarding enforcement activities in or near sensitive locations. Compl., Ex. 2, ECF No. 1-2, Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, "Guidelines for Enforcement Actions in or

Near Protected Areas" (Oct. 27, 2021) (Mayorkas Memorandum).  The Mayorkas Memorandum stated that "[t]o the fullest extent possible, we should not take an enforcement action in or near a protected area."  *Id.* at 3.  This statement did *not* prohibit enforcement actions in or near places of worship.  Rather, it recognized that there were circumstances "under which an enforcement action" in or near a sensitive location "needs to be taken[,]" including "exigent circumstances[.]"  *Id.* at 3-4.  Absent exigent circumstances, immigration officers could "seek prior approval from their Agency's headquarters, or as" component commissioners, directors, and other senior officials "otherwise delegate," before conducting an enforcement action in or near a sensitive location. *Id.* at 4.  The Mayorkas Memorandum offered a non-exhaustive list of circumstances that would justify an enforcement action in or near a sensitive location but emphasized that the list included "only examples" and was "not complete" and that "the exercise of judgment is required[.]"  *Id.*  The exercise of judgment is also required when determining what constitutes "near" for purposes of an enforcement action.  *Id.*  at 3.  Finally, the Mayorkas Memorandum made clear that "[t]his guidance does not limit an agency's or employee's statutory authority . . . ."  *Id.* at 4.

On January 20, 2025, the then-Acting Secretary of Homeland Security Benjamine Huffman issued new guidance on enforcement actions in or near sensitive locations, superseding the Mayorkas Memorandum.  Compl., Ex. 1, ECF No. 1-1, Memorandum from Benjamine C. Huffman, Acting Secretary, ICE, "Enforcement Actions in or Near Protected Areas" (Jan. 20, 2025) (Huffman Memorandum).  The Huffman Memorandum eschewed default or bright-line rules, observing that officers frequently exercise discretion "to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location."  *Id.*  It directed that "[g]oing forward, law enforcement officers should continue to use that discretion along with a healthy dose of common sense" when considering enforcement actions in or near sensitive locations. *Id.*  While the Huffman Memorandum stated that "[i]t is not necessary" for DHS "to create bright line rules regarding where

our immigration laws are permitted to be enforced," it acknowledged that component heads "may wish to issue further guidance to assist officers in exercising appropriate enforcement discretion." *Id.*

The then-acting ICE Director Caleb Vitello subsequently issued further guidance. *See* Memorandum from Caleb Vitello, Acting Director, ICE, "Common Sense Enforcement Actions in or Near Protected Areas" (Jan. 31, 2025) (Vitello Memorandum), attached as Exhibit A. The Vitello Memorandum reiterated ICE officers should exercise discretion and directed supervisory oversight over enforcement actions in or near sensitive locations by charging ICE Assistant Field Office Directors (AFODs) and Assistant Special Agents in Charge (ASACs) "with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area." *Id.* at 2. Such ICE officials "may provide authorization for such actions either verbally or in writing." *Id.*

## III.    Plaintiffs' Lawsuit

Plaintiffs, a coalition of 16 national and regional denominational bodies and 11 denominational and interdenominational associations rooted in the Jewish and Christian faiths, filed this lawsuit on February 11, 2025, seeking declaratory and injunctive relief. *See* Compl. ¶ 1; Prayer for Relief. They allege that the Huffman Memorandum's rescission of the Mayorkas Memorandum violates their rights under RFRA and infringes their First Amendment right of expressive association. *Id.* ¶¶ 162-78. Plaintiffs also seek an order setting aside the Huffman Memorandum as arbitrary and capricious in violation of the APA. *Id.* ¶¶ 180-86; Prayer for Relief. On February 21, 2025, Plaintiffs moved for a preliminary injunction enjoining Defendants from conducting enforcement activities at Plaintiffs' places of worship or during religious ceremonies absent exigent circumstances or a judicial warrant. *See* Mem. in Supp. of Pls.' Mot. for Prelim. Inj. at 33, ECF No. 11-1 (Pls.' Mem.). Plaintiffs also seek a stay of the Huffman Memorandum's effective date pursuant to Section 705 of the APA. *Id.* at 34.

## IV.    Related Lawsuits

The Huffman Memorandum has been challenged in two separate lawsuits.  In *Philadelphia Yearly Meeting of Religious Society of Friends v. U.S. Department of Homeland Security*, several religious groups filed suit alleging violations of the First Amendment, RFRA, and APA.  *Philadelphia Yearly*, ---F. Supp. 3d.---, 2025 WL 585768, at *1 (D. Md. Feb. 24, 2025).  Those religious groups sought and received a preliminary injunction.  *Id.* at *25-26.  The court found that the plaintiffs likely had standing and had made a sufficient showing on their First Amendment and RFRA claims.  *See generally id.*  The court, however, rejected the plaintiffs' request for a nationwide injunction that altered the status quo by requiring Defendants to obtain a judicial warrant before carrying out enforcement actions in or near plaintiffs' places of worship, limiting relief to the plaintiffs and their member congregations.  *Id.* at *25-26.  The court, consistent with Section 1252(f)(1) of Title 8 of the U.S. Code, further limited the injunction by not "restrict[ing] or enjoin[ing] DHS's ability to engage in arrests pursuant to an administrative [or judicial] warrant."  *Id.* at *14; *see also* *25, *27.  Defendants disagree with the court's standing analysis and its ruling on the merits for the reasons discussed below.

In *Denver Public Schools v. Noem*, No. 1:25-cv-00474-DDD-KAS (D. Colo.), the Denver Public School system filed a lawsuit alleging the Huffman Memorandum as applied to the public school system violated the APA and moved preliminary relief.  The court denied the motion for lack of standing.  *See id.*, Hearing Tr. (Mar. 7, 2025), attached as Exhibit B.

## <u>STANDARD OF REVIEW</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs must *"by a clear showing"* establish that they (1) have a substantial likelihood of success on the merits; (2) will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest.  *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (citation omitted).

## ARGUMENT

### I.    Plaintiffs' Are Unlikely To Succeed On The Merits Of Their Claims

#### A.  Plaintiffs Lack Standing

"[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)).  One element of this limitation is that a plaintiff must have standing to sue, a requirement that is "built on separation-of-powers principles" and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.*

As the parties invoking federal jurisdiction, Plaintiffs bear the burden of establishing the three elements that constitute the "irreducible constitutional minimum of standing,"—namely that they have (1) suffered an "injury in fact"—an invasion of a legally protected interest which is "concrete and particularized," "actual or imminent" and not "conjectural" or "hypothetical" that is (2) "fairly traceable" to the challenged conduct of the defendant, and will (3) "likely" be redressed by a favorable decision. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560-61 (1992).

Plaintiffs bring this lawsuit on behalf of themselves and their members.  *See* Pls.' Mem. at 12. Organizations have standing to sue on their own behalf if they satisfy the three elements of standing that apply to individuals.  *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 393-94 (2024). Organizations have standing to sue on their members' behalf when their members "would otherwise have standing to sue in their own right," the interests they "seek[] to protect are germane" to their purpose, and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  "At the preliminary injunction stage," Plaintiffs "must make a 'clear showing'" that they are "'likely' to

establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation omitted). Plaintiffs have not made that clear showing as to any element of standing.

### 1. Plaintiffs have not clearly shown a cognizable injury

Plaintiffs assert they are injured by the Huffman Memorandum because the "fear of immigration enforcement action" in or near their places of worship is decreasing worship attendance and social service ministry participation, forcing them to make a "Hobson's choice" between tenets of their faith, and compelling them to undertake costly protective measures that are "in tension with their religious duties of openness and hospitality." Pls.' Mem. at 14. The chill on Plaintiffs' religious exercise and expressive association rights is compounded, Plaintiffs contend, by the immigration enforcement activity that has been occurring in their communities since the Huffman Memorandum was issued. *Id.* at 13. And Plaintiffs point to four instances where that immigration enforcement activity has occurred in or near a place of worship. *Id.* The harms Plaintiffs describe, however, do not constitute a cognizable injury sufficient to support Plaintiffs' standing.

It is well-settled that a cognizable injury cannot arise merely from the knowledge that the Government is engaged in certain activities. *Saline Parents v. Garland*, 88 F.4th 298, 304 (D.C. Cir. 2023) (citing *Laird v. Tatum*, 408 U.S. 1, 11 (1972)). There must be "some concrete harm (past or immediately threatened) apart from the 'chill' itself" that arises from an "'exercise of governmental power'" that is "regulatory, proscriptive, or compulsory in nature[.]" *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984) (quoting *Laird*, 408 U.S. at 11). And the "complainant" must be either "presently or prospectively subject to the regulations, proscriptions, or compulsions" at issue. *Laird*, 408 U.S. at 11. In other words, the challenged Government action must directly regulate or constrain the party challenging the exercise of governmental power by issuing a "command[] or prohibition[] to the[] [P]laintiffs" or setting forth "standards governing their conduct." *United Presbyterian Church*, 738 F.2d at 1378; *see also Clapper*, 568 U.S. at 419 (recognizing that past cases

do not "suggest[] that plaintiffs can establish standing" based on the alleged chilling effect of a policy that "does not regulate, constrain, or compel any action on [the plaintiffs'] part").

