**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MENNONITE CHURCH USA et al., | |
| *Plaintiffs,* | |
| *v.* | Civil Action No. 1:25-cv-00403-DLF |
| U.S. DEPARTMENT OF HOMELAND SECURITY et al., | |
| *Defendants.* | |

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................ii

ARGUMENT......................................................................................................................1

   I.    Plaintiffs Have Standing To Challenge DHS's New Enforcement Policy ............................1

      A. Plaintiffs Have Established Cognizable Injury .................................................................1

         1.  Plaintiffs face an imminent threat of enforcement action. ..................................1

         2.  Plaintiffs are also presently injured by DHS's new enforcement policy..............3

      B. Plaintiffs' Injuries Are Traceable To DHS's New Enforcement Policy .............................5

      C. The Requested Preliminary Injunction Will Redress Further Injury......................................7

   II.    Plaintiffs Are Likely To Succeed On The Merits Of Their Claims .......................................8

      A. Plaintiffs Are Likely To Succeed On Their RFRA Claim ...................................................8

         1.  DHS's new enforcement policy substantially burdens Plaintiffs' religious exercise. .......8

         2.  The new enforcement policy does not satisfy strict scrutiny..............................10

      B. Plaintiffs Are Likely To Succeed On Their First Amendment Claim .................................13

      C. Plaintiffs Are Likely To Succeed On Their APA Claim.......................................................15

         1.  Congress has not granted DHS unfettered and unreviewable discretion to authorize immigration enforcement actions in places of worship. ...............................15

         2.  The Rescission Memo is final agency action.....................................................18

   III.    The Remaining Preliminary Injunction Factors Favor Plaintiffs .......................................21

   IV.    Section 1252(f)(1) Is Inapplicable Here ...............................................................................22

   V.    The Scope Of Plaintiffs' Request Relief Is Proper.................................................................24

CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586 (D.C. Cir. 2022)......3

*Al Otro Lado v. Exec. Office for Immigr. Rev.*, 120 F.4th 606 (9th Cir. 2024) ...............................................23

*Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021)...........................................................................15

*Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710 (D.C. Cir. 2015) ..................................................21

*Attias v. Carefirst, Inc.*, 865 F.3d 620 (D.C. Cir. 2017) .................................................................................6

*Bates v. City of Little Rock*, 361 U.S. 516 (1960) ..........................................................................................14

*Block v. Meese*, 793 F.2d 1303 (D.C. Cir. 1986)...........................................................................................4

*Bostock v. Clayton County*, 590 U.S. 644 (2020)...........................................................................................24

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) .....................................................................................13, 14

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ...................................................................9, 11, 12

*Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284 (D.D.C. 2020) .................................................12

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) .................................................................................1, 3, 5

*Cohen v. United States*, 578 F.3d 1 (D.C. Cir. 2009)................................................................................18, 19

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) .................................................................................3, 4, 17, 18

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ..............................................16, 17

*District of Columbia v. U.S. Dep't of Ag.*, 444 F. Supp. 3d 1 (D.D.C. 2020) .................................................25

*Epic Sys. Corp. v. Lewis*, 584 U.S. 497 (2018) ..............................................................................................24

*Fellowship of Christian Athletes v. District of Columbia*, 743 F. Supp. 3d 73 (D.D.C. 2024) .......................11

*General Elec. Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002) ......................................................................19, 20

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) ........................................11

*Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020)..............................................................................................16

*Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658 (D.C. Cir. 1978) ...........21

*Healy v. James*, 408 U.S. 169 (1972)............................................................................................................13

*Heckler v. Chaney*, 470 U.S. 821 (1985) ..................................................................................................16, 17

*Holt v. Hobbs*, 574 U.S. 352 (2015) ..............................................................................................................11

*Iowaska Church of Healing v. Werfel*, 105 F.4th 402 (D.C. Cir. 2024) .........................................................10

*Ipsen Biopharm., Inc. v. Becerra*, 678 F. Supp. 3d 20 (D.D.C. 2023) ...........................................................6

*Johnson v. District of Columbia*, 71 F. Supp. 3d 155 (D.D.C. 2014)...............................................................3

*Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008)................................................................................9

*Laird v. Tatum*, 408 U.S. 1 (1972) ...................................................................................4

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ..............................................................1

*Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988) ..............................10

*Mach Mining, LLC v. EEOC*, 575 U.S. 480 (2015).........................................................15

*Make the Road N.Y. v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020)...........................................16

*Nat'l Ass'n for Advancement of Colored People v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958)................14

*Nat'l Assoc. of Diversity Officers in Higher Educ. v. Trump*, -- F. Supp. 3d --, No. 1:25-cv-333,
    2025 WL 573764 (D. Md. Feb. 21, 2025) .............................................................25

*Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, -- F. Supp. 3d --, No. 25-cv-239,
    2025 WL 597959 (D.D.C. Feb. 25, 2025).............................................................25

*Nielsen v. Preap*, 586 U.S. 392 (2019) ............................................................................23

*Orangeburg v. FERC*, 862 F.3d 1071 (D.C. Cir. 2017)......................................................6

*Perez v. Mtg. Bankers Ass'n*, 575 U.S. 92 (2015) ...........................................................25

*Phila. Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, -- F. Supp. 3d --,
    No. 25-cv-243, 2025 WL 585768 (D. Md. Feb. 24, 2025) .....................6, 8, 10, 12, 14, 23

*Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989) ..................5

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ...............................................................15

*Roman Cath. Archbishop of Wash. v. Bowser*, 531 F. Supp. 3d 22 (D.D.C. 2021)...........12

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47 (2006) ...........................13

*Saline Parents v. Garland*, 630 F. Supp. 3d 201 (D.D.C. 2022).....................................4

*Singh v. Berger*, 56 F.4th 88 (D.C. Cir. 2022).................................................................11

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ................................................3

*Sutton Invs. v. Perlmutter*, No. 1:21-cv-3226, 2021 WL 6062635 (D.D.C. Dec. 22, 2021).......................25

*Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996) ...............................................................7

*Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007) ............................................................13

*Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186 (5th Cir. 2024)............................23

*Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707 (1981) .................................9

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) ...................................20

*U.S. Telephone Ass'n v. FCC*, 28 F.3d 1232 (D.C. Cir. 1994)...................................20, 21

*United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984) .....4

*United States v. Texas*, 599 U.S. 670 (2023) .................................................................17

*Urban Health Care Coal. v. Sebelius*, 853 F. Supp. 2d 101 (D.D.C. 2012)......................2

*Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021)..................................................................7

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9 (2018)......................15, 16, 17

**Statutes**

42 U.S.C. § 2000bb-1(b)................................................................................... 10, 11

42 U.S.C. § 2000bb-1(c) ........................................................................................23

42 U.S.C. § 2000bb-3(a) ........................................................................................23

5 U.S.C. § 553(d) ...................................................................................................25

5 U.S.C. § 705 .......................................................................................................24

8 U.S.C. § 1225(b)(1)(A)(iii)(I) ..............................................................................16

8 U.S.C. § 1252(f)(1) .............................................................................................22

8 U.S.C. § 1357 .....................................................................................................22

8 U.S.C. § 1357(a)(3) .............................................................................................18

8 U.S.C. § 1357(e) .................................................................................................18

8 U.S.C. §§ 1221–1231 ..........................................................................................22

**Regulations**

8 C.F.R. § 287.8 ...............................................................................................22, 23

8 C.F.R. § 287.8(f) ................................................................................................22

Enhancing the Enforcement Authority of Immigration Officers, 59 Fed. Reg. 42406-01

(Aug. 17, 1994).................................................................................................22

**Other Authorities**

Ted Hesson, *Top ICE Officials Reassigned Amid Pressure To Increase Arrests*, Reuters (Feb. 12, 2025),
https://www.reuters.com/world/us/top-ice-officials-reassigned-amid-pressure-increase-arrests-
sources-say-2025-02-12/ .....................................................................................2

## ARGUMENT

**I.    Plaintiffs Have Standing To Challenge DHS's New Enforcement Policy**

Plaintiffs allege "concrete and particularized" harms that are "actual or imminent," "fairly traceable" to DHS's sudden reversal of a decades-long immigration-enforcement policy, and redressable through the requested injunctive relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). These allegations are supported by evidence in the form of detailed declarations describing the source, scope, and nature of Plaintiffs' injuries. DHS's challenge to Plaintiffs' standing fails.

