UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA, *et al.*,

    *Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

    *Defendants*.

No. 25-cv-00403 (DLF)

## MEMORANDUM OPINION

Twenty-seven faith communities bring this action against federal immigration agencies seeking injunctive relief. On January 20, 2025, the U.S. Department of Homeland Security (DHS) rescinded its "sensitive locations" policy, which previously directed immigration officers to avoid enforcement actions in or near places of worship. Plaintiffs allege that the rescission violates the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb *et seq.*; the First Amendment; and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* Before the Court is the plaintiffs' motion for a preliminary injunction. Pls.' Mot., Dkt. 11. For the reasons that follow, the Court will deny the motion.

**I.   BACKGROUND**

    **A.   Statutory Background**

DHS is the executive agency with principal responsibility for enforcing the nation's immigration laws. 8 U.S.C. § 1103(a)(1). Congress has authorized immigration officers to interrogate, arrest, detain, and remove aliens who are unlawfully present in the United States or otherwise subject to removal. *Id.* §§ 1226, 1357. For over three decades, DHS and its predecessors have limited enforcement actions in or near "sensitive locations," including places of worship and

other religious ceremonies.  Compl. ¶ 60, Dkt. 1; *see* Memorandum from James A. Puleo, Acting Assoc. Comm'r, INS, "Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies," HQ 807-P (May 17, 1993), Dkt. 1-6.  Under the long-standing policy, enforcement actions in or near sensitive locations were permitted only with prior written supervisory approval or under exigent circumstances.  *Id.*; *see* Memorandum from Julie L. Myers, Assistant Sec'y, ICE, "Field Guidance on Enforcement Actions or Investigative Activities at or Near Sensitive Community Locations," 10029.1 (July 3, 2008), Dkt. 1-5; Memorandum from John Morton, Dir., ICE, "Enforcement Actions at or Focused on Sensitive Locations," 10029.2 (Oct. 24, 2011), Dkt. 1-4.

In 2021, then-Secretary of DHS Mayorkas issued updated guidance on the sensitive locations policy.  Memorandum from Alejandro N. Mayorkas, Sec'y, DHS, "Guidelines for Enforcement Actions in or Near Protected Areas" (Oct. 27, 2021) ("Mayorkas Mem."), Dkt. 1-2.  The Mayorkas Memorandum superseded prior guidance but reaffirmed that "to the fullest extent possible, [immigration officers] should not take an enforcement action in or near a protected area," including at a "place of worship or religious study, whether in a structure dedicated to activities of faith (such as a church or religious school) or a temporary facility or location where such activities are taking place."  *Id.* at 2–3.  It defined enforcement actions to include "arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance." *Id.* at 4.  The Memorandum continued to recognize exceptions for actions taken with prior written approval or under exigent circumstances.  *Id.* (defining exceptions as where "[a] safe alternative location does not exist"; an action involves "a national security threat," "imminent risk of death, violence, or physical harm to a person," "hot pursuit of an individual who poses a public safety threat," or "a personally observed border-

crosser"; or where there is an "imminent risk that evidence material to a criminal case will be destroyed"). It further explained that "the exercise of judgment" was required to determine what was "near" a sensitive location and whether exigent circumstances existed. *Id.* at 3–4.

Shortly after the current administration took office on January 20, 2025, then-Acting DHS Secretary Huffman issued a new memorandum rescinding the Mayorkas Memorandum. Memorandum from Benjamine C. Huffman, Acting Sec'y, DHS, "Enforcement Actions in or Near Protected Areas" (Jan. 20, 2025) ("Rescission Mem."), Dkt. 1-1. The Recission Memorandum "supersedes and rescinds" prior guidance and provides that DHS will no longer impose "bright line rules regarding where our immigration laws are permitted to be enforced." *Id.* It directs officers to use "discretion along with a healthy dose of common sense" to make enforcement determinations, including in or near sensitive locations. *Id.* Then-acting Director of U.S. Immigration and Customs Enforcement (ICE) Vitello issued follow-on guidance, charging "Assistant Field Office Directors (AFODs) and Assistant Special Agents in Charge (ASACs) with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area." Memorandum from Caleb Vitello, Acting Dir., ICE, "Common Sense Enforcement Actions in or Near Protected Areas" (Jan. 31, 2025) ("Vitello Mem."), Dkt. 16-1.

