| | |
|---|---|
| 1 | BEFORE THE UNITED STATES DISTRICT COURT |
| | FOR THE DISTRICT OF COLUMBIA |
| 2 | |

```
 3   MENNONITE CHURCH USA, et al.,    .
                                      .   Case Number 25-cv-403
 4              Plaintiffs,           .
                                      .
 5         vs.                        .
                                      .   Washington, D.C.
 6   U.S. DEPARTMENT OF HOMELAND      .   April 4, 2025
     SECURITY, et al.,                .   10:02 a.m.
 7                                    .
                Defendants.           .
 8   - - - - - - - - - - - - - - - -
```

```
 9                 TRANSCRIPT OF MOTION HEARING
            BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                UNITED STATES DISTRICT JUDGE
```

11   APPEARANCES:

```
12   For the Plaintiffs:        KELSI CORKRAN, ESQ.
                                KATE TALMOR, ESQ.
13                              JULIA GEGENHEIMER, ESQ.
                                ALEXANDRA LICHTENSTEIN, ESQ.
14                              SHELBY CALAMBOKIDIS, ESQ.
                                Institute for Constitutional
15                                 Advocacy and Protection
                                600 New Jersey Avenue Northwest
16                              Washington, D.C. 20001
```

```
17   For the Defendants:        KRISTINA WOLFE, ESQ.
                                United States Department of Justice
18                              P.O. Box 883
                                Washington, D.C. 20044
19
```

20

```
21   Official Court Reporter:   SARA A. WICK, RPR, CRR
                                333 Constitution Avenue Northwest
22                              Room 4704-B
                                Washington, D.C. 20001
23                              202-354-3284
```

24

```
     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.
```

P R O C E E D I N G S

(Call to order of the court.)

COURTROOM DEPUTY:  We are in Civil Action 25-403, Mennonite Church USA versus United States Department of Homeland Security, et al.

Starting with plaintiffs, please approach the podium and state your name for the record.

MS. CORKRAN:  Good morning.  My name is Kelsi Corkran. I am here on behalf of the plaintiffs.  I have with me Alex Lichtenstein, Julia Gegenheimer, Shelby Calambokidis, and Kate Talmor.

THE COURT:  All right.  Good morning to all of you.

MS. WOLFE:  Good morning, Your Honor.  Kristina Wolfe on behalf of defendants, and I'm joined today by Andrew Warden.

THE COURT:  All right.  Good morning to you.

We are here on the plaintiffs' motion for preliminary injunction.

Mr. Corkran, will you be arguing for the plaintiffs?

MS. CORKRAN:  Yes, with your permission, I will cover everything but the APA claim, which I'm hoping my colleague, Ms. Talmor, can address.

THE COURT:  That's fine.  Thank you.

MS. CORKRAN:  Should I go ahead and begin?

THE COURT:  You may begin.

MS. CORKRAN:  Good morning, Your Honor.  May it please

1    the Court.  My name is Kelsi Brown Corkran, and I am here on

2    behalf of the plaintiffs, 16 Jewish and Christian-rooted

3    denominational bodies and 11 religious associations.

4        It is exceptionally rare for any of these religious groups

5    to bring suit and unprecedented for them to do so together.  We

6    are here because the Department of Homeland Security's new

7    immigration enforcement policy toward places of worship is

8    itself an unprecedented assault on plaintiffs' religious

9    exercise.

10        For over three decades, DHS's official policy substantially

11    restricted immigration enforcement activity at places of

12    worship.  Under the most recent iteration of that policy, the

13    2021 Mayorkas memo, enforcement action is -- must be avoided to

14    the fullest extent possible, with only narrow exceptions for

15    things like exigent circumstances, national security threats, or

16    where no safe alternative exists.

17        On January --

18        THE COURT:  Let me ask you about that, because while

19    the Mayorkas memo certainly listed various exigent

20    circumstances, even he recognized that there might be limited

21    circumstances in which enforcement would be appropriate even in

22    those circumstances.

23        MS. CORKRAN:  Yes, that's right.  The memo starts with

24    the general rule, which is that these enforcement actions are to

25    be avoided to the fullest extent possible, and then it

recognizes a number of narrow exceptions.

It says, for example, "But I think under canons of construction, we would assume any other examples would closely mirror the ones that are there."  And essentially, there are a couple of them that are exigent circumstances, which would be permissible under the Fourth Amendment, and then national security threats and situations where no safe location is possible.

So those really are -- those were the only exceptions or, you know, circumstances similar to that.

THE COURT:  All right.  So what have you alleged here that would not have been permitted under the 2021 Mayorkas memo?

MS. CORKRAN:  Everything but those narrow exceptions is now permitted.  Under the January 20th rescission memo, officers now have complete discretion to conduct enforcement action.  They are told to rely on their common sense.

THE COURT:  But I mean, in this case, what evidence do you have that they're taking action that they could not take under the 2021 memo?

MS. CORKRAN:  So at this point, we're now two months in, I think we have one example of an enforcement action at one of our plaintiffs' places of worship.  There's also the example that happened in Georgia that was widely publicized that we cite in our brief.

I think we haven't seen a lot of it yet for two reasons.

One, we've been in a litigation posture for two months.  The
Philadelphia Yearly Meeting suit was filed right after -- the
week after inauguration, and they now have an injunction.

And of course, the government's primary position in this
case and that one is that there's no imminent threat of
enforcement.  So I think it's unsurprising that while we're
litigating that we wouldn't see a lot of action.

But also equally important, DHS is currently under this
mass deportation mandate.  So ICE and CBP are getting as many
people as possible, but they are focusing right now on the
really low hanging fruit.  Right?  People with ankle monitors,
people who are coming in for their asylum check-ins.  So they
haven't needed to go into sensitive locations yet to meet their
quotas, but I expect that would change quite soon if we are not
able to get an injunction.

So that I think goes to this question of imminent threat,
which is one of our injuries.  I think certainly if and when we
have an enforcement action in one of the churches or synagogues,
there's indisputably a concrete injury there.

But we also have three present injuries.  And I think
probably the one that's most notable is the one that the
Philadelphia Yearly Meeting court relied on, which is the
substantial decrease in attendance.  And that is not subject to
the Clapper test.  That's subject to Department of Commerce,
which looks at likely, you know, predictable third-party

1    conduct.

2             THE COURT:  Understood.  And you have overwhelming

3    evidence that attendance is down.

4             MS. CORKRAN:  Yes.

5             THE COURT:  The question is whether that reduction in

6    attendance is tied specifically to this memo.

7             MS. CORKRAN:  Yes.

8             THE COURT:  Or the change in policy as reflected in

9    the memo.

10            MS. CORKRAN:  And as this Court recognized in Ipsen

11   Biopharm, traceability doesn't require proximate causation.

12   It's really -- I think Your Honor's opinion said, you don't have

13   to show that the challenged conduct is the only source of the

14   injury.

15        So certainly, I think that backdrop mass deportation

16   mandate informs kind of the imminence of the threat.  That's why

17   the sensitive locations policy was rescinded, to allow ICE to

18   meet those quotas by going into churches and synagogues.

19        But I think it would be implausible to say that the

20   recission of the sensitive locations policy has nothing to do

21   with the reduced attendance before the rescission memo.  The

22   plaintiffs' congregants and social service participants did have

23   a measure of security when they were in places of worship under

24   that prior policy, and that's no longer there.

25        And also, I would say that our declarant -- our

1    declarations attest that the reason that the congregants and

2    social service participants are not coming to the places of

3    worship anymore is because of the change in policy towards

4    places of worship.

5              THE COURT:  But that all boils back to whether I can

6    read the memo as really effecting a change in policy, as opposed

7    to, you know, eliminating certain sorts of supervisory approval,

8    not entirely, but not requiring pre-approval in writing and that

9    sort of thing.

10             MS. CORKRAN:  Yes, I'm happy to address that.

11        So as we were talking about before, the Mayorkas memo

12   starts with this proposition that we will not go into sensitive

13   locations to the fullest extent possible.  It identifies the

14   narrow exceptions.

15        It then says that in the absence of exigent circumstances,

16   you have to get headquarters' approval in order to conduct a

17   planned enforcement action.  I think if you read that in

18   context, the district court in Maryland did this, you know.

19   That headquarters approval is limited to the narrow

20   circumstances that are enumerated above or situations of that

21   sort of -- of that sort of ilk.

22        So that's very different than the kind of broad discretion

23   and reliance on common sense we have here.

24        The government did cite in its opposition brief a

25   subsequent memo.  I don't know that it's been made public, but

1    the Vatello memo.

2              THE COURT:  The Vatello memo.  And to what extent

3    should the Court consider that in interpreting the meaning of

4    the rescission memo?

5              MS. CORKRAN:  So that was -- so I would say first that

6    that memo only applies to ICE.  So it's not applicable to CBP.

7    But if you look at it, the level of authority that it's

8    allowing, it's low-level assistant officers within kind of the

9    regional offices, and there's no constraint on what can be

10   approved.  It can be done verbally.

11        So that's very different from what we had.

12             THE COURT:  But the level of approval, why does that

13   necessarily mean that there's a substantive change?

14             MS. CORKRAN:  So, it's the combination of the narrow

15   constraints on what could be approved under the Mayorkas memo.

16   So I just want to make sure that part is clear.

17             THE COURT:  But in terms of approval, whether it's in

18   writing, whether it's orally, whether it's to the SAC, or

19   whether it's to the director or general counsel, that doesn't

20   necessarily mean that there's a change in policy alone; right?

21             MS. CORKRAN:  So that alone, I think, though, is much

22   easier under the Vatello memo.  You're just asking your local

23   assistant director, who can tell you on the phone.

24        What the Mayorkas memo is contemplating is an actual

25   proposal going to headquarters.  It requires headquarters

1    authority.  There's a reference to a delegate, but I don't know

2    there's any evidence that that ever happened.

3        So that process, for anyone who has been in government,

4    would look very different than talking to someone in your

5    regional office and getting a verbal signoff.

6        THE COURT:  But even the Mayorkas memo recognized

7    there are going to be times when you can't get that high-level

8    approval, and you're to consult after afterwards; right?  So is

9    there really a distinction there?

10        MS. CORKRAN:  Yes, because that's only under exigent

11    circumstances.  Law enforcement generally can go into places

12    under exigent circumstances without warrants or approval.  So

13    that was just mirroring the Fourth Amendment constraints there.

14    There is no exigent circumstance constraint in the Vatello memo

15    or the rescission memo.

16        THE COURT:  So you're saying, in addition to the

17    change in language, which I'm going to let you get to, but

18    you're saying that the mere change in procedure which makes the

19    process easier, more efficient for agents, that alone is

20    something that the Court can consider in assessing whether

21    there's causation here.

22        MS. CORKRAN:  Right.  I wouldn't suggest that the

23    Court consider it in isolation, because it's in the context of

24    the broader constraints on the Mayorkas memo; right?  In the

25    Mayorkas memo, even headquarters was constrained by those narrow

1    circumstances, or situations like those narrow circumstances,

2    unless, again, there was exigent circumstances.

3        So at this point, under the Vatello memo, an ICE officer

4    could say to their local assistant director, I know -- I think

5    there might be undocumented people in that church over there,

6    can I go in?  And the assistant director would say yeah, sure,

7    go ahead.

8        That clearly couldn't have happened even at the

9    headquarters level under the Mayorkas memo.  Right?  You would

10   have had to propose something that either implicated a national

11   security threat or showed that there was no safe location that

12   existed.

13       What I'm saying, I think, maps what the district court in

14   Philadelphia Yearly Meeting said.

15           THE COURT:  Do you want to pivot to the more

16   substantive argument again, the change in the memo itself, what

17   you view as a legal change.

18           MS. CORKRAN:  So do you mean with respect to RFRA and

19   the First Amendment?

20           THE COURT:  No, no, no.  I mean with respect to the

21   language in the memo that is absent now, to the fullest extent

22   possible.

23           MS. CORKRAN:  I think I've covered the two big

24   changes.  Previously, these sorts of enforcement actions did not

25   happen in places of worship except in these narrow

circumstances.  They were quite rare.  And the new policy

contemplates none of those previous constraints.

Now, as we say in our briefing, we're not saying that the

sensitive locations policy was necessarily compliant with RFRA

and the First Amendment.  In particular, we think that

supervisory -- or the headquarters authority exception in the

Mayorkas memo also is problematic in the sense that it's not

narrowly tailored under the -- under RFRA or the First

Amendment.