The Huffman Memorandum issues no such command or prohibition. Nor does it set forth standards governing Plaintiffs' conduct. Instead, the memorandum instructs *immigration enforcement officers* to exercise their discretion and use common sense when contemplating enforcement actions in or near sensitive locations. Because the Huffman Memorandum does not directly "regulate, constrain, or compel" Plaintiffs or their members, any harms stemming from their fear that immigration enforcement activity might occur in or near their places of worship at some indeterminate point in the future are not cognizable. *Clapper*, 568 U.S. at 419; *see also Saline Parents v. Garland*, 630 F. Supp. 3d 201, 206-07 (D.D.C. 2022) (Friedrich, J.) (memorandum from Attorney General instructing FBI and U.S. Attorneys to discuss strategies for assessing threats directed toward school personnel did not "create an imminent threat of future legal actions against" the plaintiffs because the memorandum "could not be considered [to] arguably proscribe" plaintiffs' conduct given that it did not "require that any particular action be taken"), *aff'd*, 88 F.4th 298 (D.C. Cir. 2023).

Moreover, the Huffman Memorandum "does not *direct*" immigration enforcement officers to take actions in or near sensitive locations, it "merely *authorizes* them" to do so. *United Presbyterian Church*, 738 F.2d at 1380; *see also Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 26 (D.D.C. 2003). Because the Huffman Memorandum "*authorizes*—but does not *mandate or direct*—" the immigration enforcement actions Plaintiffs and their members fear, Plaintiffs' "allegations are necessarily conjectural." *Clapper*, 568 U.S. at 412. "Simply put, [Plaintiffs] can only speculate as to how" immigration enforcement officers "will exercise their discretion" and common sense in determining whether to carry out enforcement operations in or near their places of worship. *Id.* Such speculation is insufficient to establish a cognizable injury. *Id.*; *see also Al-Owhali*, 279 F. Supp. 2d at 27 (holding that "merely" being "within the class of persons subject to" an attorney-client monitoring regulation

without having "actually been the subject of such monitoring" does "not afford [the plaintiff] standing to challenge the monitoring regulation" (quoting *United Presbyterian Church*, 738 F.2d at 1380)).

Plaintiffs' statement that immigration enforcement activities are occurring in their communities and their identification of four instances where immigration enforcement activity has recently occurred in or near a place of worship, *see* Pls.' Mem. at 13, does not convert the speculative nature of their described harms into an "actual or imminent," *Lujan*, 504 U.S. at 560-61, injury sufficient to support standing. As an initial matter, Plaintiffs identify two instances of immigration enforcement activity in or near non-Plaintiff churches: one "next door" to a Plaintiff church, and the other a widely publicized enforcement action outside a church in Georgia. *See* Pls.' Mem. at 13 (citing Ex. 46, Dease Decl. ¶ 7, ECF No. 11-49; Compl. ¶ 6). Neither of these two instances, even when viewed against the backdrop of increased immigration enforcement activity in Plaintiffs' communities, establish standing because Plaintiffs do not assert that they were the subject of those actions. *See Al-Owhali*, 279 F. Supp. 2d at 27 (no standing where plaintiff has not actually been subject to the challenged action).

As for the remaining two instances, Plaintiffs aver they occurred in or near a member church of two Plaintiffs: General Commission on Religion and Race of the United Methodist Church and The North Georgia Conference of the United Methodist Church. *See* Pls.' Mem. at 13 (citing Ex. 32, Doe #12 Decl. ¶ 5, ECF No. 11-35; Ex. 46, Dease Decl. ¶ 7). Plaintiffs, however, do not provide any details about these instances, such as the name of the church and date of the activity, that would allow Defendants to address or otherwise rebut the allegations. *See* Ex. 32, Doe #12 Decl. (pastor of a church in the Southeastern U.S. states that his church "knows that ICE has already shown up at our worship services and waited for someone to exit the sanctuary")[1]; Ex. 46, Dease Decl. ¶ 7 (stating that

---

[1] Because the "public has a legitimate interest in open proceedings," courts traditionally require a person seeking to use a pseudonym in court filings to make a showing akin to "good cause" to

"ICE agents" entered the daycare office of a church in Atlanta "looking for a staff member who they believed to be undocumented"). But even accepting Plaintiffs' allegations that a member of Plaintiff General Commission on Religion and Race of the United Methodist Church and a member of Plaintiff The North Georgia Conference of the United Methodist Church have recently been the target of an immigration enforcement action, it "still fall[s] short of the 'genuine threat' required to support" Plaintiffs' theory of standing for the prospective injunctive relief they seek because, as discussed above, the Huffman Memorandum did not direct or require that immigration enforcement activity; it merely authorized it. *See United Presbyterian Church*, 738 F.2d at 1380.

In any event, there is nothing in the record that suggests these two churches—much less any of Plaintiffs' other churches—will be the subject of *future* immigration enforcement activity given that the Huffman Memorandum does not direct that immigration enforcement operations take place at those or any other place of worship. *See Murthy*, 603 U.S. at 58 ("because the plaintiffs request forward-looking relief, they must face 'a real and immediate threat of repeated injury'" (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974))); *Clapper*, 568 U.S. at 412 (exercise of governmental power that merely authorizes but does not direct the conduct a plaintiff fears is "necessarily conjectural"); *see also United Presbyterian Church*, 738 F.2d at 1380. To conclude Plaintiffs have standing to challenge an internal guidance memorandum instructing immigration enforcement officers to exercise discretion

---

proceed in that manner. *See Doe v. Von Eschenbach*, No. 06-cv-2131, 2007 WL 1848013, at *2 (D.D.C. June 27, 2007) (citing *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 490-92 (1975)); *cf. Chang v. Republic of S. Sudan*, 548 F. Supp. 3d 34, 37 (D.D.C. 2021) ("court may . . . for good cause, 'require redaction of additional information'" from filings (quoting Fed. R. Civ. P. 5.2(e)(1))). Plaintiffs have not made such a showing. Indeed, Doe #12 states that he is submitting his declaration anonymously "out of fear that if [his] church is identified, it will be targeted" by ICE and CBP. Ex. 32, Doe #12 Decl. ¶ 2. This statement does not support a finding of good cause given Doe #12 acknowledges that ICE is already aware of the church's existence and location due to the recent immigration enforcement activity that occurred during a worship service at his church, as well as his statement that "ICE is aware of [the] church campus" due to the "social services" the church "provide[s] to the immigrant community[.]" *See id.* ¶¶ 5, 7. The Court should thus disregard Doe #12's declaration.

and use common sense when contemplating an enforcement action in or near a sensitive location would be tantamount to "acknowledg[ing] . . . that all churches would have standing to challenge a statute which provides that search warrants may be sought for church property if there is reason to believe that felons have taken refuge there." *Id.* But "[t]hat is not the law." *Id.* at 1380.

It also does not give rise of a cognizable injury-in-fact that Plaintiffs and their members allege they have implemented, or are contemplating implementing protective measures that are inconsistent with the tenets of their faith. Plaintiffs cannot demonstrate a cognizable injury by pointing to "costly and burdensome measures" they have already taken or are contemplating taking in response to a speculative risk of harm. *See Clapper*, 568 U.S. at 415-16 (finding "unavailing" the contention that the plaintiffs took measures and incurred costs "as a reasonable reaction to a risk of harm").

In the absence of any certainly impending injury, Plaintiffs effectively seek pre-enforcement review of DHS's hypothetical application of the Huffman Memorandum. But pre-enforcement review is severely limited and warranted only "under circumstances that render the threatened enforcement sufficiently imminent." *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 158-59 (2014). Plaintiffs have not carried their burden to meet that standard here.

As the D.C. Circuit has emphasized, a plaintiff's ability to claim a credible threat of enforcement "depends on how likely it is that the government will attempt to use [the challenged] provisions against them—that is, on the threat of enforcement—and not on how much the prospect of enforcement worries them." *Am. Library Ass'n v. Barr*, 956 F.2d 1178, 1193 (D.C. Cir. 1992). In cases "[w]here there is no expectation of enforcement, there is unlikely to be a credible threat of prosecution." *Johnson v. District of Columbia*, 71 F. Supp. 3d 155, 160 (D.D.C. 2014) (citation omitted). The likelihood of enforcement depends on the "full panoply of circumstances" present in each case, such as "the history of enforcement of the challenged statute to like facts" and "any threats of

enforcement." *Id.* (citing *Blum v. Holder*, 744 F.3d 790, 798 (1st Cir. 2014) and *Hill v. City of Hous.*, 789 F.2d 1103, 1107 (5th Cir. 1986)).

"[C]ourts often find the absence of a specific threat [of enforcement] fatal" to pre-enforcement standing. *Id.* (citing *Seegars v. Gonzales*, 396 F.3d 1248, 1252 (D.C. Cir. 2005)). Indeed, in the D.C. Circuit, to establish a credible threat of prosecution, a pre-enforcement plaintiff must "prove not only that the threat is credible, but also that it is imminent." *Urb. Health Care Coal. v. Sebelius*, 853 F. Supp. 2d 101, 113 n.11 (D.D.C. 2012). In other words, the plaintiff must show "that the potential prosecution 'results from a special law enforcement priority,'" *id.* (quoting *Ord v. District of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009)), "or that the plaintiff has been 'singled out or uniquely targeted' for prosecution," *id.* (quoting *Parker v. District of Columbia*, 478 F.3d 370, 375 (D.C. Cir. 2007)); *see also Whole Woman's Health v. Jackson*, 595 U.S. 30, 50 316 (2021) (stating that "this Court has always required proof of a more concrete injury and compliance with traditional rules of equitable practice" when a plaintiff brings a "pre-enforcement suit" challenging a law that "is said to chill the free exercise of religion").

Plaintiffs here make no allegation that they have received any threat of immigration enforcement, nor have they presented evidence to establish that the Government considers them a special priority to enforce the immigration laws against them or their members at their places of worship, or that they have been "singled out or uniquely targeted" for enforcement. *See Parker v. District of Columbia*, 478 F.3d 370, 375 (D.C. Cir. 2007), *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008). Because Plaintiffs fail to present sufficient facts suggesting it is likely, much less imminent, that the Government will attempt to enforce the Huffman Memorandum against them in the future, their purported fears of potential enforcement amount to no more than a subjective chill, which is insufficient to confer pre-enforcement standing to assert a challenge to a future enforcement action. *See Am. Library Ass'n*, 956 F.2d at 1193.