**A. Plaintiffs Have Established Cognizable Injury**

**1.    Plaintiffs face an imminent threat of enforcement action.**

DHS does not contest that Plaintiffs will be injured by immigration enforcement action at their places of worship. Nor does it contest that, if such enforcement action is imminent, Plaintiffs satisfy Article III's injury requirement. *See* Defs.' Mem. in Opp'n to Pls.' Mot. for Prelim. Inj. 13, ECF No. 16 ("Defs.' Mem."). DHS argues only that enforcement action is not imminent because the Rescission Memo does not expressly command agents to carry out enforcement activity at Plaintiffs' places of worship. *Id.* at 10. DHS's argument misunderstands both the applicable legal standard and the evidence in this case.

DHS's principal authority is *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), which considered a challenge based on the plaintiffs' fear that their communications would be monitored under a foreign electronic surveillance program. The Supreme Court concluded that the "highly attenuated chain of possibilities" on which the asserted injury relied—requiring that the government imminently target plaintiffs' communications with foreign contacts, that its authority to conduct the surveillance rely on the challenged statute instead of another source, and that a court then actually authorize the surveillance—was too speculative to confer standing. *Id.* at 410–11.

There is nothing "highly attenuated" about the threat of enforcement Plaintiffs face here. Whatever discretion it insists the Rescission Memo preserves, DHS does not dispute that ICE and CBP are very much under a mandate: To find, detain, and deport *every* removable person in the country. *See* Compl. ¶ 5, ECF No. 1; Mem. in Supp. of Pls.' Mot. for Prelim. Inj. 12–13, ECF No.

11-1 ("Pls.' Mem.").[1]  As their declarations establish, all Plaintiffs regularly host undocumented people at their places of worship, either as congregants or as visitors to Plaintiffs' social service ministries.[2]  And as DHS acknowledges, the purpose and effect of the Rescission Memo is to allow ICE and CBP to freely pursue those people in places of worship.  Defs.' Mem. 5–6.  In other words, the specific purpose of the new policy is to empower ICE and CBP agents to fulfill their mandate to detain every undocumented person by targeting them in places of worship and other sensitive locations.  *See* Compl. ¶ 4 (news article on DHS website stating that ICE agents understand the rescission "to free them up to go after more illegal immigrants").  Plaintiffs' undocumented congregants and visitors are thus absolutely a "special law enforcement priority" for DHS, Defs.' Mem. 14 (quoting *Urban Health Care Coal. v. Sebelius*, 853 F. Supp. 2d 101, 113 n.11 (D.D.C. 2012)), and finding them in their places of worship is part of the enforcement plan.

 Against this backdrop, the threat of enforcement activity at Plaintiffs' places of worship is far from hypothetical.  Plaintiffs are clear targets for an immigration enforcement action.  Their churches and synagogues are located in states, cities, and neighborhoods with large immigrant populations.  *See, e.g.*, Exs. 6, 13, 19, 34, 59.  Some are close to the border.  *See, e.g.*, Exs. 18, 39, 52.  That Plaintiffs' congregants and visitors include undocumented people is generally known to their communities, *see* Pls.' Mem. 4 (citing, e.g., Exs. 3, 24, 31), and in some instances, to immigration authorities as well, *see, e.g.*, Exs. 43, 66.  Several Plaintiffs have already experienced immigration enforcement actions at or near their places of worship since the policy rescission, putting them even

---

[1] Indeed, ICE's two most senior officials were recently demoted for failing to deliver on arrest and deportation quotas, despite arrest levels "three times higher" than before.  Ted Hesson, *Top ICE Officials Reassigned Amid Pressure To Increase Arrests*, Reuters (Feb. 12, 2025), https://www.reuters.com/world/us/top-ice-officials-reassigned-amid-pressure-increase-arrests-sources-say-2025-02-12/ [https://perma.cc/W7VT-2GLP] (quoting "border czar" Tom Homan).

[2] *See, e.g.*, Ex. 1 ¶¶ 8–9; Ex. 3 ¶¶ 9–10; Ex. 5 ¶ 8; Ex. 6 ¶ 6; Ex. 7 ¶ 10; Ex. 9 ¶¶ 9–10; Ex. 12 ¶¶ 7–8; Ex. 16 ¶¶ 7–8; Ex. 21 ¶¶ 8–12; Ex. 24 ¶ 7; Ex. 25 ¶ 7; Ex. 26 ¶ 7; Ex. 30 ¶ 8; Ex. 33 ¶¶ 9–10; Ex. 35 ¶¶ 7–9; Ex. 37 ¶ 8; Ex. 40 ¶¶ 4–8; Ex. 42 ¶¶ 6–8; Ex. 44 ¶¶ 6–7; Ex. 46 ¶¶ 4, 8–9; Ex. 49 ¶¶ 5, 8–9; Ex. 53 ¶ 6; Ex. 54 ¶¶ 7–8; Ex. 56 ¶¶ 8, 10; Ex. 58 ¶ 7; Ex. 60 ¶ 8; Ex. 63 ¶ 7; Ex. 65 ¶ 8.  Citations to "Ex. _" herein, without further reference, are to the declarations attached to Plaintiffs' motion for preliminary injunction.  *See* Exs. 1–66, ECF Nos. 11-4 to 11-69.

more squarely in ICE's sights.[3]  Some Plaintiffs have seen enforcement actions in close proximity to their churches.  *See* Pls.' Mem. 13 (citing, e.g., Exs. 18 (ICE raids near churches), 35 (ICE enforcement within two miles), 37 (ICE raid down the street), and 39 (ICE raid down the street)).  Others have seen indications of ICE surveillance.  *Id.* (citing Exs. 20 (agents taking photos of food pantry participants), 66 (suspected ICE surveillance outside church)).  And still others have already been the direct subjects of ICE enforcement actions.  *Id.* (citing Exs. 32, 46).

DHS's insistence that Plaintiffs point to a specific announcement of planned enforcement action at their places of worship, Defs.' Mem. 14, ignores the reality of law enforcement operations, which seldom broadcast the time and place of their occurrence to the targets of those operations, as well as the *Clapper* standard: Plaintiffs are not "uniformly require[d] . . . to demonstrate that it is literally certain that the harms they identify will come about"; rather, standing can be "based on a 'substantial risk' that the harm will occur."  568 U.S. at 414 n.5.  The Supreme Court has reiterated that standing can derive from "certainly impending" harm, "'substantial risk' that the harm will occur," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014), or "sufficient likelihood" of the asserted injuries, *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019).  Plaintiffs have more than met their burden of demonstrating that the "full panoply of circumstances" satisfies this standard. *Johnson v. District of Columbia*, 71 F. Supp. 3d 155, 160 (D.D.C. 2014).

### 2.  Plaintiffs are also presently injured by DHS's new enforcement policy.

Plaintiffs' declarations establish that they are also experiencing present injuries: (1) worship attendance and social services participation have already decreased as a result of the sensitive locations policy rescission; (2) the imminent risk of enforcement action is forcing Plaintiffs to violate

---

[3] DHS contends that Doe # 12's declaration does not show good cause to allow the use of a pseudonym.  Defs.' Mem. 11 n.1.  An organization need not make such a showing or reveal the identities of its members to establish standing.  *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 594 (D.C. Cir. 2022).  In any event, Doe # 12 (and all Doe declarants) have established good cause for pseudonymity because they fear that participation in this lawsuit will lead the government to retaliate against them.  That Doe # 12 is already known to the government only heightens the risk that participation in this suit will draw attention to him and prompt retaliation.

their religious beliefs now by either withdrawing their welcome to immigrants or instead making them easy targets for enforcement in their places of worship; and (3) the imminent risk of enforcement action is forcing Plaintiffs to undertake security measures now that are both costly and in tension with their religious duties.  *See* Pls.' Mem. 14.