The rescission of the sensitive locations policy reflects the administration's broader initiative to accelerate immigration enforcement. Compl. ¶ 5. Officials have publicly announced the goal of deporting all immigrants unlawfully present in the U.S., and ICE officers have been directed to meet increased quotas for daily arrests. *See id.* ¶¶ 5, 74, 77 & n.41. DHS's press release about the policy rescission, as posted on the government website, highlights that "ICE agents who spoke to Fox News said they believe that rescinding the Mayorkas order is going to free them up

to go after more illegal immigrants." Press Release, DHS, "Promises Made, Promises Kept: President Trump Is Already Securing Our Border and Deporting Criminal Aliens" (Jan. 26, 2025); *see* Compl. ¶ 4 & n.5

### B.    Factual and Procedural Background

Plaintiffs are a coalition of sixteen denominational bodies and eleven denominational and interdenominational associations rooted in the Jewish and Christian faiths. Compl. ¶ 1. "Welcoming and serving the stranger, or immigrant, is . . . a central precept of their faith practices." *Id.* Plaintiffs' member congregations offer worship services and provide social service ministries—including food and clothing pantries, language classes, legal assistance, and job training services—to all persons "without regard to [their] documentation or legal status." *Id.* ¶¶ 2, 7. Many of plaintiffs' member churches and synagogues have undocumented congregants or are in areas with significant immigrant populations. *E.g.*, *id.* ¶¶ 7, 88, 100, 103, 124.

Since the policy recission, one enforcement action has taken place at a plaintiff church.[1] Two enforcement actions have taken place at non-plaintiff churches campuses.[2] And four plaintiffs report that ICE has conducted surveillance at or near their members' premises.[3]

---

[1] *See* Pls.' Mot. Ex. 46 ¶ 7, Dkt. 11-49 ("In the local church that was raided, which is located in Atlanta, ICE agents came into the daycare office looking for a staff member who they believed to be undocumented.").

[2] *See* Compl. ¶ 6; Am. Decl. of Bishop Robin Dease ¶ 7, Dkt. 24-2.

[3] *See* Pls.' Mot. Ex. 16 ¶ 6, Dkt. 11-19 ("ICE recently showed up at a food pantry hosted by a congregation in California to take photographs of people lined up to receive food."); *id.* Ex. 20 ¶ 4, Dkt. 11-23 ("We have seen an ICE presence outside some of our churches, and in early February, ICE agents showed up outside the Food Pantry at one of our congregations and took pictures of people who were in line to receive food."); *id.* Ex. 35 ¶ 8, Dkt. 11-38 ("Congregants have reported . . . [ICE] surveillance targeting direct service programs such as legal counsel, education, youth ministry, after school care, and food provision."); *id.* Ex. 66 ¶ 7, Dkt. 11-69 ("[W]e have recently noticed an unknown vehicle repeatedly idling on the edges of our property for 15 to 30 minutes at a time over the course of several days. We suspect ICE is surveilling us again.").

According to the plaintiffs, such enforcement actions and surveillance are "devastating to their religious practice," "shatter[] the consecrated space of sanctuary," and "thwart[] communal worship." *Id.* ¶ 7. Many plaintiffs also allege that their congregations have seen a significant decline in attendance at worship services or in social service ministries.[4] Plaintiffs' pastors and reverends attest that congregants have stopped attending because of the policy rescission.[5] Finally, the plaintiffs allege that congregations have incurred costs for increased security measures to protect immigrant congregants, for example monitoring attendance, requiring registration, or moving worship services online. *E.g.*, *id.* ¶¶ 120, 123, 129, 149.

On February 11, 2025, the plaintiffs filed suit against DHS, the Secretary of DHS, U.S. Customs and Border Protection (CBP), the Commissioner of CBP, ICE, and the Director of ICE, challenging the recission of the sensitive locations policy. The plaintiffs claim that immigration enforcement actions in or near their places of worship burden members' freedom of religious exercise and right to expressive association, in violation of RFRA and the First Amendment. *Id.* ¶¶ 161–78. They further claim that the rescission of the Mayorkas Memorandum was an arbitrary