THE COURT:  In considering your motion, don't I have

to just go back to the status quo --

MS. CORKRAN:  So I think the --

THE COURT:  -- which would be the 2021 memo, if I rule

in your favor?

MS. CORKRAN:  I don't think that's right.  So if you

look at -- I think the case that is cited is Huish, H-u-i-s-h.

It says that the status quo is the last uncontested period.  So

here, that would have been January 19th when the entire

enforcement policy scheme was different.

The other thing that happened on January 20th was this move

to eliminate the enforcement priorities of the prior

administration.  So under the prior administration, you had the

sensitive locations policy, and that was mapped onto a policy

that limited enforcement to, I think it was, convicted felons,

terrorists, or people who had just crossed the border.  So it

1    was the combination of those two policies that meant that my

2    plaintiffs' -- or the plaintiffs' places of worship --

3         THE COURT:  But that happens in every administration.

4    The Clinton Administration came in and on the southern border of

5    California started charging 1326(b) instead of (a).  That's not

6    something that can be challenged.

7         MS. CORKRAN:  No, no, we're not challenging that.  My

8    point was, if we're going to go back to the status quo of the

9    chances that there would be a immigration raid in the

10   plaintiffs' places of worship, I think that that backdrop would

11   factor in.

12        So if you were to put the sensitive locations policy back,

13   we would be happy to have that back.  We think it doesn't

14   actually comply with RFRA because of that headquarters authority

15   exception.

16        I think to make these sorts of enforcement actions as rare

17   as they were on January 19th, the injunction we're proposing

18   would accomplish that.  Essentially, what it does is it allows

19   plaintiffs to have the protections that they would typically get

20   under the Fourth Amendment for their private property.  This is

21   their private property.

22        The reason that the government doesn't think those

23   protections apply is because as a part of their religious

24   mandate, they open their private property to the public.

25        So what we're asking is an injunction that would restore

those Fourth Amendment constraints on their private property while still allowing them to keep their houses of worship open to their community members.

THE COURT:  All right.  I just want to make sure I understand your position.  You think the Mayorkas memorandum did not comply with RFRA?

MS. CORKRAN:  I think if there had been a challenge at the time, a plaintiff could have said that the supervisory -- or the headquarters authority exception was not narrowly tailored, that having just a judicial warrant exception and an exigent circumstances exception, which would map the Fourth Amendment, would suffice.

And if we go -- as we go along in the case, that's an argument we will continue to make.  We are asking for that as our preliminary injunction now, with the sensitive locations policy as our alternative.

THE COURT:  But you can't expect these prosecution investigation memos to have the full extent of the law stated.

MS. CORKRAN:  Certainly.  And I didn't mean to suggest that.

THE COURT:  And don't you have to show -- isn't there a presumption that the government's going to follow the law, that a memo is not expected to capture --

MS. CORKRAN:  Yes.

THE COURT:  -- the full law?  And absent evidence to

the contrary, you can't say that the Mayorkas memorandum was

violating RFRA.

MS. CORKRAN:  Well, I think that the question would be

if the government were to -- the current DHS were to invoke the

supervisory or the headquarters authority exception under the

Mayorkas memo, our position would be that would violate RFRA

because it's not the most narrowly tailored way of meeting the

government's --

THE COURT:  But it might be in a certain case, if

they've exhausted all of the ways in which they have to find a

certain individual.

How can you say across the board that there's not an

instance in which it would be the least restrictive means, to go

into a church and arrest an alien?

Congress has given the authority to ICE to do that.  So how

can you say in the abstract that a memo that would permit that

would not still comply with RFRA?

MS. CORKRAN:  I think a couple of points there.

The constraints that we're suggesting here are the ones

that typically apply in the law enforcement context.  They're

the ones that would apply to plaintiffs' private property if

they weren't engaged in this kind of religious duty of openness

and hospitality.

When we talk about kind of the conscience injury they're

experiencing, right now, many of the plaintiffs, kind of faced

with the possibility of ICE and CBP coming in and injuring their congregants, are now putting signs on their doors saying that they're not open to the public, they're locking their doors. They're essentially turning their places of worship back into private property that ICE and CBP can't enter except under the Fourth Amendment constraint.

So all we're asking for here is that we allow the plaintiffs to enjoy their Fourth Amendment rights without compromising their religious duty of openness and hospitality. And we know that that standard, judicial warrants and exigent circumstances, have been working in the general law enforcement context since the beginning of -- since the founding.

So I think that there would be a significant burden on the government to show why they couldn't comply with those same constraints in the immigration enforcement context.

THE COURT:  But is it the government's burden now, when there's not actual evidence at this point of a violation of RFRA?

MS. CORKRAN:  So our burden is to show that there is currently a substantial burden on our religious rights.  Once we do that, the burden shifts to the government to show that their policy is not the most narrowly tailored.

THE COURT:  And you believe that you've done that so far with the one specific enforcement action alleged at the church in Exhibit 46?

1      MS. CORKRAN:  No, that goes only -- that's a standing

2  point, and it goes to one of our four concrete injuries, which

3  would be this imminent threat of an actual enforcement agent --

4  action.  You don't need to reach that if you find that our

5  decreased worship attendance is itself a presently inflicted

6  injury under Department of Commerce.

7      At that point, we have standing.  We shift to the actual

8  kind of RFRA analysis.  So once we get to the RFRA analysis,

9  we're asking a different question about substantial burden.

10      There, I think, you know, we would consider yes, of course,

11  I don't think the government disagrees that an actual

12  enforcement action in the places of worship would substantially

13  interfere with their religion.

14      But I think you can also there consider the impact on their

15  reduced participation, the conscience injury that they're

16  experiencing now where they're having to make choices about how

17  to change their programming and security measures in order to

18  keep ICE and CBP out.

19      So I think you can rely on all of that when you're doing

20  the RFRA analysis.

21      THE COURT:  And the direct burden right now on

22  churches is?

23      MS. CORKRAN:  That if they continue to keep their

24  doors open and to welcome immigrants into their worship services

25  and social service ministries, they are now making those

visitors and congregants an easy target for ICE enforcement.
They're bringing them into a space that ICE can now come in and
get them, which of course would be devastating for those
undocumented congregants, but also for the congregation as a
whole.  These are sacred spaces, and having armed federal agents
come into their spaces and desecrate their worship area I think
is a profound injury.

And right now, under Alliance for Hippocratic Medicine, a
conscience injury is concrete if the plaintiff can show that
what the government is doing is likely to cause them to violate
their religious beliefs.  And we can already see that happening
here.

THE COURT:  But is that really a direct burden?  Are
they really saying you can't bring in unlawful immigrants into
your church?

MS. CORKRAN:  They're not saying that.  But RFRA does
not require a direct burden.  Under Camberland, if what the
government is doing puts substantial pressure on the adherence
to change their behavior in a way that violates their religious
beliefs, that the RFRA standard is satisfied.

And I think that's satisfied here for the reason I just
said.  They are already facing this Hobson's choice right now.
If they continue to do these ministries, if they continue to
worship the way they are, they are setting themselves up to
being these easy targets.  They are essentially doing ICE's job

1  for it.  ICE now has a place where everyone has congregated, and

2  they can come in and conduct their detentions.

3            THE COURT:  All right.  So there's the threat of

4  arrests?

5            MS. CORKRAN:  Yes.

6            THE COURT:  That's the burden.

7            MS. CORKRAN:  So that the choice -- and I would go to

8  Hobby Lobby on this as well.  When you put a religious adherent

9  in a position where they have to choose between options that

10  violate their religious beliefs --

11            THE COURT:  You're talking about the actual

12  individuals as opposed to the church; right?

13            MS. CORKRAN:  No, I'm talking about -- it's hard.  The

14  undocumented congregants are a part of the congregation.  Let's

15  talk about the congregation.

16       For them, they are the ones that have to decide right now

17  whether they're going to continue to keep their doors open.

18  Many of them do social service ministries that are directed at

19  immigrant communities.  So clothing pantries, food banks, ESL

20  classes, legal services, health services, they have been doing

21  that as a core mission of their religious practice.

22       They can't do that anymore without exposing all of the

23  people that they've invited into their place of worship to ICE

24  enforcement.  We know ICE has said, the secretary said, if you

25  are here unlawfully, we will find you and deport you.

1      So every one of those undocumented congregants and social

2   service recipients is a target for ICE, and ICE is trying to

3   figure out where it can find them.  They can't facilitate ICE

4   action in that way without violating their religious beliefs.

5           THE COURT:  So again, that indirect burden on those

6   individuals you think is sufficient, even though it's not on the

7   church, it's on the individuals?

8           MS. CORKRAN:  Right.  I think what I just articulated

9   satisfies the Camberland test.

10      I would also point out that RFRA's language itself is

11   capacious.  It just says is this a substantial burden, and as

12   the Supreme Court said in Hobby Lobby, every indication from the

13   language and the context of RFRA is that Congress intended it to

14   be very protective of religious rights.

15      And so I think when you look at that text, what I just

16   described, it pretty comfortably fits within it.

17           THE COURT:  All right.  Can you address whether this

18   is the least restrictive means, whether you've met that?

19           MS. CORKRAN:  As I was saying before, I think the

20   Fourth Amendment provides a good framework for how law

21   enforcement can be effective within the constraints we've

22   suggested.

23      So we have acknowledged that whatever -- the government may

24   have a compelling interest in immigration enforcement generally.

25   They have to show here that their interest is targeted at these

particular plaintiffs.  Right?  Why they can't make an exception with respect to plaintiffs' places of worship.

But they also have to show, as you just said, Your Honor, that there is no other way to accomplish what they want to accomplish without going into plaintiffs' places of worship.

And our point is that under the Fourth Amendment, judicial warrants and exigent circumstances suffice to allow law enforcement to do its job here.  And the government hasn't shown any reason that those constraints wouldn't be appropriate here.

They also haven't --

THE COURT:  But is that true in all cases?

MS. CORKRAN:  It is -- it works in the Fourth Amendment context.  Again, the burden would be on the government to show why that would be -- would not be true here.

Now, it could be as we move forward in discovery, that there's a lot more back and forth on this.  But given the record that the Court has now, looking particularly at the Vatello memo and at the rescission memo, there's no explanation in those memos for why the prior sensitive locations policy didn't suffice.  So at minimum, they haven't shown that that wasn't narrowly tailored.  And it's their burden at this point.

So I think we've done what we need to do for the preliminary injunction stage.

THE COURT:  Do all the arguments that you're making also apply to just general law enforcement activities not

related to immigration, in other words, police going into

churches to make arrests related to robberies or anything else?

            MS. CORKRAN:  So that would be covered -- yes, Your

Honor.  I think under those circumstances, there isn't a

dispute.  I'm not aware of any general law enforcement exception

to the Fourth Amendment constraints, that officers are going in

in the criminal context.  At least that hasn't been briefed in

this case.

            THE COURT:  I know.  I'm wondering, all these

arguments that you're making that law enforcement officers need

to be restrained to comply with RFRA would apply in that context

as well?

            MS. CORKRAN:  I would revert back to the point that

this is plaintiffs' private property.  The only reason that the

Fourth Amendment might not apply is because they have very

intentionally invited their community members in.  They can

change that.  That's the position they're in now.  But when they

do that, they're violating their religious beliefs.  And those

are the constraints that apply to all other private property.

    So I think the government would bear a heavy burden in

showing why those constraints aren't workable here.

            THE COURT:  Okay.  Go ahead.

            MS. CORKRAN:  I'm happy to address anything else that

would be helpful to Your Honor.  We have asserted both

associational and organizational standing.  I think all of

1    our -- we were very careful to make sure each of our plaintiffs

2    satisfies both.  So you will see in the record an individual

3    congregation declaration for each one of the plaintiffs.

4        But I think that organizational standing is probably a more

5    natural fit for the denominational bodies.  They really are;

6    right?  This is the Episcopal Church, the Presbyterian Church

7    USA, and their congregations are kind of their local

8    manifestations.

9        So the standard there is, have they shown a direct

10   interference with their core mission, and I think we've done

11   that through the declarations.

12       And then we have the 11 associations.  For them, for

13   everyone, we've attached at least one declaration from an

14   individual member showing the injury and the traceability and

15   redressability.

16       So I just wanted to clarify that.

17           THE COURT:  So you think the chilling of worship is

18   sufficient under RFRA?