Finally, the Supreme Court's decision in *United States v. Texas*, 599 U.S. 670 (2023) confirms that Plaintiffs lack a cognizable injury. At bottom, Plaintiffs' challenge to the Huffman Memorandum asks this Court to second guess the Executive Branch's discretionary decision regarding where and how vigorously to direct its immigration enforcement resources. *Id.* at 679. The Supreme Court has made clear, however, that parties challenging immigration enforcement priorities lack an Article III injury because such lawsuits "run up against the Executive's Article II authority to enforce federal law," *id.* at 678, and "courts generally lack meaningful standards for assessing the propriety of enforcement choices" with respect to arrest and detention, given the needs of the Executive Branch to weigh "resource constraints and regularly changing public-safety and public-welfare needs" when devising policy, *id.* at 679-80. Consequently, "federal courts lack Article III jurisdiction over suits that challenge the Executive's enforcement decisions." *Id.* at 685.

Accordingly, notwithstanding the fear Plaintiffs and their members have about the possibility of immigration enforcement activities taking place in or near their places of worship, Plaintiffs have not, either on their own behalf or on behalf of their members, shown a sufficiently direct and cognizable injury from the Huffman Memorandum.[2]

### 2. Even if Plaintiffs have demonstrated a cognizable injury, they have not clearly shown the injury was caused by and is traceable to the Huffman Memorandum

Plaintiffs submit numerous declarations stating that since the President took office and the Huffman Memorandum was issued, they have experienced a reduction in worship attendance, had to

---

[2] If the Court were to disagree, it should limit its finding of a cognizable injury-in-fact to Plaintiffs General Commission on Religion and Race of the United Methodist Church and The North Georgia Conference of the United Methodist Church—the only Plaintiffs whose members assert they have been the subject of an immigration enforcement action since the Huffman Memorandum was issued. *See M.M.V. v. Garland*, 1 F.4th 1100, 1110-11 (D.C. Cir. 2021) (recognizing that courts are not prohibited from "paring down a case by eliminating plaintiffs who lack standing"). As the Supreme Court has emphasized, "[s]tanding is not dispensed in gross," *Davis v. FEC*, 554 U.S. 724, 734 (2008) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)), thus each Plaintiff in this lawsuit "must demonstrate standing for each claim [it] seeks to press" and for "each form of relief sought," *DaimlerChrysler Corp.*, 547 U.S. at 352.

scale back service ministries, and had to implement or consider implementing protective measures to prevent congregants from "being placed at risk should ICE show up to their houses of worship[.]" Pls.' Mem. at 15. To establish standing, Plaintiffs must clearly show they have suffered a cognizable injury "that is fairly traceable to the [D]efendant[s'] allegedly unlawful conduct . . . ." *Haaland v. Brackeen*, 599 U.S. 255, 291-92 (2023) (citation omitted). This requires Plaintiffs to demonstrate that their claimed injury is actually caused by the specific wrongful conduct that they allege. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (requiring an evidentiary showing of "*de facto* causality").

Plaintiffs' claimed injuries arise from the fear experienced by their congregants and other participants in their social service ministries who are confronted with the potential of immigration enforcement, including individuals with lawful immigration status. *See* Pls.' Mem. at 15. "[W]here a causal relation between injury and challenged action depends upon the decision[s] of [] independent third part[ies] . . .standing is not precluded, but it is ordinarily substantially more difficult to establish." *California v. Texas*, 593 U.S. 659, 675 (2021) (citation omitted); *see also Clapper*, 568 U.S. at 414 (expressing "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors"). To satisfy the causation and traceability element of standing, Plaintiffs must adduce facts that clearly show the third parties "will likely react in predictable ways" to the challenged Government action. *Dep't of Com.*, 588 U.S. at 768; *see also Murthy*, 603 U.S. at 68 n.8 (noting that the plaintiffs in *Department of Commerce* "met their burden of showing that third parties will likely react in predicable ways" to the challenged citizenship question on the Census questionnaire because the evidence "made clear" that it was the challenged citizenship question that "drove noncitizens' lower response rates"). Under the law of this Circuit, Plaintiffs are required to present "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015) (citation omitted).

Plaintiffs have not met their burden. The evidence Plaintiffs have adduced is, at best, "murky[.]" *Murthy*, 603 U.S. at 68 n.8. As noted above, several of Plaintiffs' declarants state that since the Huffman Memorandum was issued, they have experienced a reduction in worship and social service ministry attendance and have taken or are contemplating taking "protective measures to prevent congregants from being placed at risk." Pls.' Mem. at 15. But "[c]orrelation is not causation." *In re Navy Chaplaincy*, 738 F.3d 425, 429 (D.C. Cir. 2013) (citation omitted). Plaintiffs acknowledge that the President has prioritized enforcement of our Nation's immigration laws since taking office, which has led to an increase in enforcement actions as well as media coverage of those actions. *See* Pls.' Mem. at 9-11; *see also id.* at 25. Further, many of the declarations Plaintiffs cite in support of their argument acknowledge that immigration enforcement activities have been conducted in their communities in or near locations other than their places of worship. *See, e.g,* Ex. 30, Arroyo Decl. ¶ 7, ECF No. 11-33 (stating that "in the last few weeks," ICE "raids have taken place in many cities where churches are open for worship and provide social services"); Ex. 28, Doe #10 Decl. ¶ 5, ECF No. 11-31 (stating that North Carolina, the state where declarant is located, is a state with "significant" ICE "activity, including several raids just this past week"); Ex. 26, Oh Decl. ¶ 6, ECF No. 11-29 (acknowledging their congregations are located in "cities along the U.S. border and [in] locations where there has been a significant increase" in ICE "activity in recent weeks"); *see also* Ex. 2, Doe #1 Decl. ¶ 5, ECF No. 11-5 (stating that "[a]s of just a few weeks ago," a church in Northern California has seen immigration enforcement "ramp up" in community); Ex. 13, Rojas Decl. ¶ 5, ECF No. 11-16 ("I am aware of immigration enforcement raids in Fort Worth and the surrounding areas within the past few weeks"); Ex. 21, Reeves Decl. ¶ 7, ECF No. 11-24 (acknowledging "media reports" that ICE "has conducted raids or enforcement actions" in several cities throughout Texas "in recent weeks" where member churches are located); Ex. 35, Everett Decl. ¶ 6, ECF No. 11-38 (stating ICE has "conducted

several widely reported enforcement actions across the state of Massachusetts[]," including "significant enforcement" within two miles of a church in Boston and outside of a supermarket).

This evidence does not, however, establish that the Huffman Memorandum is the cause of reduced attendance at Plaintiffs' places of worship, as opposed to more general concerns from third parties about enhanced immigration enforcement around the country, to say nothing of the myriad other economic, social, or personal reasons that might cause someone not to attend worship or ministry services. At most, Plaintiffs' point to a temporal correlation between reduced attendance and the Huffman Memorandum, but Article III standing demands more. Plaintiffs have not clearly shown that their alleged harms are traceable to the Huffman Memorandum rather than a predictable response by third parties to the recent and highly publicized prioritization of immigration enforcement more generally. *Murthy*, 603 U.S. at 68 n.8; *see also* Minute Entry, *Denver Public Schools*, ECF No. 37 (denying motion for a temporary restraining order and preliminary injunction for the reasons stated on the record); Hearing Tr. at 54-54 (holding alleged harms not fairly traceable to the Huffman Memorandum and would not be redressed by a preliminary injunction because they are "based largely on broader immigration enforcement policy changes that wouldn't be affected by" the grant of preliminary relief).

Even when a plaintiff can show that the injury is based on the predictable actions of third parties, the plaintiff cannot rely on risks that are too attenuated. Organizations and their members can be affected by all manner of federal decisions and policies. But they generally do not have standing to challenge decisions and policies of general applicability unless they can show that those federal decisions and policies directly affect them. "The causation requirement also rules out attenuated links," including "distant (even if predictable) ripple effects." *Hippocratic Medicine*, 602 U.S. at 383. For example, in *Hippocratic Medicine*, the Court declined to recognize standing for the plaintiff-doctors to challenge drug approvals merely because "use of the drugs by others may cause more visits to doctors." *Id.* at 392. The Court reasoned that such an approach to standing would be "limitless" with

"no principled way to cabin such a sweeping doctrin[al] change to doctors or other healthcare providers." *Id.* By way of example, the Court observed that if it found standing in such a situation, teachers in border states would have standing to "sue to challenge allegedly lax immigration policies that lead to overcrowded classrooms." *Id.*

That same logic applies here. The Huffman Memorandum provides generally applicable guidance. To conclude that Plaintiffs' purported injuries are fairly traceable to the memorandum, which does not regulate or otherwise constrain Plaintiffs' conduct would confer standing on "virtually every citizen" to "challenge virtually every government action" that they disagree with. *Id.* The Supreme Court declined to go down that path in *Hippocratic Medicine. See id.* So too should this Court.