DHS asserts that these are not cognizable injuries because the Rescission Memo does not "directly regulate or constrain" Plaintiffs, but rather "instructs *immigration enforcement officers* to exercise their discretion and use common sense when contemplating enforcement actions in or near sensitive locations." Defs.' Mem. 9–10.  But none of the cases DHS cites limit standing to allegations of harm from direct regulation of a plaintiff's own conduct.  *See Laird v. Tatum*, 408 U.S. 1, 14 (1972) (plaintiffs lacked standing because they did not allege "specific present objective harm[s] or a threat of specific future harm"); *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984) (plaintiffs lacked standing because they identified no "concrete harm[s] (past or immediately threatened) apart from the 'chill' itself'"); *Saline Parents v. Garland*, 630 F. Supp. 3d 201, 206 (D.D.C. 2022) (plaintiffs lacked standing to challenge mere existence of policy that did not "create an imminent threat of future legal actions against anyone, much less the plaintiffs").

Myriad cases, moreover, expressly recognize injury in the absence of such direct regulation. Plaintiffs' first present injury—decreased worship attendance and social services participation—is supported by well-established precedent on cognizable injury resulting from predictable third-party conduct.  In *Department of Commerce v. New York*, the state plaintiffs argued that the reinstatement of a citizenship question on the decennial census would prompt noncitizens to respond to the census at lower levels, resulting in inaccurate population counts that would reduce the states' political representation and federal funding.  588 U.S. at 772–73.  Although these injuries were directly attributable to noncitizens' decisions not to respond to the census, rather than to the citizenship question itself, the Court agreed that the states' injuries were cognizable based on the "sufficient likelihood" that the injuries would occur as "the predictable effect of Government action on the decisions of third parties."  *Id.* at 767–68; *see also Block v. Meese*, 793 F.2d 1303, 1306 (D.C. Cir. 1986)

4

("It is impossible to maintain, of course, that there is no standing to sue regarding [government action] which harms the plaintiff only through the reaction of third persons.").

In *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989), the Ninth Circuit adopted similar reasoning in a First Amendment challenge to an undercover immigration investigation of a church's activities. The court found that a chilling effect on third-party congregants, who in turn declined to participate in worship activities, was a sufficient impairment of the plaintiff churches' religious ministries to produce organizational injury. Rejecting the government's argument that the alleged injuries fatally did "not derive from coercive action by the [government]," the court determined that the "concrete, demonstrable decrease in attendance" at worship activities, though derived from a chill on individual congregants, was a "distinct and palpable" injury to the churches. *Id.* at 522 (internal quotation marks omitted).

Existing precedent makes equally clear that Plaintiffs' other current and ongoing injuries— the impossible choice between actions that violate Plaintiffs' religious beliefs, and costly security measures to protect against enforcement—are cognizable as well. Both injuries stem from the imminent *threat* of enforcement action at Plaintiffs' houses of worship, not from any subjective or speculative *fear* of enforcement, and are thus sufficient to support standing. *See Clapper*, 568 U.S. at 417–18 (distinguishing self-imposed costs and other harms borne out of "a threat of specific future harm" from those arising out of fears over the mere existence of a government activity).

**B. Plaintiffs' Injuries Are Traceable To DHS's New Enforcement Policy**

DHS limits its traceability argument to Plaintiffs' present harms of decreased worship attendance and social service participation and the measures Plaintiffs are currently undertaking to protect their congregants and visitors from enforcement action. DHS speculates that these injuries are not traceable to the new enforcement policy but rather to the general "increase in enforcement actions" since President Trump took office, "as well as media coverage of those actions." Defs.' Mem. 17.

To the extent DHS's point is that its general increase in enforcement action in Plaintiffs' neighborhoods and communities further heightens the risk of enforcement at Plaintiffs' places of

worship, Plaintiffs emphatically agree and appreciate the concession—as explained above and in Plaintiffs' motion, DHS's mass deportation efforts are one of the factors contributing to the imminent threat Plaintiffs face. *See supra* pp. 1–3; Pls.' Mem. 12–13. But that does not help DHS's traceability argument. "Article III standing does not require that the [challenged action] be the most immediate cause, or even a proximate cause, of the plaintiffs' injuries; it requires only that those injuries be 'fairly traceable' to the [challenged action]." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017); *see also Orangeburg v. FERC*, 862 F.3d 1071, 1080 (D.C. Cir. 2017) (the existence of an "equally important player in the story does not erase [the challenged action's] role"); *Ipsen Biopharm., Inc. v. Becerra*, 678 F. Supp. 3d 20, 33 (D.D.C. 2023) (under *Clapper*, traceability "does not require a plaintiff to show that the source of the injury is the *only* possible source").

The notion that DHS's new enforcement policy is not at least partly responsible—indeed, primarily responsible—for Plaintiffs' present injuries is implausible. It is the Rescission Memo that specifically empowered ICE and CBP to freely target Plaintiffs' places of worship for immigration enforcement action without the strict constraints previously imposed by the 2021 Memo and its strong presumption against enforcement in such locations. Plaintiffs' declarations, moreover, specifically attest that (1) congregants and social service recipients identify the new enforcement policy as the reason they have stopped coming to Plaintiffs' places of worship; and (2) Plaintiffs themselves identify the new enforcement policy as the reason they are undertaking measures to protect their congregants and visitors that are in tension with their religious beliefs. *See* Pls.' Mem. 14 (citing Exs. 1, 9, 30, 37, 43, 49, 51, 52, 58); *see also, e.g.*, Exs. 10, 46. As in *Philadelphia Yearly Meeting of Religious Society of Friends v. U.S. Department of Homeland Security*, "[w]here the religious institutions themselves, after hearing from their members, have concluded that the reduced attendance is caused by the 2025 Policy, and where it appears to have occurred only since the issuance of [that policy], DHS's attempts to contest the validity of this causal connection are not persuasive." -- F. Supp. 3d --, 2025 WL 585768, at *10 (D. Md. Feb. 24, 2025).

**C. The Requested Preliminary Injunction Will Redress Further Injury**

Finally, DHS argues that the requested preliminary injunction will not redress Plaintiffs' present injuries because "it is speculative to assume that [congregants'] subjective concerns . . . would be assuaged" if ICE and CBP can still enter places of worship under "exigent circumstances or with a judicial warrant." Defs.' Mem. 19–20.

Notably, DHS does not assert that the preliminary injunction would not result in fewer enforcement actions at Plaintiffs' places of worship, *see id.*, which would surely provide some redress to the injury directly inflicted on Plaintiffs by such actions. That implicit concession defeats DHS's redressability challenge, as "the ability to effectuate a partial remedy satisfies the redressability requirement." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) (internal quotation marks omitted). DHS also does not dispute that the lower risk of enforcement under the injunction would alleviate the present pressure Plaintiffs face to undertake costly protection measures that conflict with their religious obligations—which also amounts to "partial relief . . . sufficient for standing purposes." *Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996).

DHS's sole claim is that the reduction in enforcement actions under the preliminary injunction would not suffice to convince all of Plaintiffs' congregants and visitors to come back to their places of worship. *See* Defs.' Mem. 19–21. This argument is both beside the point under *Uzuegbunam*'s partial remedy standard and also belied by Plaintiffs' many declarations attesting that congregants and social service participants have identified DHS's new enforcement policy as the reason for their reduced attendance and participation. *See supra* p. 6.