---

[4] *E.g.*, Pls.' Mot. Ex. 9 ¶ 12, Dkt. 11-12 ("One largely Hispanic congregation in our Pacific Southwest District has reported a decrease in attendance at its weekly worship services from approximately 140 to 90 individuals."); *id.* Ex. 11 ¶ 8, Dkt. 11-14 ("Attendance at Sunday worship services has declined from an average attendance of approximately 370 to 270 individuals."); *id.* Ex. 26 ¶ 12, Dkt. 11-29 ("[A] congregation in North Carolina has seen a roughly 50 percent decrease in attendance at their church food pantry, GED and ESL classes, and clothing ministry."); *id.* Ex. 61 ¶ 9, Dkt. 11-64 ("On Sunday, February 16, 2025, no immigrant members or congregants attended worship services, meaning a 100 percent decrease in immigrant attendance.").

[5] *E.g.*, Pls.' Mot. Ex. 9 ¶ 12 (attesting that attendance has "fall[en] by half as word spread that ICE and CBP has become active in the area and that churches are no longer considered off limits to immigration authorities"); *id.* Ex. 10 ¶ 8, Dkt. 11-13 ("My congregants tell me that the reason they are no longer attending services is that they fear ICE or CBP will target our congregation."); *id.* Ex. 59 ¶ 9, Dkt. 11-62 (attesting that at least one congregant "stopped attending services because of the sensitive locations policy rescission"); *id.* Ex. 62 ¶ 10, Dkt. 11-65 ("One member church, St. Luke's, has already been told by one member family that they do not feel safe coming to church services under DHS's new policy.").

and capricious agency action, in violation of the APA. *Id.* ¶¶ 179–86. On February 21, the plaintiffs filed a motion for a preliminary injunction, requesting that the Court (1) enjoin the federal defendants from conducting immigration enforcement actions in or near plaintiffs' places of worship, absent exigent circumstances or a judicial warrant; and (2) stay the Rescission Memorandum. *See* Pls.' Mot. at 1. On April 4, the Court held a hearing on the motion.

## II.  LEGAL STANDARDS

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). To prevail, a party seeking preliminary injunctive relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citations and internal quotation marks omitted). Where a federal agency is the defendant, the last two factors merge. *Am. Immigr. Council v. DHS*, 470 F. Supp. 3d 32, 36 (D.D.C. 2020).

To succeed on the merits, "[a] plaintiff must show a likelihood of success encompass[ing] not only substantive theories but also establishment of jurisdiction," including standing to sue. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting *Mills v. D.C.*, 571 F.3d 1304, 1308 (D.C. Cir. 2009)). "In the context of a preliminary [relief] motion, [courts] require the plaintiff to show a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,* 878 F.3d 371, 377 (D.C. Cir. 2017). The plaintiff "bear[s] the burdens of production and persuasion." *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 281 (D.D.C.

6

2005) (citing *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)). A plaintiff's "inability to establish a substantial likelihood of standing requires denial of the motion for preliminary injunction." *Food & Water Watch*, 808 F.3d at 913.

## III.     ANALYSIS

### A.     Standing

To establish standing, a plaintiff must show: (1) an "injury in fact"; (2) a "causal connection between the injury" and the challenged action; and (3) a likelihood that the "injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted). When an organization seeks to bring suit on behalf of its members—that is, to assert associational standing—it must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wa. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). When an organization seeks to sue on its own behalf—that is, to assert organizational standing—it must show that the actions of the defendant concretely injure the organization's own ability to carry out its mission or activities. *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015).

The plaintiffs assert four injuries in support of Article III standing. First, they assert an associational injury based on the imminent risk that immigration enforcement actions will be taken at member congregations. Pls.' Mot., at 12. Second, they assert an organizational injury based on concrete declines in attendance at worship services and social service ministries. *Id.* at 13. Third, they assert a conscience injury—the recission allegedly forces congregations to make a "Hobson's choice," between openly welcoming all immigrants consistent with their religious obligations or restricting in-person services to protect immigrants from law enforcement. *Id.* Fourth, they assert

an organizational injury based on the costs of increased security measures that congregations have taken to protect their members. *Id.*