19           MS. CORKRAN:  We aren't just talking about chilling

20   here.  We're also talking about the reduced attendance.  I think

21   that's significant under RFRA as well.  That's certainly an

22   injury.  We know that from the United Presbyterian Ninth Circuit

23   case.  But even cases like Department of Commerce recognize that

24   those sort of third-party injuries are a burden.  So I think

25   that would satisfy as well.

1        And then again, I want to go back to that conscience

2    injury.  Conscience injuries are concrete under Article III if

3    you can show that the government action is likely to cause the

4    plaintiff to violate their religious beliefs.  So I think we've

5    shown that here as well.

6        So we have a constellation of injuries that I think

7    probably any one of them would suffice for substantial burden,

8    but together, I think they certainly do.

9            THE COURT:  And what about under the First Amendment?

10   Is there a difference in the substantial burden standard --

11           MS. CORKRAN:  No, I think our arguments are largely

12   the same, and I think the government's responses are largely the

13   same, that under the First Amendment, we have this exacting

14   scrutiny standard, which is a little different than strict

15   scrutiny.  It's a lesser burden, but importantly, exacting

16   scrutiny is also subject to that narrow tailoring requirement.

17       So I think the policy fails the First Amendment inquiry as

18   well.

19       The one thing we haven't discussed, if Your Honor has any

20   questions, is the Section 1252(f) argument that the government

21   makes.

22       So the government's argument is that under 1252(f), you

23   can't have injunctive relief for the particular provisions that

24   are identified, which are 1226, I think, through -- or 1221

25   through 1231.  Those -- none of those provisions are implicated

here.  Most of what -- all of what the sensitive locations policy and rescission memo are directed at fall under a regulation, which is 8 C.F.R. 2878.

If you look at that regulation, it's covering everything we're talking about here.  In particular, (f)(4) is the provision authorizing immigration officers to enter private property that is open to the general public without a warrant. That's, obviously, directly on point.  And if you go up a few provisions higher, you get the ones that are governing how immigration arrests are conducted.

And that's the question here.  1226 talks about authority to conduct administrative arrests.  This provision, 2878, is talking about how you conduct the arrests.  That's what we're concerned about here, not the execution or the authorization of administrative arrests.

All of that -- all of those regulatory provisions fall under 1357, and the government acknowledges that 1357 is not subject to the injunctive bar.

And I just want to note that, because I think that the district court in Maryland did err there in carving out 1226 administrative arrests.

THE COURT:  All right.  Do you want to talk a little bit about your APA claim?

MS. CORKRAN:  Yes.  Can I switch places with my colleague, Ms. Talmor?

1          THE COURT:  Sure.

2          MS. CORKRAN:  Thank you.

3          THE COURT:  Good morning.

4          MS. TALMOR:  Good morning, Your Honor.  Thank you.

5      Plaintiffs demonstrated in their motion that DHS's

6  rescission memo violates the APA in numerous ways.  DHS failed

7  to proffer any explanation, reasonable or otherwise, to support

8  its decision.  It ignored the reliance interests of congregants

9  in places of worship.  It paid no heed to the serious concerns

10  that motivated its prior policy, including the burden that

11  enforcement actions in sacred places would impose on religious

12  exercise.  And it declined to consider any lesser burdensome

13  alternatives.

14      Remarkably, DHS does not dispute those arguments.  Its

15  entire defense of plaintiffs' APA claim here relies on two

16  threshold reviewability defenses, neither of which have any

17  merit.

18      I'm happy to take those in either order, but if Your Honor

19  has no preference, I might turn to the second defense posed by

20  DHS, because it relates a bit to the colloquy you had with my

21  colleague today.

22          THE COURT:  That's fine.

23          MS. TALMOR:  So, DHS's rescission of its

24  three-decade-old rule that prohibited specific actions is final

25  agency action.  That turns in this instance on what it was that

the 2021 Mayorkas memo actually did.  That memo set restrictive

standards that cabined agents' conduct.  And by binding its own

exercise of discretion, DHS had promulgated a rule through that

memo.

So what that memo did that has been reversed here is the

2021 policy created a strong presumption against taking these

enforcement actions in sensitive locations.  That's what's been

displaced through the rescission.

So the memo, as you discussed with my colleague, stated

that agents needed to avoid these exercises of, you know,

enforcement authority within sacred locations to the fullest

extent possible.  It stated three times in a short document that

we should not take enforcement action in or near sensitive

locations.  And by doing that, it removed officers' discretion

to take these actions.

It also stated that, quote, "our obligation to refrain to

the fullest extent possible applies at all times and is not

limited by hours or days of operation."

An obligation isn't permissive.  It obligates, by its own

terms, agents to comply with its directives.  So by stating a

strong presumption that these enforcement actions would not take

place, the agency bound itself to avoid them except in very

narrow circumstances.

THE COURT:  Okay.  But the memo itself says it cannot

be relied upon to create any right benefit in any matter.

1          MS. TALMOR:  Your Honor, that's boilerplate language

2     that occurs in many agency actions.

3          THE COURT:  Understood.  But what is the right that

4     was created?

5          MS. TALMOR:  The right that is created there was the

6     right to be free from having immigration agents conduct site

7     inspections and disruptive raids in houses of worship and sacred

8     locations.  It created an enforcement regime specifically by

9     choosing to withdraw discretion that DHS may otherwise have had

10    under the INA.

11         THE COURT:  But it still left open discretion.

12         MS. TALMOR:  Exceptionally narrow discretion.  So if

13    you look at the exceptions that were set forth in the 2021

14    policy, they were very narrow exceptions, and it was phrased as

15    there might be limited circumstances where enforcement needs to

16    take place.  Those were things like a national security threat,

17    an imminent risk of death or violence, the hot pursuit of a

18    safety threat, et cetera.

19         THE COURT:  But the memo said the list is not

20    complete, these are just examples, and that the exercise of

21    judgment is required.  So granted, the memo is much more

22    specific, but in the end, it does not give up the discretion

23    that the 2025 memo embraces front and center.  But that

24    discretion is still in existence here.

25         MS. TALMOR:  Your Honor, I disagree, because I think

1    that what the memo did was withdraw from the purview of the

2    agents who conduct these operations discretion as to whether to

3    proceed.  I think that read in context, the exceptions here are

4    so narrow and they made clear that if an agent was going to

5    undertake such an operation, absent exigent circumstances, which

6    I will briefly discuss separately, but if an agent wanted to

7    take these actions, they needed to seek headquarters approval,

8    and the circumstances needed to mirror those set forth in the

9    memo, which set an exceptionally high bar.  So agents were on

10   notice that they didn't have discretion to take these actions.

11       And then even if the exigent circumstances exception

12   applied and they did need to take such an action, they needed to

13   immediately report that back to headquarters.  So it told agents

14   that any action in an exigent circumstances needed to be

15   justifiable after the fact.

16       So what the agency did here was opt to withdraw discretion

17   that it otherwise may have possessed, at least under the INA.

18   And by doing so, the agency bound itself, and that's what made

19   that policy a final rule.

20       There's a body of D.C. Circuit case law that specifically

21   says that when an agency acts to cabin its own discretion, it

22   creates a binding norm or rule and that the presence of narrow

23   exceptions doesn't displace that.

24       So specifically, in Guardian Savings & Loan -- this is a

25   D.C. Circuit opinion at 589 F.2d 666 -- the existence of some

discretion is not sufficient to classify a rule as a general
statement of policy, nor does a discretionary waiver provision
make an otherwise nondiscretionary rule into a general statement
of policy, because a discretionary waiver is no substitute for
the exercise of informed discretion in each case arising.

So under that 2021 policy, agents didn't have discretion in
each case to say, do I want to raid a church or a synagogue
today or do I not?  They knew that that discretion had been
closely cabined by a policy that created such a strong
presumption and a requirement to justify any actions that did
take place that the agency cabined its own discretion.

Similarly, in --

THE COURT:  Sorry to interrupt.  But if this memo had
been tweaked in more minor ways, would you still be here saying
it's loosened discretion and, therefore, you have a claim?

MS. TALMOR:  It is the case that a small tweak around
the edges might not have been enough to be final agency action.
What happened here is that the agency had acted to bind itself
and then displaced that entirely, and the action to bind itself
through the previous policy is what created a rule.

Iterations of the policy before 2021 that had tweaked the
policy around the edges may not have been enough to create a
rule.  We haven't briefed individually whether these previous
rescinded memos each created a rule in their own right.  But we
acknowledge that an agency doesn't necessarily create a new rule

1    when it makes just the minor tweaks around the edges.

2        But what they've done here is bound themselves and then

3    displaced that, and that decision to displace the prior rule

4    must comport with standards of reasoned agency decisionmaking.

5            THE COURT:  And I'm -- I hear what you're saying, and

6    over time, it may bear out that the policy has changed in

7    significant ways in terms of the actions.  But I guess I'm just

8    still struggling with what do we have on the record now that

9    demonstrates your concern about what this new memo means?

10        We have a lot of public statements.  We have all of that.

11    But in terms of actual evidence that supports your position that

12    this really is unleashing agents to act in a way that violates

13    RFRA and the First Amendment and all of the carefully crafted

14    limitations that the prior administration had on the exercise of

15    this authority, can we really say that at this point, at this

16    stage?

17            MS. TALMOR:  As an initial matter, we do think that

18    DHS has relied on it.  We cite an instance in our complaint

19    where there was an action taken at a church in Georgia.

20        But the inquiry under the APA is a little bit different.

21    The inquiry under the APA is, has the agency undertaken a rule

22    or the recission of a rule such that the requirements of the APA

23    have been triggered, which is a little bit different inquiry

24    than the inquiry that I think Your Honor set forth there.

25        Here, where we have a policy that I believe so clearly did

1   cabin the exercise of discretion that the agency does have, when

2   they wipe that off the books and say we're no longer going to

3   have a presumption against these actions, we're going to askew

4   any brightline rules and allow agents to use their own

5   discretion to decide whether or not to do this, that is a

6   reversal.

7       And so plaintiffs aren't required to show that that

8   reversal has yet been utilized to go after one of their members

9   in order to say, wait a minute, under the APA, this has to

10  comport with requirements for reasoned agency decisionmaking.

11      THE COURT:  But the memo also does contemplate

12  additional guidance, some of which we now have from ICE, and

13  you're saying that's still not enough?

14      MS. TALMOR:  It doesn't displace the requirement that

15  in rescinding a previous rule, they had to follow the APA.  They

16  don't, you know, get a pass by saying we're going to continue to

17  look at this over time or put out additional guidance.  When

18  they take a policy that closely cabins the agency's discretion

19  and they wipe it off the books, that has to comport with the

20  APA.

21      For instance, under Telephone Association versus FCC, a

22  D.C. Circuit case cited in our papers, the agency there had set

23  forth standards that the agency used to cabin some of its own

24  discretion.  It stated 12 times in that document that it

25  retained discretion to deviate from its standards.

1          But the D.C. Circuit said no, no, no.  Just stating that or

2     having limited discretion doesn't mean that you have a general

3     statement of policy.  When you're cabining your employees'

4     discretion and how they're going to go about exercising their

5     statutory responsibilities, you've created a rule, and that's

6     what the APA is for, is to constrain agencies within the limits

7     of reasoned agency decisionmaking.

8          THE COURT:  So does this need to be replaced with a

9     written rule?

10         MS. TALMOR:  DHS certainly has the authority to

11    re-evaluate its prior rule and alter its policies, as long as it

12    follows the requirements in the APA.  So here, they would have

13    had to set forth an explanation that's reasonable and reasonably

14    explained.  They would need to consider reliance interests.  And

15    they don't have to demonstrate why the new policy is better, but

16    they have to acknowledge that they're changing policy, the

17    factors that motivated the prior policy, and put forth a

18    reasoned decision.

19         And here, saying on Inauguration Day we're going to

20    displace this policy, we're not going to consider the impact on

21    religious communities, and we're not even going to acknowledge

22    the serious interests that motivated the prior policy, the

23    serious religious interests that motivated the prior policy,

24    that's certainly not enough under the APA.

25         So what we have here is we have an agency action that

deemed it unnecessary to create these brightline rules.  And so it's altering a legal regime that plaintiffs have been subject to before.  It's denying them the safe harbor of knowing that they can set up their social service ministries, that they can freely practice their faith, knowing that their services or their ministries aren't going to be disrupted by a site inspection or an immigration raid during their services.