### 3. Plaintiffs have not clearly shown a favorable decision will redress their injury

Even if Plaintiffs could demonstrate that their claimed injury is cognizable and traceable to the Huffman Memorandum, Plaintiffs have not clearly shown that their "injury likely would be redressed by the requested judicial relief." *Id.* at 380. Plaintiffs claim that their requested injunction— "which would require DHS to abstain from immigration enforcement" in or near Plaintiffs' places of worship absent exigent circumstances or a judicial warrant—would "restore Plaintiffs' and their communities' confidence that their sacred spaces remain inviolable." Pls.' Mem. at 15. Because the likelihood of Plaintiffs' claimed injuries being redressed is grounded in the "unfettered choices" made by independent third parties not before the Court and "whose exercise of broad and legitimate discretion the [C]ourt[] cannot presume either to control or to predict," Plaintiffs must show that those choices by third parties "will be made in such a manner as to . . . permit redressability of injury." *Lujan*, 504 U.S. at 562. But Plaintiffs offer no evidence showing that their requested injunction would provide such redress for their claimed injuries. *See* Pls.' Mem. at 15-16.

In the absence of such evidence, it is speculative to assume that the subjective concerns of worship and social service ministry attendees about future immigration enforcement activity at

Plaintiffs' places of worship would be assuaged by the requested injunction, which would still permit immigration enforcement actions when officers, exercising their discretion, determine exigent circumstances exist or with a judicial warrant.  "[R]edressability [that] requires speculat[ion]" is insufficient to support standing.  *DaimlerChrysler Corp.*, 547 U.S. at 344.

Moreover, "[t]he usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation."  *Cobell v. Kempthorn*, 455 F.3d 301, 314 (D.C. Cir. 2006) (citation omitted). As such, if the Court were to grant Plaintiffs relief, that relief should be limited to a return to the status quo—reinstatement of the Mayorkas Memorandum.  *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) ("The status quo is the last *uncontested* status which preceded the pending controversy." (citation omitted)).  The Mayorkas Memorandum did not restrict immigration enforcement actions to when exigent circumstances were present or to execute a judicial warrant.  Such actions were permitted so long as pre-approval was granted by a high-level agency official or delegee.  *See* Compl., Ex. 2 at 4. Thus, even if a preliminary injunction was issued, the potential for immigration enforcement in or near Plaintiffs' places of worship would remain, as Plaintiffs' declarations acknowledge.  *See, e.g.*, Ex. 4, Kaper-Dale Decl. ¶ 7, ECF No. 11-7 (declaring that the Reformed Church of Highland Park has "had numerous confrontations with ICE at our church over the years" due to its "outspoken support of [its] undocumented neighbors"); Ex. 25, Doe #8 Decl. ¶ 6, ECF No. 11-28 (stating that "[t]here is a history of ICE activity in our area" and that "in the past, we have observed DHS agents conducting surveillance near our location"); Ex. 37, Carlson Decl. ¶ 7, ECF No. 11-40 (noting that a "church in Pennsylvania previously experienced ICE activity in its neighborhood, including a raid that targeted five of its congregants"); Ex. 42, Cook Decl. ¶¶ 8, 11, ECF No. 11-45 (stating that "while the sensitive locations policy was still in place, a sanctuary guest was arrested by ICE shortly after leaving church property" and noting that there was a "noticeable decline in immigrant attendance at the soup kitchen on church property" following a "series of ICE enforcement actions near the church in 2017"); Ex.

66, Doe #26 Decl. ¶ 7, ECF No. 11-69 (stating that a Lutheran church in Wisconsin "believes that ICE has conducted surveillance outside of [the] church in the past").  Accordingly, Plaintiffs have not made a clear showing that the relief they seek would in fact redress their asserted injuries.

### B.  This Court Lacks Jurisdiction to Issue the Requested Injunction

Section 1252(f)(1) of Title 8 of the U.S. Code provides that, except in a case brought by "an individual alien" in removal proceedings, and "[r]egardless of the nature of the action or claim of the identity of the party or parties bringing this action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter."  8 U.S.C. § 1252(f)(1).  Part IV of the subchapter includes Sections 1221-1231, which the Supreme Court has described as provisions that "charge the Federal Government with the implementation and enforcement of the immigration laws governing the inspection, apprehension, examination and removal of aliens."  *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549-50 (2022).

In *Aleman Gonzales*, the Supreme Court interpreted Section 1252(f)(1) as applying broadly to immigration enforcement operations.  The Court explained that the provision "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions."  *Id.* at 550. Accordingly, if an order enjoins or restrains action that "in the Government's view" serves to "enforce, implement, or otherwise carry out" Sections 1221-1231, it is impermissible—regardless of whether the court considers the Government to be carrying out those sections as "properly interpreted."  *Id.* at 550-52.  Because Plaintiffs' requested injunction would restrict the manner in which the Government engages in immigration enforcement activity in or near their places of worship, it restrains the Government "from actions that[,]" in the Government's view, "are allowed" by Sections 1221-1231, and it "interfere[s] with the Government's efforts to operate" those provisions.  *Id.* at 551. Section 1252(f)(1) thus bars this Court from enjoining or restraining Defendants from engaging in the

apprehension of aliens as authorized by Sections 1226 and 1231.[3]  *See Biden v. Texas*, 597 U.S. 785, 797 (2022) (holding that lower-court order enjoining DHS's Migrant Protection Protocols, a programmatic implementation of Section 1225(b)(2)(C), "violated" Section 1252(f)(1)).

### C.  Plaintiffs Have Failed to Establish a Likelihood of Success on their RFRA Claim

#### 1.  Plaintiffs have not demonstrated that their religious exercise is substantially burdened by the Huffman Memorandum directing law enforcement officers to exercise their "discretion" and "common sense"

The Court should also find that Plaintiffs have no likelihood of success on their RFRA claim. Plaintiffs allege that the Huffman Memorandum "substantially burdens" their religious exercise by posing an "imminent risk" of "actual disruption" to their worship services and ministries.  Pls.' Mem. at 17-18.  This risk, Plaintiffs assert, is manifested in a decline in worship service attendance and social service ministry participation.  *Id.* at 18-19.  Plaintiffs also contend it has forced them to choose between "engag[ing] in conduct motivated" by the tenets of their faith or "engag[ing] in conduct contrary" to their faith, and has led them to implement or contemplate implementing protective measures to minimize the risk.  *Id.* at 19-20.  Defendants do not doubt the sincerity of Plaintiffs' beliefs.  Plaintiffs, however, have not clearly shown that the Huffman Memorandum substantially burdens their religious beliefs for reasons similar to why Plaintiffs' lack standing.

RFRA provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(a), (b).  RFRA does not define "substantial burden," so courts look

---

[3] Section 1252(f)(1) does not extend to immigration enforcement actions conducted under 8 U.S.C. § 1357, which vests Defendants with the authority to, among other things, interrogate and arrest without a warrant individuals believed to be aliens.

to First Amendment cases decided before *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), to construe the term. *See* 42 U.S.C. § 2000bb(b)(1). Under those cases, "[a] substantial burden exists when government action puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs[.]'" *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981)).

The quintessential example of such coercive pressure is *Wisconsin v. Yoder*, cited favorably by Congress when passing RFRA, where members of the Amish religion were convicted of violating a Wisconsin law that required their children to attend school until the children reached the age of sixteen, under the threat of criminal sanctions for the parents. 406 U.S. 205, 207-08 (1972); *see* 42 U.S. § 2000bb(b). The Supreme Court reversed the defendants' convictions, holding the application of the compulsory school-attendance law to the defendants "unduly burden[ed]" the exercise of their religion, in violation of the Free Exercise Clause. *Yoder*, 406 U.S. at 220. Indeed, "[c]ases finding a substantial burden under RFRA have consistently done so" where the burden that interfered with claimants' religious exercise is, similar to *Yoder*, "directly implicated by federal action." *Real Alternatives, Inc. v. Sec'y Dep't of Health & Hum. Servs.*, 867 F.3d 338, 360-61 (3d Cir. 2017) (collecting cases); *see also Henderson v. Kennedy*, 253 F.3d 12, 16 (D.C. Cir. 2001) (observing that a substantial burden exists when the challenged government action "forces [plaintiffs] to engage in conduct that their religion forbids or that it prevents them from engaging in conduct their religion requires").

Contrary to Plaintiffs' assertion, *see* Pls.' Mem. at 17, such direct coercive pressure is not present in the Huffman Memorandum. By its plain terms, the Huffman Memorandum does not directly coerce Plaintiffs and their members to modify their behavior or violate the tenets of their faith because it does not expressly issue any commands or prohibitions to them—it simply instructs immigration enforcement officers to exercise their "discretion" and "common sense" when deciding where to enforce federal immigration law. *See* Compl., Ex. 1. Nor does it direct immigration

enforcement officers to enforce federal immigration law at sensitive locations—it merely authorizes such activity. *See id.* Plaintiffs therefore have not—and cannot—demonstrate that the guidance substantially burdens their religious exercise through direct coercion.