These declarations also foreclose DHS's suggestion that a less fulsome preliminary injunction—one that reverts back to the 2021 policy—would not redress Plaintiffs' reduced attendance injury. Defs.' Mem. 20. The 2021 policy demanded that, "to the fullest extent possible, [agents] should not take an enforcement action in or near" a sensitive location, subject to only exceptionally narrow exceptions (e.g., "a national security threat" or "imminent risk of death, violence, or physical harm"). Compl. Ex. 2, ECF No. 1-2, at 3–4. Even then, such actions required

headquarters-level approval unless exigent circumstances made such preclearance impossible. *See id.* at 4. That policy provided a safe harbor for Plaintiffs to gather to worship and minister freely.

Plaintiffs request an injunction that does not include the 2021 policy's exception for certain actions with headquarters-level approval because, as explained below, *infra* pp. 8–15, that exception does not survive scrutiny under RFRA and the First Amendment, which require DHS to utilize the least (or significantly less) restrictive means to further any interest it has in conducting immigration enforcement at Plaintiffs' places of worship. Because exceptions for exigent circumstances and judicial warrants suffice to further any governmental interest, *see infra* pp. 11, 15, a more expansive supervisory-authority exception is unlawful. But the 2021 sensitive locations policy certainly provided some meaningful limitations on the unchecked enforcement authorized by the Rescission Memo. Either the requested injunction or an injunction reverting to the 2021 policy would realistically "reduce both the number of enforcement actions that would occur at a place of worship and the level of fear and concern over such actions that has caused the reduction in attendance at Plaintiffs' places of worship," and thus redress Plaintiffs' injuries, albeit to different degrees. *Phila. Yearly Meeting*, 2025 WL 585768, at *12.

## II.    Plaintiffs Are Likely To Succeed On The Merits Of Their Claims

### A.    Plaintiffs Are Likely To Succeed On Their RFRA Claim

#### 1.    DHS's new enforcement policy substantially burdens Plaintiffs' religious exercise.

DHS does "not doubt the sincerity" of Plaintiffs' religious beliefs, Defs.' Mem. 22, about the importance of "[w]orshipping together in person as a congregation, welcoming immigrants into their congregations, and serving immigrants in their communities through social service ministries," Pls.' Mem. 17. DHS nonetheless argues that the new enforcement policy does not substantially burden Plaintiffs' exercise of those beliefs.

As an initial matter, DHS does not and cannot contest that a raid of Plaintiffs' sanctuaries by ICE and CBP agents, interrupting Plaintiffs' worship, prayer, and ministry activities, will substantially burden Plaintiffs' religious exercise. *See* Defs.' Mem. 26. If the Court agrees with Plaintiffs that the threat of such interference is imminent, *see supra* pp. 1–3, it need go no further to

reject DHS's substantial burden argument. DHS is wrong, however, that its new enforcement policy does not presently burden Plaintiffs' religious exercise by imposing unconscionable choices on them and reducing participation in their religious activities.

The parties agree that "[a] substantial burden exists when government action puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (quoting *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981)); *see* Defs.' Mem. 23. According to DHS, the new enforcement policy does not substantially pressure Plaintiffs to modify their religious exercise because it "does not coerce Plaintiffs or their members to choose between the tenets of their faith and a government benefit or penalize Plaintiffs for following the tenets of their faith." Defs.' Mem. 24. This is false: If Plaintiffs continue to welcome undocumented people as their faith requires, they will be subject to ICE and CBP enforcement action at their places of worship—surely a penalty by any definition.

The Hobson's choice that Plaintiffs face is no different in effect than the one the Supreme Court recognized as substantially burdensome in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). To avoid a tax penalty under the challenged contraceptive care provision, the plaintiff employers could either include contraception coverage in their employee health insurance plan or drop insurance coverage altogether. *Id.* at 720. Although there was some factual dispute about the employer costs associated with the latter, the Court explained that even if dropping insurance coverage would save the plaintiffs money, they had "religious reasons for providing health-insurance coverage for their employees." *Id.* at 721. The challenged law thus substantially burdened their religious exercise by forcing them to choose between two options that both violated their religious beliefs. So, too, here. Indeed, if anything, the burden here is more profound, as the *Hobby Lobby* plaintiffs had a third option of paying additional taxes, *id.* at 720—a financial burden but not a religious one. Plaintiffs have no third option: They must either withdraw their welcome to undocumented people in violation of their religious beliefs or make their congregants and visitors easy targets for enforcement action in violation of their religious beliefs. *See* Pls.' Mem. 17–20. Either choice is unconscionable.

9

Addressing only Plaintiffs' reduced attendance and participation injuries, DHS cites *Iowaska Church of Healing v. Werfel*, 105 F.4th 402, 413 (D.C. Cir. 2024), for the proposition that injuries that "flow from the 'independent decisions of third part[ies]'" cannot amount to "a RFRA substantial burden." Defs.' Mem. 24 (alteration in original). *Iowaska* in fact says the opposite: The D.C. Circuit recognized that the Supreme Court relied on the "predictable" actions of third parties in determining whether the ACA's contraceptive mandate imposed a substantial burden in *Hobby Lobby*. 105 F.4th at 413. The court held only that the *Iowaska* plaintiff's reliance on third party conduct was too attenuated to establish Article III traceability. *Id.*; *cf. supra* pp. 5–6 (traceability satisfied here).

DHS's reliance on cases involving the government's management of its own internal affairs is also misplaced. Defs.' Mem. 24–25. These cases hold that "incidental effects of government programs, which may make it more difficult to practice certain religions, but which have no tendency to coerce individuals into acting contrary to their religious beliefs," do not trigger heightened scrutiny. *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988). A policy that removes limits on law enforcement interactions with the public in certain locations is not the government managing internal affairs, and there is nothing incidental about the effects of that policy on the communities in those locations. *See Phila. Yearly Meeting*, 2025 WL 585768, at *22 (holding that the new policy "effected a substantial change to DHS's immigration enforcement policy and its impact on individuals and groups outside of the Government by eliminating the specific limitations and safeguards set forth in the 2021 Policy").

DHS's final substantial burden argument—that the link between the Rescission Memo and Plaintiffs' injuries is "too attenuated," Defs.' Mem. 26—is a rehash of its standing argument and fails for the reasons explained above, *see supra* pp. 1–8.

2. **The new enforcement policy does not satisfy strict scrutiny.**

Because DHS's new enforcement policy substantially burdens Plaintiffs' religious exercise, RFRA entitles them to relief unless DHS demonstrates that its imposition of the burden on Plaintiffs is the least restrictive means of furthering a compelling governmental interest. *See* 42 U.S.C. § 2000bb-1(b). DHS's compelling interest argument consists mostly of general commentary

on immigration policy that glosses over RFRA's requirement that the government show a compelling interest in applying the challenged policy "to the *person*—the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt v. Hobbs*, 574 U.S. 352, 363 (2015) (emphasis added) (internal quotation marks omitted); *see also* 42 U.S.C. § 2000bb-1(b). DHS's reference to the importance of "[e]nforcing our Nation's immigration laws," Defs.' Mem. 27, for example, is the type of "broadly formulated interest," *Holt*, 574 U.S. at 362 (internal alteration and quotation marks omitted), that falls short under RFRA. So, too, is its description of the national immigration crisis and its impact on the American public, which sheds no light on any "specific harm that would . . . result from granting specific exemptions" to Plaintiffs and their members here. *Singh v. Berger*, 56 F.4th 88, 97 (D.C. Cir. 2022) (internal quotation marks omitted); *see also Fellowship of Christian Athletes v. District of Columbia*, 743 F. Supp. 3d 73, 86 (D.D.C. 2024) (RFRA looks to the government's "'marginal interest in enforcing' [its] policy" (quoting *Hobby Lobby*, 573 U.S. at 727)).