### 1. Imminent Immigration Enforcement Actions

The plaintiffs' first asserted injury amounts to a pre-enforcement challenge against threatened immigration enforcement actions at their places of worship. A pre-enforcement challenge requires a showing that the threatened enforcement is "sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014); *see Am. Libr. Ass'n v. Barr*, 956 F.2d 1178, 1196 (D.C. Cir. 1992) (requiring a "credible threat" of enforcement). To demonstrate imminence, a plaintiff must show that enforcement "results from a special law enforcement priority," namely that the plaintiff has been "singled out or uniquely targeted by the . . . government for [enforcement]." *Ord v. D.C.*, 587 F.3d 1136, 1140 (D.C. Cir. 2009) (finding that a plaintiff had been singled out when law enforcement had issued a warrant for his arrest); *Parker v. D.C.*, 478 F.3d 370, 375 (D.C. Cir. 2007). Whether the threat of enforcement is adequate "in any particular preenforcement challenge is a factual and case-specific" determination. *Navegar, Inc. v. United States*, 103 F.3d 994, 999 (D.C. Cir. 1997).

At least at this juncture and on this record, the plaintiffs have not made the requisite showing of a "credible threat" of enforcement. *Am. Libr. Ass'n*, 956 F.2d at 1196. Neither the Rescission Memorandum nor the Vitello Memorandum direct law enforcement to target churches or synagogues or to treat places of worship as high priority locations for immigration enforcement. Rescission Mem. (directing officers to use "common sense"); Vitello Mem., at 2 (charging law enforcement to use "judgment" and supervisors to make "case-by-case determinations"); *see Laird v. Tatum*, 408 U.S. 1, 11 (1972) (finding no injury where a challenged policy was not "regulatory, proscriptive, or compulsory in nature"); *Saline Parents v. Garland*, 630 F. Supp. 3d 201, 206

8

(D.D.C. 2022). As the government represented at the preliminary injunction hearing, the policy recission reflects only "a modest change in the internal guidance that DHS is providing its immigration officers" and does not mandate conducting enforcement activities during worship services or while social service ministries are being provided. April 4 Hr'g Rough Tr., at 44, 49.

Nor does the present record show that places of worship are being singled out as special targets. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013) (requiring plaintiffs to "set forth [] specific facts demonstrating that" they are being targeted). Since the policy rescission took effect over 10 weeks ago, only one enforcement action has taken place at the hundreds of plaintiffs' member congregations. *See* Pls.' Mot. Ex. 46 ¶ 7. The plaintiffs can point to only three instances, since January 20, 2025, where any immigration enforcement action has taken place in or near any place of worship anywhere in the country, even under the current administration's more vigorous immigration priorities and increased ICE quotas. *See id.*; Compl. ¶ 6; Am. Dease Decl. ¶ 7. This limited pattern further undermines the inference that actions against plaintiffs' congregations are imminent. *See Murthy v. Missouri*, 603 U.S. 43, 59 (2024) ("'Past exposure to illegal conduct' can serve as evidence of threatened future injury but 'does not in itself show a present case or controversy regarding injunctive relief.'" (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974))). And although four plaintiffs do allege that ICE has engaged in surveillance near their premises, they have not presented any direct link between that surveillance and an actual or pending immigration raid at a church or synagogue. *See United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1380 (D.C. Cir. 1984) (finding past surveillance insufficient to plead an injury where plaintiffs had "not adequately averred that any specific action is threatened or even contemplated against them").

Absent evidence of specific directives to immigration officers to target plaintiffs' places of worship, or a pattern of enforcement actions, the Court finds no credible threat of imminent enforcement. Accordingly, the plaintiffs lack standing to assert a pre-enforcement challenge.

### 2. Attendance Declines

Next, the plaintiffs allege that many congregations are experiencing concrete and measurable decreases in worship attendance and social services participation. *See Presbyterian Church v. United States*, 870 F.2d 518, 522 (9th Cir. 1989) (finding that a "concrete, demonstrable decrease in attendance at . . . worship activities" can constitute injury for a religious organization); *Philadelphia Yearly Meeting of Religious Soc'y of Friends v. DHS*, -- F. Supp. 3d --, 2025 WL 585768, at *8 (D. Md. Feb. 24, 2025). As alleged—and as likely necessary to plead an injury under *Presbyterian Church*—the attendance declines in plaintiffs' congregations have been significant, amounting to double-digit percentages or dozens of congregants being absent. For example, since January 20, 2025: one largely Hispanic congregation "has reported a decrease in attendance at its weekly worship services from approximately 140 to 90 individuals," Pls.' Mot. Ex. 9 ¶ 12; at another Spanish-speaking congregation, "attendance at worship services has dropped by 25 to 40 percent since mid-January," *id.*; at a West Coast church, "[a]ttendance at Sunday worship services has declined approximately 33 percent, from an average attendance of approximately 140 to approximately 90 individuals," *id.* Ex. 10 ¶ 8; and a "worshiping community in the Midsouth reports a decline in attendance of over half its families as a result of the new policy," *id.* Ex. 26 ¶ 12.