THE COURT:  But that presumes that there was in fact a safe harbor.

MS. TALMOR:  Your Honor, I think that the 2021 memo, by its terms, creates a safe harbor by that strong presumption that we discussed earlier.  I think that it created a safe harbor by ensuring that agents weren't able to freely exercise discretion to raid a church or a synagogue any time they wanted to.

A leading D.C. Circuit test on this is from Cohen.  There, the D.C. Circuit explained that when an agency acts to forfeit discretion that an agency retained prior to issuing its purported policy, that that is a rule.  So where an agency is making commitments to the public that curb its otherwise significant discretion, that's a substantive rule.

I would like to briefly note that that's consistent with the lead case that DHS relies on, Association of Flight Attendants.  There's a lot of discussion in there that DHS cites, but that was distinguishing between an action that bound

1  the public versus one that didn't.

2      Even that case acknowledges that an agency action that

3  narrowly limits administrative discretion constitutes a

4  legislative rule.  That's clearly established in the case law.

5      If there are no other questions on final agency action, I

6  will briefly touch on the fact that Congress did not grant DHS

7  unfettered discretion to raid places of worship.

8      DHS admits in its brief that this analysis must start with

9  the statute, but the brief does not cite any provision that

10  purports to grant this unfettered discretion.  The Supreme Court

11  has made very clear that the 701(a)(2) exception for actions

12  committed at agency discretion is exceptionally narrow, that the

13  APA creates a strong presumption that agency actions are subject

14  to judicial review, and that it can be rebutted only by showing

15  that a statute's language or structure demonstrates that

16  Congress wants an agency to police its own conduct.

17      That does not describe the INA here.  What we are looking

18  at here is 8 U.S.C. 1357, which grants the powers of immigration

19  officers and employees.  Far from a grant of broad discretion,

20  it's a highly reticulated scheme that governs how immigration

21  enforcement is to take place.

22      Among other provisions, it has provisions that specifically

23  discuss the location where such actions should take place and

24  gives very specific commands.  For instance, agents may not

25  enter a farm or agricultural operation without consent of the

1    owner or a properly executed warrant.  They can board a vessel

2    within territorial waters or a railway car or aircraft

3    conveyance but only within a reasonable distance of an external

4    boundary.

5            THE COURT:  Isn't it notable that there are no

6    restrictions on the churches like there are with the farms?

7            MS. TALMOR:  I think it's entirely reasonable that

8    Congress would not have anticipated that immigration agents

9    would be raiding churches and synagogues in order to perform

10   their immigration tasks.  I think there are other constraints

11   that Congress has written into the law, specifically RFRA.  The

12   First Amendment always operates there.  So I think that there

13   is -- it's no surprise that Congress wouldn't have felt the need

14   to specifically say be very careful before you go into a church

15   or a synagogue to perform these actions.

16       More importantly, however, DHS is portraying here the

17   standard as requiring the statute to specifically set forth some

18   standard cabining the exercise of discretion.

19       But that's not how this area of law works.  The statute

20   itself has to grant an unreviewable area of discretion such that

21   it displaces the presumption that agency actions are subject to

22   the general requirements of reasoned agency decisionmaking.

23           THE COURT:  Isn't the presumption in this area, when

24   you're dealing with enforcement, prosecution, investigation,

25   isn't the presumption that it's within the Executive Branch?

1          MS. TALMOR:  No, Your Honor.

2          THE COURT:  Heckler v. Chaney, that whole line of

3    cases, isn't this an area where Congress is really hands-off?

4          MS. TALMOR:  No, Your Honor.  Heckler versus Chaney is

5    clearly inapplicable here.  Heckler versus Chaney dealt with a

6    situation, and it has been described by the Supreme Court very

7    recently in Department of Commerce versus New York, as

8    concerning a decision not to institute enforcement proceedings.

9    It is certainly the law that a decision not to institute

10   enforcement proceedings is subject to an agency's unreviewable

11   discretion.

12         Heckler versus Chaney does not establish and has not been

13   cited as establishing that all decisions with any connection to

14   enforcement powers are unreviewable.  And courts review actions

15   related to immigration and other law enforcement routinely.

16         So what Heckler relied on was two factors.  It said that it

17   was a rare instance where a statute was drawn such that there

18   was no law to apply.  And here, we don't have that.  We don't

19   have any, and DHS hasn't purported to cite any broad grant of

20   this unreviewable discretion.

21         In its place, we have a highly reticulated scheme that sets

22   forth all kinds of restraints on immigration officers' conduct.

23         Heckler versus Chaney also relied heavily on the fact that

24   there is a general unsuitability for judicial review of an

25   agency decision to refuse to institute enforcement proceedings.

1    That is clear, but that does not mean that anything connected to

2    enforcement is presumptively unreviewable.

3        So in Department of Commerce versus New York, the Supreme

4    Court said, we have limited this exception to certain categories

5    of administrative decisions where courts have traditionally

6    regarded it as committed to discretion; i.e., not to institute

7    enforcement or an intelligence agency terminating national

8    security employees.

9        That doesn't look like what we have here.  On the contrary,

10    the D.C. Circuit has specifically found that one INA provision

11    did grant unreviewable discretion.  And I think the language

12    used there is instructive, as it is so distinct from anything we

13    have here.  So 8 U.S.C. 1225(e)(1)(A)(3)(i) grants the secretary

14    expedited removal decisions shall be in the sole and

15    unreviewable discretion of the secretary and may be modified at

16    any time.

17        We don't have anything like that here.  And so decisions

18    about where to conduct enforcement still have to comport with

19    general standards of reasoned agency decisionmaking.

20        In fact, the Supreme Court has specifically said that if

21    all matters committed to an agency's discretion were

22    unreviewable, then we could never find that something abused

23    discretion.  It's simply not the law.

24        It's noteworthy here plaintiffs are not challenging DHS's

25    general exercise of enforcement discretion.  They're not

1    challenging whether or not ICE can commit immigration

2    enforcement in their communities or how it allocates its

3    priorities or resources.

4         They're not challenging decisions on who to remove or how

5    to accomplish that mission.  This is a narrow and specific

6    challenge to the reversal of a long-standing policy and a

7    decision to authorize site inspections and disruptive raids in

8    sacred places.  And it's a policy that DHS long recognized was

9    necessary to protect religious exercise.

10        So by having cabined its discretion before for strong

11   reasons and then opting to wipe that policy off the books, DHS

12   is subject to general standards of reasoned agency

13   decisionmaking.

14             THE COURT:  All right.

15             MS. TALMOR:  If Your Honor has no further questions.

16             THE COURT:  Thank you.

17        Ms. Wolfe?

18             MS. WOLFE:  Good morning again, Your Honor.

19             THE COURT:  Good morning.

20             MS. WOLFE:  What we've heard here this morning from

21   plaintiffs' counsel makes clear that plaintiffs are making a

22   pre-enforcement facial challenge to the Hoffman memorandum,

23   which the Supreme Court has made clear is a high bar to watch.

24        Plaintiffs have not met that high bar.  They admittedly, in

25   the very vast record that they have produced thus far, have only

1    pointed to a single instance where there has been enforcement

2    activity at a day care center that is affiliated with a place of

3    worship.  My understanding from reading that declaration, that

4    that was a very narrow and brief interaction.  They have pointed

5    to nothing in the record that demonstrates that the conduct they

6    seem to be concerned about, these raids of ICE agents or CBP

7    agents rolling up to a place of worship during services and

8    storming into the sanctuary and yanking people out to then

9    question them about their immigration status, has happened.

10            And by not pointing to that, without any evidence, they

11   have not demonstrated that their places of worship are special

12   law enforcement priority, that they have been singled out or

13   uniquely targeted for enforcement, which is what is required for

14   a pre-enforcement challenge.

15            THE COURT:  Can you provide any more details on that

16   instance?  Have you been able to identify that instance, and can

17   you tell me whether that would have been covered by the 2021

18   memorandum?

19            MS. WOLFE:  So as we mentioned in our paper, there was

20   not enough details in the -- in their declaration for us to

21   identify the day care incident.  And so I don't --

22            THE COURT:  So even now today, you don't know what

23   incident they're talking about?

24            MS. WOLFE:  The information that I have is the

25   information that they have provided in the record.

1          THE COURT:  All right.

2          MS. WOLFE:  So, you know, they seem to preface their

3     position that they are targeted, that plaintiffs' members'

4     churches have been singled out because there has been an

5     increase in enforcement activity in their states and their

6     cities, in their communities, but the fact that there has been a

7     general increase of enforcement activity is not in and of itself

8     reflective of the fact that their member churches and synagogues

9     and other places of worship have been targeted.

10         And in fact, the Hoffman memorandum itself does not

11    reference places of worship at all beyond dropping a footnote to

12    define what a "sensitive location" is, where they reference that

13    sensitive locations may include schools, medical facilities,

14    places where children gather, social service establishments, and

15    places of worship.  So they just have not shown that they have

16    been specifically targeted.

17         THE COURT:  How should the Court read these two

18    memoranda?  Should it assume that they're not -- that there's

19    not a change other than procedural ease at getting approval?  Is

20    there a substantive change, in your view?

21         MS. WOLFE:  No, there's not.  In the government's

22    view, Your Honor, there's not a substantive change here.  It's a

23    modest change, in our view.

24         As Your Honor pointed out in the exchange with plaintiffs'

25    counsel, the Mayorkas memo contains several references to the

1    exercise of judgment, and in no way does it indicate that the

2    list, whether it's the list of protected areas, the -- or the

3    list of circumstances where enforcement action in a sensitive

4    location would take place, is a complete list.  It's

5    nonexhaustive.  It describes them as examples.

6        And it goes on in both of those instances to direct that

7    the exercise of judgment is required.  Certainly, it did include

8    an instruction that absent exigent circumstances, an officer

9    must seek prior approval from the agency's headquarters or the

10   agency's headquarters' delegee, whoever that may be.

11       So unlike --

12            THE COURT:  I'm less concerned about who gives the

13   okay to proceed to go into a church.  I'm more concerned about

14   the content of what the agents are being told.

15       Can you give me any reassurance other than the fact that

16   the plaintiffs only point to one instance in which there's been

17   law enforcement activity, the day care incident that you just

18   referenced, I think it was in Atlanta, any reassurance that the

19   government's intention is to comply with RFRA?

20            MS. WOLFE:  I think the reassurance that we could give

21   is that the Hoffman memo has been -- it's been about two and a

22   half months since it was issued, and irrespective of the

23   immigration enforcement incidents that plaintiffs point to as

24   them having experienced, they've pointed to no example where

25   there has been the type of activity that they are concerned

1    about here, which is a raid where they are going into a church.

2         THE COURT:  No, I get that.  I get the argument.  But

3    I'm looking for some assurance from you that the government

4    intends to fully comply with RFRA, despite the fact that this

5    memo doesn't include the same degree of detail as the earlier

6    memo.

7         MS. WOLFE:  Well, the government always intends to

8    comply with all laws, Your Honor.  And as the Supreme Court has

9    recognized, that there is a presumption that the government will

10   comply with laws.  There's nothing here in this record to

11   indicate that the government will not comply with the law, with

12   RFRA.  Plaintiffs here have not shown that the Hoffman

13   memorandum substantially burdens their exercise of religion.

14        THE COURT:  Is it appropriate for the Court to look at

15   the Vatello memorandum in interpreting the 2025 rescission?

16        MS. WOLFE:  Yes, Your Honor, it's certainly

17   appropriate for you to.  The Hoffman memorandum specifically

18   expresses that the components of DHS could issue their own

19   guidance, and ICE has chosen to do that.  That guidance is now

20   governing ICE's -- ICE's enforcement actions.

21        And here, similar to the Mayorkas memo, the ICE memo has

22   instituted a supervisory approval when agents are contemplating

23   carrying out an enforcement action at a sensitive location.

24        THE COURT:  What should the Court make of the language

25   in the memo that requires specific authorization from the

principal legal advisor in the local office before authorizing

or before taking immigration enforcement actions at a site where

public demonstration is underway but not in a sensitive location

like a church?

Does the -- clearly, the memo suggests that there are

concerns about making sure agents have guidance on

constitutional considerations in that context.  What about in

the context of the church and RFRA?  Is the omission of similar

language that would apply there something the Court should read

into?

MS. WOLFE:  I don't think the omission is something

the Court should read into, Your Honor.  The memo suggests that

agents consult with the local attorney, the local ICE attorney

in their area, but it does not require them to get approval.