Nor does the Huffman Memorandum indirectly coerce Plaintiffs or their members by imposing "substantial pressure" to modify their behavior or violate their religious beliefs. *Kaemmerling*, 553 F.3d at 678. A hallmark example of indirect coercion is *Sherbert v. Verner*, 374 U.S. 398 (1963). There, the Supreme Court held that a claimant's "ineligibility for [unemployment] benefits derive[d] solely from the practice of her religion" and thus indirectly coerced her to modify her behavior by forcing her to choose between the tenets of her faith or forfeiting unemployment benefits. *Id.* at 403-04. More recently, the Supreme Court concluded in *Burwell v. Hobby Lobby Stores, Inc.* that a regulation mandating certain employers provide health-insurance coverage for methods of contraception substantially burdened the plaintiffs' religious exercise by coercing them to either provide the health-insurance coverage in violation of their religious beliefs or pay monetary fines. 573 U.S. 682, 690-91, 726 (2014). Unlike in *Sherbert* and *Hobby Lobby*, the Huffman Memorandum does not coerce Plaintiffs or their members to choose between the tenets of their faith and a government benefit or penalize Plaintiffs for following the tenets of their faith. Moreover, the religious burdens Plaintiffs assert as injuries here all flow from the "independent decisions of third part[ies]," *Iowaska Church of Healing v. Werfel*, 105 F.4th 402, 413 (D.C. Cir. 2024)—aliens who are present in the United States unlawfully or otherwise removable. That kind of alleged harm fails to identify a RFRA substantial burden or support a finding of Article III traceability and redressability. *See id.*

Further, RFRA, like the Free Exercise Clause, "simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particularized citizens." *Bowen v. Roy*, 476 U.S. 693, 699 (1986) (plurality op.); *see also Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450-51 (1988) (holding, under *Bowen*, that the government's use

of its own land does not burden the free exercise of religion); *Kaemmerling*, 553 F.3d at 679 (no substantial burden where plaintiff failed to identify any religious observance that the government's extraction and storage of plaintiff's DNA information impedes). As discussed *infra* at 36-40, the Huffman Memorandum by its own terms does not create any right or benefit and thus does not constitute final agency action. Compl., Ex. 1. Rather, the memorandum is an internal guidance document that governs how Defendants exercise their discretion in enforcing the Nation's immigration laws and does not require any particular action against any particular individual, group of individuals, or religious entity. *See id.* It is well-settled that the Executive Branch "retains discretion over whether to remove a noncitizen from the United States." *Texas*, 599 U.S. at 679 (citing *Arizona*, 567 U.S. at 396). How the Executive Branch exercises that discretion is an internal matter not suitable for judicial review. *Id.* at 679-80. That is because, as noted above, courts "generally lack meaningful standards for assessing the propriety of enforcement choices in this area" due in part to the fact that the Executive Branch "must constantly react and adjust to the ever-shifting public-safety and public-welfare needs of the American people." *Id.* It is, therefore, not surprising that Plaintiffs cite no authority holding that a general law enforcement policy that authorizes—but does not mandate— specific enforcement actions constitutes a substantial burden on religious exercise.

Plaintiffs' reliance on the Ninth Circuit's decision in *Presbyterian Church (U.S.A.) v. United States*, *see* Pls.' Mem. at 19, is misplaced. To start, the Ninth Circuit merely held that plaintiffs in that case had alleged a cognizable injury for purposes of standing; it did not find that plaintiffs' religious exercise was substantially burdened. *Presbyterian Church*, 870 F.2d 518, 521-22 (9th Cir. 1989). In any event, *Presbyterian Church* is distinguishable on its facts. There, plaintiff churches alleged that their members had stopped attending after learning that immigration officers had entered plaintiffs' churches over a nine-month period to surreptitiously record worship services. Plaintiffs have not alleged that Defendants have engaged in similarly direct and recurrent conduct at their houses of worship pursuant

25

to the Huffman Memorandum, or that the Huffman Memorandum—rather than other publicly announced immigration enforcement initiatives to which Plaintiffs themselves refer—is responsible for any decrease in attendance. *See Al-Owhali*, 279 F. Supp. 2d at 27 (distinguishing *Presbyterian Church*).

Finally, the link between the Huffman Memorandum and the burdens on Plaintiffs' religious exercise is too attenuated to rise to the level of "substantial." That is because it is speculative that immigration enforcement officers will decide to exercise their discretion and common sense to carry out an enforcement action in or near Plaintiffs' places of worship. It is also speculative that the decisions Plaintiffs, their congregants, and other community members have and will make relating to worship service attendance, social service ministry participation, and measures to decrease the risk that an enforcement action will occur during those activities, are a response to the Huffman Memorandum as opposed to a response to the general increase in immigration enforcement activity in Plaintiffs' communities. Indeed, as previously noted, many of Plaintiffs' declarations specifically reference general immigration enforcement action in their communities as the basis for their concerns. *See, e.g.*, Ex. 47, Gilreath-Rivers Decl. ¶¶ 6, 9, ECF No. 11-50 (noting that there have been "several" ICE "raids" in the church's "community, including raids at businesses and factories" and that "congregants [have been] arrested and deported"); Ex. 34, Doe #13 Decl. ¶ 7, ECF No. 11-37 (stating that a church in Southern California is "aware of raids within a 20-mile radius of [the] church, within the communities of many of [its] commuter congregants"); Ex. 22, Doe # 6 Decl. ¶ 5, ECF No. 11-25 ("I understand from media reports that there have been immigration raids in recent weeks in Brownsville[.]"); *see also supra* at 17-18.

## 2. The Huffman Memorandum furthers compelling governmental interests in uniform enforcement of the Nation's immigration laws and is the least restrictive means of advancing those interests

Even if the Court were to conclude that the Huffman Memorandum imposes a substantial burden on Plaintiffs, the memorandum does not violate RFRA if the government "demonstrates that

application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). Here, Defendants have a compelling interest in the uniform enforcement of the Nation's immigration laws in light of the overwhelming surge of illegal immigration over the past several years and the Huffman Memorandum is the least restrictive means of advancing those interests. *See generally Kaemmerling*, 553 F.3d at 685 (noting that RFRA does not require the government to adopt an alternative that is "less effective" at accomplishing the government's compelling interest than the government action challenged).

Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. "The Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant." *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) (citing cases); *see Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 672 (1989) (stating that the federal government has "compelling interests in safety and in the integrity of our borders"). Congress, through the INA, delegated to the Secretary of Homeland Security significant authority to administer and enforce the immigration and nationality laws, without placing any limitations on the Executive's arrest authority on property owned or operated by religious organizations. *See, e.g.*, 8 U.S.C. §§ 1226, 1231, 1357; *see also Arizona*, 567 U.S. at 396 ("A principal feature of the removal system is the broad discretion exercised by immigration officials."). "The continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings [Congress] established, and permits and prolongs a continuing violation of United States law." *Nken v. Holder*, 556 U.S. 418, 435 (2009) (cleaned up).

The Government's compelling interest is even stronger in the current context because of the "unprecedented flood of illegal immigration" that has occurred over the past four years. Exec. Order No. 14,159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443 (Jan. 20, 2025). As the

27

President has recognized, "[m]illions of illegal aliens crossed our borders or were permitted to fly directly into the United States on commercial flights and allowed to settle in American communities, in violation of longstanding Federal laws." *Id.* The numbers are staggering. As documented by the House Committee on Homeland Security, "U.S. Customs and Border Protection has reported more than 8.2 million encounters of inadmissible aliens at the Southwest border, a number that grows to more than 10.1 million when factoring in America's borders and ports of entry nationwide." *See* House Committee on Homeland Security, *Crisis by Design: A Comprehensive Look at the Biden-Harris Administration's Unprecedented Border Crisis* at 3 (Sept. 18, 2024) (citation omitted); *Biden*, 597 U.S. at 816-17 (2022) (Alito, J., dissenting) ("In fiscal year 2021, the Border Patrol reported more than 1.7 million encounters with aliens along the Mexican border.").

This massive increase in illegal immigration has imposed significant harms on the American people. The recent influx has "cost taxpayers billions of dollars at the Federal, State, and local levels." Exec. Order No. 14159, 90 Fed. Reg. at 8443. "Deadly narcotics and other illicit materials have flowed across the border[.]" Exec. Order No. 14165, *Securing Our Borders*, 90 Fed. Reg. 8467 (Jan. 20, 2025); *see also Hernandez v. Mesa*, 589 U.S. 93, 107 (2020) ("During the last fiscal year, approximately 850,000 persons were apprehended attempting to enter the United States illegally from Mexico, and large quantities of drugs were smuggled across the border"). "Foreign criminal gangs and cartels" have extended their influence beyond the southern border into American cities. Proclamation 10886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327 (Jan. 20, 2025). "Many of these aliens unlawfully within the United States present significant threats to national security and public safety," thus the Government must take appropriate action to "protect[] the American people by faithfully executing the immigration laws of the United States." Exec. Order No. 14,159, 90 Fed. Reg. at 8443; *see also* Exec. Order No. 14,165, 90 Fed. Reg. at 8467; Proclamation No. 10,866, 90 Fed. Reg. at 8327.

A policy that exempts certain locations from the reach of immigration enforcement, or imposes heightened procedural requirements for such enforcement beyond what Congress provided in the INA, would create a nationwide hodgepodge of immigration enforcement sanctuaries with different rules for the enforcement of generally applicable laws. Such a scheme would undermine Congress's instruction that "the immigration laws of the United States should be enforced vigorously and *uniformly*." Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, § 115(1), 100 Stat. 3359, 3384 (emphasis added); *see also Arizona*, 567 U.S. at 401-02 (emphasizing that the Federal Government is "responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders"). The Supreme Court has expressly recognized that "that there may be instances in which a need for uniformity precludes the recognition of exceptions to generally applicable laws under RFRA." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006).[4] This case is one of those instances because both Congress and the Supreme Court have emphasized the need for uniform application and enforcement of the Nation's immigration laws. *See United States v. Lee*, 455 U.S. 252, 260 (1982) (holding, in a pre-RFRA context, that "[b]ecause the broad public interest in maintaining a sound tax system is of such a high order, religious belief in conflict with the payment of taxes affords no basis for resisting the tax"); *see also Gonzales*, 546 U.S. at 435 (discussing other cases with uniformity interest); *Iowaska Church of Healing*, 105 F.4th at 416 (stating that the challenged "IRS Decision and the attendant tax regulatory scheme could be justified by a compelling government interest that necessitates uniform application"). Defendants accordingly have a compelling interest in "denying an exemption to these specific plaintiffs" from the uniform and

---

[4] The Supreme Court declined to recognize the uniformity interest in *Gonzales* because of "the longstanding exemption from the Controlled Substances Act for religious use of peyote, and the fact that the very reason Congress enacted RFRA was to respond to a decision denying a claimed right to sacramental use of a controlled substance." 546 U.S. at 436-437. By contrast, as explained above, Congress and the Supreme Court have emphasized the need for uniformity in immigration enforcement.

evenhanded enforcement of the Nation's immigration laws. *Singh v. Berger*, 56 F.4th 88, 99 (D.C. Cir. 2022) (citation omitted); *see also United States v. Grady*, 18 F.4th 1275, 1287 (11th Cir. 2021) (stating that "RFRA is not a 'get out of jail free card,' shielding [individuals] from criminal liability").