DHS eventually asserts a "need for uniformity" in immigration enforcement, *see* Defs.' Mem. 29 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006)), an argument that at least gestures at why DHS believes it has an interest in conducting enforcement actions at Plaintiffs' places of worship. But this argument also falls short of the specificity RFRA requires. To "demonstrate a compelling interest in uniform application of a particular program," the government must "offer[] evidence that granting the requested religious accommodations would seriously compromise its ability to administer the program." *Gonzales*, 546 U.S. at 435. The only "evidence" that DHS points to here is Congress's instruction that "the immigration laws of the United States should be enforced vigorously and *uniformly*" in the Immigration Reform and Control Act of 1986. Defs.' Mem. 29. DHS offers no explanation for why limiting enforcement actions at Plaintiffs' places of worship to exigent circumstances or the execution of a judicial warrant would seriously undermine effective immigration enforcement, which is what *Gonzalez* requires. *See* 546 U.S. at 435.

DHS's appeal to uniformity is also belied by the existence of secular exemptions under ICE's current policy. *See* Defs.' Mem. Ex. A, ECF No. 16-1; *see also* Defs.' Mem. 6 (explaining that DHS's

enforcement policy acknowledges that component heads "may wish to issue further guidance to assist officers in exercising appropriate enforcement discretion" and that ICE has issued such guidance). Despite its disclaimer of "bright line rules," Defs.' Mem. Ex. A at 1, ICE's guidance draws a clear line between secular protestors and religious worshippers, preferencing secular over religious activity in setting the threshold for enforcement authorization, *see id.* at 1 n.1, 2 (setting a higher level of internal review for enforcement targeting "public demonstration[s]" than that targeting "churches, synagogues, mosques, or other institutions of worship" due to "constitutional considerations"). Providing more protection for public demonstrations than religious gatherings "implies that [the government] favors some gatherings (protests) over others (religious services)" and "undermines" the government's "compelling interest." *Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 298 (D.D.C. 2020) (enjoining COVID regulations that were enforced at houses of worship but not public demonstrations); *see also Roman Cath. Archbishop of Wash. v. Bowser*, 531 F. Supp. 3d 22, 39 (D.D.C. 2021) (same as to regulations enforced at houses of worship but not stores).

As to narrow tailoring, DHS essentially argues that the new enforcement policy is narrowly tailored because it "eschews bright line rules" and instead "directs officers to rely on their discretion along with a healthy dose of common sense when contemplating enforcement actions in a sensitive location," Defs.' Mem. 30 (internal quotation marks omitted)—in other words, the policy is narrowly tailored because it is not tailored at all. Making matters worse, DHS makes no attempt to explain why the sensitive locations policy—which the agency followed for three decades—is not a more narrowly tailored alternative. That omission cannot be squared with DHS's "exceptionally demanding" burden to demonstrate that it "lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion." *Hobby Lobby*, 573 U.S. at 728; *see also Phila. Yearly Meeting*, 2025 WL 585768, at *23 ("[T]he 'least restrictive means' requirement [is not met] where the 2021 Policy itself provides an example of a less restrictive means that has not been shown to be inadequate to meet the governmental interest"); *cf. Hobby Lobby*, 573 U.S. at 730–31 (finding preexisting exemptions demonstrated that the government interest in a policy could be accomplished "equally well" through those exemptions' less-restrictive approaches).

12

Plaintiffs carefully tailored their preliminary injunction request to account for any legitimate interest DHS might have in enforcement in their places of worship: (1) In urgent situations, ICE and CBP may enter Plaintiffs' places of worship under the exigent circumstances exception that generally applies to warrantless law enforcement on private property; and (2) when ICE and CBP determine that they need to execute an arrest at Plaintiffs' places of worship under non-exigent circumstances, they may do so with a judicial warrant.  The framework proposed by Plaintiffs imposes the same limitations on ICE and CBP that have proven workable in other law enforcement contexts.  Because DHS has not demonstrated a compelling interest in any additional access to Plaintiffs' places of worship, RFRA entitles Plaintiffs to their requested preliminary injunction.

## B.  Plaintiffs Are Likely To Succeed On Their First Amendment Claim

As to Plaintiffs' First Amendment claim, DHS's primary contention is that Plaintiffs' expressive association rights are not infringed by the new enforcement policy because courts recognize only a limited variety of expressive association injuries that do not include the circumstances of this case.  Defs.' Mem. 31 (citing cases about penalizing membership in a disfavored group, compelling disclosure of group membership, or forcing a group to accept members it does not desire).  None of the cases cited by DHS support the limitation it urges; to the contrary, the Supreme Court has instructed courts to "give deference to an association's view of what would impair its expression."  *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000).

Courts have thus found unconstitutional infringement of expressive association in myriad circumstances that raised "First Amendment concerns about affecting the group's ability to express its message," including indirect government interference that "made group membership less attractive." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 69 (2006); *see, e.g.*, *Healy v. James*, 408 U.S. 169, 176, 183 (1972) (substantial burden includes denying recognition of student organization, which in turn prevented them from using campus communication platforms and other campus facilities); *Tabbaa v. Chertoff*, 509 F.3d 89, 102 (2d Cir. 2007) (law enforcement searches and detentions of religious-conference attendees were "sufficiently significant to implicate the protections of the First Amendment" (internal quotation marks omitted)).  Plaintiffs' First

Amendment claim lands squarely among the "many forms" of "[g]overnment actions that may unconstitutionally burden this freedom" of expressive association. *Boy Scouts*, 530 U.S. at 648.

Plaintiffs' evidence establishes that the challenged enforcement policy creates an imminent risk of enforcement action at the places where they gather for religious expression, thereby predictably decreasing participation in those collective faith services and ministries. Sounding in many of the same concerns that supported successful objections to compelled group membership disclosure in other cases, Plaintiffs challenge the new enforcement policy's terms, which facilitate the identification, interrogation, and detention of their congregants and visitors at their houses of worship—all with significant disruption to Plaintiffs' religious gatherings. *See Nat'l Ass'n for Advancement of Colored People v. Alabama ex rel. Patterson*, 357 U.S. 449, 462–63 (1958) (substantial burden where membership disclosure would "likely" prompt members to withdraw from plaintiff association or refrain from joining); *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960) (reduction in group membership stemming from compelled member identification "work[ed] a significant interference" with expressive association).

DHS also asserts that the new enforcement policy cannot infringe Plaintiffs' expressive association because it does not directly regulate Plaintiffs' conduct, Defs.' Mem. 32–33, and leaves immigration enforcement to officers' discretion, *id.* at 33. This repackaging of DHS's arguments on standing are unavailing here for the reasons already identified. *See supra* pp. 1–8. Moreover, there is no requirement that a significant burden on expressive association result from direct regulation of Plaintiffs' conduct. *See NAACP*, 357 U.S. at 461 (recognizing that "abridgement" of expressive association rights, "even though unintended, may inevitably follow from varied forms of governmental action"); *Phila. Yearly Meeting*, 2025 WL 585768, at *16 ("[A] government action may significantly affect or burden the right of expressive association without intending to do so and without directly restricting the right of individuals to associate freely." (citing cases)). Indeed, DHS acknowledges that interference with expressive association rights may result from either direct *or* indirect restrictions, Defs.' Mem. 31 (noting that penalizing or incentivizing individuals can affect group membership); it can include "state action which *may* have the effect of curtailing the freedom

14

to associate," or even an "unnecessary risk of chilling," *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 616 (2021) (internal quotation marks omitted).

DHS alternatively asserts that its infringement of Plaintiffs' expressive association is permissible under the First Amendment because it satisfies "exacting scrutiny," Defs.' Mem. 32— i.e., it serves a compelling government interest "that cannot be achieved through means significantly less restrictive of associational freedoms," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984). DHS's discussion on this point, *see* Defs.' Mem. 33, repeats its RFRA strict scrutiny defense, *see id.* at 26–31, which fails for the reasons already identified, *see supra* pp. 10–13.