Even assuming without deciding that attendance decreases comprise an injury,[6] to establish standing, the plaintiffs must also show that injury is traceable to the government's policy, *see Dep't of Com. v. New York*, 588 U.S. 752, 767–68 (2019), and redressable with the requested injunction, *see Lujan*, 504 U.S. at 562.  The Court will address each in turn.

### a. Traceability

To establish traceability, the plaintiffs must show that their alleged injury—a decline in attendance—is "fairly traceable" to the sensitive locations policy rescission.  *Dep't of Com.*, 588 U.S. at 767.  Where, as here, the "causal relation between injury and challenged action depends upon the decision of an independent third party"—the church congregants—it is "substantially more difficult to establish" traceability.  *California v. Texas*, 593 U.S. 659, 675 (2021) (citation and internal quotation marks omitted).  To do so, the plaintiffs must put forth evidence showing their injury arises from the "predictable effect of Government action on the decisions of third parties."  *Dep't of Com*, 588 U.S. at 768.  In other words, the plaintiffs must present "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress."  *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015) (cleaned up).  Although the challenged policy need not be the sole cause of their injury, it must be a "but-for" cause.  *Cmty. Nutrition Inst. v. Block*, 698 F.2d 1239, 1247–48 (D.C. Cir. 1983), *rev'd on other grounds*, 467 U.S. 340 (1984); *Orangeburg v. FERC*, 862 F.3d 1071, 1080 (D.C. Cir. 2017) (finding traceability where there was another "equally important"

---

[6] The Court notes that the factual circumstances of *Presbyterian Church* differ significantly from the present record.  In that case, officers conducted an extensive undercover surveillance operation and repeatedly attended and tape-recorded worship services.  870 F.2d at 520.  In contrast here, only four out of the twenty-seven plaintiffs allege any actual surveillance activity, *see* Pls.' Mot. Exs. 16, 20, 35, 66; that activity has been significantly less intrusive; and no plaintiff alleges any immigration officer has entered church premises during worship services.

cause of an injury); *Ipsen Biopharmaceuticals, Inc. v. Becerra*, 678 F. Supp. 3d 20, 31 (D.D.C. 2023), *aff'd*, 108 F.4th 836 (D.C. Cir. 2024) (requiring the challenged government action to be "directly and inextricably" tied to the injury).

At least on the existing record, the plaintiffs have not presented "substantial evidence" that the policy rescission—as opposed to the administration's broader immigration crackdown—has caused the widespread congregant absences from religious services. *Arpaio*, 797 F.3d at 20. The plaintiffs acknowledge that broader immigration enforcement actions, and the extensive media coverage of those actions, have caused many undocumented immigrants to refuse to go out in public in general. Reply, at 5–6, Dkt. 20; *see also* Opp'n, at 17, Dkt. 16. As multiple affiants have attested, congregants "are afraid to leave their homes" as a result of the increased ICE activity in "members' neighborhoods, apartment complexes, homes, and at work sites." Pls.' Mot. Ex. 16 ¶ 6; *see e.g.*, *id.* Ex. 12 ¶ 13, Dkt. 11-15 ("The pastor at Azle Avenue Baptist has reported that several of his congregants are no longer leaving their homes out of fear of ICE."); *id.* Ex. 35 ¶ 12 ("[R]umors of escalating ICE enforcement . . . [are] driving congregants to avoid leaving their homes."); *id.* Ex. 61 ¶ 9 ("[Congregants] do not want to leave their homes out of fear of ICE arrest."). That evidence suggests that congregants are staying home to avoid encountering ICE in their own neighborhoods, not because churches or synagogues are locations of elevated risk.