So they can consult, but they certainly don't have to have

a agency attorney sign off on any or approve or otherwise

authorize any type of enforcement activity at a protest or some

other type of demonstration.  So the fact that, you know, they

suggest that you should consult with an agency attorney really

doesn't -- I don't want to say it's completely immaterial,

because that would make me as an attorney immaterial.  But it

certainly is not required for -- they're not the ones making the

decision to authorize.

THE COURT:  You mean the agent isn't?

MS. WOLFE:  The attorney.  The ICE agents do not

1    need -- there's nothing in this memo, in this language that

2    indicates that the attorney would have to authorize such action

3    and that the action could not take place unless an agency

4    attorney had authorized.

5             THE COURT:  There's just some reassurance that agents

6    are being apprised of the law in that instance at least.

7             MS. WOLFE:  There's also the reassurance in the ICE

8    memo that when contemplating any enforcement action at a

9    sensitive location, that officers, you know, do have to consult

10   with their supervisors and to get approval.

11        So it's not -- with respect to the ICE guidance and the

12   immigration enforcement actions taken by ICE officers, you know,

13   their discretion is exercised in tandem with having to consult

14   with their supervisors before they move forward to carry out any

15   enforcement action at a sensitive location.

16            THE COURT:  And what about the lack of the memo from

17   Broder Patrol?  Any significance to that?

18            MS. WOLFE:  There's no requirement in the Hoffman memo

19   for CBP to issue a memorandum.  So I don't think that there is

20   any significance in the fact that, you know, two and a half

21   months after the memorandum has issued, that CBP has not issued

22   a memorandum.  Should they decide to do so, the government would

23   provide a copy of that memorandum to the Court and to

24   plaintiffs' counsel.

25        But the Hoffman memorandum has only been in existence for

1    about two and a half months.

2        THE COURT:  All right.  You've suggested in your

3    briefs that the plaintiffs' interpretation of the Hoffman

4    memorandum, the rescission 2025 memorandum, is an unreasonable

5    one in that it doesn't follow as a result of that memo that RFRA

6    is now going to be violated; the memo itself does not justify

7    the reaction of the immigrants and the churches in terms of this

8    memo is really a sea change in what has been permitted

9    previously.

10       Is that fair?

11       MS. WOLFE:  I think that's fair, Your Honor.  I think

12   that the Hoffman memorandum, as we previously discussed,

13   represents, you know, a modest change in the internal guidance

14   that DHS is providing its immigration officers.  Just like the

15   Mayorkas memo, the Hoffman memorandum does not direct

16   immigration officers to conduct immigration enforcement activity

17   at a sensitive location, including places of worship, does not

18   mandate that they do so.  It simply authorizes them to do so.

19   They were authorized to do so under the Mayorkas memorandum and

20   under the previous memorandums as well.

21       But in terms of substantial burden at this juncture on the

22   record before us, much like with standing, there's simply

23   nothing in the record to suggest that the depressed attendance,

24   worship service attendance is related to the Hoffman memorandum

25   as opposed to the administration's decision to increase

enforcement actions in general here.

So it's -- at this juncture on this record, it's speculative whether or not the Hoffman memorandum is driving the plaintiffs' purported injuries here.

THE COURT:  Do you agree, though, with what the plaintiffs say about the change in memos does give the agents unfettered discretion and some of that discretion the agency had forfeited earlier through the Mayorkas memo?

MS. WOLFE:  I wouldn't characterize the Mayorkas memo as forfeiting officers' discretion.  They certainly needed to discuss and get approval with their -- you know, from a supervisory official.  In the Mayorkas memo, it was a headquarter official or that person's designee.

But again, the Mayorkas memo did not define what "near" meant, and it said that that's fact-specific and it's going to require, you know, the exercise of discretion.

Again, the list of circumstances that the Mayorkas memo indicated would support an exception to the general rule of not taking enforcement or carrying out enforcement actions in sensitive locations, the list was not complete.  They made it clear that it was merely examples and that you needed to exercise discretion.  So officers were exercising that discretion in tandem with the supervisory officials that they were consulting with.  That is what is occurring now with respect to ICE.

1          You know, I also note that there's language here in the

2    Mayorkas memo that the guidance does not limit an agency's

3    statutory authority.  And so the prior administration was very

4    clear that the memo here, the policy in no way limited their

5    ability to carry out their functions under, shall we say,

6    Section 1226 of Title 8, which is to execute administrative

7    warrants to -- under Section 1231 of Title 8, to arrest

8    individuals with orders of removal.

9          THE COURT:  But you do agree that the new memo gives

10   the agents greater discretion?

11         MS. WOLFE:  I'm sorry.  Could you repeat?

12         THE COURT:  That the new memo gives the agents greater

13   discretion than they had before.

14         MS. WOLFE:  It gives the agents a -- there is an

15   increase in discretion, certainly.  But particularly with

16   respect to ICE, the overarching supervisory, you know, approval

17   is still there.

18         So yes, I would agree that there is an increase in

19   discretion.  I wouldn't say that it is an overwhelming increase

20   in discretion, given all the carve-outs in the Mayorkas

21   memorandum.

22         THE COURT:  So what is authorized now that would not

23   have been authorized before?

24         MS. WOLFE:  I can't honestly -- candidly, I can't

25   think of anything that wasn't authorized before.

1          THE COURT:  So why do you say they have more

2     discretion?  Is it just procedurally?

3          MS. WOLFE:  So I think procedurally, they would have

4     more discretion.  The Mayorkas memo, you know, gives them

5     guidelines to consider when they're exercising that discretion.

6     But it makes clear that there are other circumstances in play.

7     Certainly, an enforcement officer may need to carry out an

8     enforcement action at a sensitive location for a national

9     security threat or an imminent risk of death or, you know, hot

10    pursuit or a safe alternative location does not exist.

11         But that list is nonexhaustive.  And by being

12    nonexhaustive, it contemplates that there are other

13    circumstances that may warrant taking out or carrying out an

14    enforcement action at a sensitive location.  It doesn't

15    foreclose that from happening.

16         THE COURT:  Can you explain why, what was the

17    administration's reason for issuing a new memo?  I know almost

18    every administration has done so, but why issue a new one if the

19    end result substantively, in your view, is the same?

20         MS. WOLFE:  Well, as Your Honor is probably aware, and

21    I don't want to skip ahead to RFRA, but in our discussion of the

22    government's compelling interest, you know, the government does

23    have a compelling interest in ensuring and enforcing our

24    nation's immigration laws.  That interest has been recognized

25    and acknowledged by the Supreme Court, as well as Congress, that

Congress has directed the Executive to vigorously and uniformly

enforce the immigration laws.

So the Mayorkas memo and the other memorandums that were

issued prior to that, they represented a approach to immigration

enforcement that was not uniform.  The Hoffman memorandum

reflects Congress's direction that the enforcement of our

nation's immigration laws be uniform.

Beyond that congressional directive, defendants admit that,

you know, based on the record before us, the Hoffman memorandum

does not go into detail as to the reasons why it made the

decision on January 20th to issue a new memorandum.

But turning back to the standing issue here, in addition --

or notwithstanding the pre-enforcement challenge, I think when

you're applying the standard under Laird and Clapper that the

injury has to be clearly -- or certainly imminent, plaintiffs

just have not adduced any evidence to make that showing.

As Your Honor is aware, in cases beginning with -- a line

of cases beginning with Laird versus Tatum, that they made clear

that a cognizable chilling injury does not simply arise from the

knowledge that the government is engaged in certain activity.

The government's actions must be regulatory, prescriptive, or

compulsory in nature.  And a plaintiff must be either presently

or prospectively subject to those regulations, prescriptions, or

compulsions that are being challenged.

And here, the Hoffman memorandum is not regulatory in

1    nature.  It's not prescriptive in nature.  It's not compulsory

2    in nature.  It issues no commands.  It issues no prohibitions.

3    Nor does it set forth standards for plaintiffs' conduct or the

4    conduct of their members.

5        Moreover, the Hoffman memorandum, just like the Mayorkas

6    memorandum and the memorandums that came before it, they merely

7    authorize the carrying out of enforcement actions at sensitive

8    locations.  It does not mandate that the immigration enforcement

9    officers carry out enforcement actions at those churches.

10            THE COURT:  Do you --

11            MS. WOLFE:  So it's purely, at this juncture,

12    speculative that there will be any immigration enforcement

13    action at any of plaintiffs' places of worship or another place

14    of worship.

15        Does that mean that there won't be any in this year, in the

16    next two years, in the next four years?  No, but there were

17    enforcement actions, as I think at least one or more of

18    plaintiffs' declarations indicate that's in the record before

19    the Court, where there was immigration enforcement activity in

20    their churches under the Mayorkas memo or under some of the

21    other prior memos.

22        But there's nothing here to suggest that the Hoffman

23    memorandum mandates the type of activity that plaintiffs are

24    fearful of, which is the, you know, rolling up to church and

25    conducting a raid while worship services are ongoing or while

social ministry services are being provided.  They've pointed to nothing of that.

Moreover, their standing really rests on the actions of independent actors that are not before the Court, and that makes standing not impossible to surmount, but certainly, as the Supreme Court has recognized, more difficult to make.

Here, as I have previously mentioned, the evidence that is currently before the Court is, I think, at best mirky.  Not only in plaintiffs' declarations, but we've heard this morning from plaintiffs' counsel that concerns are being driven, it sounds like in large part, from the administration's decisions to increase the general enforcement of our nation's immigration laws.

So while defendants certainly recognize that plaintiffs have submitted declarations that address and acknowledge the Hoffman memorandum's issuance, but the -- as it stands right now, in the record before the Court now, the evidence is simply too murky for plaintiffs to have made a clear showing that the fears of their congregants and their visitors, again parties who are not before this Court, are fairly traceable back to the Hoffman memorandum as opposed to the general increase in enforcement.

THE COURT:  All right.  So your briefs seem to focus mainly on associational standing.  Do you agree that as organizations, their reduction in congregants is an injury in

fact?  I understand the traceability and redressability

arguments, but do you agree that that would constitute an injury

in fact?  And I specifically want to know what your position is

with regard to the Ninth Circuit Presbyterian Church case.

MS. WOLFE:  So I will start there, Your Honor, with

the Ninth Circuit case.

The Ninth Circuit case is readily distinguishable from the

facts that are presented here, by plaintiffs' own admissions.

The Ninth Circuit case, there, the Court, the Ninth Circuit

found that plaintiffs there did have standing based on the fact

that the immigration officers had over a nine-month period gone

into the plaintiff churches and secretly recorded their worship

services.  It wasn't one incident.

THE COURT:  No, I understand.  I'm just trying to get

to the point that that can be injury, the reduction in the

congregation, the numbers, and it seems that they've certainly

established that.  Whether they've established that is due to

the change in memos or enforcement policy generally, I get that

argument.

MS. WOLFE:  So the reduction -- yes, to answer your

question, the reduction in attendance could support a cognizable

injury.  It does not support a cognizable injury here, and the

Ninth Circuit's decision in United Presbyterian Church counsels

very much so that it doesn't.

Because -- for again, the prospective relief that

1    plaintiffs are seeking here, they're not seeking damages for the

2    incident at the day care center.  They are seeking prospective

3    relief.  And they have a burden to demonstrate that their harms

4    are imminent and will be repeated in order to get that

5    prospective relief.

6        That was demonstrated in the Ninth Circuit case.  That is

7    not here.  There is nothing in the record to suggest that there

8    will be a repeated incident at the place of worship with the day

9    care center or that there will be any incident at any of

10   plaintiffs' places of worship.

11       THE COURT:  Was there a remand in that case on the

12   prospective relief, or am I confusing that with another case?

13       MS. WOLFE:  If my memory serves me correctly, Your

14   Honor, there was a remand in that case, and I believe on remand

15   that the district court there found that they had standing.

16       But again --

17       THE COURT:  Prospectively?

18       MS. WOLFE:  Prospectively.  But again, the record was

19   the pervasive and repeated entry of immigration enforcement

20   officers at plaintiffs' churches over a nine-month period where

21   they were secretly recording the worship services.  And that

22   once that information came to light to those churches'

23   congregations, that it was that information that drove down the

24   attendance there at both worship and I think those churches also

25   had social service ministries.