The Huffman Memorandum is also the least restrictive means of furthering Defendants' compelling interests. "Discretion in the enforcement of federal immigration law is vital for accomplishing the purposes of federal immigration law." *United States v. Iowa*, 126 F.4th 1334, 1347 (8th Cir. 2025). The Huffman Memorandum is narrowly tailored to further that important interest because it eschews "bright line rules regarding where our immigration laws are permitted to be enforced" in favor of officers' individual discretion. Compl., Ex. 1. The memorandum acknowledges that "officers frequently apply enforcement discretion to balance a variety of interests" when conducting immigration enforcement activities, "including the degree to which any law enforcement action occurs in a sensitive location." *Id.*; *see also Texas,* 599 U.S. at 680 ("In light of inevitable resource constraints and regularly changing public-safety and public-welfare needs, the Executive Branch must balance many factors when devising arrest and prosecution policies."). The memorandum, therefore, directs officers to rely on their "discretion along with a healthy dose of common sense" when contemplating enforcement actions in a sensitive location. Compl., Ex. 1. Allowing immigration officers to exercise their discretion in this manner is narrowly tailored to further the "vigorous enforcement program" that Congress contemplated "in passing the Immigration and Nationality Act." *Castillo*, 659 F.2d at 1219, 1221. A contrary holding would conflict with the Supreme Court's warning that courts should not create "rigid" limitations on law enforcement officers by imposing "a clear rule to guide their conduct." *United States v. Place,* 462 U.S. 696, 709 n.10 (1983). Instead, the memorandum is the least restrictive means to further the well-established principle that law enforcement officers should be given broad discretion, within the bounds of reasonableness, "to graduate their responses to the demands of any particular situation." *Id. Cf. Cady v. Dombrowski,* 413 U.S. 433, (1973) ("The fact

that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, itself, render the search unreasonable.").[5]

### D. Plaintiffs Have Failed to Establish a Likelihood of Success on their First Amendment Claim

It is well settled that "implicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit" of religious ends. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). The Supreme Court has recognized that that Government may unconstitutionally infringe this right by imposing penalties or withholding a benefit because of membership in a disfavored group, *id.* at 622-23, or requiring disclosure of the fact of membership for groups seeking anonymity, both of which makes "group membership less attractive," *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 69 (2006). They can also take the form of interference with a group's internal organization or affairs by forcing the group to accept members it does not desire. *See Roberts*, 468 U.S. at 622-23; *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

The right of expressive association, however, "is not absolute." *Boy Scouts*, 530 U.S. at 648. And the Supreme Court has never recognized the novel expressive association claim that Plaintiffs advance here, which would require the Government to relax a neutral law enforcement policy that allegedly disincentivizes certain individuals from attending communal gatherings. Traditionally, interference with a plaintiff's expressive association rights, either through direct or indirect restrictions on the ability to freely associate, will only result in a violation of the First Amendment if the

_____

[5] To the extent the Court determines more analysis is required, Defendants lack concrete, particularized facts to further assess the interests and burdens involved because Plaintiffs have failed to provide specific details about how a particular application of the Huffman Memorandum has caused a substantial burden on their religious exercise, even in the two instances in which they identify enforcement action that took place in or near their places of worship. Without particular concrete facts to analyze how the Huffman Memorandum might operate, it is impossible to further assess Defendants' compelling interests and whether those interests are furthered by the least restrictive means in a particular context. *See Gonzales*, 546 U.S. at 431 ("strict scrutiny 'at least requires a case-by-case determination . . . , sensitive to the facts of each particular claim" (quoting *Smith*, 494 U.S. at 899) (O'Connor, J., concurring in judgment)).

infringement would significantly burden those rights. *See id.* at 653; *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618-19 (2021). Even if a governmental action significantly burdens expressive-association rights, the action does not violate the First Amendment if it serves a compelling interest that "cannot be achieved through means significantly less restrictive of associational freedoms." *Boy Scouts*, 530 U.S. at 648 (quoting *Roberts*, 468 U.S. at 623); *cf. Ams. for Prosperity*, 594 U.S. at 607 (explaining that the standard of review for "First Amendment challenges to compelled disclosure" is "exacting scrutiny[,]" which requires the Government to demonstrate a "substantial relation between the disclosure requirement and a sufficiently important governmental interest" (citation omitted)).

### 1. Plaintiffs have not shown that the Huffman Memorandum significantly burdens their expressive association rights

Plaintiffs argue that the Huffman Memorandum "unconstitutionally burdens [their] collective religious expression and exercise" because the "looming threat of immigration enforcement actions" has "predictabl[y] . . . decreased attendance" at worship services and social service ministries. Pls.' Mem. at 24-25. They also contend that "[a]n enforcement action" worship or ministry services "will also directly impair" their expressive associational rights "by interrupting" those activities. *Id.* at 25. But in support of their argument, Plaintiffs point to "widely reported" prior immigration enforcement actions and "the current Administration's threats to engage in broad and heavy-handed immigration enforcement[,]"—not the Huffman Memorandum—to rebut the contention that these burdens are "hypothetical or subjective." *Id.* These arguments, however, reenforce the speculative nature of Plaintiffs' claim by demonstrating that any burdens on their religious exercise stem not from the Huffman Memorandum, but rather from the President's prioritization of immigration enforcement and past enforcement actions taken prior to the memorandum's issuance.

The speculative nature of the burdens Plaintiffs describe is further evidenced by the fact that the Huffman Memorandum does not directly force or prohibit Plaintiffs' expressive association because, as discussed above, the memorandum does not regulate, constrain, or compel Plaintiffs to

modify their behavior. *See supra* at 9-10. Nor does the memorandum require immigration enforcement officers to carry out enforcement actions in or near Plaintiffs' places of worship. The burdens Plaintiffs describe are thus based on conjecture—the possibility that immigration enforcement officers will decide to exercise their discretion and common sense to conduct enforcement activities in or near Plaintiffs' places of worship. Such speculation simply does not support a finding that the burdens Plaintiffs describe are significant.

### 2. The Huffman Memorandum furthers compelling governmental interests in uniform enforcement of the Nation's immigration laws that cannot be achieved through means significantly less restrictive of associational rights

Because Plaintiffs have failed to carry their burden of establishing that the Huffman Memorandum imposed a direct and significant burden on their right to expressive association, the First Amendment does not require Defendants to respond further. *See Boy Scouts*, 530 U.S. at 656 (inquiring whether the application of a state law runs afoul of the freedom of expressive association after having determined the existence of a significant burden on expression). Even if the Court were to conclude otherwise, the Huffman Memorandum serves the compelling governmental interest in enforcement of the Nation's immigration laws and is the least restrictive means to further that interest. *See supra* at 26-31.

### E. Plaintiffs Are Not Likely to Succeed on their APA claim

Plaintiffs assert that Defendant DHS acted arbitrarily in violation of the APA when it adopted the Huffman Memorandum and thus changed the agency's internal guidance to immigration enforcement officers regarding enforcement actions carried out in or near sensitive locations. Pls.' Mem. at 26-30. Plaintiffs' APA claim fails because (1) DHS's internal guidance to its enforcement officers regarding its enforcement approach is committed to agency discretion by law and (2) the decision is not a "final agency action" that is subject to judicial review.

### 1.  Immigration enforcement is committed to agency discretion by law

Plaintiffs' APA claim fails because discretionary policy choices about how best to enforce immigration law are committed to agency discretion by law.  The APA bars judicial review of agency action to the extent that it "is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  Agency action may be deemed committed to agency discretion "even where Congress has not affirmatively precluded review."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  Where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"— where, effectively, "there is no law to apply"—the APA does not permit judicial review.  *Id.*

When considering whether a matter is committed to agency discretion, courts review the statutory scheme to determine if it provides an adequate standard of review.  *Id.* at 831.  "Congress may limit an agency's exercise of enforcement power if it wishes," but only when Congress "has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, is there 'law to apply' under § 701(a)(2)."  *Id.* at 833-34.  Courts may also consider whether, as a matter of tradition, action is committed to agency discretion.  *See id.* at 832 ("[S]uch a decision has traditionally been 'committed to agency discretion,' and we believe that the Congress enacting the APA did not intend to alter that tradition.").

Decisions are "general[ly] unsuitabl[e]" for judicial review when they require "a complicated balancing of a number of factors which are peculiarly within its expertise" or involve where best to spend "agency resources," including whether the agency "is likely to succeed if its acts" and "whether the particular enforcement action requested best fits the agency's overall policies."  *Id.* at 831.  Decisions committed to agency discretion include, for example, an agency's decision not to institute enforcement proceedings, *id.* at 831-35; the allocation of lump-sum appropriations, *see Lincoln v. Vigil*, 508 U.S. 182, 192-95 (1993); and the refusal of an agency to grant reconsideration, *Interstate Com. Comm'n. v. Bhd. Of Locomotive Eng'rs*, 482 U.S. 270, 282-83 (1987).