### C.  Plaintiffs Are Likely To Succeed On Their APA Claim

As Plaintiffs' motion explains, the Rescission Memo flouts the APA by failing to provide a reasonable explanation for DHS's rescission of its decades-old policy directing officers to avoid immigration enforcement in sensitive locations. *See* Pls.' Mem. 26–30. Remarkably, DHS's opposition brief makes no attempt to defend the substance of the Rescission Memo or otherwise argue that the rescission satisfies the APA's arbitrary-and-capricious standard. *See* Defs.' Mem. 33– 39. DHS instead relies solely on two threshold defenses that are inapplicable here.

### 1. Congress has not granted DHS unfettered and unreviewable discretion to authorize immigration enforcement actions in places of worship.

DHS's argument that its policy is committed to agency discretion by law is foreclosed by the Supreme Court's repeated instruction that § 701(a)(2)'s reviewability exception be read "narrowly," restricted "to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (internal quotation marks omitted). The narrowness of § 701(a)(2)'s reviewability exception reflects the APA's "strong presumption favoring judicial review of administrative action," which can be rebutted only by a showing that "a statute's language or structure demonstrates that Congress wanted an agency to police its own conduct"—"a heavy burden" for the agency to bear. *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (internal quotation marks omitted).

Ignoring this standard, DHS simply asserts that *all* "policy choices about how best to enforce immigration law" generally are "committed to agency discretion by law." Defs.' Mem. 34. That is indisputably wrong: The INA contains no blanket grant of unreviewable discretion, and indeed, courts review APA challenges to INA enforcement policies frequently. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) (vacating DHS's rescission of the Deferred Action for Childhood Arrivals program as arbitrary and capricious under the APA); *Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020) (vacating various asylum processing policies as arbitrary and capricious). In the rare cases where courts have applied § 701(a)(2) to decisions related to immigration enforcement, it was because a specific INA provision explicitly committed the challenged decision to the agency's unreviewable discretion. *See, e.g.*, *Make the Road N.Y. v. Wolf*, 962 F.3d 612, 631–32 (D.C. Cir. 2020) (provision stating that decisions regarding expedited removal "shall be in the sole and unreviewable discretion of the [Secretary] and may be modified at any time" rendered such decisions immune from arbitrary-and-capricious review (quoting 8 U.S.C. § 1225(b)(1)(A)(iii)(I))). DHS does not identify any such grant of unbridled discretion here.

DHS's argument also rests upon a mischaracterization of Plaintiffs' claims as a challenge to DHS's exercise of enforcement discretion. Defs.' Mem. 35. Plaintiffs' complaint and motion make clear that they are not asking the Court to broadly superintend DHS's efforts to conduct immigration enforcement in their communities. This suit does not challenge DHS's allocation of enforcement resources, its determination of immigration priorities, its decisions on what immigrants to remove or how to accomplish such removals, or its general execution of arrests and apprehensions. Plaintiffs challenge only DHS's decision to reverse longstanding policy and authorize enforcement activities—including disruptive raids and site inspections—in sacred religious spaces. That challenge is narrow and specific, and it does not "involve[] agency decisions that courts have traditionally regarded as unreviewable," *Weyerhaeuser Co.*, 586 U.S. at 23.

DHS principally relies on *Heckler v. Chaney*, 470 U.S. 821 (1985), to argue that the sensitive locations policy falls within this category of traditional nonreviewability. But *Heckler* does not stand for the proposition that all decisions with some connection to an agency's enforcement authorities

are inherently unreviewable. *Heckler* held merely that "an agency's decision *not to take enforcement action* should be presumed immune from judicial review under § 701(a)(2)." *Id.* at 832 (emphasis added). Key to the Court's holding was the fact that "when an agency refuses to act it generally does not exercise its coercive power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect," *id.* (emphasis omitted), and the fact that decisions "not to prosecute or enforce" the law against specific parties have traditionally been viewed as "general[ly] unsuitab[le] for judicial review," *id.* at 831.

Here, the situation is reversed. By authorizing immigration enforcement at Plaintiffs' places of worship, DHS is exercising its coercive power in a way that directly infringes Plaintiffs' religious liberty and property rights, creating a "focus for judicial review." *Id.* at 832; *see also Regents*, 591 U.S. at 18 (rejecting government's portrayal of DACA policy as simply "a passive non-enforcement policy" in finding rescission of the policy reviewable). Again, Plaintiffs do not challenge DHS's discretionary decisions regarding whether and how to enforce immigration law, but only its rescission of a decades-old policy that was necessary to protect religious exercise. Because this "is not one of those areas traditionally committed to agency discretion," the Rescission Memo is "amenable to review . . . according to the general requirements of reasoned agency decisionmaking." *Dep't of Com.*, 588 U.S. at 772–73. After all, "[a] court could never determine that an agency abused its discretion if all matters committed to agency discretion were unreviewable." *Weyerhaeuser*, 586 U.S. at 23.[4]

DHS's argument reduces to the contention that, because the INA does not specifically set forth parameters to determine whether, when, and how the agency should conduct enforcement

---

[4] The various other cases DHS cites for the well-settled proposition that law "[e]nforcement decisions traditionally involve considerable agency discretion," Defs.' Mem. 35, do not change the fact that DHS's sensitive locations policy is not the kind of non-enforcement decision traditionally considered nonreviewable. And *United States v. Texas*, 599 U.S. 670 (2023), is inapposite twice over: It is an Article III standing decision that does not address § 701(a)(2) at all, and it involved a challenge to DHS's decision *not* to arrest and deport more noncitizens, *id.* at 678, not a decision to rescind a longstanding policy setting forth the agency's standards for conducting enforcement actions in specific locations deemed by the agency as warranting special consideration.

actions in or near places of worship, Defs.' Mem. 36, DHS's abrupt reversal of its longstanding policy is wholly unreviewable. That contention is foreclosed by *Department of Commerce*. Although the Census Act "confer[red] broad authority" on the Secretary of Commerce to conduct the census, including to select its questions, the Court concluded that Congress did "not leave [t]his discretion unbounded." 588 U.S. at 771–72. The statute did not dictate the census questions, but it did contain general provisions that "constrain[ed] the Secretary's authority to determine the form and content of the census," and those provisions confirmed that the decision was "amenable to review . . . according to the general requirements of reasoned agency decisionmaking." *Id.* at 772–73.

The same is true here. The INA does not specify the permissibility of immigration raids in churches and synagogues, but it *does* constrain DHS's use of its enforcement authority in ways that confirm this "is not one of those areas traditionally committed to agency discretion." *Id.* at 772; *see, e.g.*, 8 U.S.C. § 1357(a)(3) (permitting warrantless arrest in specified locations, such as a "railway car, aircraft, conveyance, or vehicle . . . but not dwellings"); *id.* § 1357(e) (restricting entry to a farm or outdoor agricultural operation absent a "properly executed warrant" or owner's consent). And, as with the census, "courts [hear] both constitutional and statutory challenges to" the INA. *Dep't of Com.*, 588 U.S. at 772.

### 2. The Rescission Memo is final agency action.

DHS next contends that the Rescission Memo is unreviewable because it amounts to no more than a "statement of policy" explaining how DHS will "enforce the Nation's immigration[] laws." Defs.' Mem. 40. DHS is wrong. In adopting the 2021 Memo, DHS bound itself and its agents "to refrain, to the fullest extent possible, from conducting a law enforcement action in or near" a place of worship. Compl. Ex. 2 at 3. By setting restrictive standards that cabined agents' conduct, DHS adopted an agency rule; its abrupt rescission of that rule is final agency action.