The Court cannot infer the requisite "but-for" causation from affidavits that do not delineate between the effects of broader immigration enforcement priorities and the policy rescission specifically.[7] *See Cmty. Nutrition*, 698 F.2d at 1247–48. To date, the plaintiffs have

---

[7] *E.g.*, Pls.' Mot. Ex. 1 ¶ 12, Dkt. 11-4 ("[C]ongregants [are] conveying that they are now afraid of going to church due to the imminent risk of an ICE raid or enforcement action."); *id.* Ex. 7 ¶ 12, Dkt. 11-10 ("Our pastors report that some of their congregants are staying home from church for fear of being detained."); *id.* Ex. 19 ¶ 8, Dkt. 11-22 ("Our congregants are afraid of coming to

12

offered insufficient evidence that the Rescission Memorandum is a but-for cause of the reduced religious attendance. Affiants summarily attest that congregations "ha[ve] already had congregants stop coming to church out of fear of ICE under DHS's new policy." Pls.' Mot. Ex. 47 ¶ 10, Dkt. 11-50; *see e.g.*, *id.* Ex. 59 ¶ 9 ("[O]ne member of our congregation has already stopped attending services because of the sensitive locations policy rescission."). But such limited and conclusory assertions are not enough for the Court to conclude with "little doubt" that the policy rescission has caused the widespread declines in attendance. *Arpaio*, 797 F.3d at 20. Nor have the plaintiffs offered any objective statistical evidence showing that religious attendance declines were a predictable effect of the rescission policy. *See Dep't of Com.*, 588 U.S. at 768 (relying on trial evidence that "noncitizen households have historically responded to the census at lower rates" to find a response decrease predictable). Some affiants date the declines to mid-January,[8] when the rescission policy took effect, but that is also the date when the current administration took office and began implementing broader immigration policy changes.

Taken as a whole, the affidavits do not meet the high bar that is required to show a causal relationship between the government policy and third-party conduct. Affiants' representations are conclusory, second-hand, and limited in nature, in contrast to the evidence of an undisputed alternative cause for the declines in religious attendance. *See* Hr'g Tr., at 44–54, *Denver Public Schools v. Noem*, No. 25-cv-00474 (DDD) (D. Colo. Mar. 7, 2025) (finding no traceability where attendance declines were "based largely on broader immigration enforcement policy changes that

---

church or our programs because they are afraid of being detained, harmed, separated from their families, and deported by ICE.").

[8] *E.g.*, Pls.' Mot. Ex. 24 ¶ 10, Dkt. 11-27 ("A congregant family at a Texas meeting has not attended services since the sensitive locations policy rescission, expressing their fear of being arrested and deported by ICE or CBP."); *id.* Ex. 60 ¶ 11, Dkt. 11-63 ("Since DHS adopted the new enforcement policy, worship attendance has decreased by more than sixty percent [at one church].").

wouldn't be affected by" an injunction on the policy rescission). On the existing record, the Court cannot conclude that the plaintiffs have proffered "substantial evidence" tying the rescission to the alleged declines in religious attendance. *Arpaio*, 797 F.3d at 20.

### b. Redressability

For similar reasons, the plaintiffs have not shown that a preliminary injunction would redress their alleged attendance injury. *Lujan*, 504 U.S. at 562. Were the Court to grant the requested injunction, the parties would be returned to the previous status quo under the Mayorkas Memorandum. *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022). But the evidence does not establish, with "little doubt," that religious attendance would rebound under a return to that policy. *See Arpaio*, 797 F.3d at 20. As the plaintiffs acknowledged in the preliminary injunction hearing, a return to the Mayorkas Memorandum without reverting to the "enforcement priorities of the prior administration" would not remedy their alleged burdens on religious exercise. April 4 Hr'g Rough Tr., at 10 (arguing that the headquarters authority exception in the Mayorkas Memorandum violates RFRA and the First Amendment). In other words, the plaintiffs recognize that their requested injunction would not rectify the alleged attendance declines. *See Denver Public Schools* Hr'g Tr., at 54.