1          THE COURT:  All right.  Do you want to move on to -- I

2     don't want to cut you off on standing.  Is there anything more

3     you would like to say about standing?

4          MS. WOLFE:  Unless the Court has questions, no, I can

5     move on.  I'm hear to answer your questions.  So if there's a

6     particular question on another subject matter, I'm willing to

7     answer that.

8          THE COURT:  If you can just respond to the plaintiffs'

9     arguments with respect to RFRA.

10          MS. WOLFE:  So, you know, as with standing here, with

11     RFRA, there's no direct course of pressure on plaintiffs or

12     their members to modify their behavior.  Because again, the

13     Hoffman memorandum issues no commands, no prohibitions.  It does

14     not set forth standards for their conduct.  And it merely

15     authorizes.  It does not mandate enforcement activity at

16     sensitive locations.

17          So, you know, with respect to the indirect course of

18     pressure, again, the burdens flow here from the independent

19     decisions of third parties.  And plaintiffs have not adduced

20     clear evidence that it is a predictable outcome that their

21     congregants and other visitors will have a real refrain from

22     in-person attendance at worship services or at social service

23     ministry activities because of the Hoffman memorandum.

24          So the link here between the Hoffman memorandum and the

25     purported burdens on plaintiffs' religious exercise at this

stage in the case are simply, you know, too attenuated to rise

to the level of substantial, because it's just speculative at

this juncture that both immigration officers will decide to

exercise their discretion and common sense to carry out an

enforcement action at plaintiffs' places of worship.

It's also speculative that the decisions of the congregants

and other community members will make the decision not to go or

not to attend worship services or other ministry activities as a

response to the Hoffman memorandum, as opposed to a response to,

you know, an increase in the general enforcement activity that

they're seeing in their communities or any number of other

individualized concerns.

THE COURT:  All right.  If I get to the least

restrictive means, how has the government shown that it's

exercising least restrictive means here?

MS. WOLFE:  Well, as I said earlier, Your Honor,

Congress has directed the Executive Branch to vigorously and

uniformly enforce the nation's immigration laws.  The Mayorkas

memo and the other memos that came before it, they did not

uniformly, you know, carry out that directive from Congress.

THE COURT:  And what's the lack of uniformity?  That

they're not running into churches and schools like they are

parks?  What do you mean by "lack of uniformity"?

MS. WOLFE:  That the laws of general applicability

are -- that the immigration laws are being enforced equally

amongst people, in locations, that there are no special rules or

considerations for any particular group.

THE COURT:  But in general, law enforcement doesn't

typically go into churches, no matter what the offense is.  It's

not a first line of attack generally; is that fair?

MS. WOLFE:  I think that's fair, Your Honor, and I

think that as the record has demonstrated, it has not been

defendant's first line of attack in the two and a half months

that this administration has been in power and has been

operating under the Hoffman memorandum.

This is internal guidance directed at its immigration

enforcement officers that is simply instructing them to exercise

their discretion and common sense, like the memorandums that

have come before them, you know.  Two and a half months in, I

think if we were to be concerned that there was going to be a

run on storming places of worship, we would have seen that by

now, and we have not.

THE COURT:  The plaintiffs say it's because of the

cases, the pending cases.

MS. WOLFE:  Oh, the pending litigation?

THE COURT:  Uh-huh.

MS. WOLFE:  Well, I don't think that's a fair

assessment, Your Honor.  The preliminary injunction in the

Philadelphia Yearly case is party-specific.  It's not a

nationwide injunction.

1    So while certainly the defendants have to comply with the

2    restrictions of the preliminary injunction that were imposed by

3    the district court in Maryland with respect to those plaintiffs'

4    places of worships --

5         THE COURT:  I think they're saying they're chilling

6    you across the country with the pending cases.

7         MS. WOLFE:  There is no evidence of that in the

8    record, Your Honor, and I don't think there's any -- I don't

9    think there's any evidence of that in the public sphere as well.

10   I think, based on media reports, that the administration has

11   vigorously been enforcing the nation's immigration laws.

12        THE COURT:  All right.  I hear you on the vigorous

13   enforcement, uniform enforcement, as you say.  That's the

14   government's interest here.

15   What was not working with the Mayorkas memo?  Why the need?

16   Can you articulate why that was precluding agents from uniformly

17   executing the laws as Congress directs?

18        MS. WOLFE:  So, there's nothing in the record, Your

19   Honor, that articulates why it was not working.  And any answer

20   that I would provide would be speculative at this point.

21   The Hoffman memorandum, like I said before, you know,

22   reflects Congress's direction that the immigration laws be

23   enforced uniformly.

24        THE COURT:  All right.  On the APA claims, why is this

25   not subject to the APA?

1          MS. WOLFE:  So it's not subject to the APA for two

2     reasons, and I will take them in the same order that plaintiffs

3     took them.

4          With respect to final agency action, you know, the

5     D.C. Circuit has recognized that an agency action that merely

6     explains how the agency will enforce a statute or regulation, in

7     other words how it will exercise its broad enforcement

8     discretion under some statute or regulation -- here, that's the

9     INA -- is a general policy statement.

10          The Mayorkas memorandum has no legal effect, because again

11     it issues no commands or prohibitions.  It doesn't set forth

12     standards for conduct.  It doesn't offer an interpretation of

13     the INA or other statutes governing -- providing immigration

14     laws.

15          It states that the guidance does not limit any agency or

16     employees' authority.  It also, as Your Honor pointed out,

17     includes language that -- express language that it does not

18     create any legal right, whether that be in an administrative

19     context, a civil context, or a criminal context.

20          Plaintiffs' argument that it creates a safe harbor is just,

21     you know, simply incorrect.  The case that they cite in their

22     reply papers for that, the 2016 Hawkes Company Supreme Court

23     case, there the Court found that the Army Corps of Engineers'

24     approval of a jurisdictional termination with respect to some

25     Clean Water Acts, some navigable waters, created a safe harbor

because, A, the Army Corps' regulations described approved jurisdictional determinations as final agency actions; and two, they specified that an approved jurisdictional determination will remain valid for a period of five years.

That clearly, clearly and definitively, provided a five-year safe harbor for any entity that received approval of a jurisdictional determination.  Likewise, if an entity did not receive approval of its jurisdictional determination, then that was a denial of a safe harbor.

The Mayorkas memorandum does not provide the same definitive and concrete promises, for lack of a better word, that we see in Hawkes, because again the list of circumstances in which enforcement actions would be warranted, for lack of a better word, was not complete.  It was just examples.

And the memorandum made clear that officers and the supervisory authority needed to exercise their discretion.  The memo expressly stated that it was not defining the term "near." Remember, the memorandum provides that to the fullest extent possible, that we're not going to conduct immigration enforcement actions in or near a place of worship, but it did not define "near."  And it said that's a fact-specific determination that you're going to need to exercise your discretion on.

It also made clear again, like I said before, that there's no limitation on the agency's authorization under the statute,

1    as well as the language that said that the -- specifically said

2    that this does not create a right, unlike the regulation in

3    Hawkes that specifically said this is a jurisdictional

4    determination, is a final agency action.

5         So the Mayorkas memo simply did not create a safe harbor

6    here.  So therefore, there's no legal consequences that flow

7    from the Mayorkas memo.  And if there's no legal consequences

8    that flow from the Mayorkas memo, then it follows that the

9    Hoffman memorandum also does not have legal consequences such as

10   denying a safe harbor that under the Mayorkas memo did not exist

11   for places of religion or any other sensitive location that was

12   identified in that memo.

13        With respect to the Hoffman memo being committed to agency

14   discretion by law, the standard there is that the underlying

15   statute has to be drawn so that there would be no meaningful

16   standard against which to judge the agency's exercise of

17   discretion.

18        Here, the INA does not provide any meaningful standard by

19   which to judge defendant's enforcement discretion with respect

20   to carrying out enforcement actions in sensitive locations.  It

21   does expressly provide guidelines that would restrict officers

22   from going into a farmland or other agricultural operation.

23        But beyond that, the INA is silent with respect to where

24   enforcement conduct or enforcement actions can be conducted in

25   any location.

1    And of course, as the Supreme Court emphasized recently in

2    United States versus Texas, you know, lawsuits like the ones

3    that plaintiff has brought here that's challenging an agency's

4    discretionary enforcement policies runs up against the

5    Executive's Article II authority to enforce federal law.  And

6    courts generally lack meaningful standards to assess the

7    propriety of enforcement choices.

8    And at bottom, that is what is at issue here, is the

9    agency's enforcement choices in where, when, how, and how

10   aggressively it is going to enforce the nation's immigration

11   laws.

12   And as the Texas court explained, that when -- the courts

13   generally lack a meaningful standard for assessing propriety of

14   enforcement choices with respect to arrest and detention given

15   the needs of the Executive Branch to weigh resource constraints

16   and the regularly changing public safety and public welfare

17   needs when devising arrest and prosecution policies.

18   The administration has issued executive orders and has made

19   statements to make clear that the increase in illegal

20   immigration, illegal immigrants coming across our borders has

21   risen significantly in the past four years.

22   So, in balancing that increase in the number of individuals

23   who are coming into this country illegally, along with our

24   public safety concerns and other public welfare needs, this is

25   the balance that the administration has struck at this time.

1        Does that mean that the balance might shift or might change

2   later on in this administration or in a different

3   administration?  No.  That's something for each executive to

4   constantly weigh and balance with the interests that are, you

5   know, currently in the -- currently in the population.

6        Unless the Court has other questions on the APA, I will

7   briefly address Section 1252.

8              THE COURT:  Sure.

9              MS. WOLFE:  Okay.  So, plaintiffs' position is that

10  Section 1252(f) is not applicable here and that the district

11  court in Maryland got it wrong in determining that it was

12  applicable to this instance.  But the very action, the very

13  action that is at issue here or one of the actions that are at

14  issue here is the authority of the agency to conduct arrests

15  pursuant to Section 1226 and 1231, and those provisions are

16  expressly identified in Section 1252(f).  And so, you know,

17  therefore, they're directly applicable.

18       With respect to any collateral effects or collateral

19  concerns that plaintiffs may have, defendants do not dispute

20  that enforcement activity that is authorized pursuant to Section

21  1357 is not subject to 1252.

22       That activity, I think, is relevant here, does permit

23  warrantless arrests and warrantless questioning of individuals

24  without probable cause.  So, you know, if enforcement activity

25  was being taking place pursuant to Section 1357, then -- and

during that activity they would obtain probable cause for an
administrative warrant under 1262, we agree that the collateral
effects rule that the Ninth Circuit has discussed in its case,
that that would -- that that would not be subject to 1252.

But when we're talking about a officer that has an
administrative warrant that is based on probable cause that was
issued pursuant to Section 1226 or 1231 and they had that in
hand before they go out to carry out their enforcement activity,
that that is precluded -- that that is covered by
Section 1252(f), and this Court is precluded from restraining
the defendants from carrying out.

THE COURT:  All right.  Thank you.

MS. WOLFE:  Thank you.

THE COURT:  Ms. Corkran?

MS. CORKRAN:  So I will start by saying much of the
conversation with my friend focused on the pre-enforcement
framework, the substantial threat language under Clapper and
Susan B. Anthony List.  That question of the likelihood of
future enforcement, I think they're wrong about the likelihood
for a number of reasons.

But that only goes to plaintiffs' first injury.

THE COURT:  Understood.  But even with respect to your
second, the decreased attendance, which seems to be your
strongest --

MS. CORKRAN:  Yes, yes, we think that's right.  There,

1      you're looking at the Department of Commerce test, and so when

2      we're talking about the Department of Commerce test, looking on

3      paper, what's the difference between the Mayorkas memo and what

4      we have here?  There are substantial differences.

5          The Mayorkas memo says, We will avoid this sort of

6      enforcement action to the fullest extent possible.  The new memo

7      says nothing like that.  It's discretionary.

8          And I think importantly, what was allowed under the --

9      what's allowed now that wasn't before?  Right now, an agent in

10     Texas can say, You know what?  I know that there are a lot of

11     undocumented immigrants in that church, they're all there on

12     Sunday, I'm going to go, is that okay, to my supervisor?  And

13     the supervisor says yes verbally, and they can go in.  That

14     clearly wasn't allowed under the Mayorkas memo.