Enforcement decisions traditionally involve considerable agency discretion. *See Texas*, 599 U.S. at 678 ("Under Article II, the Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'" (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021)); *see also JGE ex rel. Tasso v. United States*, 772 F. App'x 608, 612 (10th Cir. 2019) ("law enforcement decisions surrounding the investigation and prosecution of crimes . . . involve the exercise of discretion"); *Go Leasing, Inc. v. Nat'l Transp. Safety Bd.*, 800 F.2d 1514, 1523 (9th Cir. 1986) ("the Administrator need not promulgate rules constraining his discretion as to when to employ a particular statutory enforcement action"). Law enforcement guidance is generally committed to agency discretion because enforcement inherently requires a complicated balancing of factors to assess how the agency can best carry out its responsibility to enforce the law. *Cf. Heckler*, 470 U.S. at 831; *Texas*, 599 U.S. at 680 ("the Executive Branch must balance many factors when devising arrest and prosecution policies").

Finally, where "the type of agency decision in question has traditionally been committed to agency discretion," the action does not "become[] reviewable" just because "the agency gives a reviewable reasons" for it (or fails to do so). *Locomotive Eng'rs*, 482 U.S. at 282-83 (citation omitted).

Under these standards, DHS's adoption of the Huffman Memorandum, which provides internal guidance to immigration enforcement officers, is committed to agency discretion. The analysis begins with the statute. Congress through the INA and other statutes has granted immigration officers broad discretion in carrying out immigration laws. *See Arizona*, 567 U.S. at 396 ("A principal feature of the" congressionally established "removal system is the broad discretion exercised by immigration officials."). Nothing in the relevant statutes indicates that Congress intended to "limit [the] agency's exercise of enforcement power . . ., either by setting substantive priorities, or by otherwise circumscribing [the] agency's power to discriminate among issues or cases it will pursue." *Heckler*, 470 U.S. at 832-33. Thus, the INA's enforcement provisions, far from seeking to impose

constraints on the agency's "exercise of enforcement power," affords the Executive ample discretionary authority to prioritize when and where it will enforce law. *Id.* at 833.

Plaintiffs do not address Defendants' enforcement discretion in their memorandum and thus do not evaluate the discretionary nature of the INA. *See* Pls.' Mem. at 26-30. That decision is unsurprising given that the INA does not provide any meaningful standard by which to judge the agency's discretion as to enforcement actions in or near places of worship. As noted above, the INA imposes few location-based restrictions on DHS's broad authority to investigate and make arrests, and it evinces only limited intent to dictate agency discretion with respect to the mechanics of enforcement operations. *See, e.g.,* 8 U.S.C. §§ 1226(a), 1231(a)(1)(A), (2), 1357(a). For example, Congress limits when immigration officers may enter a farm or similar agricultural operation for investigative purposes. *Id.* § 1357(e). But aside from the requirement to obtain warrants in certain circumstances, *see, e.g., id.* § 1226(a), Congress has not placed other restrictions on Defendants' enforcement discretion, such as whether, when, or under what circumstances immigration offices may enter or approach sensitive locations, such as places of worship. Because Congress has circumscribed the Executive Branch's discretion in limited ways as to where it can conduct enforcement actions or under what circumstances, Congress's failure to do so with respect to places of worship means that Defendants' enforcement guidance is committed to agency discretion by law.

### 2. The Huffman Memorandum is not a reviewable final agency action

The APA claim fails for another reason: Plaintiffs have not shown that the Huffman Memorandum was a reviewable final action that has led to legal consequences. Judicial review is available only to challenge a "final agency action for which there is no other adequate remedy in a court . . . ." 5 U.S.C. § 704; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) ("When, as here, review is sought not pursuant to [a] specific authorization in the substantive statute, but only

under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'") (quoting 5 U.S.C. § 704).

Agency action may be deemed final if two conditions are satisfied. "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *U.S. Army Corp. of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). "[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett*, 520 U.S. at 178). The Huffman Memorandum does not meet this standard because it is "nothing more than an internal guidance document that does not carry the '"force and effect of law."' *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 713 (D.C. Cir. 2015) (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015)).

"In litigation over guidance documents, the finality inquiry is often framed as the question of whether the challenged agency action is best understood as a non-binding action, like a policy statement or interpretive rule, or a binding legislative rule." *Id.* at 716. "A policy statement 'explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion . . . under some extant statute or rule." *Id.* (citation omitted). The purpose of a policy statement is to "appris[e] the regulated community of the agency's intentions as well as informing the exercise of discretion by agents and officers in the field." *Id.* (citation omitted). A policy statement is neither binding on the public nor the agency and the agency "retains the discretion and the authority to change its position . . . in any specific case." *Id.* (citation omitted). Interpretive rules, "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers[,]" are similarly nonbinding because they "do not carry the force and effect of law[.]" *Id.* (citation omitted).

By contrast, a legislative rule "*modifies or adds* to a legal norm based on the agency's *own authority* flowing from a congressional delegation to engage in supplementary lawmaking." *Id.* at 716 (citation omitted). "The most important factor in differentiating between binding and nonbinding actions is 'the actual legal effect (or lack thereof) of the agency action in question,'" *id.* at 717 (citation omitted)— that is, whether the guidance carries "the force and effect of law," *id.* at 713 (citation omitted).

Plaintiffs assert that the Mayorkas Memorandum constituted a final agency rule because it "set forth the agency's 'fundamental' policy" with respect to enforcement actions at sensitive locations, which provided a "safe harbor" for religious institutions. Pls.' Mem. at 27-28 (quoting *Hawkes Co.*, 578 U.S. at 599). The Huffman Memorandum, they contend, "creates a new agency rule" by denying them the safe harbor they had relied upon to "freely . . . practice their faith" and thus constitutes reviewable final agency action. *Id.* But neither memorandum carries binding, legal consequences for Plaintiffs. They merely serve as internal advisements to immigration enforcement officers about the use of discretion for enforcement actions in or near sensitive locations and thus do not carry the force and effect of law. *See* Compl., Ex. 1; Ex. 2.

To begin, contrary to Plaintiffs' assertion, *see* Pls.' Mem. at 27, the Mayorkas Memorandum did not constitute an agency rule subject to review under the APA. DHS's enforcement authority is derived from statute. *See, e.g.*, 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained . . . ."). The Mayorkas Memorandum does not modify the applicable legal regime by interpreting the scope of the parties' statutory rights or duties. It offers no interpretations of the statutes and regulations governing immigration enforcement, and it states that the guidance contained within the memorandum "does not limit an agency's or employee's statutory authority[.]" Compl., Ex. 2 at 4. Although the Mayorkas Memorandum expressly provides that the agency's officers should, "[t]o the fullest extent possible" refrain from taking enforcement actions in or near a sensitive location, it does not prohibit such actions. *See id.* at 3-4. Rather, the memorandum

acknowledges that enforcement actions in or near sensitive locations may be taken and that ultimately, the decision to take or refrain from taking such an action requires the "exercise of judgment[.]"  *See id.*; *see also supra* at 20-21 (discussing enforcement actions taken at several of Plaintiffs' places of worship prior to issuance of Huffman Memorandum).  Because the Mayorkas Memorandum does not "definitive[ly]" provide a safe harbor for places of worship and other sensitive locations, it does not "give[] rise to 'direct and appreciable legal consequences,'" and thus does not satisfy the second prong of the test for final agency action.  *Hawkes Co.*, 578 U.S. at 598; *see also Ass'n of Flight-Attendants-CWA*, 785 F.3d at 717 ("a document that reads like an edict is likely to be binding, while one riddled with caveats is not").

Given that the Mayorkas Memorandum does not carry the force and effect of law, it follows that neither does the Huffman Memorandum.  As an initial matter, it cannot "'alter[] the legal regime' to which Plaintiffs are 'subject[,]'" Pls.' Mem. at 28 (quoting *Bennett*, 520 U.S. at 178), because the Mayorkas Memorandum did not create a legal regime (i.e., safe harbor) for places of worship.  Further, as with the Mayorkas Memorandum, the Huffman Memorandum offers no interpretations of the statutes or regulations governing immigration enforcement and does not require or prohibit enforcement actions in or near sensitive locations.  *See* Compl., Ex. 1.

The Huffman Memorandum thus does not share the characteristics of agency actions that the Supreme Court has found to be final agency actions subject to APA review.  The Supreme Court has found the "final agency action" requirement satisfied where an agency order exposed a party to double penalties in a future enforcement proceeding and limited its ability to obtain a government permit, *see Sackett v. EPA*, 566 U.S. 120, 126 (2012); where an agency terminated a program providing for certain non-Mexican nationals to be returned to Mexico to await the results of their removal proceedings and preventing government staff from returning aliens to Mexico pending removal proceedings, *see Biden*, 597 U.S. at 791, 793, 807-09; where, as discussed above, an agency made a definitive determination

whether property contained "waters of the United States," which affected the property owner's liability for the disposal of pollutants and was binding for five years, *Hawkes Co.*, 578 U.S. at 593, 598-600; and where an agency adopted regulatory requirements for actions that will affect endangered species, thus altering the "legal regime," *Bennett*, 520 U.S. at 158, 177-78. The Huffman Memorandum has no similar legal consequences for any external parties. *See Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1037 (D.C. Cir. 2007) (holding that EPA enforcement agreements are "exercises of its enforcement discretion" that "are not reviewable by this court"); *cf. Ass'n of Flight Attendants-CWA*, 785 F.3d at 712-13 ("internal guidance document issued to FAA aviation safety inspectors" "does not carry the 'force and effect of law'" and therefore "does not reflect final agency action" (quoting *Perez*, 575 U.S. at 97)).

Accordingly, the Huffman Memorandum is a statement of policy that explains how Defendants will exercise their broad discretion to enforce the Nation's immigration's laws. This Court, therefore, lacks jurisdiction over Plaintiffs' APA claim.

## II.    Plaintiffs Have Not Shown Irreparable Harm

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Conclusory or speculative allegations do not establish a likelihood of irreparable harm. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("[T]he injury must be both certain and great; it must be actual and not theoretical" and be "of such *imminence* that there a clear and present need for equitable relief to prevent irreparable harm" (citation omitted)).