In evaluating whether an agency action created rights or obligations, or "produced legal consequences" for purposes of final agency action, courts "inquire whether the language and the content of the [action] bound the [agency] or genuinely left the agency and its decisionmakers free to exercise discretion." *Cohen v. United States*, 578 F.3d 1, 7 (D.C. Cir. 2009) (internal alteration and

quotation marks omitted), *rehearing in part granted on other grounds*, 599 F.3d 652 (D.C. Cir. 2010).  A document "laden with mandatory language" that "curb[s] the agency's discretion" in particular cases within its purview will be viewed as having binding effect and thus as final for purposes of reviewability.  *Id.*  Relatedly, when "the language of the document is such that private parties can rely on it as a norm or safe harbor by which to shape their actions, it can be binding as a practical matter."  *General Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (citation omitted); *see also Cohen*, 578 F.3d at 9 (holding that notice not only "created an obligation on the part of the IRS" but "also gave taxpayers the concomitant right to receive a refund if they conformed to the notice's instructions").

Both the Rescission Memo and the 2021 Memo fit this mold.  The 2021 Memo set forth the agency's "fundamental" policy, which directed officers "[t]o the fullest extent possible . . . not [to] take an enforcement action in or near a location" deemed "a 'protected area,'" including places of worship, religious study, or ceremonies.  Compl. Ex. 2 at 2–3.  The Memo is replete with language indicating DHS intended to bind itself and its officials to the code of conduct it laid out: "Our obligation to refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area thus applies at all times and is not limited by hours or days of operation."  *Id.* at 3.  And although the 2021 Memo recognized "that there might be limited circumstances under which an enforcement action needs to be taken in or near" a sensitive location, *id.*, the exceptionally narrow set of situations in which DHS contemplated such actions "might" be permissible confirms the restrictive nature of the 2021 policy.  Specifically, DHS envisioned that enforcement in or near places of worship "might" be necessary when there existed "a national security threat," "imminent risk of death, violence, or physical harm," "hot pursuit of an individual who poses a public safety threat" or "a personally observed border-crosser," no "safe alternative location" to conduct the operation, or "an imminent risk that evidence material to a criminal case will be destroyed."  *Id.* at 3–4.  Those tightly circumscribed scenarios in which an exception "might" be warranted cabined the discretion of agents by creating a very strong presumption against entering sacred spaces.  And even

when exceptional circumstances justified a deviation from the policy, headquarters-level advanced approval was required, absent exigent circumstances. *Id.* at 4.

The 2021 policy thus was no "mere[] . . . internal advisement[] to immigration enforcement officers about the use of discretion," *contra* Defs.' Mem. 38. By strictly limiting the scenarios in which immigration enforcement could take place in religious spaces, the 2021 policy created "a norm or safe harbor by which" Plaintiffs and other religious groups could "shape their action[,]" *General Elec.*, 290 F.3d at 383 (citation omitted). As set forth in Plaintiffs' declarations and discussed above, Plaintiffs' congregations relied on DHS's 30-year unbroken policy of refraining from immigration enforcement in sensitive locations as they structured their religious practice—and especially their social-service offerings—to fulfill their religious mandate while serving immigrant community members.

Just as the 2021 Memo bound the agency and constituted final agency action, so too does the Rescission Memo. Communities of faith now must suffer "the denial of the safe harbor" they previously relied upon. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016). DHS attempts to defeat this straightforward conclusion by claiming that, because the 2021 Memo contained (highly circumscribed) exceptions, it did "not 'definitive[ly]' provide a safe harbor for places of worship" and thus did not satisfy the test for final agency action. *See* Defs.' Mem. 39 (alteration in original). But the authority on which DHS relies, *Hawkes Co.*, 578 U.S. at 598, does not support the proposition that the presence of narrow exceptions in an otherwise-binding policy render it nonfinal for purposes of review. (Were that the case, agencies could evade judicial review simply by writing exceptions into otherwise-applicable policies.) The *Hawkes* Court merely noted that the "definitive" nature of the decision under review there was not altered by the fact that the agency could revise its determination if presented with new information. 578 U.S. at 598.

DHS's argument that narrow exceptions in the previous policy mean that it did not bind the agency is inconsistent with D.C. Circuit precedent. For example, in *U.S. Telephone Association v. FCC*, 28 F.3d 1232, 1234 (D.C. Cir. 1994), the Court rejected an agency's characterization of a detailed set of standards "as a policy statement" despite the fact that the agency "reiterated 12 times that it

retained discretion to depart from the standards in specific applications." *Id.* What mattered was that the standards set forth "an exhaustive framework" that "cabin[ed] [the agency's] discretion." *Id.*. "If it appears that a so-called policy statement is in purpose or likely effect one that narrowly limits administrative discretion . . . it is a binding rule of substantive law" since "[t]he mere existence of some discretion is not sufficient, although it is necessary, for a rule to be classified as a general statement of policy." *Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666–67 (D.C. Cir. 1978); *see also id.* at 667 n.33 ("[A] discretionary waiver provision is not sufficient to qualify an otherwise nondiscretionary regulation as a 'general statement of policy.'").

Likewise here, the existence of narrow "discretion to depart from the standards in specific applications," *Telephone Ass'n*, 28 F.3d at 1234, did not render the agency's binding rule a mere statement of policy. For decades Plaintiffs invited undocumented community members to worship and to partake of their social service offerings without fear that, by so doing, they would set those individuals up as easy targets for immigration enforcement. By denying Plaintiffs that safe harbor on which they have relied for decades, DHS's rescission has altered Plaintiffs' rights, and created appreciable legal consequences, permitting judicial review.[5]

**III.    The Remaining Preliminary Injunction Factors Favor Plaintiffs**

As DHS acknowledges, Defs.' Mem. 40–41, its irreparable harm argument is the same as its standing and final agency action arguments. With respect to the last two factors—the public interest and the balance of the equities—DHS recycles its RFRA and First Amendment merits arguments.

---

[5] DHS's heavy reliance on *Association of Flight Attendants-CWA v. Huerta*, 785 F.3d 710, 713 (D.C. Cir. 2015), is misplaced. *Flight Attendants* involved a challenge to an internal guidance document that advised aviation safety inspectors how to evaluate airlines' carry-on baggage programs for compliance with regulations allowing airlines to permit the use of personal electronic devices if the airline determines such use will not interfere with navigational and communication systems. *Id* at 714–15. That internal advice neither required any airline to "alter any policy in response to it," "eliminate[d] the discretion of safety inspectors," nor required the approval or disapproval of any baggage program—in short, it did not create "rights or obligations[] or produce legal consequences." *Id.* at 714. Importantly, not only did that guidance not purport to bind the public—it also did not bind the agency nor purport to limit its discretion. *Id.* at 717–18.

*Id.* at 41–42.  These arguments fail for the reasons already identified.  *See supra* pp. 1–8 (standing), 18–21 (final agency action), 8–15 (RFRA and First Amendment).

## IV.    Section 1252(f)(1) Is Inapplicable Here

DHS contends that the Court lacks jurisdiction to enter Plaintiffs' requested injunction because 8 U.S.C. § 1252(f)(1) specifies that, except for cases brought by "an individual alien" challenging her own removal proceedings, "[r]egardless of the nature of the action or claim or of the identity of the party . . . no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter."  Part IV includes §§ 1221–1231 of the INA, which contain certain authorities permitting the inspection, apprehension, examination, exclusion, and removal of aliens.  *See* 8 U.S.C. §§ 1221–1231.

DHS does not explain how, precisely, the requested injunction would implicate a covered provision, and instead relies on the vague assertion that "in the Government's view" restraining DHS from engaging in immigration enforcement in or near Plaintiffs' places of worship would "interfere[] with the Government's efforts to operate" unspecified aspects of "those provisions." Defs.' Mem. 21.  But Plaintiffs' requested injunction is best understood as impacting DHS's enforcement activities generally, and that conduct is governed by 8 C.F.R. § 287.8, "Standards for enforcement activities."  Those standards include provisions governing, *inter alia*, the use of force, interrogation and temporary detention, arrest conduct, and the transport of detained individuals.