Reverting to the Mayorkas Memorandum would not mitigate the risks cited by congregants of leaving their homes generally, or of traveling to or from religious services. On its face, the Mayorkas Memorandum creates no legally enforceable rights and confers only limited protections against immigration officers' exercise of discretion. *See* Mayorakas Mem., at 3–4. For example, it provides "no bright-line definition of what constitutes 'near'" a place of worship and directs officers to use the "exercise of judgment," thus allowing officers to take enforcement actions within blocks of churches or synagogues. *Id.* It further provides that immigration officers *may*

14

enter places of worship with "prior approval from their Agency's headquarters" or from a supervisor the agency may "otherwise delegate." *Id.* at 5. That prior written approval requirement has changed only minimally under the Vitello guidance, which directs officers to seek prior verbal or written approval from Assistant Field Office Directors and Assistant Special Agents in Charge. *See* Vitello Mem., at 2. Further, it is questionable that any substantive distinctions between the memoranda deter the kinds of immigration enforcement actions that the plaintiffs seek to prevent. *See* April 4 Hr'g Rough Tr., at 39, 46 (government counsel representing that the Rescission Memorandum represents only a "modest change" in procedure and does not authorize any substantive enforcement action "that wasn't authorized before").

\* \* \*

As a whole, the plaintiffs have not shown that reinstating the Mayorkas Memorandum—without restraining executive discretion more broadly, which the Court cannot do—would provide the reassurance necessary to redress the alleged declines in religious attendance. Because the attendance injury is not fairly traceable to the rescission, nor redressable by the requested preliminary injunction, the Court finds that the plaintiffs have not shown a substantial likelihood of standing.

### 3. Conscience Injury

Next, the plaintiffs allege that the policy rescission works a conscience injury, by forcing congregations to make a "Hobson's choice" between withdrawing welcome to all immigrants or else making those immigrants "an easy target for enforcement action" in their places of worship. Pls.' Mot., at 14. Either option would violate the plaintiffs' sincerely held religious beliefs. *Id.* The Supreme Court has recognized, in limited circumstances, that such a conscience injury can constitute a concrete injury-in-fact for purposes of Article III standing. *See FDA v. All. for*

*Hippocratic Med.*, 602 U.S. 367, 387 (2024) (recognizing a conscience injury if a doctor were required provide abortion services in violation of her religious beliefs). But even a conscience injury must be actual and imminent. *Id*. at 387–88 (finding no concrete injury where no plaintiff doctor was actually forced to provide abortion services over conscience objections).

Here, the plaintiffs speculate that if their congregations were to continue to hold doors open to undocumented immigrants, those individuals *would* be subject to immigration raids during worship gatherings or social service ministries. To be clear, the plaintiffs do not—and could not—allege that the policy recission imposes any direct prohibition on plaintiffs' invitation to all. Rather, the alleged conscience injury—the pressure to restrict immigrants' in-person access to services—arises from the plaintiffs' own assumption that congregants will in fact be targeted while attending church or synagogue. But as the Court has explained, the current record does not establish that such enforcement actions are sufficiently likely or imminent. Instead, the plaintiffs' alleged Hobson's choice is driven by "subjective chill" and "fear" of enforcement. *Am. Libr. Ass'n*, 956 F.2d at 1196. This type of chilling effect, or even a plaintiff's "reasonable reaction to a risk of harm . . . [that is] not certainly impending," does not suffice to establish standing. *Clapper*, 568 U.S. at 415–16. In other words, absent a credible threat of enforcement, the causal link between religious welcome and an immigration raid at a place of worship is "simply too speculative or too attenuated to support Article III standing." *Hippocratic Med.*, 602 U.S. at 393. Accordingly, the Court finds that the plaintiffs' alleged conscious injury does not confer standing.

### 4. Costs of Increased Security Measures

Finally, the plaintiffs allege that congregations have been forced to incur costs to secure their premises to protect members from immigration officers. But a plaintiff "cannot manufacture standing by incurring costs in anticipation of non-imminent harm." *Clapper*, 568 U.S. at 422. As

previously explained, the plaintiffs have not shown that enforcement actions are imminent at their places of worship. Thus, they cannot establish standing because "they incurred certain costs . . . based on their fears of [that] hypothetical future harm." *Id.* at 416 (citing *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976)).

## CONCLUSION

For these reasons, at least on the present record, the plaintiffs have not established a substantial likelihood of Article III standing. Accordingly, the motion for a preliminary injunction is DENIED. A separate order consistent with this decision accompanies this memorandum opinion.

April 11, 2025

_____
DABNEY L. FRIEDRICH
United States District Judge