15             THE COURT:  Right.  Let me focus your attention on the

16     Ninth Circuit case, the Presbyterian Church case.

17         Do you agree with that decision and the analysis?

18             MS. CORKRAN:  The Ninth Circuit one, yes, I think

19     that's right.  It was focused on damages, and that's why it was

20     backward-looking.  It's important, I think, to our case, not

21     because it answers this question of imminent threat but because

22     it recognized the reduced attendance as a concrete injury.

23             THE COURT:  Understood.  But it also recognized that

24     the effect on the churches was not a subjective chill on their

25     worship activities; it was a concrete, demonstrable decrease in

attendance at the worship activities that was tied to the harm

there, which was, you know, a greater record, you concede, than

you have here.

MS. CORKRAN:  I think that that one was focused on

damages.  So we had prior enforcement action.  We do have some

prior enforcement action here, but the --

THE COURT:  You have a single in a church; correct?

MS. CORKRAN:  Yes.

THE COURT:  Can you give me anything more about that

other than what was alleged in the declaration?

MS. CORKRAN:  The day care center was in the church

building.  So this would have been a violation of the sensitive

locations policy if they didn't have a judicial warrant or had

not obtained headquarters approval.

THE COURT:  But can you give me enough about those

instances for me to be confident that those would have been a

violation of the earlier policy?

MS. CORKRAN:  Officers did not present any sort of

judicial warrant.  There was no administrative warrant, as far

as I know.  There was no exigent circumstances.

THE COURT:  How do you know that there were none?

MS. CORKRAN:  The people who were witnesses said they

were not given any papers to that effect.

But I think importantly, this focus on likelihood of future

enforcement misses that the question right now, there are

present injuries right now that are violating RFRA.  The policy

itself is violating RFRA.  And I agree that is a distinction

from United Presbyterian.  But it's --

THE COURT:  The chilling effect is not enough.

MS. CORKRAN:  Right.  This is not about chilling.

These are actual injuries under the Department of Congress --

sorry, Department of Commerce.

So we have right now, the question is --

THE COURT:  You have congregation going down, but you

still have to show the tie to the memo.

MS. CORKRAN:  Right.  And so the question is, when we

compare the two memos, is it a predictable reaction of the

plaintiffs' congregants and social service recipients, knowing

now that the policy has changed in the way it has, and again,

that church in Brownsville that is almost entirely undocumented

congregants, is it reasonable, is it predictable that the way

that they're going to respond to the difference between these

two memos is to stop coming into the place of worship because

they're now exposed based on the papers.

So that's the violation of RFRA.  We don't have to wait for

an actual enforcement action in order to have a substantial

burden.

And then also this conscience injury, that Alliance for

Hippocratic Medicine, the question is, is what the government is

doing likely to make you change your conduct?  And we've shown

1    that here, too.  So I think United Presbyterian is different

2    because it was a challenge to the actual interference, the

3    actual enforcement action.

4              THE COURT:  But then there was a prospective element;

5    right?

6              MS. CORKRAN:  That was remanded; that piece of it was,

7    correct.  Our challenge is to the change in policy and how that

8    change in policy is substantially burdening our plaintiffs.

9        And so again, if we look at some of the declarations,

10   there's a church in Exhibit 1, the social service ministry in

11   its church building that serves approximately 500 immigrants

12   daily, most of whom are undocumented.  So under the new policy,

13   all that the agent in the local office has to do is say, You

14   know what?  There are 500 people in that church.  Let's just go

15   over, let's do a raid, let's start asking them questions.  And

16   they get verbal consent to do that, and then they go in.

17       If you are those social service recipients, if you're the

18   leaders of that church and you're looking at this change in

19   policy, the predictable reaction is going to be, Well, now we

20   need to shut down this ministry, we don't want to make these

21   people vulnerable.  The reaction of the participants is going to

22   be, Well, now we're not safe in this church anymore.

23       I understood my friend to kind of be suggesting that maybe

24   the department is going to secretly follow the sensitive

25   locations policy despite changing.  I think Your Honor asked an

important question, which is why would you have changed the

policy if you had intended to continue to constrain yourself in

those ways.  But even if they had, the change in policy and the

change of what they've kind of communicated is itself an injury

right now.

     And I would note also kind of this reassurance.  There were

no reassurances from my friend that what I just described

wouldn't happen, that you wouldn't have agents saying, Well,

yeah, common sense, there are 500 undocumented immigrants in

that church right now, that's a really easy way to go to fill

our quota right now.  So these are concrete injuries that are

happening right now and that are substantial burdens under RFRA.

     And I would note also, just in response to my friend's

suggestion that maybe this is more constrained, we cite in our

opening brief an article that's on the DHS website that

specifically describes ICE and CBP agents as understanding that

the change in policy frees them up to go into churches and

synagogues.

     That is relevant to the predictable reaction that people

are having.

          THE COURT:  That people are having, yeah.

          MS. CORKRAN:  That's right.  I'm happy to answer any

other questions Your Honor has, but I would just emphasize, this

is devastating.  Many of the plaintiffs here have never been

involved in litigation.  They wouldn't be here right now if this

1    hadn't already had an extraordinary impact on their

2    congregations.  Their pews are empty.  Their ability to fulfill

3    their social service ministries has been severely compromised.

4    They are currently doing things that violate their religious

5    beliefs, putting up signs on their doors saying that their

6    community members aren't welcome.

7        So these are injuries that are happening now that are

8    redressable under RFRA and that entitle the plaintiffs to

9    injunctive relief.

10            THE COURT:  I want to go back to the Mayorkas memo and

11    the exigent circumstances.

12        You suggested that pre-approval was required?

13            MS. CORKRAN:  Under the Mayorkas memo, if you had

14    exigent circumstances, you did not need pre-approval.  If it

15    were one of the narrow circumstances that did not involve an

16    exigent circumstance, you did need pre-approval from

17    headquarters.

18            THE COURT:  Okay.

19            MS. CORKRAN:  So if you look at the enumerated list, I

20    think the national security threat is not necessarily exigent.

21    You could determine that in advance, make a plan, get

22    headquarters approval.  The no safe alternative location also

23    wouldn't necessarily be exigent.

24        I understand the memo, if you look at the enumerated kind

25    of examples, you have some that would be permitted under the

Fourth Amendment.  You have these two that wouldn't necessarily be permitted without a judicial warrant.  But the memo allows, in lieu of a judicial warrant, the officers can get headquarters approval.

Did that make sense?

THE COURT:  I read it to mean that you don't need pre-approval for anything that's listed.

MS. CORKRAN:  Except that the two I just named are not exigent circumstances.  National security threats and no safe alternative existing are not exigent circumstances.

THE COURT:  But it says national security threat.  Is that not one of the listed --

MS. CORKRAN:  It's one of the listed examples of what might be an exception to the rule that the agency is not to conduct enforcement actions to the fullest extent possible.  So we have that overarching rule.

We then have some examples of when it might not be possible.  Some of those are exigent, and some of them are not.  And then you go down to the next sentence, which says if it's not exigent, then you do need to get the headquarters approval.

THE COURT:  Okay.

MS. CORKRAN:  And I think again as just a matter of canon constructions, you would -- although that list is not exhaustive, these are examples, you would expect any sort of limited exception to mirror those, to be closely related to

them.  And that would be necessary.

You wouldn't have said at the beginning of the memo "to the fullest extent possible avoid" and then allow what I just described as permissible under the 2025 memo.  There are a whole bunch of undocumented immigrants in that church; let's just go get them because it's convenient.

THE COURT:  Where is the specific exigent circumstances language, the list?

MS. CORKRAN:  You have the enumerated list.  As I just said, it's the sorts of things that would fall outside of avoiding to the full extent possible.  That certainly didn't include there are a lot of undocumented immigrants, let's go get them.  And then it says, "Absent exigent circumstances, an agent or officer must seek approval."

So this is how the district court in Maryland read this language, that the "absent exigent circumstances" means that when you're talking about the enumerated list, if there is anything on that list that isn't exigent, then you need headquarters approval.

I think some of them, you know, imminent risk of death, violence, or physical harm, that's going to be an exigent circumstance.

THE COURT:  It is very confusing.

MS. CORKRAN:  I think this is the right reading.

THE COURT:  I don't want to interrupt.  You get the

1    last word here.  But let me just ask the government to state its

2    interpretation.  You can speak into the microphone there.

3         Do you agree with the way the district court interpreted

4    the memo in Maryland?

5              MS. WOLFE:  We did not agree, Your Honor.

6              THE COURT:  So how do you read these itemized -- this

7    itemized list that's not complete?

8              MS. WOLFE:  So I read this itemized list -- and I

9    agree that the wording could use some clarity.  But I agree, I

10    read this itemized list as a nonexhaustive list of exigent

11    circumstances.

12              THE COURT:  That's how I read it.

13              MS. WOLFE:  Right.  Because -- and I'm sorry.  I don't

14    mean to speak over you.  But with the exception of a safe

15    alternative location does not exist, which that's questionable

16    if it's exigent circumstances, you may think all of the items on

17    this list are exigent circumstances.  Certainly, national

18    security could be an exigent circumstance as well.

19             MS. CORKRAN:  And I would just respond, a national

20    security threat could be exigent or could not be exigent.

21             THE COURT:  But the fact that we're struggling over

22    what this memo means leads me to ask, how can I rely on a single

23    congregant's impression of the memo?  They probably don't even

24    have access to it.  They're relying on --

25             MS. CORKRAN:  What they would know is that this memo

1    said that to the fullest extent possible, we should not take

2    enforcement action at sensitive locations.  And it describes

3    this as a fundamental principle.  "We cannot accomplish our

4    enforcement mission without denying access to places of

5    worship."

6         So this language --

7         THE COURT:  But then it goes on to expand on that and

8    give a more fulsome understanding of what that means.  And if

9    someone is relying on the memo in an incorrect way, does that

10   create a reliance issue?

11        MS. CORKRAN:  So I will say, I don't think this is the

12   most important part, but just to be directly responsive to that,

13   Department of Commerce does not require that the predictable

14   third party be rational.  Right there, the idea that the

15   government was going to use the sentence to go after

16   undocumented immigrants, that would have been against the law

17   for the government to do it.

18        What the Court looked at was just predictability, what is

19   the predictable reaction going to be to this language.  And that

20   language I read earlier said just they will not be going into

21   places of worship except under these narrow circumstances.  And

22   in any circumstance that's not exigent, you're going to have to

23   go to headquarters and get headquarters' approval in advance.

24        There's no reasonable reading of the Mayorkas memo that

25   would allow what I just described earlier as permissible under

the Vatello and Hoffman memos, which is, this is a church that
has a lot of undocumented people in it, it's near a border, this
is a church that serves a lot of undocumented people, that's a
great way to meet our quota today.  Right?  Common sense, let's
go meet our quota there, round up a whole lot of people.  There
is no reading of the Mayorkas memo that would have allowed that.

      And so that change, the predictable reaction to that is
going to be what we have seen, which is the devastation of
plaintiffs' places of worship, dramatic changes in how they're
able to worship and serve together.

      So we ask that the Court give us an injunction that would
allow -- that would allow the plaintiffs to restore the sanctity
of their places of worship.

            THE COURT:  Any further points you want to make on
RFRA?

            MS. CORKRAN:  You had asked my friend to reassure you
that they weren't going to violate RFRA.  I don't think you got
those reassurances.  I didn't hear the government suggest that
they wouldn't do what I just described, which is as a matter of
common sense this is an easy place to go and round up a bunch of
undocumented people.  And I think it's also not responsive to
the actual violation that's happening now.  The devastation that
the plaintiffs are experiencing in their congregations is
already happening as a result of the change in policy.

            THE COURT:  Well, that's the key.  Is it as a result

1    of this change in policy?

2         MS. CORKRAN:  And I would point to our declarations,

3    which say it's attributable to the new enforcement policy.  The

4    district court in Maryland said, Well, we have these

5    declarations that are tying the link.

6         And again, I would say, go back to Your Honor's opinion in

7    Ipsen Biopharm, which is it doesn't have to be the only cause.

8         THE COURT:  No, it doesn't.  I get that.  And it

9    doesn't have to be fully redressable.  I get that, too.

10        But -- and I understand the point you're making about the

11   individual congregants, it being a plausible way in which

12   they're reading the news about this memo, to think that they

13   shouldn't go to church.  I get that argument, too.

14        But don't I also have to look at the memos in assessing the

15   government's conduct and is there a substantial burden, are they

16   using the least restrictive means?  And your record on that

17   point is slim.