For the same reasons Plaintiffs lack standing to bring this lawsuit, *see supra* at 8-21, Plaintiffs fail to carry their burden of establishing irreparable harm. Plaintiffs' claims that the Huffman Memorandum burdens their exercise of religion and infringes on their right to associate is based on the subjective concerns of their members and other community members not before this Court. As

40

such, Plaintiffs' alleged harm is speculative and does not demonstrate a harm that is "certainly impending." *Clapper*, 568 U.S. at 409; *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (holding prospective relief unavailable based on mere speculation of future injury).

Plaintiffs also cannot establish irreparable injury by alleging RFRA and First Amendment violations. *See* Pls.' Mem. at 30-31. That argument improperly conflates the merits with the harm analysis. As already explained, Plaintiffs have not shown that they are likely to succeed on the merits of those claims because Plaintiffs' allegations supporting those claims are based on the subjective fears of their members and other congregants not before this Court and thus are too speculative to demonstrate that the Huffman Memorandum substantially burdens the exercise of their religion or their ability to communally gather for purposes of worship and other ministry activities.

Finally, Plaintiffs cannot establish irreparable injury with respect to their APA claim because they have not demonstrated that the Huffman Memorandum constitutes reviewable final agency action. Even if the Court were to reach a different conclusion, Plaintiffs have not demonstrated that the relief they seek—staying the Huffman Memorandum during the pendency of this litigation and thus returning to the Mayorkas Memorandum—would prevent Plaintiffs' claimed harms because the Mayorkas Memorandum did not prohibit immigration enforcement actions at places of worship. Nor have Plaintiffs' shown that the Mayorkas Memorandum would have prohibited the enforcement actions that were taken at two member churches. Plaintiffs' argument that they will be harmed by immigration enforcement if the Huffman Memorandum is not stayed is, therefore, too speculative to demonstrate irreparable harm.

## III. Plaintiffs Have Not Shown That The Balance Of Equities And Public Interest Tip In Their Favor

The final two preliminary injunction factors, the public interest and the balance of the equities, also weigh against granting Plaintiffs' motion. These factors merge when the Executive is a party. *Nken*, 556 U.S. at 435. As discussed above, Plaintiffs cannot establish a cognizable injury sufficient to

confer Article III standing, let alone the much higher standard of an irreparable injury required for a preliminary injunction. *See Winter*, 555 U.S. at 21-22 (stating that the moving party must establish that irreparable harm is "*likely* in the absence of an injunction" and not merely a "possibility"). Nor have they demonstrated that they are likely to succeed on the RFRA and First Amendment claims. In contrast, Defendants have explained that the public interest in enforcement of the Nation's immigration laws is significant, particularly in light of the substantial increase in illegal immigration over the past several years. *See supra* at 26-31. To be sure, Section 1252(f)(1) reflects Congress's determination that the public interest supports avoiding judicial interference with enforcement by immigration officers carrying out their arrest and removal functions. The relief Plaintiffs seek would interfere with those enforcement functions, hindering "vigorous enforcement of [Congress's] prohibition against illegal immigration." *Castillo*, 659 F.2d at 1221. The balance of equities and the public interest thus tip in favor of Defendants.[6]

## IV.    Plaintiffs' Requested Relief is Overbroad

If the Court is inclined to grant Plaintiffs relief, it should reject the terms of Plaintiffs' overbroad injunction in favor of issuing an order that maintains the status quo.

Plaintiffs' requested injunction would prohibit Defendants from "carrying out immigration enforcement activities at Plaintiffs' places of worship or during religious ceremonies, absent exigent circumstances or . . . judicial warrant." Pls.' Mem. at 33. This language far exceeds the guidance contained in the Mayorkas Memorandum and would drastically alter the status quo that existed for years before the Huffman Memorandum was issued. The Mayorkas Memorandum simply required

---

[6] Plaintiffs also argue that the "preliminary injunction would simply preserve the status quo" and thus would provide Defendants "with alternative means of accomplishing their goals," tipping the scales in their favor. Pls.' Mem. at 32. The injunction Plaintiffs seek—enjoining Defendants from carrying out enforcement actions at Plaintiffs' places of worship absent exigent circumstances or a judicial warrant—alters the status quo and extends well beyond the status quo ante that existed under the Mayorkas Memorandum.

supervisor approval in the absence of an exigent circumstance—not a judicial warrant. Plaintiffs have provided no explanation or legal basis for the new judicial warrant requirement. Nor have they explained why a return to the status quo would be insufficient to redress their claimed injuries. The Court should decline to issue a mandatory injunction that "would change the status quo," particularly where Plaintiffs have failed to explain why altering the status quo is necessary. *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 92-93 (D.D.C. 2021) (citation omitted).

Moreover, because "standing is not dispensed in gross," any injunction must be tailored only to those specific plaintiffs who establish standing "for each form of relief that they seek." *Murthy*, 603 U.S. at 61. As explained above, only two Plaintiffs have even averred an immigration enforcement activity at a member's place of worship after the Huffman Memorandum was issued. *See supra* at 11-13; *M.M.V.*, 1 F.4th at 1110-11 (recognizing that courts are not prohibited from "paring down a case by eliminating plaintiffs who lack standing"). Any injunction should also, consistent with Section 1252(f)(1), not restrict Defendants' ability to execute administrative warrants or enforcement activity under 8 U.S.C. §§ 1221-1231. *See supra* at 21-22; *Philadelphia Yearly*, 2025 WL 585768, at * 14, 25, 27. And consistent with Federal Rule of Civil Procedure 65(d), any Plaintiff that has been granted relief should file a list of the names and addresses of their members' places of worship, so Defendants have fair notice of the locations where enforcement is restrained by any injunction. *See* Fed. R. Civ. P. 65(d)(1) (an injunction must "state its terms specifically" and "describe in reasonable detail—and not be referring to the complaint or other document—the act or acts restrained or required.").

The Court should also reject Plaintiffs' request that the Court stay the effective date of the Huffman Memorandum pursuant to Section 705 of the APA. *See* 5 U.S.C. § 705. As an initial matter, Plaintiffs cannot rely on Section 705 for relief because their APA claims fail for the reasons explained above. Additionally, consistent with the plain text of Section 705, courts have held that the phase "postpone the effective date" of an agency action authorizes the "postpone[ment of] the effective date

of a *not yet effective rule*, pending judicial review," but not suspension of a rule that is already in effect. *Safety-Kleen Corp. v. EPA*, Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324, at *2-3 (D.C. Cir. Jan. 19, 1996) (per curium) (emphasis added); *accord Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 204 (D.D.C. 2022) (collecting cases); *Nat. Res. Def. Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 151 (S.D.N.Y. 2019); *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1118 (N.D. Cal. 2017). Although these cases addressed an agency's own decision to "postpone the effective date" of an action, Section 705 uses identical language in the context of "the reviewing court . . . postpon[ing] the effective date of an agency action." 5 U.S.C. § 705.[7]

In any event, a Section 705 stay is subject to the same equitable limits as a preliminary injunction. Section 705 was designed "to reflect existing law . . . and not to fashion new rules of intervention for District Courts." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). The House Report that accompanied the APA explained that relief under Section 705 should "normally, if not always, be limited the parties' complainant." Administrative Procedure Act, S. Doc. No. 79-248, at 277 (1946).

The Supreme Court recently instructed that "[w]hen interpreting a statute that authorizes federal courts to grant" preliminary relief, courts "do not lightly assume that Congress has intended to depart from established principles" of equity. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (citation omitted). The plain language of Section 705 requires the Court to consider relief that merely "preserve[s] status or rights pending conclusion of the review proceedings" tailored "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. In limiting such relief "to the extent necessary to prevent irreparable injury," *id.*, the statue directs courts to apply traditional equitable principles,

---

[7] That Section 705 also authorizes reviewing courts to "preserve status or rights pending conclusion of the review proceedings" does not change the result. An order staying a rule after it has taken effect would not preserve, but rather alter, the status quo. *See, e.g.*, *Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*, 473 U.S. 1301, 1305 (1985) (explaining that a temporary restraining order that would have prevented implementation of regulations "would . . . have disturbed the status quo," rather than "preserv[ing]" it) (internal quotation marks omitted)).

which include tailoring relief to be no more intrusive than necessary to prevent irreparable harm to the parties.  Furthermore, Section 705 states that a court may enter relief where "justice so requires." *Id.*  Relief that is "just" simply accords with traditional equitable principles.  *Starbucks*, 602 U.S. at 348.

Accordingly, if the Court were to conclude that Plaintiffs have supported their claim of irreparable harm, a Section 705 stay would not be necessary to prevent that harm because the narrower remedy of temporarily enjoining the Huffman Memorandum against only those Plaintiffs that had demonstrated a cognizable injury.

Finally, the Court should order security with any preliminary injunction.  Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined."  Fed. R. Civ. P. 65(c).  In the event the Court issues an injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction.  *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied.

Dated:  March 14, 2025                    Respectfully submitted,

                                        YAAKOV M. ROTH
                                        Acting Assistant Attorney General

                                        ALEXANDER K. HAAS
                                        Branch Director

                                        ANDREW I. WARDEN
                                        Assistant Branch Director

                                        /s/ *Kristina A. Wolfe*
                                        KRISTINA A. WOLFE (VA Bar No. 71570)
                                        Senior Trial Counsel

United States Department of Justice
Civil Division
Federal Programs Branch
1100 L Street, NW, Room 7506
Washington, D.C. 20530
Tel: 202-353-4519
Fax: 202-616-8470
Email: Kristina.Wolfe@usdoj.gov