Of particular importance, the regulation also governs site inspections, which are "enforcement activities undertaken to locate and identify aliens illegally in the United States . . . at locations where there is a reasonable suspicion, based on articulable facts, that such aliens are present."  8 C.F.R. § 287.8(f).  It further prohibits site inspections of non-public areas in the absence of a warrant or lawful consent.  *Id.*  DHS's standards for enforcement activities were not promulgated under the authorities granted in §§ 1221–1231, but instead were adopted "to implement section 503 of the Immigration Act of 1990," which is codified at 8 U.S.C. § 1357. Enhancing the Enforcement Authority of Immigration Officers, 59 Fed. Reg. 42406-01, 42406 (Aug. 17, 1994).  Section 1357, in turn, is not covered by § 1252(f)'s bar on injunctive relief, as DHS

acknowledges.  *See* Defs.' Mem. 22 n.3.  In short, Plaintiffs' requested relief is not barred by

§ 1252(f)(1) because it implicates regulatory authority promulgated under non-covered provisions.

Moreover, even if Plaintiffs' requested injunction did in some way affect the agency's

operation of covered provisions, § 1252(f)(1) still would not apply because an injunction that directly

implicates a non-covered provision but has some "collateral effect on DHS's operation of

proceedings under covered provisions" is not "within the scope of § 1252(f)(1)."  *Al Otro Lado v.*

*Exec. Office for Immigr. Rev.*, 120 F.4th 606, 627 (9th Cir. 2024); *see also Texas v. U.S. Dep't of Homeland*

*Sec.*, 123 F.4th 186, 209–10 (5th Cir. 2024) (same).  That is the situation here: The requested

injunction is directed at DHS's general enforcement conduct governed by 8 C.F.R. § 287.8 and

would have at most a collateral effect on the agency's implementation of a covered provision.

In *Philadelphia Yearly Meeting*, the district court largely rejected DHS's § 1252(f) argument but

nonetheless excluded from its injunction "one provision that appears to provide the authority for

. . . arrests pursuant to an administrative warrant."  2025 WL 585768, at *14.  This carve-out was

unnecessary.  Although § 1226(a) generally provides authority for such arrests, it does not address

*where* DHS can conduct immigration enforcement and thus is not directly implicated by the

requested injunction.  As explained above, *supra* p. 22, where DHS may conduct immigration

enforcement is governed by its regulation regarding onsite inspections.

In the event the Court disagrees with Plaintiffs that their requested injunctive relief does not

amount to enjoining § 1226(a), Plaintiffs have preserved a direct challenge to § 1226(a).  *See* Compl.

pp. 78–79 (paras. (a)–(c)).  At minimum, § 1252(f) does not bar declaratory relief, *see Nielsen v. Preap*,

586 U.S. 392, 402 (2019), and the Court should also find that it also does not bar injunctive relief as

necessary to remedy Plaintiffs' injuries under RFRA: If § 1252(f) is interpreted to foreclose lower

courts from enjoining immigration enforcement action in places of worship, it conflicts directly with

RFRA's directive that persons whose religious beliefs are burdened in violation of RFRA are entitled

broadly to "appropriate relief," 42 U.S.C. § 2000bb-1(c), an entitlement that "applies to all Federal

law, and the implementation of that law, whether statutory or otherwise, and whether adopted

before or after November 16, 1993," *id.* § 2000bb-3(a).  "When confronted with two Acts of

Congress" in conflict, courts "come armed with the strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (cleaned up). There is no indication that when Congress enacted § 1252(f)'s bar on certain lower-court injunctions, it impliedly repealed RFRA's pre-existing protections for religious liberty. To the contrary, it is RFRA that "operates as a kind of super statute, displacing the normal operation of other federal laws." *Bostock v. Clayton County*, 590 U.S. 644, 682 (2020). Accordingly, any tension between § 1252(f) and RFRA must be resolved in favor of RFRA.

## V.    The Scope Of Plaintiffs' Request Relief Is Proper

DHS ends with a hodgepodge of challenges to the scope of Plaintiffs' requested injunction, none with merit. As explained, *supra* p. 8, Plaintiffs seek an injunction that is broader than the 2021 sensitive locations policy only with respect to the narrow exceptions available with headquarters-level approval, and that is because those exceptions do not survive scrutiny under RFRA or the First Amendment. DHSs current plan to conduct mass deportations until every removable person in the country is gone, *see* Pls.' Mem. 9–11, is itself an upheaval of the status quo, and restricting enforcement in places of worship to judicial warrants or exigent circumstances will ensure that such enforcement remains as prudently rare as in the previous 30 years.

Plaintiffs agree with DHS that they are entitled to an injunction that covers the members and congregations of each Plaintiff that has established standing, Defs.' Mem. 43, which is all 27 Plaintiffs. *See supra* pp. 1–8; Pls.' Mem. 12–16. Plaintiffs have no objection to providing DHS a list of their covered places of worship subject to an appropriate protective order.

DHS next argues that the Court is powerless to stay the effective date of its Rescission Memo simply because the rule already has taken effect. Not so: the APA confirms that, "to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. DHS relies on cases holding that *an agency* may not stay a rule once it takes effect without undergoing notice-and-comment rulemaking, Defs.' Mem. 43–44,

but those decisions rely on the principle that the APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance," *Perez v. Mtg. Bankers Ass'n*, 575 U.S. 92, 101 (2015), and that principle has no bearing on the power of a reviewing court to issue a § 705 stay. Were DHS correct that a reviewing court is powerless to stay a rule once it has taken effect, agencies would be incentivized to issue rules that take immediate effect, in contravention of the requirement to publish notice of a substantive rule "30 days before its effective date," 5 U.S.C. § 553(d). Regardless, DHS's attempt to limit the scope of relief available under the APA is wrong for the reasons explained thoroughly by then-Chief Judge Howell in rejecting precisely the arguments pressed here. *See District of Columbia v. U.S. Dep't of Ag.*, 444 F. Supp. 3d 1, 46–55 (D.D.C. 2020) (concluding that § 705 "plainly and simply authorizes courts to stay agency rules pending judicial review" (internal quotation marks omitted)).

Finally, DHS suggests that the Court require Plaintiffs to "post an appropriate bond commensurate with the scope of any injunction." Defs.' Mem. 45. Rule 65(c) "'has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond,' 'including the discretion to require no bond at all[.]'" *Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, -- F. Supp. 3d --, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (citations omitted); *see also Sutton Invs. v. Perlmutter*, No. 1:21-cv-3226, 2021 WL 6062635, at *6 n.4 (D.D.C. Dec. 22, 2021) (waiving Rule 65(c) bond). The Court should decline to require a bond here. DHS has not identified any financial cost it will incur as a result of the requested injunction, and courts "frequently waive[] the bond requirement in cases where a fundamental constitutional right is at stake," *Nat'l Assoc. of Diversity Officers in Higher Educ. v. Trump*, -- F. Supp. 3d --, 2025 WL 573764, at *30 (D. Md. Feb. 21, 2025), or where requiring a bond "would have the effect of denying the plaintiffs their right to judicial review," *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19.

## CONCLUSION

The Court should grant Plaintiffs' motion for a preliminary injunction, as set forth in Plaintiffs' proposed order, and stay the effective date of DHS's 2025 Rescission Memo, pending final resolution of Plaintiffs' claims.

Dated: March 24, 2025

Respectfully submitted,

/s/ *Kelsi Brown Corkran*
Kelsi Brown Corkran (Bar No. 501157)
Shelby B. Calambokidis (Bar No. 1684804)
Julia Gegenheimer* (NY Bar No. 4949475)
Alexandra Lichtenstein (Bar No. 1724947)
Kate Talmor* (Maryland Bar)
INSTITUTE FOR CONSTITUTIONAL ADVOCACY
    AND PROTECTION
600 New Jersey Avenue, NW
Washington, DC 20001
(202) 661-6728
kbc74@georgetown.edu

*Attorneys for Plaintiffs*

*Admitted pro hac vice. DC Bar application pending, practice pursuant to Rule 49(c)(8), DC Courts, and supervised by DC Bar member.*