18        MS. CORKRAN:  Well, I don't think it's -- restrictive

19   means is going to be the government's burden, and they haven't

20   really offered anything other than that they wanted to have

21   discretion.  So I think that piece of it is easy, if the Court

22   gets there, and I hope it does.

23        And so again, we're looking at a predictable reaction.  If

24   we just focus on those hypotheticals I gave, we have a number of

25   churches that are almost 100 percent undocumented people,

immigrants that under -- on the face of the Vatello memo and on
the face of the Hoffman memo, it is fine for ICE and CBP agents
to target those churches because they are low-hanging fruit for
getting undocumented people.

My friend did not say anything that would suggest that was
not the case. And if it's not the case and there's some sort of
secret policy that they've adopted where they're actually not
going to go into places of worship --

THE COURT: But you're asking me to, in effect,
assume, based on the record we have that, based on this
memorandum, they will violate RFRA.

MS. CORKRAN: No, I am not asking you to assume that.
I'm asking you to look at the memo as it's written. I don't
think there's any dispute that as it's written, it would permit
the sorts of enforcement actions I just described.

THE COURT: But so would the Mayorkas memo. It was
not constrained to certain limited instances.

MS. CORKRAN: I don't think there's any reasonable
reading of the Mayorkas memo where you would have gotten
headquarters approval if what you had said is, This is a church
that has a lot of undocumented people in it, we can go arrest a
bunch of people today.

THE COURT: Fair enough. But do we have that with
this memo?

MS. CORKRAN: We do. The only limitation is common

1    sense.  There is no indication anywhere in either of those memos

2    that they're going to avoid enforcement action at places of

3    worship.  And that is a profound difference from what you have

4    in the Mayorkas memo.

5              THE COURT:  But you could also interpret the Mayorkas

6    memo in the same way.  I agree it's not plausible.  You're

7    asking me to say it's plausible to interpret this memo that way.

8              MS. CORKRAN:  I don't think it is, because if you look

9    at that language I read, we are going to avoid to the fullest

10   extent possible going into a particular church because there are

11   a lot of undocumented people there and it's an easy way to meet

12   your quota is not avoiding actions to the fullest extent

13   possible.

14             THE COURT:  But that's one approach they could take.

15   The other approach could be, We're going to exhaust other

16   methods and then do that.

17             MS. CORKRAN:  Under the Mayorkas memo?

18             THE COURT:  No, no.  I mean under this memo, too.

19   They still could be exercising their discretion that way.

20             MS. CORKRAN:  Right.  But the question is, how are

21   third parties, how are plaintiffs -- is it predictable that

22   they're going to respond to this change in policy, a change in

23   policy that again ICE and CBP agents have described as freeing

24   them up to go into sensitive locations.  There would have been

25   no need to rescind the policy if they weren't planning on doing

something that was very different than what they had before.

So if this is a predictable reaction we're seeing --

THE COURT:  But if I find that this would constitute a substantial burden, if I find that, you're saying that it is the government's burden to show it's furthering a compelling government interest, right, and that it is the least restrictive means of furthering that compelling interest, and you're saying their memo needs to say more?

MS. CORKRAN:  I'm saying if they didn't actually intend to -- what I heard my friend saying is well, it's kind of an unrestrained discretion on its face, but in fact, when they're exercising their discretion, they're not going to target places of worship.

There's no reason to think that's true from the face of the memo, and there's no reason for plaintiffs --

THE COURT:  So the memo needs to say more, and if it did say not exactly what the Mayorkas memo said but close enough, then they would have satisfied that burden.

MS. CORKRAN:  If there was a memo that said this is how we're going to conduct enforcement actions in places of worship going forward and it deviated from the sensitive locations policy, then we would need to look at that deviation and figure out whether or not it was a substantial burden or not.

THE COURT:  Is the government, in just normal law

1    enforcement instances, required to outline like this is when we

2    will take this step?

3            MS. CORKRAN:  This, I think, goes a bit to the APA

4    question.  But for 30 years, we did have policies where the

5    agency was communicating to the public and to its own officers

6    we don't think that enforcement actions in places of worship are

7    a good idea.

8            THE COURT:  But we're still reserving -- we're still

9    going to reserve this possibility.

10           MS. CORKRAN:  Right.  But the Mayorkas memo again is

11   reserving it.  It says these are the kinds of circumstances in

12   which we cannot avoid enforcement actions at places of worship.

13       And even if you read it the way the government was reading

14   it and saying there might be other circumstances that

15   headquarters approves, that overarching role, we have to avoid

16   to the fullest extent possible, that scenario I'm describing

17   where it's just this is a church that has a lot of undocumented

18   immigrants, let's go get them, that would not -- there's no way

19   that that could have been approved under the Mayorkas memo.

20       Certainly, if you are a reasonable person reading the

21   Mayorkas memo, you wouldn't think that the headquarters approval

22   would have included just this is a church with a lot of

23   undocumented people.  And even if it had, having to go to

24   headquarters and get that approval in advance is very different

25   than just asking your local officer, Hey, can you give me verbal

1    approval, I see a church that has a lot of immigrants in it

2    right now.

3              THE COURT:  So do all the police for law enforcement

4    activity need written guidelines before they go into a church?

5              MS. CORKRAN:  So written approval -- so you're asking

6    me --

7              THE COURT:  Just generally, any crime.

8              MS. CORKRAN:  I don't know that that's -- so this gets

9    back to this kind of Fourth Amendment protection question.

10             THE COURT:  But under your argument, to comply with

11   RFRA, there needs to be a written investigations policy that

12   would apply broadly to immigration offenses and to any other

13   criminal activity.

14             MS. CORKRAN:  So I don't know that you would need a

15   written policy.  Maybe the hypothetical is where there was never

16   a sensitive locations policy, and that for 30 years, there just

17   wasn't anything on the books at all.  I think that would have

18   been a much more difficult argument to make, both with respect

19   to -- well, mostly with respect to standing.  Right?

20       What's happening here is that we're having a predictable

21   reaction to the rescission of the sensitive locations policy.

22   So immigration enforcement had already been constrained in this

23   way.

24       How are third parties, how are plaintiffs supposed to read

25   this rescission of the policy?  Again, we're kind of getting

1    into APA land, but --

2         THE COURT:  I'm also hung up on the RFRA, too.  If the

3    Court reaches the merits and I'm assessing the RFRA claim, how

4    can the government ever prevail on that claim unless they adopt

5    the Mayorkas memo?  And surely, that can't be the case when

6    these memos have been different from administration to

7    administration.

8         MS. CORKRAN:  Right.  I think --

9         THE COURT:  Any loosening -- if we're going to apply

10   least restrictive means, and you're saying that has to be in

11   writing, these guidelines, it can't be orally, it has to be in

12   writing because they've done it before, so they always moving

13   forward have to do that.

14        MS. CORKRAN:  So I don't -- there's a theoretical

15   question, you know, in 2022, could a church have brought a

16   challenge to the sensitive locations policy as not being

17   restrictive enough under RFRA or the First Amendment?

18       I think that there would be merit to that claim, but that

19   church likely would not have had standing to bring it because

20   that would have been a policy -- you read the sensitive

21   locations policy on its face.  There wasn't a reason to think

22   that there was an imminent threat.  Not even just an imminent

23   threat.  Right?  But that the policy had changed in a way over

24   the course of the years that would have changed the risk.

25       So it's hard -- I don't think it's insignificant or

irrelevant that there has been this policy for 30 years and that
that's different than the regular law enforcement.

THE COURT:  But the policy hasn't been the Mayorkas
memo for 30 years.

MS. CORKRAN:  Right.  But there's always over the
course of those 30 years --

THE COURT:  So if they do a written policy and they
add the word "you shall comply with RFRA," the sentence "you
shall comply with RFRA," is that enough?

THE WITNESS:  That would, I think, go a long way.  I
think we and the government disagree about what satisfies RFRA
under these circumstances in terms of actual enforcement action.
I think what would satisfy RFRA is treating plaintiffs' private
property as private property under the Fourth Amendment, where
they can continue to allow people in but you would need judicial
warrant or exigent circumstances.

THE COURT:  But do you have to wait until you have
those cases to bring those cases?

MS. CORKRAN:  No.

THE COURT:  You're presuming that they're going to
interpret RFRA in a way that you think is unlawful.

MS. CORKRAN:  I don't think that we need to have
actual examples.  Sorry.  I've lost the thread a bit.

So there are kind of two different questions.  Does the
enforcement action itself violate RFRA, and does the policy

1   violate RFRA?  And I understand Your Honor's question to be what
2   if there was no policy at all.
3         THE COURT:  Or a policy that just said "comply with
4   RFRA."
5         MS. CORKRAN:  Right.  I think that would be different
6   than what we have here, because we're asking how the public is
7   responding to the change in policy.
8         THE COURT:  But the government's just said publicly
9   we're going to comply with RFRA.  Does it need to be in writing?
10  Does it need to do more than say we are going to comply with
11  RFRA?  If so, how detailed does it need to be, and should a
12  Court be in the business of drawing those lines?
13        MS. CORKRAN:  If we had that memo, I think I'd
14  probably want to know more information.  But I don't think the
15  Court's disposition of this case is going to in any way kind of
16  implicate or suggest that you would need something more than
17  what you're describing.  But I think you could give us the
18  injunction in this case and in that future case against that
19  hypothetical memo --
20        THE COURT:  I could tell them they have to comply with
21  RFRA?
22        MS. CORKRAN:  Right.  But I think we would want to
23  explain what that means.
24        THE COURT:  But --
25        MS. CORKRAN:  The note that I just got from my

colleagues is responsive to your question about the general law

enforcement context, which is that the constraint in that

context is the requirement of probable cause that a crime has

been committed, and there's no probable cause requirement under

the Hoffman memo or under any of the regulations.

If you look at those regulations that we cite in our brief,

278.8, it allows law enforcement to go into places of worship

without any constraints, without any suspicion of anything.

They are free to go in and question people and see what they can

find.

That's very different than what you would have in the

typical law enforcement context.

THE COURT:  Okay.  But the memo, once you have one in

writing, you're kind of stuck with this is the floor, you have

to at least adopt this moving forward.  You can't loosen

anything because there's reliance on this memo, even though the

memo itself says this is not exhaustive.

MS. CORKRAN:  I think I'm struggling with kind of the

hypothetical, just because I think the inquiry is about the

predictability of the response, both the congregation's and

their attendees'.  So I would want to have a lot more

information about whether it's predictable.

If there's no policy at all for people to kind of suddenly

say, Oh, now I think you're doing something different than you

were doing before, it might be a harder argument.

1      Here, it does matter in terms of understanding how the

2      plaintiffs are responding, that there was this policy that was

3      in place for 30 years, and the government has very abruptly

4      rescinded it and replaced it with this common-sense standard

5      that again allows all sorts of enforcement action that would not

6      reasonably -- or that the Mayorkas memo could not reasonably

7      read as permitting.

8          THE COURT:  But following your predictability

9      argument, I don't know that an administration could ever change

10     the policy and make it less detailed.

11         MS. CORKRAN:  I think if it was more on the margins,

12     it might not be predictable.  If the Hoffman memo had said we

13     are still going to avoid enforcement action at churches to the

14     fullest extent possible but we're not going to have brightline

15     rules or we're going to shift from headquarters, if they had

16     made some other tweak, then I would have to come to court to you

17     and say that tweak is substantial enough that it's predictable

18     that people will respond by not going to church anymore.

19         That's a harder argument.  I'm not saying we couldn't make

20     that argument.  But it's a much harder argument than the one we

21     have here where you do have the very different policies and

22     where that avoidance canon that you have seen for the past 30

23     years is no longer present.

24         THE COURT:  Okay.  Any other points you want to make

25     in response to the government?

1    MS. CORKRAN:  No, I think we've covered everything,

2 unless you have questions.

3    THE COURT:  Thank you for your arguments.  I really

4 appreciate it.  I will take this under advisement.  We have a

5 lot of cases right now, but I hope to issue an opinion on this

6 in the next week or two.

7    (Proceedings adjourned at 12:15 p.m.)

8

9 - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

10

11               CERTIFICATE OF OFFICIAL COURT REPORTER

12

13    I, Sara A. Wick, certify that the foregoing is a

14 correct transcript from the record of proceedings in the

15 above-entitled matter.

16

17

18

19 /s/ Sara A. Wick                    April 30, 2025

20 SIGNATURE OF COURT REPORTER         DATE

21

22

23

24

25